# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, et al.,    *

    *Plaintiffs*,    *

    v.    *    Civil Case No. 1:10-cv-2068-JFM

TERRENCE SHERIDAN, et al.,    *

    *Defendants*.    *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*
    \*

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

DOUGLAS F. GANSLER
Attorney General of Maryland

DAN FRIEDMAN (Bar ID 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

MATTHEW J. FADER (Bar ID 29294)
Assistant Attorney General
STEPHEN M. RUCKMAN (Bar ID 28981)
Attorney
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906
Fax. 410-576-6955
mfader@oag.state.md.us
sruckman@oag.state.md.us

March 22, 2011

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................ 4

I.   PLAINTIFF WOOLLARD'S HANDGUN WEAR AND CARRY PERMITS ......................... 4

II.  MARYLAND'S FIREARMS LAWS .................................................................... 6

    A.   Maryland Does Not Require a Permit to Possess a Firearm, Including a Handgun, in the Home or Under Numerous Other Circumstances .............................................................................. 6

    B.   Maryland Does Not Require a Permit to Wear and Carry a Long Gun Outside the Home ..................................................... 7

    C.   Maryland Law Provides for the Issuance of Handgun Wear and Carry Permits to Law-Abiding Individuals with Good and Substantial Reason to Wear and Carry a Handgun ..................... 7

III. HANDGUNS, VIOLENCE, AND CRIME ........................................................... 10

    A.   Handgun Violence Is a Major Public Safety Concern Nationwide ............. 10

    B.   Handgun Violence Is a Particularly Troubling Threat to Public Safety in Maryland ............................................................... 11

    C.   Handguns Outside of the Home Present a Greater Danger to Public Safety Than Do Handguns Inside the Home................... 14

ARGUMENT ................................................................................................... 16

I.   THE SECOND AMENDMENT GUARANTEES AN INDIVIDUAL RIGHT FOR LAW-ABIDING CITIZENS TO KEEP AND BEAR ARMS FOR SELF-DEFENSE IN THE HOME, SUBJECT TO EXCEPTIONS .......................................................... 18

II.   MARYLAND'S HANDGUN WEAR AND CARRY PERMIT STATUTE IS
      CONSTITUTIONAL.................................................................................... 22

      A.   As Applied to the Concealed Carry of Handguns, Maryland's
           Handgun Wear and Carry Permit Statute Is Constitutional ........................ 22

      B.   Maryland's Handgun Wear and Carry Permit Statute Falls
           Outside the Scope of the Second Amendment ............................................ 23
      .
           1.   Other Courts Have Overwhelmingly Concluded that
                Statutes Regulating Handgun Possession Only Outside
                of the Home Do Not Fall Within the Scope of the
                Second Amendment Right ................................................................. 24

           2.   Statutes and Case Law Contemporaneous With Passage
                of the Second and Fourteenth Amendments Indicate
                that the Maryland Permit Statute Falls Outside the
                Scope of the Fourteenth Amendment................................................. 25

      C.   If the Conduct at Issue Would Fall Within the Scope of the
           Second Amendment, the Appropriate Standard of Scrutiny Is
           Reasonable Regulation or, at Most, Intermediate Scrutiny......................... 28

           1.   The Permit Statute Should Be Upheld So Long as It
                Constitutes a "Reasonable Regulation." ........................................... 28

           2.   If the Permit Statute Is Not Subject to the "Reasonable
                Regulation" Standard of Review, It Is Subject to
                Intermediate Scrutiny ...................................................................... 29

      D.   Maryland's Permit Statute Satisfies Any Applicable Standard
           of Scrutiny .............................................................................................. 32

           1.   Maryland's Permit Statute Seeks to Promote the
                Compelling Government Objective of Promoting Public
                Safety by Reducing Handgun Violence. ............................................ 32

           2.   Maryland's Handgun Wear and Carry Permit Statute Is
                a Reasonable Fit to the Government's Substantial
                Objective of Promoting Public Safety................................................ 33

           3.   Maryland's Handgun Permitting Process Is Not
                Arbitrary, Nor Does it Permit "Unbridled Discretion.".................... 38

E.     Even if Maryland's Handgun Wear and Carry Permit Statute Were Subject to Strict Scrutiny, It is Narrowly Tailored to the Government's Compelling Interest in Maintaining Public Safety ........................................................................................................ 39

V.     THE PRIOR RESTRAINT DOCTRINE DOES NOT APPLY TO SECOND AMENDMENT CHALLENGES ................................................................................... 42

VI.    THE PLAINTIFFS' EQUAL PROTECTION CLAIM MUST BE DISMISSED ..................... 46

**CONCLUSION** ............................................................................................................ 50

## TABLE OF AUTHORITIES

**Page**

### Cases

*Albright v. Oliver*, 510 U.S. 266 (1994) ........................................................... 46

*Alexander v. United States*, 509 U.S. 544, 550 (1993) ........................................ 42

*Andrews v. State*, 50 Tenn. 165, 1871 WL 3579 (1871) ..................................... 27

*Bateman v. City of West Bountiful*, 89 F.3d 704 (10th Cir. 1996) ..................... 47

*Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175 (1968) ........ 43

*Citizens United v. FEC*, 130 S.Ct. 876 (2010) .................................................. 39

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432(1985) ............ 47

*De Jonge v. State of Oregon*, 299 U.S. 353 (1937) ............................................ 42

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................. passim

*English v. State*, 35 Tex. 473 (1871) .................................................................. 26

*Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008) ................................... 48

*Fife v. State*, 31 Ark. 455 (1876) ....................................................................... 27

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) ................................... 46

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008) ...................................... 48

*Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977 (E.D. Wisc., May 11, 2010) ................................................................................................................... 24

*Heller v. District of Columbia*, 698 F. Supp.2d 179 (D. D.C. 2010) ..... 31, 32, 33

*Heller v. Doe*, 509 U.S. 312 (1993) ................................................................... 47

*Kelley v. Johnson*, 425 U.S. 238 (1977) ........................................................... 32

*Lewis v. Bd. of Educ. of Talbot County*, 262 F. Supp. 2d 608 (D. Md. 2003) ... 47

*Little v. United States,* 989 A.2d 1096 (D.C. 2010) .......................................... 24

*Lovell v. City of Griffin*, 303 U.S. 444 (1938) .................................................. 43

*McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010) ...... passim

*Minotti v. Whitehead*, 584 F. Supp. 2d 750 (D. Md. 2008) ................................................ 24

*Monroe v. City of Charlottesville*, 579 F.3d 380 (4th Cir. 2009) ...................................... 33

*Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001) ....................................................... 48

*Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ........................................ 43

*New Orleans v. Dukes*, 427 U.S. 297 (1976) ............................................................... 47, 48

*Nunn v. State*, 1 Ga. 243 (1846) ........................................................................................ 27

*Orin v. Barclay,* 272 F.3d 1207 (9th Cir. 2001) ................................................................ 47

*People v. Aguilar*, ---N.E.2d.----, 2011 WL 693241 (Ill. App. 1 Dist., Feb. 23,
2011) ..................................................................................................................................... 24

*People v. Dawson*, 934 N.E.2d 598 (Ill. App. 2010) .......................................................... 24

*People v. Flores,* 86 Cal.Rptr.3d 804 (Cal. Ct. App. 2008) ............................................... 24

*People v. Marin*, 795 N.E.2d 953 (Ill. App. 2003) ............................................................. 37

*People v. Yarbrough*, 169 Cal. App. 4th 303 (2008) .......................................................... 30

*Peruta v. San Diego*, ___ F. Supp. 2d ___, 2010 WL 5137137 (S.D. Cal. Dec. 10,
2010) ................................................................................................................. 31, 33, 34, 48

*Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006) ....................................... 47

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ............................................................... 19, 22

*Schall v. Martin*, 467 U.S. 253 (1984) .............................................................................. 32

*Scherr v. Handgun Permit Review Board*, 163 Md. App. 417 (2005) ............................ 8, 9

*Schleifer v. City of Charlottesville*, 159 F.3d 843(4th Cir. 1998) ..................................... 33

*Snowden v. Handgun Permit Review Board*, 45 Md. App. 464 (1980) .............................. 8

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ...................................... 43

*State v. Chandler*, 5 La. Ann. 489 (1850) ......................................................................... 27

*State v. Comeau*, 448 N.W.2d 595 (Neb. 1989) ................................................................. 29

*State v. Knight*, 218 P.3d 1177 (Kan. Ct. App. 2009) ....................................................... 24

*State v. Reid*, 1 Ala. 612 (1840) ......................................................................................... 27

*State v. Workman*, 14 S.E. 9 (W. Va. 1891) ...................................................................... 27

*Staub v. City of Baxley*, 355 U.S. 313 (1958).................................................... 45

*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002)......................................... 43

*United States v. Barton*, --- F.3d ----, 2011 WL 753859 (3rd Cir. March 4, 2011) .......... 23

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............................. passim

*United States v. Cruikshank*, 92 U.S. 542 (1876)............................................. 42

*United States v. Hart,* 726 F.Supp. 2d 56 (D. Mass. 2010)................................ 24

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ................... 21, 31, 45

*United States v. Masciandaro,* 648 F.Supp. 2d 779 (E.D. Va. 2009) ............... 24

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009).................. 32

*United States v. Radencich*, 2009 WL 12648 (N.D. Ind. Jan. 20, 2009).......... 32

*United States v. Salerno*, 481 U.S. 739 (1987).................................................. 32

*United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010) *(en banc)*.......................................................................... 21

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) ...................... 31

*United States v. Schultz*, 2009 U.S. Dist. LEXIS 234 (N.D. Ind. 2009) .......... 31

*United States v. Tooley*, 717 F. Supp. 2d 580 (S.D. W. Va. 2010) .................. 29

*United States v. Walker*, 2010 WL 1640340 (E.D. Va. 2010) ......................... 31

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) .................................... 20

*Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002) ................................................. 47

*Whitney v. California*, 274 U.S. 357 (1927)...................................................... 43

*Williams v. State*, 417 Md. 479 (2011)................................................... 3, 22, 23

*Wilson v. Cook County*, --- N.E.2d ----, 2011 WL 488753 (Ill. App. Ct., Feb. 9, 2011)............................................................................................................... 49

## United States Constitution

U.S. CONT. amend. I............................................................21, 28, 31, 42-45

U.S. CONT. amend. II .....................................................................passim

U.S. CONT. amend. IV ........................................................................ 45

U.S. Cont. amend. XIV ................................................................. 25, 27, 45, 47

## Statutes

Md. Code Ann., Crim. Law § 4-102 ................................................................. 7

Md. Code Ann., Crim. Law § 4-202 ................................................................ 14

Md. Code Ann., Crim. Law § 4-203 ................................................................. 6

Md. Code Ann., Crim. Law § 4-203(b)(2) ....................................................... 34

Md. Code Ann., Crim. Law § 4-203(b)(3) .................................................... 7, 23

Md. Code Ann., Crim. Law § 4-203(b)(4) .................................................... 7, 23

Md. Code Ann., Crim. Law § 4-203(b)(5) ......................................................... 7

Md. Code Ann., Crim. Law § 4-203(b)(6) .................................................... 6, 33

Md. Code Ann., Crim. Law § 4-203(b)(7) .................................................... 6, 33

Md. Code Ann., Crim. Law § 4-208 ................................................................. 7

Md. Code Ann., Pub. Safety § 5-302 ............................................................... 9

Md. Code Ann., Pub. Safety § 5-306 ...................................................... 2, 8, 34

Md. Code Ann., Pub. Safety § 5-309(a) ........................................................... 9

Md. Code Ann., Pub. Safety § 5-312 ........................................................... 9, 10

Md. Code Ann., State Gov't § 10-222.1 .......................................................... 10

## Regulations

COMAR 11.03.01.03-1I .................................................................................. 7

COMAR 11.03.02.08C(1) .............................................................................. 7

COMAR 11.05.07.04B4 .................................................................................. 7

COMAR 29.03.02.02-04 ................................................................................. 8

COMAR 29.03.02.06 ....................................................................................... 9

COMAR 104.05.01.03B .................................................................................. 7

## Treatises, Journals, Other Sources

*2 More Students are Shot at City High Schools*, BALT. SUN, Oct. 30, 1971 ...................... 13

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007) .......................................................................................................................... 29

Barry C. Rascovar, *Mandel Seeks Tighter Gun Law*, BALT. SUN, Dec. 7, 1971 ............. 13

Brief of Thirty-Four Professional Historians and Legal Historians as *Amici Curiae* in Support of Respondents 2010 WL 59028 .................................... 26

Craig Perkins, *Weapon Use & Violent Crime*, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS 2 (2001) ........................................ 11

D.W. Webster, J.S. Vernick, & L.M. Hepburn, *Relationship between licensing, registration, and other gun sales laws and the source of state crime guns*, 7 INJURY PREVENTION 1 .......................................................................................................... 37

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1524 (2009) ...................................................................................................................... 25, 26

FED. BUREAU OF INVESTIGATION, LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED, 1973-2005 ............................................................................................. 10, 11

FRANKLIN E. ZIMRING, CRIME IS NOT THE PROBLEM: LETHAL VIOLENCE IN AMERICA 200 (1997) ................................................................................................ 14

Harry L. Wilson, *Concealed Weapons Laws*, *in* GUNS IN AMERICAN SOCIETY 136, 136 (Gregg Lee Carter ed., 2002) ...................................................................... 41

Karen Brock & Marty Langley, *License to Kill IV, More Guns, More Crime*, VIOLENCE POLICY CENTER 2 (2002) ................................................................. 35

Lawrence Rosenthal & Joyce Lee Malcolm, McDonald v. Chicago: *Which Standard of Scrutiny Should Apply to Gun-Control Laws?*, 105 NW. U. L. REV. COLLOQUY 85 (2010) ........................................................................................... 20

Mark Tushnet, Heller *and the Perils of Compromise*, 13 LEWIS & CLARK L. REV. 419 (2009) .......................................................................................................... 45

Marianne W. Zawitz, *Guns Used in Crime*, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS 1 (1995) ........................................................................... 14

MAYORS AGAINST ILLEGAL GUNS, *Trace the Guns* (2010) ............................................ 37

MSP, CRIME IN MARYLAND: 2009 UNIFORM CRIME REPORT 16 (2009) ...................... 9, 12

Officer Down Memorial Page, Inc., "Fallen Officers in Maryland," (2011) .............. 12, 15

Officer Down Memorial Page, Inc., "Honoring All Fallen Members of the
Baltimore City Police Department," (2011) ...................................................................... 12

Philip J. Cook, et al., *Criminal Records of Homicide Offenders*, J. AM. MED.
ASS'N., 294(5): 598-601 (2005) ...................................................................... 35

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American
Origins of Gun Control*, 73 FORDHAM L. REV. 487, 505 (2004) ...................................... 25

Patrick J. Charles, *Scribble Scrabble, The Second Amendment, and Historical
Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105
NW. U. L. REV. 227, 237-38 (2011) ................................................................. 26

Thomas Jefferson, Letter to William Roscoe, Dec. 27, 1820 .......................................... 44

U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CRIME IN THE UNITED
STATES (2009) Expanded Homicide Data Table ................................................... 10, 11, 12

U.S. DEP'T OF JUSTICE OFFICE OF STRATEGIC INTELLIGENCE & INFORMATION,
MARYLAND FIREARMS TRACE DATA 2009 ....................................................... 12

VIOLENCE POLICY CENTER, TOTAL PEOPLE KILLED BY CONCEALED HANDGUN
PERMIT HOLDERS (2011) ................................................................. 35

*Youth Shot at School*, BALT. SUN, Nov. 25, 1971 ........................................................ 13

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The defendants, Terrence Sheridan, Superintendent of the Maryland State Police, and Denis Gallagher, Seymour Goldstein, and Charles M. Thomas, Jr., members of Maryland's Handgun Permit Review Board, submit this memorandum in support of their cross-motion for summary judgment (Paper No. 25) and in opposition to the plaintiffs' motion for summary judgment (Paper No. 21).

## INTRODUCTION

The plaintiffs, Raymond Woollard and the Second Amendment Foundation, proffering a flawed interpretation of recent Supreme Court decisions, have asked this Court to declare unconstitutional a statute that plays a critical role in Maryland's effort to protect the public from gun violence. The statute in question requires individuals seeking a permit to wear and carry handguns in public to demonstrate that they have a "good and substantial reason" to do so. In asking the Court to find this that this "good and substantial reason" requirement is unconstitutional, the plaintiffs are essentially asking the Court to force Maryland to adopt policies in line with states that, over the past twenty-five years, have made their own legislative decisions to be more permissive toward the public carry of handguns. The plaintiffs argue that the Second Amendment dictates this outcome. The plaintiffs are incorrect.

Handgun violence is a devastating problem in Maryland. As of 2009, Maryland had the ninth highest violent crime rate in the United States, including the third-highest homicide rate. Handguns, because of their easy concealability, light weight, and deadly

impact, are the weapon of choice of violent criminals, and they also can quickly cause non-lethal situations to escalate into lethal ones.  There were 438 homicides in Maryland in 2009.  Of the 305 homicides involving firearms, 297, more than 97%, were committed with handguns.  Reducing this handgun violence is of critical importance to the State.

Because of the prevalent and destructive role handguns play in criminal activity and in shooting deaths, Maryland generally requires individuals seeking to wear and carry a handgun in public, whether openly or concealed, to obtain a permit.  One requirement of Maryland's handgun wear and carry permit statute ("Permit Statute"), Md. Code Ann., Pub. Safety § 5-306, and the only one challenged in this action, is that the permit applicant be found to have "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."  Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii).  Neither this requirement specifically nor the Permit Statute generally: (1) burdens in any way the right to wear and carry any type of firearm in one's home or business; (2) burdens in any way the right to wear and carry any firearms other than handguns; or (3) prohibits any law-abiding, adult citizen with a demonstrated need from obtaining a permit to wear and carry a handgun in public.

As to the Permit Statute's regulation of concealed carry, because the Supreme Court has previously approved of cases holding that complete bans on concealed carry were lawful, Maryland's more permissive regulation is necessarily lawful.  Furthermore, even if bans on concealed carry are only "presumptively lawful," the plaintiffs cannot carry their burden of overcoming that presumption.

2

As to the Permit Statute's regulation of open carry, the Fourth Circuit, in its recent decision in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), established a framework for analyzing challenges to statutes that do not fall within certain categories identified by the Supreme Court as "presumptively lawful."  First, courts are to address whether the conduct being regulated would have come within the scope of the protection of the Second Amendment at the time it was enacted.  If not, the inquiry ends.  Second, if the conduct regulated would have fallen within the scope of the Second Amendment, courts are to apply a form of means-end scrutiny that: (1) is greater than rational basis; (2) includes intermediate scrutiny; and (3) might include other levels of scrutiny.

With respect to the first question in the *Chester* framework, numerous courts, including the Maryland Court of Appeals in assessing a related provision of Maryland's handgun laws, *Williams v. State*, 417 Md. 479 (2011), have held that regulations that do not regulate conduct within the home do not fall within the scope of the Second Amendment as described in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, ___ U.S. ___, 130 S.Ct. 3020 (2010).  Courts have uniformly rejected claims that *Heller* and *McDonald* prohibit regulations on the public carrying of guns.

With respect to the second question in the *Chester* framework, even if Maryland's Permit Statute does regulate conduct within the scope of the Second Amendment, it satisfies any applicable level of scrutiny.  Maryland has an important and, indeed, compelling governmental interest in keeping its citizens safe from gun violence, and there is a reasonable fit between the Permit Statute and that governmental interest.  The

3

Permit Statute reduces the chances for violent gun conflict by precluding people who lack a good and substantial reason to carry a handgun in public from doing so, while still permitting: (1) anyone with a documented self-defense need to obtain a permit; (2) anyone to wear and carry a handgun or a long gun in their home or business; and (3) anyone who can lawfully possess a long gun to wear and carry it, concealed or openly, anywhere the holder of a handgun carry permit could carry a handgun.

The plaintiffs' equal protection challenge fails for the same reasons as its Second Amendment challenge.  Maryland's Permit Statute does not improperly classify people with respect to a fundamental right or discriminate against similarly-situated individuals.

For these reasons, the Court should enter judgment on behalf of the defendants.

## STATEMENT OF FACTS

### I.   PLAINTIFF WOOLLARD'S HANDGUN WEAR AND CARRY PERMITS

On December 24, 2002, plaintiff Woollard was at his Baltimore County home when his son-in-law, Kris Lee Abbott, shattered a window and broke in.  Ex. 1, Declaration of Raymond Woollard ("Woollard Decl.") ¶ 2; Ex. 2.B., *In re: Raymond Woollard*, Case No. 09-4138, Decision of the Handgun Permit Review Board, ("Review Bd. Decision") at 1-2.  Abbott, who was unarmed at the time, was attempting to retrieve the keys to his wife's car so he could drive to Baltimore City to buy drugs.  Ex. 2.A., Statement of Raymond Woollard to the Handgun Permit Review Board ("Woollard Statement"), at 1; *see also* Ex. 2.B., Review Bd. Decision, at 1-2.

 After Abbott broke into Woollard's home and went upstairs to the second floor, Woollard aimed his shotgun at his son-in-law.  Ex. 1, Woollard Decl., ¶ 2; Ex. 2.A.,

Woollard Statement, at 1.  Abbott grabbed the barrel of the shotgun that Woollard was holding, put it to his own (Abbott's) head, and "told Woollard to pull the trigger."  Ex. 3.A., Baltimore County Police Report, Dec. 24. 2002 ("Police Report"), at 1.  According to Woollard, Abbott then took the shotgun downstairs and "stated that he was going [to] kill himself."  *Id.*  Although there is no mention of it in the contemporaneous police report, Woollard has subsequently claimed that after Abbott took away the shotgun, Woollard's son grabbed a second gun and aimed it at Abbott, thus defusing the situation.  Ex. 1, Woollard Decl. ¶ 2.  Woollard does not allege that Abbott used a gun of his own, or that, at any time, he aimed any weapon at anyone other than at Abbott himself.

Woollard applied for and received a handgun carry permit in 2003.  Ex. 2.B., Review Bd. Decision, at 2.  Woollard's handgun carry permit was renewed in 2006, based on information that Abbott was to be released from prison and Woollard's "apprehended fear that there would be retaliation."  *Id.*  Woollard applied for a second renewal of his permit in 2009.  Ex. 1, Woollard Decl. ¶ 6.  At that time, the Maryland State Police ("MSP") asked Woollard to provide evidence to support his claim of "apprehended fear (*i.e.* – copies of police reports for assaults, threats, harassments, stalking)."  *Id.*  Woollard failed to submit any such documentation.  Ex. 2.B., Review Bd. Decision, at 2.  As a result, the MSP denied his renewal application.  Ex. 1, Woollard Decl. ¶ 7.

Woollard appealed to the Handgun Permit Review Board, which held a hearing at which testimony was heard from Woollard; two other witnesses appearing on Woollard's behalf, Deborah Woollard and Charles Knott; and a representative of the MSP.  Ex. 2.B.,

Review Bd. Decision, at 1.  After considering the evidence, the Handgun Permit Review Board issued a decision upholding the decision to deny the permit.  *Id.* at 2-3.  Woollard elected not to pursue his right to appeal that decision to the Circuit Court for Baltimore County, and instead initiated this action.[1]

## II.   MARYLAND'S FIREARMS LAWS

Maryland's firearms laws are "reasonable firearms regulations" that reflect the State's concerted effort to "devise solutions to social problems that suit local needs and values," *McDonald*, 130 S.Ct. at 3046, while protecting the rights of law-abiding Marylanders to keep and bear arms in their homes for self-defense, *id.* at 3050.

### A.   Maryland Does Not Require a Permit to Possess a Firearm, Including a Handgun, in the Home or Under Numerous Other Circumstances.

For Maryland residents legally allowed to own a gun, Maryland law does not regulate, or restrict in any way, the wear, carry, or possession of such guns in an individual's home, on any real estate owned by that individual, on the premises of an individual's business, or on the premises of a business where the individual is a supervisory employee authorized by the owner to wear and carry the handgun.  *See generally* Md. Code Ann., Crim. Law § 4-203(b)(6) & (7).[2]  Moreover, the law does not restrict the wear, carry, or transport of an unloaded handgun to and from places where it

---

[1] On December 16, 2010, this Court denied the defendants' motion to dismiss on abstention grounds arising from Woollard's failure to pursue the available state proceedings (Paper No. 16).

[2] What a Maryland resident can or cannot do with a handgun in the absence of a wear and carry permit is defined by the exceptions contained in Maryland's criminal law relating to the wear and carry of handguns, Md. Code Ann., Crim. Law § 4-203.

may legally be possessed or carried, including: its owner's residence(s) or business; the place it was purchased; a repair shop; the site of an organized military activity, target shoot, target practice, sport shooting event, hunting, or trapping; a "dog obedience training class or show"; or a gun collector's exhibition. *Id.* § 4-203(b)(3), (4) & (5). Marylanders purchase many thousands of firearms every year, having submitted applications for the purchase of 48,620 long guns and 39,542 handguns in 2010 alone. Ex. 3, Declaration of Michael A. Jones ("Jones Decl.") ¶ 19.

**B.     Maryland Does Not Require a Permit to Wear and Carry a Long Gun Outside the Home.**

Outside of limited exceptions, Maryland does not require a permit to wear and carry a long gun outside the home.[3]

**C.     Maryland Law Provides for the Issuance of Handgun Wear and Carry Permits to Law-Abiding Individuals with Good and Substantial Reason to Wear and Carry a Handgun.**

Maryland law provides for the issuance of handgun carry permits to adults who have not been convicted of a felony, serious misdemeanor or other drug crime; who are not an alcoholic, addict or habitual user of illegal drugs; and who, based on an investigation by the MSP Handgun Permit Unit, have not exhibited a propensity for violence or instability and have "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against

---

[3] Maryland prohibits carrying any firearm on school property, Md. Code Ann., Crim. Law § 4-102; on government property, COMAR 104.05.01.03B; at state airports and ports, COMAR 11.03.01.03-1I, COMAR 11.03.02.08C(1), COMAR 11.05.07.04B4; and in or very near public places during a public demonstration, Md. Code Ann., Crim. Law § 4-208.

apprehended danger."   Md. Code Ann., Pub. Safety § 5-306(a); *see also* COMAR 29.03.02.02-04.

While allowing flexibility for the possibility that there may be additional "good and substantial reason[s]" that would entitle an applicant to a handgun carry permit, the MSP has identified four general categories of "good and substantial reason[s]" to wear and carry a handgun in public: (1) business activities that involve heightened risk, such as the need to carry cash or other "street valued" commodities; (2) participation in "regulated professions," including security guards and armored car personnel; (3) participation in "assumed risk" professions that involve the ability to restrict or take away civil liberties, including judges, prosecutors, police officers, public defenders, and correctional officers; and (4) "personal protection." Ex. 3, Jones Decl. ¶¶ 8-12.

To demonstrate a "good and substantial reason" to wear and carry a handgun for "personal protection," an applicant is generally expected to submit a letter explaining the reason(s) that caused him or her to apply and documentation (*e.g.*, police reports, restraining orders, affidavits) supporting the stated reason(s).   *Id.* ¶ 12.   In assessing a "personal protection" application, the Handgun Permit Unit follows guidance from Maryland's appellate courts that the standard requires something more than "personal anxiety," and requires applicants to demonstrate more than the level of fear of the average citizen.   *Id.* ¶ 13 (citing *Snowden v. Handgun Permit Review Board*, 45 Md. App. 464 (1980); *Scherr v. Handgun Permit Review Board*, 163 Md. App. 417 (2005)).   The Handgun Permit Unit applies the following factors in reviewing an applicant's "good and substantial reason": (1) the "nearness" or likelihood of a threat or presumed threat;

(2) whether the threat can be verified; (3) whether the threat is particular to the applicant, as opposed to the average citizen; (4) if the threat can be presumed to exist, what is the basis for the presumption; and (5) the length of time since the initial threat occurred. *Id.* ¶ 14. If a threat is especially urgent, the Handgun Permit Unit can make permits available even on a same-day basis. *Id.* ¶ 16.

If the Handgun Permit Unit determines that the applicant has provided a "good and substantial reason," permits are issued upon approval of the Secretary of the MSP. *Id.* ¶ 15; COMAR 29.03.02.06. Permits are initially valid for between two and three years, and may be renewed for three-year terms. Md. Code Ann., Pub. Safety § 5-309(a). During the four years between 2006 and 2009, the Handgun Permit Unit received 17,318 original or renewal applications, and issued 16,026 original or renewal permits, for a rate of approval of 92.5%. MSP, 2009 ANNUAL REPORT 30 (2010), *available at* http://msp.maryland.gov/downloads/2009_Annual_Report.pdf (last visited March 21, 2011).

A person whose permit application is denied is given the opportunity to appeal the decision to the Handgun Permit Review Board ("Board"), a five-person board appointed by the Governor with advice and consent of the Maryland Senate. Md. Code Ann., Pub. Safety §§ 5-302 - 312. The Board reviews documentation submitted by the MSP and the applicant and conducts a hearing in which it hears testimony from the applicant, any witnesses called by the applicant, and a representative of the Handgun Permit Unit. Md. Code Ann., Pub. Safety § 5-312(a)-(c). In the last twenty years, the Board has affirmed the Secretary's denial of an application approximately 54% of the time, reversed it

approximately 38% of the time, and modified or remanded it approximately 8% of the time.   Ex. 2, Declaration of Diana J. Beeson ("Beeson Decl.") ¶ 4.   Appeals from decisions of the Board can be made to the circuit court of the county in which the applicant resides.   Md. Code Ann., Pub. Safety § 5-312(e)(1); State Gov't § 10-222.1.

## III.   HANDGUNS, VIOLENCE, AND CRIME

### A.   Handgun Violence Is a Major Public Safety Concern Nationwide.

Handguns, far more than any other type of firearm, play a major role in violence in the United States.   In 2009, of 7,218 murders committed with an identified type of firearm, 6,452—89.4%—were committed with handguns.   U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CRIME IN THE UNITED STATES (2009) ("CIUS 2009") , Expanded   Homicide   Data   Table   8,   *available   at* http://www2.fbi.gov/ucr/cius2009/offenses/expanded_information/data/shrtable_08.html (last visited March 21, 2011).[4]   Handguns are also the primary cause of non-traffic fatalities among law enforcement officers.   FED. BUREAU OF INVESTIGATION, LAW ENFORCEMENT   OFFICERS   KILLED   AND   ASSAULTED,   1973-2005, http://bjs.ojp.usdoj.gov/content/homicide/leok.cfm#leokweap (last visited March 21,

---

[4]     Another 1,928 murders were committed with firearms where the type of firearm was not reported to the FBI.  This appears to be a function of the quality of reporting by the respective states.  For example, Maryland reported the type of firearm involved in all 305 of its firearm murders, while New York did not report the type of firearm involved in 343 of its 481 murders. *See* CIUS 2009, Table 8.

2011).   Of the 2,598 officers feloniously killed between 1973 and 2005,[5] 1,803—or

69%—are known to have been killed by handguns.   *Id.*   Handguns are used in the vast

majority of other firearms-related crimes as well.   The federal Bureau of Justice Statistics

("BJS") found that, between 1993 and 2001, 87.4% of all violent crimes by firearm—

including 93.7% of all robberies by firearm and 84% of all assaults by firearm—were

committed with handguns.   Craig Perkins, *Weapon Use & Violent Crime*, U.S. DEP'T OF

JUSTICE, BUREAU OF JUSTICE STATISTICS 2 (2001); *see also* Ex. 4, Declaration of Philip

J. Cook ("Cook Decl.") ¶¶ 9, 17.   Studies have shown that the incidence of handgun

crime is linked to handgun availability.   Ex. 4, Cook Decl. ¶¶ 12-14.

### B.   Handgun Violence Is a Particularly Troubling Threat to Public Safety in Maryland.

Maryland is a relatively small state encompassing a number of metropolitan

jurisdictions with significant illegal drug problems.   Although it has made significant

strides in recent years, Maryland had the ninth highest violent crime rate in the United

States in 2009.   CIUS 2009, Table 4.   Maryland's largest city, Baltimore, consistently

ranks as one of ten most violent cities in the country.   Ex. 5, Declaration of

Commissioner Frederick H. Bealefeld, III ("Bealefeld Decl.") ¶ 4.   In 2009, there were

33,623 incidents of violent crime in Maryland.   CIUS 2009, Table 4.   Of these incidents,

438 were homicides, giving Maryland one of the three highest homicide rates of any state

in 2009.   *Id.*   That figure is down from prior years, with Maryland having averaged 536

---

[5] This figure does not include the 72 law enforcement deaths that resulted from the terrorist attacks of September 11, 2011.   *Id.*

homicides per year between 2005 and 2008.  MSP, CRIME IN MARYLAND: 2009 UNIFORM

CRIME       REPORT       16       (2009)       ("CIM       2009"),       *available       at*

http://msp.maryland.gov/downloads/CRIME_IN_MARYLAND_2009_UCR_REPORT.p

df (last visited March 21, 2011).

      The firearm of choice for Maryland's criminals is the handgun.  Of the 305

firearm murders committed in Maryland in 2009, 297—97.4%—were committed with

handguns.  CIUS 2009, Table 20.  Handgun murders comprised 70.7% of the 420

Maryland murders using any type of weapon.  *Id.*  Of the 472 reported carjackings

involving a weapon in Maryland in 2009, 378—80.1%—were carried out with a

handgun.  CIM 2009, at 68.  Of the 7,101 firearms traces performed on crime guns

recovered in Maryland in 2009, 4,359—or 61%—were for handguns.  U.S. DEP'T OF

JUSTICE OFFICE OF STRATEGIC INTELLIGENCE & INFORMATION, MARYLAND FIREARMS

TRACE DATA 2009 ("MD TRACE DATA 2009"), at 4.

      Handguns pose a threat not only to the citizens of Maryland but to those charged

with protecting their safety.  Of the 76 State and local law enforcement officers who have

been shot and killed in the line of duty in Maryland from a firearm of known type, 49—or

64%—were shot with a handgun.  Officer Down Memorial Page, Inc. ("ODMP"), "Fallen

Officers in Maryland,"   http://www.odmp.org/browse.php?abbr=MD&state=Maryland

(last visited March 21, 2011).  In Baltimore, 85% of officer deaths due to intentional

gunfire from a firearm of known type were caused by a handgun.  ODMP, "Honoring All

Fallen     Members     of     the     Baltimore     City     Police     Department,"

http://www.odmp.org/agency/214-baltimore-city-police-department-maryland          (last

visited March 21, 2011).   Handguns are the single greatest threat to the safety of Maryland law enforcement officers.   Ex. 5, Bealefeld Decl. ¶ 8; Ex. 6, Declaration of Colonel Terrence B. Sheridan ("Sheridan Decl.") ¶¶ 9-10; Ex. 7, Declaration of Chief James W. Johnson ("Johnson Decl.") ¶ 17.

More than just numbers, the impact of handgun violence on Maryland is devastating to the communities in which it occurs.   Ex. 5, Bealefled Decl. ¶¶ 6-7; Ex. 7, Johnson Decl. ¶ 16 & 20-21.   In an attempt to address this problem, Maryland adopted the Permit Statute and an accompanying criminal statute in 1972, in the wake of a string of high school shootings over a two-month period, all perpetrated with handguns.   *See 2 More Students are Shot at City High Schools*, BALT. SUN, Oct. 30, 1971, at A1; *Youth Shot at School*, BALT. SUN, Nov. 25, 1971, at A1; Barry C. Rascovar, *Mandel Seeks Tighter Gun Law*, BALT. SUN, Dec. 7, 1971, at C10.   The 1972 legislation included the following legislative findings currently codified in the criminal code:

> The General Assembly finds that:
>
> (1) the number of violent crimes committed in the State has increased alarmingly in recent years;
>
> (2) a high percentage of violent crimes committed in the State involves the use of handguns;
>
> (3) the result is a substantial increase in the number of deaths and injuries largely traceable to the carrying of handguns in public places by criminals;
>
> (4) current law has not been effective in curbing the more frequent use of handguns in committing crime; and
>
> (5) additional regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public.

Md. Code Ann., Crim. Law § 4-202.  Based on the testimony and evidence presented, it was clear to the legislature that handguns were inextricably linked with the State's violent crime epidemic, and that limiting their availability was a significant part of the solution.

### C.   Handguns Outside of the Home Present a Greater Danger to Public Safety Than Do Handguns Inside the Home.

Research, data, and experience show that possession and carrying of handguns outside the home pose different dangers than they do inside the home.  The same factors that make handguns the weapon of choice for defense of the home also make them the weapon of choice for criminals outside the home.  Their small size, light weight, and ready concealability make them ideal for criminals who use the element of surprise in their criminal activities. Ex. 5, Bealefeld Decl. ¶¶ 6, 9; Ex. 6, Sheridan Decl. ¶¶ 6-9; Ex. 7, Johnson Decl. ¶¶ 4-5; *cf.* FRANKLIN E. ZIMRING, CRIME IS NOT THE PROBLEM: LETHAL VIOLENCE IN AMERICA 200 (1997) (determining that because handguns are uniquely useful for criminal acts, indications are that decrease in handgun violence does not result in corresponding increase in long gun violence); Marianne W. Zawitz, *Guns Used in Crime*, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS 1 (1995).

Handguns in the possession of potential victims of crime are also less likely to be effective in stopping crime outside the home than in.  Because the element of surprise is often greater in a violent altercation outside the home or business (*e.g.*, no ability to hear a window in another room of one's home being shattered; no ability to see an assailant approaching one's business via closed circuit television), a potential victim has less of an

14

opportunity to make use of a handgun for self-defense outside the home.   Ex. 5, Bealefeld Decl. ¶ 12; Ex. 6, Sheridan Decl. ¶¶ 13 & 17; Ex. 7, Johnson Decl. ¶¶ 13-14.

Worse, when handguns are in the possession of potential victims of crime, their decision to use them in a public setting may actually increase the risk of serious injury or death to themselves or others.   Unlike law enforcement officers, civilians typically are not trained to develop proper responses to potentially violent confrontations.   Ex. 6, Sheridan Decl. ¶ 14; Ex. 7, Johnson Decl. ¶ 12.   Possession of a handgun during a confrontation in a public setting may lead a civilian to harm others, through either impulsive or inadvertent use of the handgun.   Ex. 5, Bealefeld Decl. ¶¶ 13-14; Ex. 7, Johnson Decl. ¶¶ 19 & 21.   This problem is compounded when alcohol or narcotics fuel the confrontation.   Ex. 6, Sheridan Decl. ¶ 13; Ex. 7, Johnson Decl. ¶ 19.

Assailants are more likely to be able to wrest handguns away from potential victims who do not have sufficient time or training to use the handgun effectively for self-defense.   Ex. 5, Bealefeld Decl. ¶ 12; Ex. 6, Sheridan Decl. ¶¶ 16 & 20; Ex. 7, Johnson Decl. ¶ 11.   This significantly heightens the threat to the victim and puts more handguns in the hands of criminals.   Even police officers, who receive extensive training in handgun use and safety, have difficulty retaining control of their handguns when surprised by assailants.   Ex. 5, Bealefeld Decl., ¶ 12; Ex. 6,  Sheridan Decl., ¶ 11-13, and Ex. 7, Johnson Decl., ¶ 13.   Nearly a quarter of Maryland law enforcement officers known to have been killed by a handgun were killed with their own service weapon after a suspect wrested it away from them.   ODMP, "Fallen Officers in Maryland," http://www.odmp.org/browse.php?abbr=MD&state=Maryland (last visited March 21,

2011).  In response to this problem, the Baltimore Police Department has recently spent over $1 million to train its officers to avoid having their service weapons wrested away from them during an altercation.  Bealefeld Decl. ¶ 12.   Untrained, armed civilians are far more vulnerable to such an attack.  Indeed, the experience of the law enforcement community shows that these civilians may become targets of attack *because* they are known to carry handguns.  Ex. 5, Bealefeld Decl. ¶ 11; Ex. 6, Sheridan Dec. ¶¶ 16, 18; Ex. 7, Johnson Decl. ¶ 15.

Additionally, the presence of civilians with handguns can interfere with the effectiveness of law enforcement efforts.  When law enforcement officers are engaged in confrontations with criminals, the presence of civilians with handguns can, at a minimum, divert the officers' attention, forcing them to determine whether the civilian is a threat, and, at worst, can lead to the loss of innocent life.  Ex. 5, Bealefeld Decl. ¶¶ 14-15 ; Ex. 7, Johnson Decl. ¶¶ 17-18.  For all of these reasons, the same weapon that may be best suited for home defense, the handgun, is also the weapon that is most dangerous, deadly, and prone to use in criminal activities outside of the home.

## ARGUMENT

In its landmark decisions in *Heller* and *McDonald*, the United States Supreme Court held: (1) in *Heller*, that the Second Amendment codified an individual right of law-abiding, responsible citizens to keep and bear weapons for self-defense in the home, unconnected to service in the militia; and (2) in *McDonald*, that that Second Amendment right applies not only to the federal government, but also to states.  The statutes challenged in both *Heller* and *McDonald* were complete bans on the possession of

handguns, including in the home.  In both cases, the Supreme Court ruled that these bans violated the Second Amendment.  Also in both cases, however, the Court provided assurances that its decisions were limited, and that "reasonable firearms regulations" would survive.  The Court even provided a list of categories of firearms regulations it deemed "presumptively lawful," and indicated approval of decisions upholding bans on the carry of concealed weapons.  The Supreme Court declined in either case to establish the standards by which challenges to laws falling outside of these categories should be judged.

In the wake of *Heller* and *McDonald*, there has been a flurry of activity in lower courts challenging a variety of federal and state gun laws.  Two significant trends have emerged.  First, as foreshadowed in *Heller*,[6] lower courts have uniformly upheld the validity of challenged gun regulations other than absolute prohibitions against possession of handguns in the home.  Second, the vast majority of courts have adjudicated Second Amendment challenges to regulations not falling within the "presumptively lawful" categories identified in *Heller* by applying a standard of review greater than rational basis but less than strict scrutiny, usually either a "reasonable regulation" standard or an "intermediate scrutiny" standard.

Maryland's Permit Statute withstands Second Amendment scrutiny.  The Permit Statute: does not regulate any firearm possession within the home; provides individuals

---

[6] The majority stated that "it should not be thought that" cases decided prior to *Heller* upholding gun regulations "would necessarily have come out differently" under the interpretation of the Second Amendment adopted in *Heller*.  554 U.S. at 624 n.24.

who have a good and substantial reason to wear and carry a handgun in public a right to obtain a permit to do so; and does not restrict the public carry of non-handgun firearms. Thus, the Permit Statute does not fall within the scope of Second Amendment protection, and even if it did, it is outside the "core" of that protection.  As a result, Maryland's Permit Statute is subject, at most, to intermediate scrutiny, which asks whether there is a reasonable fit between the challenged regulation and a substantial government objective. Maryland's law passes this test because it is designed to address the compelling governmental interest in public safety in a way that does not burden in any way an individual's right to have a handgun in his home and also expressly provides for permits to wear and carry a handgun in public for those with a demonstrated need to do so.

## I.   THE SECOND AMENDMENT GUARANTEES AN INDIVIDUAL RIGHT FOR LAW-ABIDING CITIZENS TO KEEP AND BEAR ARMS FOR SELF-DEFENSE IN THE HOME, SUBJECT TO EXCEPTIONS.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In *Heller*, the Supreme Court overturned a Washington, D.C. law that constituted a "complete prohibition" on the use of handguns in the home.  554 U.S. at 629.  The Court focused on the D.C. law's prohibition on having a handgun in the home, "where the need for defense of self, family, and property is most acute," noting that few firearms laws in history have come close to the District's absolute prohibition, *id.*, and held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635.

Although the Court left many other issues regarding the scope of the Second Amendment for "future evaluation," *id.*, it noted with approval that commentators and courts have "routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626. The Court identified five types of regulations that had met, or "presumptively" would meet, its approval.  First, the Court noted that a majority of 19th-century courts upheld the constitutionality of bans on the carry of concealed weapons.  *Id.* at 626.  Indeed, the Supreme Court itself, in a ruling not disturbed by *Heller* or *McDonald*, stated in 1897 that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed arms."  *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).

The Court also identified as "presumptively lawful regulatory measures": (i) bans on "the possession of firearms by felons and the mentally ill"; (ii) bans on "the carrying of firearms in sensitive places such as schools and government buildings"; and (iii) "laws imposing conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 626-27 & n.26.  The Court made clear that these were only "examples; our list does not purport to be exhaustive."  *Id.* at n.26.

Finally, the Court stated that the right was limited to weapons "in common use at the [current] time," which it found supported by a historical tradition of prohibiting the carry of "dangerous and unusual weapons."  *Id.* at 627 (internal quotations omitted).  The

Court did not explain how it identified these specific "examples," or its rationale in establishing them as presumptively lawful.[7]

One of the questions left open in *Heller* was the extent, if any, to which its new interpretation of the Second Amendment would be applied to the states. The Court answered that question in *McDonald*, finding that the Second Amendment is "fully applicable to the States." 130 S.Ct. at 3026. Although *McDonald* did not further clarify the substantive scope of the Second Amendment right, it repeated *Heller*'s "assurances" that the Second Amendment is not absolute, including restating *Heller*'s list of presumptively lawful regulatory measures, and agreed that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment." *Id.* at 3047 (internal citation omitted).

More recently, in *Chester*, 628 F.3d 673, the Fourth Circuit addressed a Second Amendment challenge by a man found in possession of a firearm in his home in violation of a federal law prohibiting possession of a firearm, anywhere and at any time, by an individual convicted of a misdemeanor crime of violence. In analyzing that statute, which did not fit within any of the Supreme Court's categories of "presumptively lawful" regulations, the Fourth Circuit adopted a two-pronged approach in which the first

---

[7] Notably, many of these examples of presumptively lawful regulations first emerged only after the passage of the Second Amendment. For example, the first prohibition on concealed carry was not enacted until 1813, *McDonald* Historians Br. at 8-9; prohibitions on the possession of firearms by felons were not commonplace until the 20th century, Lawrence Rosenthal & Joyce Lee Malcolm, McDonald v. Chicago: *Which Standard of Scrutiny Should Apply to Gun-Control Laws?*, 105 NW. U. L. REV. COLLOQUY 85, 92 (2010); and Congress did not ban the mentally ill from possessing guns until 1968, *see United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). Thus, the justification for these exceptions must arise from grounds other than merely recognizing exceptions that existed at the time the amendment was enacted.

question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." 628 F.3d at 680 (internal quotations omitted). If not, the challenged law is valid; if so, the second prong is to apply "an appropriate form of means-end scrutiny." *Id.*

In determining the appropriate level of scrutiny, the Fourth Circuit found guidance in the Third Circuit's decision in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) and in the Seventh Circuit's already-vacated panel decision in *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010) (*en banc*). Based on those decisions, and its interpretation of references in the Supreme Court's decisions in *Heller* and *McDonald* to "'core' Second Amendment conduct" and to First Amendment doctrine, the *Chester* court looked to First Amendment doctrine "as a guide in developing a standard of review for the Second Amendment." 628 F.3d at 682. On that basis, the Fourth Circuit held that the "level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* The court then concluded that the defendant's claim that the Second Amendment entitled him to possess a firearm in the home "is not within the core right identified in *Heller*—the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense—by virtue of [his] criminal history as a domestic violence misdemeanant." *Id.* at 682-83 (emphasis in original). As a result, it held that intermediate scrutiny applied to the challenged statute, requiring that "the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation

21

and a 'substantial' government objective." *Id.* at 683.  The court remanded the case to allow the government to make this demonstration and to allow Chester to respond.  *Id.*

In *Williams*, 417 Md. 479, decided one week after *Chester*, the Maryland Court of Appeals addressed the constitutionality of Maryland's prohibition—subject to numerous exceptions identified above—on the wearing, carrying, or transporting of a handgun without a permit outside of one's home.  After an in-depth discussion of *Heller* and *McDonald*, the Court of Appeals concluded that the right recognized by those cases was the right to keep and bear handguns in one's home:

> *Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions against home possession, the dicta in *McDonald* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," notwithstanding. --- U.S. at ----, 130 S.Ct. at 3044, 177 L.Ed.2d at 922. Although Williams attempts to find succor in this dicta, it is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both *Heller* and *McDonald* and their answers.

*Id.* at 496.  As a result, the Maryland Court of Appeals held that the challenged statute, which did not prohibit the wear and carry of handguns in one's home without a permit, was outside the scope of, and so did not violate, the Second Amendment.  *Id.*

## II.  MARYLAND'S HANDGUN WEAR AND CARRY PERMIT STATUTE IS CONSTITUTIONAL.

### A.  As Applied to the Concealed Carry of Handguns, Maryland's Handgun Wear and Carry Permit Statute Is Constitutional.

As applied to concealed carry, Maryland's statute is a narrower regulation than the complete bans on concealed carry of which the Supreme Court has previously expressed approval.  *See Heller*, 554 U.S. at 626; *Robertson*, 165 U.S. at 281-82; *see also* Pls'

Memo. (Paper No. 21) at 12 (stating that the legality of bans on concealed carry is "presumptive").  For one, Maryland's Permit Statute is not a complete ban.  In fact, Maryland's Permit Statute is considerably narrower and far less burdensome than a ban in that it only applies to handguns and, even as to handguns, allows for the issuance of permits to people with a good and substantial reason to wear and carry them in public.

Moreover, even if regulation of concealed carry would only be deemed "presumptively lawful," the plaintiffs have not made any effort to overcome this presumption.  *Cf. United States v. Barton*, --- F.3d ----, 2011 WL 753859, *2 (3rd Cir. March 4, 2011) (finding the "presumptively lawful" language in *Heller* not to be dicta and therefore holding that the federal felon gun dispossession statute is constitutional; "the Supreme Court's discussion in *Heller* of the categorical exceptions to the Second Amendment was not abstract and hypothetical; it was outcome-determinative.  As such, we are bound by it.").  The plaintiffs cannot meet that burden, and the defendants are entitled to summary judgment to the extent the statute regulates concealed carry.  The remainder of this Argument section applies to the Permit Statute's regulation of both concealed and open carry.

### B.   Maryland's Handgun Wear and Carry Permit Statute Falls Outside the Scope of the Second Amendment.

The first prong of the *Chester* test asks whether the challenged statute imposes a burden on conduct falling within the scope of the Second Amendment.

### 1. Other Courts Have Overwhelmingly Concluded that Statutes Regulating Handgun Possession Only Outside of the Home Do Not Fall Within the Scope of the Second Amendment Right.

The Maryland Court of Appeals has already addressed precisely this question in the context of the related provision of Maryland's criminal law, finding that the statute fell outside the scope of the Second Amendment because it did not regulate in any way the possession, wearing, or carrying of a handgun in the home. *Williams*, 417 Md. at 496. Because the Permit Statute, like its companion criminal statute, does not burden in any way the wear and carry of handguns within the home, the same reasoning employed by the Court of Appeals in *Williams*, and by other courts around the country,[8] applies equally in this case. In fact, the defendants are not aware of a single state or federal court decision rendered after *Heller* that has found a right to carry a handgun outside the home to be within the scope of Second Amendment rights recognized in *Heller*.

---

[8] *See, e.g.*, *Minotti v. Whitehead*, 584 F. Supp. 2d 750, 760 n.12 (D. Md. 2008) (the litigant's reliance on *Heller* "is weak at best because the firearm was in [his] car, while the focus of the decision in *Heller* was on the inherent right of self-defense central to the Second Amendment in the context of the defense of one's home"); *United States v. Hart,* 726 F.Supp. 2d 56, 60 (D. Mass. 2010); *United States v. Masciandaro*, 648 F.Supp. 2d 779, 789-93 (E.D. Va. 2009); *Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977, *4 (E.D. Wisc., May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *People v. Aguilar*, ---N.E.2d.----, 2011 WL 693241 *10 (Ill. App. 1 Dist., Feb. 23, 2011) ("No reported cases have held that *Heller* or *McDonald* preclude states from prohibiting the possession of handguns outside of the home"); *People v. Dawson*, 934 N.E.2d 598, 605-06 (Ill. App. 2010); *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("The Supreme Court's decision turned solely on the issue of handgun possession in the home."); *Little v. United States,* 989 A.2d 1096, 1101 (D.C. 2010); *People v. Flores,* 86 Cal.Rptr.3d 804, 806-09 (Cal. Ct. App. 2008).

### 2. Statutes and Case Law Contemporaneous With Passage of the Second and Fourteenth Amendments Indicate that the Maryland Permit Statute Falls Outside the Scope of the Fourteenth Amendment.

The conclusions of these courts are consistent with the historical record, which shows that statutes in effect contemporaneous with the passage of the Second Amendment and the Fourteenth Amendment regulating the right to bear arms, including complete bans on the carry, either open or concealed, of certain easily-concealable arms, have long been upheld against constitutional challenges.[9]  *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 505 (2004) (gun laws adopted in the Founding Era and early Republic provide extensive evidence of "robust regulation").

Limitations on the right codified in the Second Amendment were carried down with the English laws from which the right originated.  For example, the English Bill of Rights, which the Supreme Court found to have been the predecessor to the Second Amendment, expressly limited the right to arms "'suitable to their condition and as

---

[9] *Heller* established that the Second Amendment, *as applied to the federal government*, is to be interpreted as the Supreme Court majority believes it was understood when it was adopted.  It is not entirely clear whether the relevant timeframe for interpreting the Second Amendment *as applied to the states* is the understanding of the right in 1791 or, because it only applies to the states as a result of its incorporation through the Fourteenth Amendment, its understanding in 1868.  *See, e.g.*, Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1524 (2009) ("And if the Second Amendment is incorporated via the Fourteenth Amendment, its scope as against the states might well be properly defined with an eye towards how the right to bear arms was understood in 1868, when the concealed-carry exception was apparently firmly established.").  Given the Supreme Court's discussion of the understanding of the Second Amendment throughout the 19th century in *Heller*, 554 U.S. at 605-619, it is clearly appropriate to consider this evidence, with the question being one of weight, not relevance.

allowed by law.'" *Heller*, 554 U.S. at 592-93 (quoting the English Bill of Rights).  The Statute of Northampton, first enacted in England in 1328, made it unlawful "to go nor ride armed by Night nor by Day in Fairs, Markets, nor in the Presence of the Justices or other Ministers nor in no Part elsewhere."  Patrick J. Charles, *Scribble Scrabble, The Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. U. L. REV. 227, 237-38 (2011).  Versions of this statute, prohibiting the carrying of arms in public areas, continued to be in force in Massachusetts, North Carolina, and Virginia at the time of the adoption of the Second Amendment.  *Id.* at 238.

Prohibitions on the wear and carry of certain classes of weapons, especially but not only those that were easily concealed, became common in the 19th century, first emerging in the 1820s and 1830s.  Brief of Thirty-Four Professional Historians and Legal Historians as *Amici Curiae* in Support of Respondents ("*McDonald* Historians' Brief"), 2010 WL 59028, at 8-9.  By the end of the 19th century, the constitutionality of bans on concealed carry "had become pretty broadly accepted."  Volokh, 56 U.C.L.A. L. Rev. at 1516.

Although a number of these laws were limited in scope to bans on concealed carry, several states banned both the open and concealed carry of entire classes of weapons.  *McDonald* Historians' Br. at 9-10; 16-17 (at least four states banned "the possession of all non-military handguns").  Many of these laws were challenged, and

26

upheld, under the federal and state constitutions.  *Id.* at 18-19.[10]  For example, in 1871,

the Tennessee Supreme Court upheld the constitutionality of a complete ban on carrying

a "belt or pocket pistol," including in the home, while rejecting a similar ban on carrying

revolvers *because it applied in the home*.  *Andrews v. State*, 50 Tenn. 165, 1871 WL

3579, *11 (1871).[11]  Indeed, a majority of states that enacted new constitutions in the

years immediately following the end of the Civil War enacted right-to-bear arms

provisions that expressly authorized legislative regulation.  *McDonald* Historians' Br. at

13-14.

In sum, a review of historical sources indicates that, both preceding and

contemporaneous with the adoption of both the Second and Fourteenth Amendments,

there were laws restricting the public carrying of certain weapons, including the

---

[10] For example, in 1876, the Arkansas Supreme Court upheld the constitutionality of an act criminalizing "carrying a pistol as a weapon."  *Fife v. State*, 31 Ark. 455 (1876).  Similarly, in 1891, the West Virginia Supreme Court upheld the constitutionality of an act prohibiting the carrying of a revolver or pistol outside of the home.  *State v. Workman*, 14 S.E. 9 (W. Va. 1891).  In *English v. State*, 35 Tex. 473 (1871), decided just three years after passage of the Fourteenth Amendment, the Texas Supreme Court upheld an act regulating and, in certain cases, prohibiting carrying of pistols and other "deadly weapons."  *But see Nunn v. State*, 1 Ga. 243, 251 (1846) (finding it impermissible to ban both concealed and open carry); *State v. Reid*, 1 Ala. 612, 616-17 (1840) (same), and *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (same).  The *Heller* Court cited *Nunn* and *Chandler* for the proposition that concealed carry bans had been upheld.  554 U.S. at 626.  The Court did not suggest that it agreed that open carry bans would be unlawful.

[11] The Plaintiffs rely on, but misread, *Andrews*.  *See* Pls' Memo. at 11.  The problem the *Andrews* court identified with the constitutionality of the carry ban as to revolvers was not its application to carry in public, but rather to carry "about his own home, or on his own premises," or traveling to a repair shop, or shooting a rabid dog in the street.  1871 WL 3579, at *11.  As a result, although the legislature could not completely ban possession of the weapon, the court held that it should be free to enact a regulation against "the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence."  *Id.*

predecessors of modern handguns.  As a result, under the first prong of the *Chester* test,

Maryland's Permit Statute, which only regulates the carrying of handguns outside of an

individual's home and business, does not fall within the scope of the Second

Amendment, and thus the defendants are entitled to summary judgment.

<blockquote>

**C.   Even If the Conduct at Issue Were Deemed to Fall Within the Scope of the Second Amendment, the Appropriate Standard of Scrutiny Is Reasonable Regulation or, at Most, Intermediate Scrutiny.**

</blockquote>

Even if this Court were to find that a statute regulating the wear and carry of

handguns outside of a person's home or business, without a demonstrated need for self-

defense, falls within the scope of the Second Amendment, Maryland's Permit Statute

would survive any applicable standard of means-end scrutiny.  The first step in the

second prong of the *Chester* analysis is determining what that standard should be.

<blockquote>

**1.   The Permit Statute Should Be Upheld So Long as It Constitutes a "Reasonable Regulation."**

</blockquote>

The Fourth Circuit has not specifically addressed the appropriate standard of

review to apply to a regulation on carrying handguns in public.  Although the defendants

acknowledge that this Court is bound by the Fourth Circuit's decision in *Chester* to view

First Amendment doctrine as a "guide" in determining the appropriate standard of review

for a Second Amendment challenge, they do not agree that the First Amendment provides

an appropriate guide for all Second Amendment doctrine questions.  *See* 628 F.3d at 687-

92 (Davis, J., concurring).  A more appropriate standard to apply to the unique aspects of

the Second Amendment, particularly given the critical, intrinsic differences between the

nature and dangers of speech compared to the use of firearms, is the "reasonable

regulation" standard that has been adopted by the vast majority of state courts, usually in the context of constitutional challenges under their own state analogues to the Second Amendment.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87 n.12 (2007).   Under this standard, which is more demanding than rational basis review, a government's ability to regulate the right to bear arms under its police power is constitutional if the exercise of that power is reasonable.  *See, e.g.*, *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989).

Although the defendants expressly preserve for appellate review their contention that "reasonable regulation" is the appropriate standard by which to judge Second Amendment challenges, the remainder of this brief focuses on the standard of review analysis employed by the majority in *Chester*.

### 2. If the Permit Statute Is Not Subject to the "Reasonable Regulation" Standard of Review, It Is Subject to Intermediate Scrutiny.

Under *Chester*, the first step in determining the appropriate standard of review is determining whether the conduct at issue falls within the "core" of the Second Amendment right.  For three independent reasons, the conduct at issue in this case does not.  First, the *Heller* court located the core Second Amendment right *in the home*, and the conduct at issue here falls *outside of the home*.  *Heller* 554 U.S. at 635; *see also United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) (concluding that possession of a firearm outside of the home is outside of "the 'core' of the Second Amendment right as defined by *Heller*"); discussion above at 23-24.

Second, Maryland's law does not impose a complete ban on the public wearing and carrying of handguns, but rather provides a mechanism by which any law-abiding, responsible individual with a legitimate, demonstrable need can obtain a permit to wear and carry a handgun.  Woollard's own experience is instructive.  Even though Woollard was never threatened outside of his home, where he has always been permitted to wear and carry any type of firearm he is legally permitted to own, and even though he, not Abbott, increased the level of danger in the encounter by introducing a firearm, he was nevertheless granted a handgun carry permit after the incident, and was granted a renewal of that permit three years later.  Woollard was only denied a second renewal of his permit when, in the more than six years after the original incident, there had been no threats of any kind against him and no incidents suggesting any danger to him or his family.

Third, the law does not regulate the wearing and carrying of all firearms in public, but is limited only to handguns.  Even individuals who lack a good and substantial reason to obtain a permit to wear and carry a handgun have the option of wearing and carrying other types of firearms in public.  Although the Supreme Court held that the option to have firearms other than handguns was not sufficient to sustain a ban on handguns *in the home*, *Heller*, 554 U.S. at 629, the character of—and danger presented by—handguns is different inside and outside of the home.  *See* discussion above at 14-16.  "Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order," exposing "persons other than the offender" to possible "physical harm."  *People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (2008) (internal citations omitted).

For all of these independent reasons, the conduct in which the plaintiffs wish to engage does not fall within the "core" right protected by the Second Amendment.[12]  As a result, *Chester* dictates that the Court apply a level of scrutiny no greater than intermediate scrutiny.[13]   Indeed, federal courts adjudicating Second Amendment challenges in the wake of *Heller* have almost uniformly employed intermediate scrutiny. *See, e.g., Skoien*, 614 F.3d at 641-42; *Marzzarella*, 614 F.3d at 97; *Peruta*, 2010 WL 5137137, at *8; *Heller II*, 698 F. Supp.2d at 187; *United States v. Walker*, 2010 WL

---

[12] Indeed, the conduct at issue here in many ways falls farther and more clearly outside the "core" Second Amendment right than the conduct at issue in *Chester*, which involved an absolute and permanent prohibition against a class of people – domestic violence misdemeanants – possessing a firearm anywhere, at any time, and for any reason.

[13] The Plaintiffs argue that the appropriate standard to apply to their challenge is strict scrutiny because "[t]he Second Amendment secures a fundamental right." Pl's Motion at 18.  As explained above, that contention is inconsistent with the analysis dictated by the Fourth Circuit in *Chester*.  Moreover, the Supreme Court's discussion in *Heller* is itself inconsistent with the application of strict scrutiny to Second Amendment challenges.  *See Heller*, 554 U.S. at 688 (Breyer, J., concurring) ("the majority implicitly, and appropriately, rejects [the Respondent's proposal to adopt a strict scrutiny standard of review] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear.").  Although the majority opinion criticized other aspects of Justice Breyer's dissent, it did not reject his conclusion that the majority had implicitly rejected the application of strict scrutiny.  *See also, e.g., Skoien*, 614 F.3d at 651 n.12 (noting that strict scrutiny would be "difficult to reconcile with *Heller*'s reference to presumptively lawful firearms regulations"); *Heller v. District of Columbia*, 698 F. Supp.2d 179, 187 (D. D.C. 2010) (*Heller II*) (citing cases and commentators).  Moreover, contrary to the plaintiffs' arguments, all "fundamental" rights are not subject to strict scrutiny review.  *See, e.g., Chester*, 628 F.3d at 682 ("We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights.")  Indeed, not even all challenges under First Amendment doctrine are subject to strict scrutiny.  *Id.*; *see also, e.g., Marzzarella*, 614 F.3d at 96 (noting that First Amendment challenges are "susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue"); *Peruta v. San Diego*, ___ F. Supp. 2d ___, 2010 WL 5137137 at *7-*8 (S.D. Cal. Dec. 10, 2010) (concluding that challenge to California concealed carry licensing statute is subject, "[a]t most," to intermediate scrutiny).

1640340 (E.D. Va. 2010); *United States v. Radencich*, 2009 WL 12648 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009) .

Intermediate scrutiny requires the government to "demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective."   628 F.3d at 683.   In addition, intermediate scrutiny allows for greater deference to legislative judgments than does strict scrutiny. *See, e.g.*, *United States v. Miller*, 604 F. Supp. 2d 1162, 1172 (W.D. Tenn. 2009).   The "degree of fit" between the regulation and "the well-established goal of promoting public safety need not be perfect; it must only be substantial."  *Heller II*, 698 F. Supp. 2d at 191 (citing cases).

**D.      Maryland's Permit Statute Satisfies Any Applicable Standard of Scrutiny.**

**1.      Maryland's Permit Statute Seeks to Promote the Compelling Government Objective of Promoting Public Safety by Reducing Handgun Violence.**

Maryland has a substantial, indeed a compelling, interest in promoting public safety, which includes  reducing handgun violence, a serious statewide problem that has had a particularly devastating impact on public safety in urban centers.  Ex. 5, Bealefeld Decl. ¶¶ 4-8; Ex. 6, Sheridan Decl. ¶¶ 5-10; Ex. 7, Johnson Decl. ¶¶ 4-5; *see also United States v. Salerno*, 481 U.S. 739, 750, 755 (1987) (the "primary concern of every government" is "a concern for the safety and indeed the lives of its citizens"; "the Government's general interest in preventing crime" is "compelling"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."); *Kelley v. Johnson*, 425 U.S. 238, 247

(1977); *Monroe v. City of Charlottesville*, 579 F.3d 380, 390 (4th Cir. 2009) ("The government's interest in protecting the citizenry from crime is without question compelling."); *Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998); *Peruta*, 2010 WL 5137137, at *8 ("The government also has an important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places."); *Heller II*, 698 F. Supp. 2d at 190-91.

### 2. Maryland's Handgun Wear and Carry Permit Statute Is a Reasonable Fit to the Government's Substantial Objective of Promoting Public Safety.

Intermediate scrutiny asks whether the challenged statute is a reasonable fit to the government's substantial objective of promoting public safety. In this case, the "good and substantial reason" requirement is an integral part of Maryland's handgun laws, including its Permit Statute, which collectively:

(1) allow, *without a permit*, individuals to wear and carry lawfully-owned handguns: (a) in their homes, Md. Code Ann., Crim. Law § 4-203(b)(6); (b) on any other real property they own or lease, *id.*; (c) in a business they own or lease, *id.*; and (d) if a supervisory official, at their place of employment when authorized by the owner or manager of the business, *id.* § 4-203(b)(7);

(2) allow, *without a permit*, individuals to transport those handguns to and from a place of sale, repair shop, bona fide residences and places of business, provided the handgun is unloaded and carried enclosed, *id.* § 4-203(b)(3);

(3) allow, *without a permit*, individuals to transport those handguns to and from military activities, target shoots, target practice, sport shooting event, hunting, safety class, trapping, and dog obedience training classes or shows, provided the handgun is unloaded and carried enclosed, *id.* § 4-203(b)(4); and

(4) allow individuals meeting certain criteria, including having a "good and substantial reason" to wear, carry, or transport a handgun, to obtain a permit

allowing them to do so, *id.* § 4-203(b)(2); Md. Code Ann., Public Safety, § 5-306(a)(5)(ii).

This handgun regulation regime enables Maryland to ensure that individuals who genuinely need to wear and carry handguns outside of their home or business are able to do so, while lessening the public safety concerns associated with allowing individuals to wear and carry handguns outside of the home without a genuine need to do so. *See, e.g.*, *Peruta*, 2010 WL 5137137 at *8 (California's "may issue" concealed carry statute enables the State "to effectively differentiate between individuals who have a *bona fide* need to carry a concealed handgun for self-defense and individuals who do not.").

The Permit Statute, including its "good and substantial reason" requirement, advances the State's interests in promoting public safety and reducing handgun violence in several ways. First, it limits a source of handguns for people inclined to engage in criminal activities. Ex. 4, Cook Decl. ¶¶ 12-14. Many criminals and would-be criminals, including many juveniles, are not lawfully permitted to obtain handguns, the weapon of choice in criminal activity. One source of handguns for them is robbery or theft from armed law-abiding citizens, including police officers. Indeed, police officers are targets of robberies and burglaries precisely because they are known to keep guns. Ex. 5, Bealefeld Decl. ¶ 11; Ex. 6, Sheridan Decl. ¶ 18. More law-abiding citizens known to be carrying handguns would be an additional source of guns for criminals. *Id.* ¶¶ 16-17; Ex. 5, Bealefeld Decl. ¶ 11; Ex. 7, Johnson Decl. ¶¶ 13 & 15. As Woollard's own experience demonstrates, maintaining control over one's weapon can be quite difficult, sufficiently so that the Baltimore Police Department recently spent over $1 million dollars to train

34

otherwise highly-trained police officers how to avoid having their guns taken from them. Ex. 5, Bealefeld Decl. ¶ 12. The availability of firearms to criminals and juveniles thus tends to be lower in states with relatively tight gun controls. Ex. 4, Cook Decl. ¶¶ 12-14; *cf.* Ex. 7, Johnson Decl. ¶ 16.

Moreover, providing permits to individuals who do not have a good and substantial reason to wear and carry handguns in public increases the risk of permit holders making use of the permit for criminal activity. Although most people who receive handgun permits in any state are undoubtedly law-abiding, and intend to remain so, there are many examples of permit holders committing crimes. The Violence Policy Center has identified 293 shooting deaths committed by holders of handgun permits since just May 2007. VIOLENCE POLICY CENTER, TOTAL PEOPLE KILLED BY CONCEALED HANDGUN PERMIT HOLDERS (2011).[14] Thus, being "law-abiding" at the time a permit is issued does not guarantee an individual will remain so. *See also* Karen Brock & Marty Langley, *License to Kill IV, More Guns, More Crime*, VIOLENCE POLICY CENTER 2 (2002) (reporting that Texas concealed carry license holders were arrested for 5,314 crimes from January 1, 1996 through August 31, 2001).

Studies have demonstrated that the majority of people who commit murder did not previously have a felony conviction that would have prevented them from obtaining a handgun permit. Ex. 4, Cook Decl. ¶¶ 23-27; Philip J. Cook, et al., *Criminal Records of*

---

[14] The only deaths in Maryland on this list were the result of a shooting at Johns Hopkins Hospital in 2010 by the holder of a permit issued in Virginia, a "shall-issue" state. *Id.* at 51. In that case, the perpetrator had no prior criminal record, but had ready access to a handgun, and the right to carry one in his home state, when his anger made him violently lash out at his mother's doctors. *Id.*

*Homicide Offenders*, J. AM. MED. ASS'N., 294(5): 598-601 (2005).  Although there are other minimum requirements that must be met to obtain a handgun carry permit, there is reason to believe that prior felony conviction is the most common one.  Ex. 4, Cook Decl. ¶¶ 28-29.  Professor Philip J. Cook has studied the prior felony convictions of murderers in Illinois and New York.  In each case, only a minority of murderers, 43% and 33% respectively, had prior felony convictions.  Ex. 4, Cook Decl. ¶¶ 24-25.  In light of the fact that many of these murderers may not have been precluded from obtaining a permit in a "shall issue" state, at least as a result of having had a prior felony conviction, the good and substantial reason requirement provides an additional check to help ensure that seemingly law-abiding people have a legitimate, law-abiding reason for carrying a handgun in public.

Second, the requirement of showing a good and substantial reason, by reducing the carrying of handguns by citizens who lack legitimate reasons for wearing and carrying them in public, helps prevent non-lethal confrontations from turning lethal.  The prevalence of guns has been shown to increase the death rate from crimes such as assault and robbery.  Ex. 4, Cook Decl. ¶¶ 14-16.  Indeed, research shows that whether a violent criminal will use a gun in a crime is closely linked to the availability of guns and that the use of a gun in a crime increases the probability of lethal results from that crime.  *Id.*.

Moreover, even non-criminal activities can turn lethal when guns are involved. Most assaults in Baltimore arise from petty disputes.  Ex. 5, Bealefeld Decl. ¶ 13.  The Baltimore Police Department has found the presence of handguns in such disputes to greatly increase the likelihood of such disputes becoming violent and deadly.  *Id.*  This

problem is not unique to Maryland.  As one appellate court has observed, the public presence of handguns can lead to "accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or . . . the danger of a police officer stopping a car with a loaded weapon on the passenger seat."  *People v. Marin*, 795 N.E.2d 953, 962 (Ill. App. 2003).  A gun holder's "otherwise 'innocent' motivations may transform into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression."  *Id.*

Third, the good and substantial reason requirement reduces negative impacts on the safety and effectiveness of police officers created by the proliferation of light-weight, easily-concealable handguns in public among people with no legitimate need for them.[15] In a confrontation between police officers and criminals, an innocent citizen with a handgun could disrupt the efforts of police officers or even result in the deaths of innocent bystanders.  Ex. 5, Bealefeld Decl. ¶¶ 14-15; Ex. 6, Sheridan Decl. ¶ 15. Moreover, an increased number of handguns would hinder police efforts to target illegal handguns.  Ex. 5, Bealefeld Decl. ¶¶ 14-15; Ex. 7, Johnson Decl. ¶ 18.

---

[15] A number of studies have demonstrated the beneficial impact on crime of more stringent gun laws.  *See, e.g.*, MAYORS AGAINST ILLEGAL GUNS, *Trace the Guns* (2010) (www.traceguns.org/report.pdf) (demonstrating the impact of various types of gun laws on the rate of export of "crime guns"); D.W. Webster, J.S. Vernick, & L.M. Hepburn, *Relationship between licensing, registration, and other gun sales laws and the source of state crime guns*, 7 INJURY PREVENTION 1, 184 (concluding that "states with registration and licensing systems appear to do a better job than other states of keeping guns initially sold within the state from being recovered in crimes").

For all of these reasons, Maryland's Permit Statute is a reasonable fit to its important interest in maintaining public safety and reducing handgun violence.  It is, therefore, constitutional, and the defendants are entitled to summary judgment.

### 3.  Maryland's Handgun Permitting Process Is Not Arbitrary, Nor Does it Permit "Unbridled Discretion."

The plaintiffs assert that Maryland's Permit Statute allows government officials to "arbitrarily determine" whether citizens may exercise their Second Amendment rights, and leaves that question to "the government's unbridled discretion."  *See, e.g.*, Pls' Br. at 12.  These assertions are false.  In fact, the permit process involves formal procedures, entails the application of well-developed standards and criteria, and affords all applicants an entitlement to administrative as well as judicial review in Maryland's appellate courts, which have interpreted and refined the legal standards to be applied. *See* discussion above at 7-10.  This is much more than a token review procedure, as the independent Handgun Permit Review Board has reversed, modified, or remanded approximately 46% of the permit denials appealed to it in the last 20 years.  *Id.* at 9-10.

The plaintiffs have introduced no evidence that Maryland's Permit Statute is administered in an arbitrary manner, nor have they even argued, much less put forward any evidence, that any individual who qualifies under the criteria used by the State to review applications has been denied a permit.  The Court should reject the plaintiffs' wholly conclusory and unsupported assertions of arbitrariness in the permit process.

**E.     Even if Maryland's Handgun Wear and Carry Permit Statute Were Subject to Strict Scrutiny, the Statute Is Narrowly Tailored to the Government's Compelling Interest in Maintaining Public Safety.**

Even if Maryland's Permit Statute were subject to strict scrutiny, it is still constitutional.  Under strict scrutiny, the government bears the burden of demonstrating that the challenged law "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United v. FEC*, 130 S.Ct. 876, 898 (2010) (citation omitted).  As previously discussed, it is beyond serious dispute that the government's interest in maintaining public safety is a compelling interest.  Maryland's Permit Statute is also narrowly tailored because, as already discussed, it is calculated to advance the State's interest in promoting public safety while minimizing the burden on the Second Amendment right.  Moreover, there are no less restrictive alternatives that would achieve the same purpose of reducing the handguns available for use in criminal activity while also preserving the ability of otherwise-qualified individuals who have a legitimate need to wear and carry handguns in public to do so.

The plaintiffs claim that Maryland's Permit Statute is not narrowly tailored for two reasons.  First, they claim, the defendants cannot predict when crime will occur, and so the permit scheme does not actually provide the right to wear and carry handguns to the people who need them.  Pls' Br. at 19.  This argument amounts to a claim that it is impossible to determine effectively who might benefit from carrying a gun, so any scheme that attempts to do so of necessity cannot be narrowly tailored.  As a result, the plaintiffs posits that the only constitutionally permissible conclusion a state may reach is

that the benefits of broadly allowing persons to carry loaded handguns on public streets and sidewalks, in cars, parks and stores, outweighs the risks of such a policy.  The State, however, has identified a critical problem of handgun violence that has a devastating impact on the residents of the State.   One significant source of that problem is a proliferation of handguns, legal and illegal, in the streets.  The State has attempted to craft a solution that, to the maximum extent possible, permits people with a legitimate need to wear and carry a handgun in the streets to do so, while still minimizing the proliferation of handguns among those who do not have a demonstrated need for them.

Although the plaintiffs are correct that the State cannot predict precisely when crime will occur, the State has identified groups of individuals who are at greater risk than others of being the victims of crime or who need handguns for their employment.  It is not possible to more narrowly tailor the statute without adversely impacting the State's compelling interest in public safety.  Moreover, the limited discretion given to the State's Handgun Permit Unit allows it to ensure that an individual with a genuine need to carry a handgun can receive a permit even if she or he does not fit into any particular, pre-set category.

Second, the plaintiffs claim that the fact that other states have more lenient permitting regimes—or no permitting regimes at all in some cases—shows that there are less restrictive alternatives available to achieve Maryland's compelling interest.  Pls' Br. at 20-21.  This argument is a non sequitur.  The fact that other states have more lenient regimes says absolutely nothing about whether those regimes actually accomplish their particular purposes or, more importantly, the purposes of Maryland, which, as a

sovereign state, ordinarily has the right to develop its own policies and to address its own problems in the manner chosen by its citizens' elected representatives.  Maryland law enforcement officials have concluded, based on their vast experience, that the "good and substantial reason" requirement assists them in their efforts to control handgun violence as that problem presents itself in Maryland and that a more lenient regime would not provide the same assistance.  *See generally* Ex. 5, Bealefeld Decl.; Ex. 6, Sheridan Decl.; Ex. 7, Johnson Decl.  The Maryland legislature has agreed.  That some, but by no means all, other states may disagree is of no relevance.  Neither the Constitution nor the public policy of Maryland is dictated by political choices made by other states.

Moreover, as recently as the beginning of 1987, there were only eight "shall issue" states.  Harry L. Wilson, *Concealed Weapons Laws*, *in* GUNS IN AMERICAN SOCIETY 136, 136 (Gregg Lee Carter ed., 2002). The fact that a majority of states now have "shall issue" permit regimes is an achievement of an energized political movement.  The interpretation of constitutional provisions, however, should not depend on the way the political wind is blowing.[16]  The plaintiffs should not be permitted to use the federal courts to convert their political gains in other states into a new constitutional floor applicable to states, like Maryland, that have made different legislative choices.  To do so would eliminate the ability to "experiment" so important in our federal system of government.  *Cf. McDonald*, 130 S.Ct. at 3046.

---

[16]  To say that the enactment of "shall-issue" regimes was "political" is not to cast aspersions on them.  To the contrary, the adoption of particular gun rights regulations, so long as they comply with the framework established by the Supreme Court, should and must be legislative decisions.

41

Maryland's handgun carry permit regime is narrowly tailored to its compelling interest in maintaining public safety.  It is limited to handguns, the primary category of arms involved in violent criminal activity, to areas outside of an individual's home and business, and it includes exceptions for the categories of people most likely to have a need to wear and carry a handgun.  Therefore, Maryland's Permit Statute also satisfies strict scrutiny.

## V.   THE PRIOR RESTRAINT DOCTRINE DOES NOT APPLY TO SECOND AMENDMENT CHALLENGES.

Attempting to carry the First Amendment analogy much farther than any court has been willing to venture, the plaintiffs make the inventive argument that Maryland's Permit Statute amounts to an impermissible prior restraint on the right to keep and bear arms.  Pls' Br. at 16.  This argument is without merit.  As an initial matter, the plaintiffs' prior restraint argument is based entirely on the contention that Maryland's handgun permit application process entrusts "unbridled discretion" in the State as to the award of permits.  Pls' Memo. at 14.  As discussed above, that is simply not true.

More fundamentally, the prior restraint doctrine is limited to restraints on First Amendment rights.  "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotations, citation, and alterations omitted); *see De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937) (observing that these rights are at the heart of "'[t]he very idea of a government, republican in form'") (quoting *United States v. Cruikshank*,

92 U.S. 542, 552 (1876)).   Indeed, the First Amendment was created in large part to combat prior restraints on speech.  *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320 (2002); *Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175, 181 n.5 (1968) (quoting *Lovell v. City of Griffin*, 303 U.S. 444, at 451-52 (1938)); *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931) ("it has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's] guaranty to prevent previous restraints upon publication.").

The application of the prior restraint doctrine is thus tied to the particular nature of First Amendment rights. The presumption against preventing potentially harmful speech in advance is justified in part because that speech, if it turns out to be truly harmful, can be effectively punished.  As the Supreme Court has stated:

> [A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); *see Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).  This principle works uniquely in the First Amendment context because harmful speech generally does not result in bodily injury or loss of life, so the risks from preventing potentially harmful speech are greater than the risks from allowing it.[17]  In addition, one of our country's

---

[17] Where speech does appear linked with the potential for bodily harm, the Supreme Court has had no trouble finding that it may cease to be protected.  *See, e.g.*, *Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175, 180 (1968) ("We do not here challenge the principle that

founding principles is that the cure for harmful speech is more speech, not less.[18]  In the Second Amendment context, however, the risks run in the opposite direction.  Harmful exercise of one's right to bear arms may well result in bodily injury or loss of life, so the risks from allowing potentially harmful exercise are greater than the risks from preventing it.  *See Chester*, 628 F.3d at 688 (Davis, J., concurring) (discussing how speech dangers cannot be compared to dangers from gun violence).

Indeed, *Heller* itself implicitly rejects the application of prior restraint doctrine.  In holding that many restraints on the right to bear arms are presumptively lawful, *Heller* approves the blanket denial of the right, in advance, to entire categories of people.  554 U.S. at 626-27 & n.26.  The Court held that, unless Heller was "disqualified from the exercise of Second Amendment rights," the District of Columbia was required to issue him "a license to carry [his handgun] in the home."  554 U.S. at 635.  Implicit in the Court's acknowledgment of the legitimacy of the system of licensing people to carry handguns, in that case even within the home, and in its acknowledgment that the state still had the right to first determine if Heller was "disqualified" from exercising his Second Amendment right, is a rejection of the prior restraint doctrine's premise that

---

there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment.").

[18] *See, e.g.*, Thomas Jefferson, Letter to William Roscoe, Dec. 27, 1820 ("For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left free to combat it.").

states' enforcement options are limited to dealing with the effects of the constitutional right only after it has been exercised.[19]

Finally, to the limited extent that courts weighing Second Amendment claims have looked to the First Amendment, it has only been as a "guide" in the development of a standard of scrutiny to apply in the Second Amendment context.  *See, e.g.*, *Chester*, 628 F.3d at 682 (looking to "the First Amendment as a guide in developing a standard of review for the Second Amendment"); *Marzzarella*, 614 F.3d at 97.  Even here, courts have been well aware of the limits of using the First Amendment as a reference point for Second Amendment cases.  *See id.* ("While we recognize that the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment.").  Judge Davis put it well in his concurrence in *Chester*:

> [The *Heller* majority's] limited references are hardly an invitation to import the First Amendment's idiosyncratic doctrines wholesale into a Second Amendment context, where, without a link to expressive conduct, they will often appear unjustified. To the extent some commentators and courts, frustrated with *Heller*'s lack of guidance, have clung to these references and attempted to force unwieldy First Amendment analogies, they muddle, rather than clarify, analysis.

*Chester*, 628 F.3d at 687; *see also* Mark Tushnet, Heller *and the Perils of Compromise*, 13 Lewis & Clark L. Rev. 419, 429-31 (2009).  The prior restraint doctrine should remain a distinctively First Amendment concept.[20]

---

[19] The plaintiffs' reliance on *Staub v. City of Baxley*, 355 U.S. 313 (1958), purportedly for the proposition that the prior restraint doctrine applies outside the First Amendment context, Pls' Br. at 13 & 16, is misplaced.  The "long line of recent decisions of this Court" discussed in *Staub* about the "freedoms which the Constitution guarantees," all had to do with First Amendment freedoms.  355 U.S. at 322-24.

## VI.   THE PLAINTIFFS' EQUAL PROTECTION CLAIM SHOULD BE DISMISSED.

The plaintiffs' final argument is that the "good and substantial reason" requirement violates the Equal Protection Clause of the Fourteenth Amendment by impermissibly and arbitrarily depriving individuals of their fundamental rights under the Second Amendment.   *See* Pls' Br. at 19; Am. Compl. ¶ 33.   Contending that strict scrutiny is generally required for Equal Protection Clause claims of an infringement of a fundamental right—here, they contend, the rights secured by the Second Amendment—the plaintiffs argue that Maryland's Permit Statute must be found unconstitutional.

The plaintiffs' equal protection argument is nothing more than an attempt to win the application of a harsher standard of review, strict scrutiny, by calling their Second Amendment claim by a different name.   Although the Equal Protection Clause is its own independent source of constitutional protection with respect to certain claims, it, like the Due Process Clause, has also been used as a generalized source of protection for "fundamental rights" that are not otherwise specifically enumerated in the Constitution. In the context of the Due Process Clause, the Supreme Court has held that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (four-Justice plurality opinion)

---

[20] The prior restraint doctrine has been employed in the Fourth Amendment context, but only to protect against the seizure of materials presumptively protected under the First Amendment.   *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63-64 (1989).

(internal quotations and citation omitted); *see also Presley v. City of Charlottesville*, 464 F.3d 480, 491 (4th Cir. 2006) (substantive due process claims subsumed by more particularized clauses); *Lewis v. Bd. of Educ. of Talbot County*, 262 F. Supp. 2d 608, 616 (D. Md. 2003) (same).

This principle applies equally to the plaintiffs' attempt to bypass the appropriate standard of review for a Second Amendment claim by attempting to bring the identical claim under the Equal Protection Clause.  *See, e.g.*, *Bateman v. City of West Bountiful*, 89 F.3d 704, 709 (10th Cir. 1996) (analyzing a claim under the Takings Clause rather than the Due Process or Equal Protection Clauses because the latter two claims were "subsumed within the more particularized protections of the Takings Clause"); *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (treating equal protection claim that was "no more than a First Amendment claim dressed in equal protection clothing" as "subsumed by, and co-extensive with" the plaintiff's First Amendment claim).  Even if equal protection analysis were applicable here, the plaintiffs' claims would not warrant strict scrutiny.  The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).  When a government activity does not involve a suspect classification or implicate a fundamental right, however, even intentional discrimination will survive constitutional scrutiny for an equal protection violation as long as it bears a rational relation to a legitimate state interest. *New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976); *Cleburne*,

473 U.S. at 439; *Giarratano v. Johnson*, 521 F.3d 298, 302-03 (4th Cir. 2008); *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319-320 (1993)).

Here, the right asserted by the plaintiffs is to wear and carry handguns in public without a demonstrated good and substantial reason to do so. As discussed above in Section II.B, even if this falls within the scope of the Second Amendment right, it is outside the "core" of that right. *See Heller*, 554 U.S. at 626 ("the right [secured by the Second Amendment] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"). The classification at issue here is the "good and substantial reason" requirement. According to plaintiffs, this requirement classifies individuals as either persons who can demonstrate a good and substantial reason to carry a handgun in public or those who "cannot satisfy that burden." Am. Compl. ¶ 33. This classification plainly falls outside the orbit of those classifications traditionally deemed to be suspect. *See Dukes*, 427 U.S. at 303. Accordingly, because the right asserted is not a fundamental right, and the classification at issue is not a suspect classification, strict scrutiny is not warranted.

Rational basis review requires the court to determine whether there is a rational reason for treating similarly situated people differently. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008). Before any such determination is made, however, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir.

2001); *see Giarratano*, 521 F.3d at 303.  Only after that showing has been made does the court proceed to decide whether the disparate treatment can be justified under the applicable level of scrutiny.  *Morrison*, 239 F.3d at 654.

The plaintiffs have failed to make that showing here.  In simple terms, the "good and substantial reason" requirement does not treat similarly situated people differently because not all Maryland gun owners are similarly situated.  Those who can demonstrate that they face a greater than average level of danger are by definition situated differently from those who cannot.  *See Peruta*, 2010 WL 5137137, at *9 ("[t]hose who can document circumstances demonstrating 'good cause' are situated differently than those who cannot"); *Wilson v. Cook County*, --- N.E.2d ----, 2011 WL 488753, *13 (Ill. App. Ct., Feb. 9, 2011) (dismissing equal protection challenge to gun ordinance).  The plaintiffs cannot satisfy that equal protection standard.

## CONCLUSION

For these reasons, the defendants respectfully request that the Court deny the plaintiffs' motion for summary judgment, grant the defendants' motion for summary judgment, and enter judgment in the defendants' favor with respect to both counts of the Amended Complaint.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

DAN FRIEDMAN (Bar ID 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

_____/S/_____
MATTHEW J. FADER (Bar ID 29294)
Assistant Attorney General
STEPHEN M. RUCKMAN (Bar ID 28981)
Attorney
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906
Fax. 410-576-6955
mfader@oag.state.md.us
March 22, 2011                    sruckman@oag.state.md.us

Counsel for Defendants