# EXHIBIT A

Hogan Lovells US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2700
Facsimile: (410) 659 2701

Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059

Counsel for *Amicus Curiae*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND


RAYMOND WOOLLARD, *et al.*,               *

              Plaintiffs,

    v.
                                          *

TERRENCE SHERIDAN, *et al.*,                         **Case No. 1: 10-cv-02068-JFM**

         Defendants.               *



                                          *



*    *    *    *    *    *      *    *    *    *    *    *

## BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ........................................................................................... 1

INTEREST OF *AMICUS* .................................................................................. 2

LEGAL BACKGROUND ................................................................................. 3

ARGUMENT ................................................................................................ 5

I.    THE PERMITTING PROCESS IN MD. PUBLIC SAFETY CODE § 5-306(a)(5)(ii) DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY................................................................... 5

    A.    The Public Carry Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because it Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald* ............................................................... 6

    B.    The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public ... 12

II.    EVEN IF THE WEAPONS PERMITTING PROCESS IN THE MARYLAND PUBLIC SAFETY CODE DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY................................................................... 15

    A.    The Reasonable Regulation Test is the Appropriate Standard of Review. 17

        1.    Licensing officers should be afforded an appropriate amount of discretion in enforcing firearm regulations.................................. 21

        2.    Given the governmental interest in protecting the public from the harms associated with firearms, deference to legislative directives is appropriate.............................................................. 23

    B.    The Carry Permitting Process at Issue Is Constitutionally Permissible..... 25

        1.    Maryland's permitting process passes the reasonable regulation test ............................................................................... 25

**TABLE OF CONTENTS**—Continued

**Page**

       2.     Maryland's permitting process would also survive intermediate scrutiny.............................................................................27

CONCLUSION.............................................................................................28

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

## TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Avant Indus. Ltd. v. Kelly*,
  318 A.2d 47 (N.J. Super. Ct. App. Div. 1974)....................................................22

*Aymette v. State*,
  21 Tenn. 154 (1840)...........................................................................................10

*Bleiler v. Chief, Dover Police Dep't*,
  927 A.2d 1216 (N.H. 2007) ..........................................................................18, 19

*Bliss v. Commonwealth*,
  12 Ky. 90 (1822).................................................................................................11

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980)............................................................................................16

*Chow v. State*,
  903 A.2d 388 (Md. 2006) ...............................................................................18, 27

*City Council v. Taxpayers of Vincent*,
  466 U.S. 789 (1984)............................................................................................16

*Commonwealth v. Robinson*,
  600 A.2d 957 (Pa. Super. Ct. 1991) ..................................................................14

*Commonwealth v. Romero*,
  673 A.2d 374 (Pa. Super. Ct. 1996) ..................................................................14

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008)............................................................................................23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................................................................... *passim*

*Dorr v. Weber*,
  741 F. Supp. 2d 993 (N.D. Iowa 2010)................................................................9

*English v. State*,
  35 Tex. 473 (1871)..............................................................................................10

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

## TABLE OF AUTHORITIES—Continued

Page(s)

*Ex parte Thomas*,
    97 P. 260 (Okla. 1908) ...................................................................10

*Fife v. State*,
    31 Ark. 455 (1876) .......................................................................10

*Galloway v. State*,
    781 A.2d 851 (Md. 2001) ................................................................7

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ..............................................................23, 27

*Gonzalez v. Village of West Milwaukee*,
    No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010) .............9

*Harman v. Pollock*,
    586 F.3d 1254 (10th Cir. 2009) .......................................................22

*Heller v. District of Columbia*
    698 F. Supp. 2d 179 (D.D.C. 2010) ..................................... *passim*

*Hill v. State*,
    53 Ga. 472 (1874) .......................................................................10

*In re Bastiani*,
    881 N.Y.S.2d 591 (2008) ................................................................9

*In re Factor*,
    2010 WL 1753307 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ..............9

*Jackson v. State*,
    68 So.2d 850 (Ala. Ct. App. 1953) .............................................18, 19

*Kelley v. Johnson*,
    425 U.S. 238 (1976) .....................................................................23

*Kennedy v. Louisiana*,
    128 S. Ct. 2641 (2008) .................................................................17

*Maryland State Police v. McLean*,
    No. 1462, 2011 WL 680279 (Md. Ct. Spec. App. Feb. 28, 2011) .......5, 8

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .....................................................................17

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

**TABLE OF AUTHORITIES**—Continued

**Page(s)**

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) .................................................................. *passim*

*Onderdonk v. Handgun Permit Review Bd.*,
407 A.2d 763 (Md. Ct. Spec. App. 1979) ............................................10

*People v. Aguilar*,
No. 1-09-0840, 2011 WL 693241 (Ill. App. Ct. Feb. 23, 2011) ................................9

*People v. Dawson*,
934 N.E.2d 598 (Ill. App. Ct. 2010) ..............................................8

*People v. Flores*,
169 Cal. App. 4th 568 (2008) ..............................................28

*People v. Pulley*,
803 N.E.2d 953 (Ill. App. Ct. 2004) ..............................................27

*People v. Yarbrough*,
169 Cal. App. 4th 303 (2008) ..............................................12

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992)..............................................17

*Queenside Hills Realty Co. v. Saxl*,
328 U.S. 80 (1946)..............................................23

*Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ..............................................24

*Riddick v. United States*,
995 A.2d 212 (D.C. 2010) ..............................................9

*Robertson v. Baldwin*,
165 U.S. 275 (1897)..............................................1, 6, 10

*Robertson v. City & Cnty. of Denver*,
874 P.2d 325 (Colo. 1994)..............................................18, 19

*Scherr v. Handgun Permit Review Bd.*,
880 A.2d 1137 (Md. Ct. Spec. App. 2005) .................................................. *passim*

*Sims v. United States*,
963 A.2d 147 (D.C. 2008) ..............................................10

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page(s)</u>

*Snowden v. Handgun Permit Review Bd.*,
  413 A.2d 295 (Md. Ct. Spec. App. 1990) ....................................................... *passim*

*State v. Buzzard*,
  4 Ark. 18 (1842) ..................................................................................................10

*State v. Cole*,
  665 N.W. 2d 328 (Wis. 2003) ........................................................................18, 25

*State v. Comeau*,
  448 N.W.2d 595 (Neb. 1989) .............................................................................18

*State v. Dawson*,
  159 S.E.2d 1 (N.C. 1968) ....................................................................................19

*State v. Hamdan*,
  665 N.W.2d 785 (Wis. 2002) ..............................................................................19

*State v. Jumel*,
  13 La. Ann. 399 (1858) ........................................................................................10

*State v. Knight*,
  218 P.3d 1177 (Kan. Ct. App. 2009) ....................................................................9

*State v. Sieyes*,
  225 P.3d 995 (Wash. 2010)..................................................................................28

*State v. Workman*,
  35 W. Va. 367 (1891) ..........................................................................................10

*Supermarkets Gen. Corp. v. State*,
  409 A.2d 250 (Md. 1979) ......................................................................................7

*Teng v. Town of Kensington*,
  No. 09-cv-8-JL, 2010 WL 596526 (D.N.H. Feb. 17, 2010) ................................9

*Terry v. Ohio*,
  392 U.S. 1 (1968)................................................................................................17

*Trinen v. City of Denver*,
  53 P.3d 754 (Colo. Ct. App. 2002) .....................................................................19

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997)............................................................................................24

BRIEF OF AMICUS CURIAE BRADY<br/>CENTER TO PREVENT GUN VIOLENCE

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page(s)</u>

*United States v. Bledsoe*,
   No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) .................19, 27, 28

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) .......................................................................... *passim*

*United States v. Engstrum*,
   609 F. Supp. 2d 1227 (D. Utah).............................................................................28

*United States v. Hart*,
   726 F. Supp. 2d 56 (D. Mass. 2010) .......................................................................9

*United States v. Hayes*,
   129 S. Ct. 1079 (2009)............................................................................................3

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010)........................................................................... *passim*

*United States v. Masciandaro*,
   648 F. Supp. 2d 779 (E.D. Va. 2009) ....................................................................28

*United States v. McCane*,
   573 F.3d 1037 (10th Cir. 2009) .............................................................................28

*United States v. Miller*,
   604 F. Supp. 2d 1162 (W.D. Tenn. 2009)...........................................19, 24, 27, 28

*United States v. Radencich*,
   No. 3:08-CR-00048(01)RM, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009) ............28

*United States v. Schultz*,
   No. 1:08-CR-75-TS, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009) .............................28

*United States v. Skoien*,
   587 F.3d 803 (7th Cir. 2009) .............................................................................4, 16

*United States v. Tooley*,
   717 F. Supp. 2d 580 (S.D. W. Va. 2010).................................................................9

*United States v. Walker*,
   380 A.2d 1388 (D.C. 1977) ..................................................................................12

*United States v. Yanez-Vasquez*,
   No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010) ..................19, 28

## TABLE OF AUTHORITIES—Continued

Page(s)

*Williams v. State*,
    10 A.3d 1167 (Md. 2011) ............................................................1, 5, 7

*Williams v. State*,
    982 A.2d 1168 (Md. Ct. Spec. App. 2009) ...........................................27

*Young v. American Mini Theatres, Inc.*,
    427 U.S 50 (1976)........................................................................24


STATUTES:

18 U.S.C. § 922......................................................................3, 19, 20

Ark. Act of Apr. 1, 1881 ...................................................................10

Md. Pub. Safety Code § 5-306 ...................................................... *passim*

Md. Pub. Safety Code § 5-311...................................................22, 26

Md. Pub. Safety Code § 5-312...................................................22, 23, 26

Md. Regs. Code tit. 29, § .03.02-4...............................................22, 23, 26

Tex. Act of Apr. 12, 1871 ..................................................................10

Wyo. Comp. Laws Chapter 52, § 1 ...........................................................10


CONSTITUTIONAL PROVISIONS:

Ky. Const. of 1850, Article XIII, § 25 .....................................................11

U.S. Const. amend. I ......................................................................15, 16

U.S. Const. amend. II......................................................................*passim*

U.S. Const. amend. IV .......................................................................17


OTHER AUTHORITIES:

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007).................17

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page(s)</u>

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and
Gun Assault*, 99 AMER. J. PUB. HEALTH 1 (Nov. 2009)...........................................................14

Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*,
109 COLUM. L. REV. 1278 (Oct. 2009) ...................................................................................11

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun
Uses: Results From a National Survey*,
15 VIOLENCE & VICTIMS 257 (2000) .......................................................................................13

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*,
34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002) .......................................................14

David McDowall *et. al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*,
86 J. CRIM. L. & CRIMINOLOGY 193 (1995) .............................................................................13

Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of
Firearms*, 275 J. AM. MED. ASS'N 1759 (1996)..............................................................25, 26

D.W. Webster *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on Firearm
Trafficking*, 6 J. URBAN HEALTH: BULLETIN OF THE
N.Y. ACAD. OF MED. 525 (2009)......................................................................................24, 26

D.W. Webster *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales
Laws and the Source State of Crime Guns*, 7 INJURY PREVENTION 184 (2001) ...............24, 26

ERNST FREUND, THE POLICE POWER, PUBLIC POLICY AND CONSTITUTIONAL RIGHTS (1904).......11

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
An Analytical Framework and a Research Agenda*,
56 UCLA L. REV. 1443 (2009) ...............................................................................................18

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-
Handgun Laws on Crime*, *in* THE ECON. OF GUN CONTROL 473 (May 1998) ........................13

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1
CENT. L.J. 259 (1874) .............................................................................................................11

Int'l Ass'n of Chiefs of Police, *Taking a Stand: Reducing Gun Violence In Our Communities*
(2007).......................................................................................................................................22

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel
Data*, 18 INT'L REV. L. & ECON. 239 (1998)...........................................................................13

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868)......................................11

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

<u>TABLE OF AUTHORITIES</u>—Continued

<u>Page(s)</u>

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*,
  73 FORDHAM L. REV. 623 (2004) ............................................................................13

John J. Donohue, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POLICY EFFECTS
  ON CRIME AND VIOLENCE (2003) ...........................................................................13

JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED
  STATES 152-53 (1868) ............................................................................................11

Lisa M. Hepburn, David Hemenway, *Firearm availability and homicide:
  A review of the literature*, 9 AGGRESSION & VIOLENT BEHAVIOR 417 (2004) .......................12

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001).................................12

Matthew Miller, David Hemenway, Deborah Azrael, *State-level homicide victimization rates in
  the US in relation to survey measures of household firearm ownership,
  2001-2003* .........................................................................................................12

Matthew Miller *et al.*, *Firearm availability and unintentional firearm deaths*,
  33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ..........................................................12

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions
  and States, 1988–1997*, 92 AM. J. PUBLIC HEALTH 1988 (Dec. 2002) ....................................12

Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?*,
  59 SYRACUSE L. REV. 225 (2008) ...........................................................................11

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare
  Perspective*, 56 UCLA L. REV. 1041 (2009) ...........................................................14

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*,
  J. PUB. ECON. 379 (2006)....................................................................................15

Violence Policy Center, *Concealed Carry Killers* (2011) ..........................................................13

**INTRODUCTION**

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents.  554 U.S. 570 (2008).  Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly.  While the Supreme Court has held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, the Court has never recognized a far broader right to carry guns in public places, which would subject the public-at-large to those grave risks.  On the contrary, *Heller* found that restrictions on public carrying are in line with permissible gun laws. *Heller*, 554 U.S. at 626-27.

Courts around the nation have refused to extend *Heller*'s limited holding beyond the home,[1] and Maryland's highest court recently held that *Heller* bears no impact on the state's public gun carrying restrictions.  *See Williams v. State*, 10 A.3d 1167, 1176-77 (Md. 2011).  The reluctance to expand *Heller* is well-founded.  In *Heller* and *McDonald v. City of Chicago*, the Court had ample opportunity to announce a right to carry in public, but it did not.  *See McDonald*, 130 S. Ct. 3020 (2010); *Heller*, 554 U.S. 570.  The Court expounded at length on the limited nature of the Second Amendment right; it did not limit itself to the constitutionality of the D.C. law at issue.  Yet it repeatedly stated its holding as bound to the home.  Numerous courts, from the 19th century to post-*Heller* and *McDonald*, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns in public.  *See, e.g., Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (holding that "the right of the public to bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons").  It would be unprecedented and unwise, therefore, to hold that the Constitution bars states and communities from choosing to keep guns out of public places, or – as Maryland has done – from allowing those tasked with protecting public safety to determine whether individuals have a "good and

---

[1] *See infra*, pp.8-10.

substantial reason" to bring handguns into public spaces. There is no Constitutional requirement that the general public, when walking to school, driving to work, or otherwise going about their daily activities, be subjected to the risks of gun carrying. And there never has been.

An extension of the Second Amendment to deny licensing officials the authority to determine who has a "good and substantial reason" to carry guns in public would run counter to the "assurances" of *Heller* and *McDonald* that "reasonable firearms regulations" will remain permissible, as well as the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 554 U.S. at 626-27 & n.26. Maryland law governing the public carrying of weapons is precisely that reasonable regulation.

The permitting process of Md. Public Safety Code § 5-306(a)(5)(ii) does not implicate protected Second Amendment activity. Even if it did, requiring a showing of a "good and substantial reason" as a condition to issue a permit to carry is a reasonable, justified, and permissible exercise of the state's police powers. So too, is entrusting the authority to issue permits to law enforcement officials specifically designated by the Maryland Legislature. While Plaintiffs may disagree with the permit laws, their recourse – as Maryland courts have reiterated – is through the legislative process, not the judiciary. This Court is obligated to uphold legislation where there is a reasonable basis to do so; declaring a new Second Amendment right that the Supreme Court has not acknowledged and by striking down a law that so plainly satisfies the state's interest in protecting public safety would usurp the functions of the Legislature and local law enforcement.

## INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws. *Amicus* brings a broad and deep perspective to the issues

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

## LEGAL BACKGROUND

Recent Supreme Court Second Amendment Jurisprudence:  In *Heller*, the Supreme Court recognized an individual right to keep and bear arms in the home for the purpose of self-defense.  554 U.S. at 628-29.  While the Court simply could have decided whether the District's handgun ban was unconstitutional, it went out of its way to assure courts that its holding did not "cast doubt" on other gun laws – even approving of the constitutionality of a number of laws and then making clear that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id.* at 626-27 & n.26.  Those "presumptively lawful" measures included laws restricting, and even banning, the public carry of weapons.  In approvingly discussing long-understood limitations on the right to keep and bear arms, the Court specifically noted that "the majority of the 19th-century courts" considered outright "prohibitions on carrying concealed weapons . . . lawful under the Second Amendment or state analogues."  *Id.* at 626.

The Court in *Heller* did not suggest that the Second Amendment requires that some minimal form of public carrying must be permitted.  Rather, the Court repeatedly referenced "the home" in its holding.  And the Court made clear that "carry" did not imply "outside the home," as the Court ultimately held that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license *to carry it in the home*."  554 U.S. 635 (emphasis added).[2]

In *McDonald*, the Court incorporated the Second Amendment to the states, but also "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws, and agreed that "state

---

[2] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

and local experimentation with reasonable firearms regulation will continue under the Second Amendment." 130 S. Ct. at 3047 (internal citation omitted).  Once again, the Court did not extend the Second Amendment right outside the home.

The Open Question: Standard of Review: Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment challenges, though the Court in *Heller* explicitly rejected the "rational basis" test and implicitly rejected the "strict scrutiny test."  *See Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) ("[S]trict scrutiny standard of review would not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures' . . . .").  The Court's reasoning also foreclosed any form of heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends, as *Heller* recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 554 U.S. at 636, and listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any such analysis.  *Id.* at 627 & n.26.

*Heller* and *McDonald* thus left lower courts with the task of determining an appropriate standard of review for Second Amendment claims: one that is less rigorous than strict scrutiny, "presumes" the lawfulness of a wide gamut of gun laws currently in force, allows for "reasonable firearms regulations," and permits law-abiding, responsible citizens to keep guns in their homes for self-defense.  As discussed below, the "reasonable regulation" test, overwhelmingly applied by courts throughout the country construing right to keep and bear arms provisions in the states, is the most appropriate standard of review for the Maryland statute at issue here.

The Two-Pronged Approach:  In the wake of *Heller* and its progeny, a number of courts have begun to utilize a two-pronged approach to Second Amendment claims.  *See, e.g.*, *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *Heller II*, 698 F. Supp. 2d at 188.  Under this approach, courts ask:  (1) does the law or regulation at issue implicate protected Second Amendment

activity, and (2) if so, does it withstand the appropriate level of scrutiny?  *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 188; *Marzzarella*, 614 F.3d at 89.  If the challenged law or regulation does not implicate protected Second Amendment activity, then the analysis ends and the law is deemed constitutional. Even if the law implicates protected activity, however, it still will be deemed constitutional if it passes muster under the appropriate level of scrutiny.  *Marzzarella*, 614 F.3d at 89.

This two-pronged approach represents an appropriate manner in which to analyze the issues presented by Second Amendment claims.  *Amicus* advocates its use by this Court in determining the constitutionality of Md. Public Safety Code § 5-306(a)(5)(ii).

## ARGUMENT

For at least two principal reasons, the firearms permitting regulations are constitutional.  First, the permitting process in Md. Public Safety Code § 5-306(a)(5)(ii) does not implicate protected Second Amendment Activity.  Second, even if it did, the provisions are permissible regulations that further important governmental interests established by the Maryland Legislature.

## I.   THE PERMITTING PROCESS IN MD. PUBLIC SAFETY CODE § 5-306(a)(5)(ii) DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

When the pending motion for summary judgment is viewed thorough the two-prong approach to Second Amendment claims, it is clear that the permitting process of Md. Public Safety Code § 5-306(a)(5)(ii) does *not* implicate protected Second Amendment activity because Plaintiffs have no Second Amendment "right to 'possess and carry weapons in case of confrontation'" in public places. Indeed, the Maryland Court of Appeals recently rejected the arguments on which plaintiff's claims are based and confirmed that "wearing, carrying, or transporting a handgun, without a permit and outside of one's home, is outside of the scope of the Second Amendment."  *Williams v. State*, 10 A.3d 1167, 1169 (Md. 2011); s*ee also Maryland State Police v. McLean*, No. 1462, 2011 WL 680279, at *8 (Md. Ct. Spec. App. Feb. 28, 2011) (denying applicant's carry permit renewal and citing *Williams* for the proposition that "gun ownership is not an unconditional right").  This Court need look no further than that analysis to grant Defendants' motion.

**A.    The Public Carry Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because it Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.**

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 554 U.S. at 635 (emphasis added).  In the course of its lengthy majority opinion, the Court had ample opportunity to state that Mr. Heller had a right to carry guns in public.  However, it did not do so: the Court never recognized a right to carry guns in public.  The Court's holding only mentions Heller's right "*to carry* [] *in the home,*" *id.* (emphasis added), and does not mention the carrying of firearms in public at all.  *See id.*  The Court's opinion focuses on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 615 (internal quotation marks omitted), and the continuing need to keep and use firearms "in defense of hearth and home."  *Id.* at 635.  The Court's holding is specifically limited to the right to keep firearms in the home:  "[i]n sum, we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense."  *Id.* at 635 (emphasis added).  Indeed, the Court had previously stated that "the right of the public to bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons," *Robertson v. Baldwin*, 165 U.S. at 281-82, and the *Heller* Court did not question, much less reverse, this ruling.

Plaintiffs argue, essentially, that the *Heller* Court embraced a Constitutional right to carry guns in public, but for some reason chose not to say so explicitly.  This, however, is a misreading of *Heller*.  Indeed, Plaintiffs cannot explain why the Court would so explicitly hold that the Second Amendment was "not unlimited," and that a (non-exhaustive) host of gun laws remained "presumptively lawful," yet keep his supposed ruling that the Second Amendment protected a right to carry guns in public hidden and implicit, leaving courts with (at most) supposed tea leaves on which to find a broad right to carry in

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

public.[3]  Nor can Plaintiffs explain why the *Heller* Court expressly approved of decisions upholding concealed carry bans, but chose not to state the flip-side that is crucial to Plaintiffs' argument – that some form of public carrying must be permitted.[4]

Plaintiffs have no basis to urge that this Court stretch *Heller* to cast aside longstanding judicial support for statutory restrictions on public carrying, especially when   *Heller* explicitly embraced concealed carry bans and repeatedly anchored its holding to the "home."  Indeed, courts are "reluctant to find a statute unconstitutional if, by any construction, it can be sustained," *Galloway v. State*, 781 A.2d 851, 858 (Md. 2001) (internal quotation marks and citations omitted), and will instead, "presum[e the legislature] "to have acted within constitutional limits."  *Supermarkets Gen. Corp. v. State*, 409 A.2d 250, 253 (Md. 1979).  Nevertheless, Plaintiffs ask the Court to fashion a novel constitutional right to strike down a statute that is the product of a clearly Constitutional, democratic process.  It need not.

In keeping with these long-held principals of judicial restraint, Maryland courts have refused to read *Heller* or *McDonald* as recognizing a right to carry guns in public.  And they have rejected the very arguments plaintiffs now seek to revive – that *Heller* overturned the Legislature's longstanding authority to restrict public carrying of firearms.   In *Williams*, Maryland's highest court considered – and summarily dismissed – the argument that *Heller* endorsed a public right to carry handguns:

> [Defendant] attempts to bring his conviction of wearing, carrying, or transporting a
> handgun in public, without a permit, within the ambit of *Heller* and *McDonald* by

---

[3] Nor do the Court's "tea leaves" even indicate its recognition of a right to carry guns in public.  For example, the *Heller* Court discussed "bear" as meaning "carry" simply to support its position that the Second Amendment's use of "bear arms" "in no way connotes participation in a structured military organization," and, therefore, the Court opined, the phrase did not indicate that the Second Amendment was limited to militia matters.  554 U.S. at 584.  The *Heller* Court did **not** state that the Second Amendment protects a right to carry arms in public.

[4] Plaintiffs' curious suggestion that *Heller*'s identification of presumptively lawful gun restrictions "confirm[s]" that other restrictions "are *not* presumptively lawful" is unavailing.  *See* Pls.' Br. 8.  First, the argument ignores the Court's instruction that *Heller*'s list was *not* exhaustive.  Moreover, the argument assumes the Court to have been burdened with the non-judicial assignment of  anticipating, identifying and listing every possible presumptively lawful restriction regardless of whether any one of them was it issue in the case at bar.  Appellate courts, and particularly the U.S. Supreme Court, do not work that way.

claiming that those opinions would prohibit his conviction. This is not the case, because *Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions *against home possession*, the dicta in *McDonald* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," notwithstanding. Although Williams attempts to find succor in this dicta, it is clear that *prohibition of firearms in the home* was the gravamen of the certiorari questions in both *Heller* and *McDonald* and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly.

10 A.3d at 1177 (emphasis added) (internal citation omitted); s*ee also Maryland State Police v. McLean*, No. 1462, 2011 WL 680279, at *8 (Md. Ct. Spec. App. Feb. 28, 2011) .

The Maryland appellate courts' rejection of Plaintiffs' reasoning is hardly unique; other courts have held similarly that the Second Amendment, post-*Heller*, does not protect a right to carry weapons in public.  In *People v. Dawson*, the Illinois Court of Appeals rejected arguments strikingly similar to Plaintiffs', and held:

> The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of "bear arms" including wearing or carrying upon the person or in clothing. Nor can the *Heller* majority's holding that the operative clause of the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" require heightened review of the AUUW statute's criminalization of the carrying of an uncased and loaded firearm.  As addressed above, *Heller specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home*, not the right to possess handguns outside of the home in case of confrontation-a fact the dissent heartily pointed out by noting that "[n]o party or *amicus* urged this interpretation; the Court appears to have fashioned it out of whole cloth." The *McDonald* Court refused to expand on this right, explaining that the holding in *Heller* that the second amendment protects "the right to possess a handgun in the home for the purpose of self-defense" was incorporated.

934 N.E.2d 598, 605-06 (Ill. App. Ct. 2010) (internal citations omitted) (emphasis added).  Recognizing that "when reasonably possible, a court has the duty to uphold the constitutionality of a statute," *id.* at 604, the *Dawson* Court rejected the contention that the Second Amendment protects a broad right to carry that would invalidate Illinois's law.

The Kansas Court of Appeals also recognized that "[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

defense purposes. [The defendant's] argument, that *Heller* conferred on an individual the right to carry a concealed firearm, is unpersuasive." *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009). And *In re Bastiani*, 881 N.Y.S.2d 591 (2008), upheld New York's law that limited carrying to those permitted based on "special need," noting that "[r]easonable regulation of handgun possession survives the *Heller* decision." *Id.* at 593.

Other courts *post-Heller* – both state and federal – have similarly held that the right recognized in *Heller* and *McDonald* is confined to the home. *See, e.g.*, *Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, 725 F. Supp. 2d 56, 60 (D. Mass. 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, 741 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526, at *5 (D.N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright 'prohibition on carrying concealed weapons' as 'presumptively lawful,' far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*."); *People v. Aguilar*, No. 1-09-0840, 2011 WL 693241, at *6 (Ill. App. Ct. Feb. 23, 2011) ("[T]he decisions in *Heller* and *McDonald* were limited to interpreting the second amendment's protection of the right to possess handguns in the home, not the right to possess handguns outside the home."); *In re Factor*, 2010 WL 1753307, at *3 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010) (Second Amendment does not "compel the

District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined." (quoting *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008))).

Furthermore, in Maryland, and across the country, this understanding of the Second Amendment (and its state analogues) as not protecting a general right to carry or a more particular right to carry concealed weapons pre-dates *Heller*. *See Robertson v. Baldwin*, 165 U.S. at 281-82; *Scherr v. Handgun Permit Rev. Bd.*, 880 A.2d 1137, 1153 (Md. Ct. Spec. App. 2005) (rejecting argument that plaintiff had "fundamental right" to "wear, carry, or transport a handgun"); *Snowden v. Handgun Permit Rev. Bd.*, 413 A.2d 295, 299-98 (Md. Ct. Spec. App. 1990) (holding that denial of permit for failure to show "good and substantial reason" was neither arbitrary nor capricious); *Onderdonk v. Handgun Permit Review Bd.*, 407 A.2d 763, 764 (Md. Ct. Spec. App. 1979) (noting that "bearing of arms was never treated as an absolute right at common law" and upholding handgun permit regulations as "a reasonable exercise of police power"); *see also* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *English v. State*, 35 Tex. 473, 473, 478 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee" – in the state Constitution of the "right of the people to keep and bear arms" – "to the right to carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature . . . have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

(1858).[5]

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places. For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES 152-53 (1868). Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L.J. 259, 287 (1874). An authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." ERNST FREUND, THE POLICE POWER, PUBLIC POLICY AND CONSTITUTIONAL RIGHTS (1904). Post-*Heller*, scholars continue to recognize the logic behind limiting the right to the home. *See, e.g.*, Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009); Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?,* 59 SYRACUSE L. REV. 225 (2008).

The permitting process at issue in this case does not meaningfully impede the ability of individuals to keep handguns in defense of their homes. Instead, it only impacts the carrying of weapons *in public*, a different issue entirely, and one that neither the Supreme Court nor other courts

---

[5] *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky Supreme Court declared Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this consistent precedent. *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868). In fact, the Kentucky legislature later corrected the anomalous decision by amending the state constitution to allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

have recognized as protected under the Second Amendment. As a result, the Court should not find that Plaintiffs are challenging protected Second Amendment activity.

>   **B.      The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public.**

There are profound public safety rationales for restricting guns in public, as courts continue to recognize post-*Heller*:

> Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender. A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety . . . .

*People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (2008) (internal quotations and citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (there is an "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor"). The carrying of firearms in public poses a number of issues and challenges not presented by the possession of firearms in the home. Three issues, in particular, are worthy of note.

First, when firearms are carried out of the home and in public, the safety of a broader range of individuals is threatened. While firearms kept in the home are primarily a threat to their owners, family members, friends, and houseguests,[6] firearms carried in public are a threat to strangers, law enforcement officers, random passersby, and other private citizens. Guns in public expose all members of society to

---

[6] *See, e.g.*, Matthew Miller, David Hemenway, Deborah Azrael, *State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003*, SOCIAL SCIENCE & MEDICINE (2006) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates"); Lisa M. Hepburn, David Hemenway, *Firearm availability and homicide: A review of the literature*, 9 AGGRESSION & VIOLENT BEHAVIOR 417 (2004) ("households with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership"); Matthew Miller, et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 AM. J. PUBLIC HEALTH 1988 (Dec 2002) ("in areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide); Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller *et al.*, *Firearm availability and unintentional firearm deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

great risks, as guns are used "far more often to kill and wound innocent victims than to kill and wound criminals … [and] guns are also used far more often to intimidate and threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000). Another study has shown that in the last four years, concealed handgun permit holders have shot and killed at least 9 law enforcement officers and 279 private citizens.  Violence Policy Center, *Concealed Carry Killers* (2011), http://vpc.org/ccwkillers.htm.  States have a stronger need to protect their citizens from individuals carrying guns in public than they do from individuals keeping guns in their homes.

Second, the carrying of firearms in public is not a useful or effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime.  Most states that enact laws broadly allowing concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted."  John J. Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003).  Laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates."  Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV.  L. & ECON. 239 (1998) (emphasis in original). Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," and may "raise levels of firearms murders" and "increase the frequency of homicide."  David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995).  Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted.  Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, THE ECON. OF GUN CONTROL 473 (May 1998).  Several different statistical approaches to the question "indicate a rather substantial increase in robbery," while "policies to *discourage* firearms in public may help prevent violence."  John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004).  Another study found that "gun

possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not protect those who possessed them from being shot in an assault." Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 1, 4 (Nov. 2009).  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults.  If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public has other negative implications for a number of social issues and societal ills that are not impacted by the private possession of handguns in the home.  When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed."  *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996) ("officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation").  Law enforcement's ability to protect the public could be greatly restricted if officers were required to effectively presume that a person carrying a firearm in public was doing so lawfully.  Under such a legal regime, it is possible that an officer would not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention.  Law enforcement should not have to wait for a gun to be fired before protecting the public.  Further, if drivers are allowed to carry loaded guns, road rage can become a more serious and even potentially deadly phenomenon.  David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

And an increase in gun prevalence in public may cause an intensification of criminal violence.  Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379, 387 (2006).

The permitting process at issue here prevents many of these risks to the public, without implicating the Second Amendment activity protected in *Heller*.  Individuals in Maryland who are not otherwise disqualified by operation of law and who can demonstrate that they can possess and use firearms responsibly are allowed to maintain handguns to protect themselves in the home.  *Heller* simply provides no basis for expanding that authority into a broad constitutional right to carry weapons in public.

## II.    EVEN IF THE WEAPONS PERMITTING PROCESS IN THE MARYLAND PUBLIC SAFETY CODE DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

Even if this Court were to hold that the Second Amendment protects a right to carry concealed guns in public, Maryland's permitting process is a permissible regulation of such a right under any appropriate level of scrutiny.

In choosing a level of scrutiny appropriate for Second Amendment challenges, courts need not – and should not – limit themselves to the choices utilized in First Amendment jurisprudence: strict scrutiny, intermediate scrutiny, or rational basis review.  While these levels of scrutiny may seem to be the easiest and most obvious options in picking a standard of review, key differences between the First and Second Amendments militate against their application.  The exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech.  While "words can never hurt me," guns are designed to inflict grievous injury and death – and often do.  To protect the public from the risks of gun violence – unlike the significantly more modest risks posed by free speech – states must be allowed wide latitude in exercising their police power authority.  Otherwise, the exercise of Second Amendment rights could infringe on the most

fundamental rights of others – life.

Plaintiffs construe the Fourth Circuit's recent decision in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), to foreclose such latitude.  Pls.' Br. 1.  It did no such thing.  In *Chester*, the Fourth Circuit endorsed the view that courts may use the First Amendment "as a guide" for approaching Second Amendment cases.  *See* 628 F.3d at 682.  But it did not read this "guidance" to counsel rigid application of a "one-size-fits-all" framework unaltered by the context of the particular Second Amendment claim and conduct at issue.  *See id.* (citation omitted).  To the contrary, the *Chester* court specifically observed that even "[i]n the analogous First Amendment context, the level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.*[7]  Second Amendment analysis is no different.  *Chester*, like *Heller*, rejects the rigid framework Plaintiffs attempt to foist upon it.  Instead, it urges courts reviewing challenges to firearm regulations to consider the specific "conduct being regulated and the degree to which the challenged law burdens the right" in fashioning the proper standard of review.  *See Chester*, 628 F.3d at 682 ("'[L]ess severe burdens on the [Second Amendment] right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified.'" (quoting *United States v. Skoien*, 587 F.3d 803, 813-14 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010) (en banc))).  *Chester* does *not* require a narrow choice between strict, rational, and intermediate scrutiny.

---

[7] Even if the Court applied a First Amendment analysis, it need not restrict itself to three levels of scrutiny.  As the Third Circuit explained in *Marzzarella*, "The right of free speech . . . is susceptible to several standards" and concluding  "we see no reason why the Second Amendment would be any different."  614 F.3d at 96-97.  *See also City Council v. Taxpayers of Vincent*, 466 U.S. 789 (1984) (upholding law prohibiting posting signs on public property because law, though overbroad, was not "substantially overbroad"); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) (developing "four-part analysis" for reviewing regulations on commercial speech).

The Supreme Court has not limited itself to three levels of scrutiny and Plaintiffs have offered no reason for this Court to behave any differently.  In fact, the Supreme Court has fashioned a wide variety of standards of review that are tailored to specific constitutional inquiries and has recognized that an individual's right to bear arms must be evaluated in light of a state's competing interest in public safety.[8] Thus, a standard of review specific to the Second Amendment context is warranted here and *amicus* respectfully submits that it lies in the test applied by courts across the country, for over a century, to construe the right to keep and bear arms: the "reasonable regulation" test.

### A.   The Reasonable Regulation Test is the Appropriate Standard of Review.

While lawmakers and judges continue to grapple with a private right to arms under the federal Constitution, courts have construed analogous state provisions for over a century.  Over forty states have constitutional right-to-keep-and-bear-arms provisions, and despite significant differences in the political backdrop, timing, and texts of these provisions, the courts in these states have, with remarkable unanimity, coalesced around the "reasonable regulation" test.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n.12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).  Under the reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that

---

[8] *See, e.g.*, *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (affirming that the Eighth Amendment's prohibition of cruel and unusual punishment should be measured by an "evolving standards of decency" test); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (applying an "undue burden" test to determine whether a statute jeopardized a woman's right to choose); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that determinations of procedural due process require a balancing of three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (upholding a "stop and frisk" under the Fourth Amendment where an officer had "reasonable grounds" to believe a suspect was armed and dangerous).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

power is reasonable." *Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 328, 333 n.10 (Colo. 1994).[9]

More demanding than rational basis review, but more deferential than intermediate scrutiny, this "reasonable regulation" test protects Second Amendment activity without unduly restricting states from protecting the public from gun violence. The test recognizes "the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people." *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989). The reasonable regulation test, which was specifically designed for cases construing the right to keep and bear arms and has been adopted by the vast majority of states, remains the standard of review best suited for Second Amendment cases after *Heller* and for the case at hand. *See Chow v. State*, 903 A.2d 388, 406 (Md. 2006) (quoting legislative determination that Maryland firearms transfer statute "*imposes reasonable regulations aimed at reducing [] gun violence . . . .*'").

The reasonable regulation test is a more demanding form of scrutiny than the rational basis test that the majority opinion in *Heller* rejected (and also than the "interest balancing" test suggested by Justice Breyer in dissent) because it does not permit states to prohibit all firearm ownership. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1458 (2009). Instead, it focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police powers" and not "merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *State v. Cole*, 665 N.W. 2d 328, 338 (Wis. 2003) (adding that principle of

---

[9] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So. 2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State . . . is subject to reasonable regulation by the State under its police power.").

"reasonable regulation" is that "the right [to bear arms] must not be allowed to become illusory").  Laws and regulations governing the use and possession of firearms thus must meet a higher threshold under the reasonable regulation test than they would under rational basis review.

Although the reasonable regulation test may be more deferential than intermediate scrutiny, it is not toothless.  Under the test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down.  Laws that are reasonably designed to further public safety, by contrast, are upheld.  *See, e.g.*, *Robertson*, 874 P.2d at 328, 330 n.10 ("The state may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable."); *Jackson v. State*, 68 So.2d 850, 852 (Ala. App. 1953) (same); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (same).

Adopting the reasonable regulation test here would not be at odds with *Chester* or other courts that have elected to use intermediate scrutiny following *Heller*.  In virtually every post-*Heller* case where a court has adopted intermediate scrutiny, the court was evaluating a particular provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad classes of individuals and types of arms.  *See, e.g.*, *Chester*, 628 F.3d at 676 (evaluating § 922(g)(9) barring domestic violence misdemeanants from possessing firearms); *Marzzarella*, 614 F.3d at 87 (evaluating § 922(k) barring possession of a handgun with an obliterated serial number); *United States v. Yanez-Vasquez*, No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (evaluating § 922(g)(5) barring illegal aliens from possessing firearms); *United States v. Miller*, 604 F. Supp. 2d 1162, 1164 (W.D. Tenn. 2009) (evaluating § 922(g) barring felons from possessing firearms); *United States v. Bledsoe*, No. SA-08-CR-

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

13(2)-XR, 2008 WL 3538717, at *1 (W.D. Tex. Aug. 8, 2008) (evaluating § 922(x) barring juveniles from possessing firearms).[10]   By contrast, Maryland's permitting process relies on *individual* determinations and law enforcement discretion.   Courts have always looked with a more wary eye on laws that impose restrictions on broad classes of people than laws that require individual determinations. Heightened scrutiny – like intermediate scrutiny – is less appropriate here.

Plaintiffs argue that *Chester* held that "law-abiding, responsible citizens" enjoy a core right to possess and carry guns, apparently *anywhere* – and that any restriction of that right must pass strict scrutiny.   *See* Pls.' Br. 18.   But this reasoning relies on a half-truth.   Plaintiffs' position is only tenable if one ignores the critical fact that *Chester* endorsed a law-abiding individual's right to possess firearms *at home*.   The Fourth Circuit's review never strayed from the context of the home:

> Although Chester asserts his right to possess a firearm **in his home** for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* – the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant.

*Chester*, 628 F.3d at 682-83 (first emphasis added).   Plaintiffs misconstrue this limitation.   The "core right identified in *Heller*" is the right of "law-abiding, responsible citizens to use arms in defense of *hearth and home*."   *Heller*, 554 U.S. at 635 (emphasis added).   The *Chester* court had no occasion to expand that right, for it simply considered the facts before it – "Chester['s] assert[ion of] his right to possess a firearm *in his home*."   *See Chester*, 628 F.3d at 682 (emphasis added).   Thus the Court did nothing more than assume the existence of the right enunciated in *Heller* – to carry and possess guns *in*

---

[10] The only exception appears to be a recent case in the United States District Court for the District of Columbia, *Heller v. District of Columbia* ("*Heller II*"), in which the plaintiffs challenged (1) the District of Columbia's firearm registration procedures, (2) the District's prohibition on assault weapons, and (3) the District's prohibition on large capacity ammunition feeding devices.   698 F. Supp. 2d 179, 181 (D.D.C. 2010).   But even in that case, two of the three provisions that the district court was evaluating were broad restrictions on entire classes of firearms.   *Id.*

*the home for self defense.  See Chester*, 628 F.3d at 681-82 (conceding that, as a baseline "[the Court] must assume . . . that [Chester] is entitled to some measure of Second Amendment protection to keep and possess firearms *in his home for self-defense*.") (emphasis added).  Because Chester's failure to qualify as a "law-abiding" citizen took him outside the Second Amendment's "core" protection, strict scrutiny was not applicable even though the law at issue forbade his possession of a gun *in the home*. *Chester* certainly does not support such a demanding standard for restrictions on gun carrying *outside the home*.

The reasonable regulation test remains most appropriate for reviewing public carrying laws.  And the test has two particular strengths that intermediate scrutiny does not: (1) it affords licensing officers the discretion they need to adequately enforce handgun laws, and (2) it gives an appropriate amount of deference to legislative directives.

     **1.**    **Licensing officers should be afforded an appropriate amount of discretion in enforcing firearm regulations.**

Licensing officers are best situated to make determinations about who in their communities can carry concealed weapons safely and responsibly.  They are likely to be more familiar with the backgrounds and personalities of the members of their communities than courts or juries situated miles (and perhaps even counties) away.  They are best situated to know, for instance, whether a man requesting a carry permit previously has threatened his wife with violence (even if, say, she declined to testify against him so he was not formally charged), suffers disqualifying mental illness that is undocumented in public records, or, for other reasons, would pose a danger if carrying weapons in public.  These are precisely the types of decisions that need to be made – and that Maryland law requires

– in order to protect communities from firearm violence.  *See* COMAR 29.03.02.04.

Maryland's multi-layered approval process reflects the gravity of this task.  *See* Md. Pub. Safety Code §§ 5-306, 5-311, & 5-312.  First, law enforcement officials who conduct a first-level review of permit applications have a particular stake in who has and can carry firearms in their communities.  Not only are law enforcement officials often tasked with enforcing state and local firearm regulations, they are also charged with responding to situations involving firearms and thus often suffer from the impacts of the irresponsible and criminal uses of firearms in greater numbers than the general population.  Law enforcement officials are thus both uniquely qualified to assess who in their communities possess the proper qualifications and need to carry handguns and uniquely positioned to feel the effects of those decisions.[11]  Courts, accordingly, afford them an appropriate degree of discretion is enforcing firearm regulations.  *See, e.g.*, *Harman v. Pollock*, 586 F.3d 1254, 1265 (10th Cir. 2009) ("[Courts] must defer to trained law enforcement personnel, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them") (internal quotation marks omitted); *Avant Indus. Ltd. v. Kelly*, 318 A.2d 47, 50 (N.J. Super. Ct. App. Div. 1974) ("The Legislature has placed in defendant, [the Superintendent of State Police,] the discretion and authority to determine" procedures for reviewing gun permits and "[w]e defer to defendant's expertise in this field.").

Second, Maryland law protects permit seekers' interests through multiple levels of appeal.  An applicant may appeal a permit denial through an informal review.  *See* Md. Pub. Safety Code § 5-311.  Subsequent to or in lieu of an informal review, the permit seeker may appeal the denial to the Handgun

---

[11] More than one-third of police officer deaths in the line of duty are caused by gunfire.  Int'l Ass'n of Chiefs of Police, *Taking a Stand: Reducing Gun Violence In Our Communities*, at 26 (2007).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Permit Review Board.  *See* Md. Pub. Safety Code § 5-312.  The Board is required to review the record upon which the denial was based or to conduct a hearing.  It may even receive and consider new evidence.  Finally, the applicant may seek judicial review of adverse administrative decisions.  *See Scherr*, 880 A.2d at 1137; *Snowden*, 413 A.2d at 295.  Through these processes, the legislature entrusted the Secretary and Board with the responsibility of carefully vetting a firearm permit applicant, using unambiguous factors enumerated in state regulations.  *See* COMAR 29.03.02.04.  Plaintiffs' efforts to undermine those processes should be rejected.

> **2.    Given the governmental interest in protecting the public from the harms associated with firearms, deference to legislative directives is appropriate.**

The governmental interest in regulating the possession and use of firearms is profound.  States have "cardinal civil responsibilities" to protect the health, safety, and welfare of their citizens.  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost . . . .").  States are thus generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . ."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks omitted).  Regulations on the carrying of firearms are an essential exercise of those powers, for the "promotion of safety of persons and property is unquestionably at the core of the State's police power."  *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

While individuals and organizations may differ on the net risks posed by guns in our society, such disagreement underscore the need for legislative rather than judicial resolutions.  In fact, Maryland courts have recognized as much with respect to the state's permit laws.  *See Scherr*, 880 A.2d at 1154 ("If the legislature had intended that only convicted criminals should be denied handguns, we can think

of no reasons why it would not have said so."); *Snowden,* 413 A.2d at 297 (recognizing that "primary function" of Handgun Permit Review Board "is to advance the will and weal of the people as ordained by their representatives in the Legislature" and "the role of the judiciary in reviewing [the Board's] decisions . . .  is extremely narrow because of the recognized expertise of the agency in a particular field").

Other courts have recognized the same.  *See Miller*, 604 F. Supp. 2d at 1172 n.13 ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches.").  Indeed, legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation affects the exercise of constitutional rights.  *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (finding state legislatures "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good within their respective spheres of authority.") (internal quotation marks and citations omitted).  State governments "must [thus] be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

In fulfilling their responsibility to protect the public, states have enacted laws, including permitting regimes like the one at issue here, to ensure that guns are used responsibly and possessed by responsible, law-abiding persons.  These laws have helped reduce the use of guns in crime and saved lives.  *See, e.g.*, D.W. Webster et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED. 525 (2009); D.W.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Webster et al., *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 INJURY PREVENTION 184 (2001); Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996).  The risks posed by invalidating or unduly restricting these legislative judgments on firearms regulations is severe, and courts should review such legislative judgments with an appropriate amount of deference.  The reasonable regulation test is better situated than either intermediate or strict scrutiny to defer to these legislative judgments.  It allows for different permitting regimes depending on the needs of the particular state or locale, and recognizes the strong interest of the state in protecting its citizens rather than being overly focused on a narrow means-end nexus of the challenged regulation.

     **B.**      **The Carry Permitting Process at Issue Is Constitutionally Permissible.**

           **1.**      **Maryland's permitting process passes the reasonable regulation test.**

Maryland's permitting process passes the reasonable regulation test.  Courts have repeatedly found that there is a "compelling state interest in protecting the public from the hazards involved with certain types of weapons, such as guns," *Cole*, 665 N.W. 2d at 344, particularly given "the danger [posed by the] widespread presence of weapons in public places and [the need for] police protection against attack in these places."  *Id.* (internal quotations omitted).  Maryland's permit regulations meet this interest.  *See Snowden*, 413 A.2d at  297 (recognizing permit regulations "as necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public"); *Scherr*, 880 A.2d at 1153 (rejecting arguments that Maryland's handgun permitting process "has no real or substantial relationship to public health, morals, safety, and welfare of citizens" or does not "bears a real and substantial relationship to the governmental object sought to be attained.").

Indeed, Plaintiffs' allegation that the permit process subjects them to an "arbitrary" review has

been squarely rejected by Maryland's Court of Special Appeals, which held licensing officers must apply an objective standard in determining whether an applicant has demonstrated "good and substantial reason." *See Snowden*, 413 A.2d at 298 (adding that divesting officers of this discretion would relegate the "State Police . . . [to] a 'rubber stamp' agency for the purpose of handing out handgun permits" and would "render[]" a "carefully considered legislation . . . absolutely meaningless insofar as the control of handguns is concerned").

Furthermore, as discussed above, substantial and compelling sociological and statistical evidence strongly confirms that permitting and registration procedures that make it more difficult for someone to carry a gun in public reduce both the number of gun deaths and criminal access to firearms. *See, e.g.*, Webster, *Relationship Between Licensing*, at 184; Webster, *Effects of State-Level*, at 525; Weil & Knox, *Effects of Limiting Handgun Purchases*, at 1759. The Second Amendment does not forbid state or local governments from using such tools to achieve these ends and both state and federal courts have upheld them for decades.

Finally, Maryland's firearms permitting process is not an outright ban on the possession or carrying of firearms and thus does not even approach the blanket prohibition on handgun ownership that the Supreme Court struck down in *Heller*. *See Heller*, 554 U.S. at 574-75. Instead, it merely requires individuals who wish to carry firearms outside the home to meet certain basic requirements and to have their request approved by law enforcement officials. *See* Md. Pub. Safety Code §§ 5-306, 5-311, & 5-312. Those officials, in turn, review applications to ensure that all the statutory requirements have been met. *See* COMAR 29.03.02.04. Furthermore, denial of a permit is appealable by informal review to the Secretary of State Police, Md. Pub. Safety Code § 5-311, formal review to the Handgun Permit Review Board, Md. Pub. Safety Code § 5-312, and judicial review to the state courts. *See Snowden*, 413 A.2d at

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

297 n.2.

In sum, the Maryland public carrying permitting process is both reasonable and not unduly restrictive of the Second Amendment right to keep guns in the home.  It is thus a valid exercise of the state's "police powers to legislate as to the protection of the lives, limb, health, comfort, and quiet of all persons," *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted), and passes the reasonable regulation test.

**2.    Maryland's  permitting  process  would  also  survive intermediate scrutiny.**

Even under intermediate scrutiny, which *amicus* maintains need not be applied in this case, Maryland's statute would pass constitutional muster, because it presents "a 'reasonable fit' between the challenged regulation and a 'substantial' government objective."  *See Chester*, 628 F.3d at 683.  Here, there is no dispute that the state has a substantial interest in reducing gun violence in public.  *See Williams v. State*, 982 A.2d 1168, 1173 (Md. Ct. Spec. App. 2009) (recognizing that "the General Assembly chose to place limits on who may lawfully own a handgun in order to reduce the possibility that they may be used 'on the streets and public ways.'"); *Chow v. State*, 903 A.2d at 406 (recognizing state interest in "reducing [] gun violence"); *Scherr*, 880 A.2d at 1154 (recognizing legislative finding that handgun permit regulations "are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public."); *see also People v. Pulley*, 803 N.E.2d 953, 959-60 (Ill. App. Ct. 2004) (recognizing substantial interest in "prevent[ing] any person from carrying a loaded weapon on his person or in his vehicle due to the inherent dangers to police officers and the general public.") (internal quotation marks omitted).  This substantial interest has not waned since *Heller*.  *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F.Supp.2d at 1171; *Bledsoe*, 2008 WL 3538717, at *4.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Furthermore, Maryland's permitting process reasonably fits that substantial interest.  A number of courts have upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms.  *See, e.g.*, *Marzzarella*, 614 F.3d at 98; *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *Heller II*, 698 F. Supp. 2d at 197; *Yanez-Vasquez*, 2010 WL 411112, at *3; *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah 2009); *Miller*, 604 F. Supp. 2d at 1171-72; *United States v. Masciandaro*, 648 F. Supp. 2d 779, 789-91 (E.D. Va. 2009); *United States v. Radencich*, No. 3:08-CR-00048(01)RM, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009); *Bledsoe*, 2008 WL 3538717, at *4; *State v. Sieyes*, 225 P.3d 995, 995 (Wash. 2010); *Flores*, 169 Cal. App. 4th at 574-75.  As demonstrated above, Maryland's permitting process empowers law enforcement to review permit applications, using carefully crafted standards.  Their determination is subject to administrative appeal and judicial review.  Maryland's process accomplishes its important interest in reducing gun violence by limiting the number of guns in public but without infringing on the rights of gun owners to possess guns in the home for self-defense.  As such, even if intermediate scrutiny is applied, Plaintiffs' claims cannot stand.

## CONCLUSION

For all the foregoing reasons, *amicus* respectfully requests that the Court find Maryland Public Safety Code § 5-306(a)(5)(ii) to be constitutional.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Dated: March 22, 2011

Respectfully submitted,

s/Nicholas G. Stavlas
Nicholas G. Stavlas (Bar No. 025047)
Hogan Lovells US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2700
Facsimile: (410) 659 2701
E-mail: Nicholas.stavlas@hoganlovells.com

Jonathan L. Diesenhaus
S. Chartey Quarcoo
Samson O. Asiyanbi
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Counsel for *Amicus Curiae*