IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RAYMOND WOOLLARD, et al., ) | Case No. 1:10-cv-02068-BEL |
| ) | |
| Plaintiffs, ) | MEMORANDUM OF POINTS AND |
| ) | AUTHORITIES IN OPPOSITION TO |
| v. ) | DEFENDANTS' MOTION FOR |
| ) | SUMMARY JUDGMENT |
| TERRENCE SHERIDAN, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, Raymond Woollard and Second Amendment Foundation,

Inc., by and through undersigned counsel, and submit their Memorandum of Points and

Authorities in Opposition to Defendants' Motion for Summary Judgment.

Dated: April 25, 2011                    Respectfully submitted,

Alan Gura                                 Cary J. Hansel
Gura & Possessky, PLLC                    Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405         6404 Ivy Lane, Suite 400
Alexandria, VA 22314                      Greenbelt, MD 20770
703.835.9085/Fax 703.997.7665            301.220.2200/Fax 301.220.1214

By: /s/ Alan Gura_____         By: /s/ Cary J. Hansel_____
    Alan Gura                                 Cary J. Hansel

                                          Attorneys for Plaintiffs

TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I..      POLICY ARGUMENTS DO NOT SUBSTITUTE FOR THE CONSTITUTION. . . . . . . 9

II.      THE SECOND AMENDMENT EXTENDS BEYOND THE HOME. . . . . . . . . . . . . . 12

III.     THE ALLEGED ABILITY TO CARRY RIFLES AND SHOTGUNS
         DOES NOT JUSTIFY DEFENDANTS' ARBITRARY DENIAL OF
         THE RIGHT TO CARRY HANDGUNS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.      THE "REASONABLE REGULATION" STANDARD IS UNAVAILABLE
         IN CASES CONSTRUING FUNDAMENTAL RIGHTS.. . . . . . . . . . . . . . . . . . . . . . . . 23

V.       DEFENDANTS' DEMAND THAT INDIVIDUALS PROVE THEIR
         NEED TO EXERCISE A *RIGHT* IS UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . 25

         A.      The Prior Restraint Doctrine Is Most Readily Applicable. . . . . . . . . . . . . . . . . . 26

         B.      A Means-Ends Standard of Scrutiny Defeats the "Good and
                 Substantial Reason" Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

TABLE OF AUTHORITIES

Cases

*Bayside Enterprises, Inc.* v. *Carson*,
 450 F. Supp. 696 (M.D. Fla. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Broadway Books, Inc.* v. *Roberts*,
 642 F. Supp. 486 (E.D.Tenn. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bsharah* v. *United States*,
 646 A.2d 993 (D.C. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Buck* v. *Bell*,
 274 U.S. 200 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
 486 U.S. 750 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Cohens* v. *Virginia*,
 19 U.S. (6 Wheat.) 264 (1821). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Commonwealth* v. *Blanding*,
 20 Mass. 304 (1825) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*District of Columbia* v. *Heller*,
 128 S. Ct. 2783 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Elam* v. *Bolling*,
 53 F. Supp. 2d 854 (W.D.Va. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Genusa* v. *Peoria*,
 619 F.2d 1203 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Marbury* v. *Madison*,
 5 U.S. (1 Cranch) 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McDonald* v. *City of Chicago*,
 130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*MD II Entertainment* v. *City of Dallas*,
 28 F.3d 492 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Minotti* v. *Whitehead*,
    584 F. Supp. 2d 750 (D. Md. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Muscarello* v. *United States*,
    524 U.S. 125 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*N.J. Envtl. Fed'n* v. *Wayne Twp.*,
    310 F. Supp. 2d 681 (D.N.J. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ohio Citizen Action* v. *City of Mentor-On-The-Lake*,
    272 F. Supp. 2d 671 (N.D. Ohio 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ohio Citizen Action* v. *City of Seven Hills*,
    35 F. Supp. 2d 575 (N.D. Ohio 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21, 27

*Patsone* v. *Pennsylvania*,
    232 U.S. 138 (1914). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Peruta* v. *County of San Diego*,
    2010 U.S. Dist. LEXIS 130878 (S.D. Cal. Dec. 10, 2010). . . . . . . . . . . . . . . . . . . . . . 15

*Peruta* v. *County of San Diego*,
    678 F. Supp. 2d 1046 (S.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Planned Parenthood of Southeastern Pa.* v. *Casey*,
    505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*R.W.B. of Riverview, Inc.* v. *Stemple*,
    111 F. Supp. 2d 748 (S.D.W.Va. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Republica* v. *Oswald*,
    1 U.S. (1 Dall.) 319 (Pa. 1788) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rex* v. *Knight*,
    90 Eng. Rep. 330 (K.B. 1686). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Schneider* v. *New Jersey (Town of Irvington)*,
    308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Silveira* v. *Lockyer*,
   328 F.3d 567 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Staub* v. *City of Baxley*,
   355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Tom T., Inc.* v. *City of Eveleth*,
   2003 U.S. Dist. LEXIS 3718 (D. Minn. March 11, 2003). . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Carolene Products Co.*,
   304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Chester*,
   628 F.3d 673 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States* v. *Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Masciandaro*,
   2011 U.S. App. LEXIS 5964 (4th Cir. March 24, 2011) . . . . . . . . . . . . . . . . . . . . passim

*United States* v. *Miller*,
   307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*United States* v. *Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Sprague*,
   282 U.S. 716 (1931). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Stevens*,
   130 S. Ct. 1577 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Watson* v. *Stone*,
   4 So. 2d 700 (Fla. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Williams* v. *State*,
   417 Md. 479, 10 A.3d 1167 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

iv

Statutes

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cal. Penal Code § 12031(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Cal. Penal Code § 12031(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cal. Penal Code § 12031(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.C. Code § 22-4504(a) (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D.C. Code § 22-4506 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Md. Public Safety Code § 5-306(a)(5)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Other Authorities

Alan Gura, *Heller and the Triumph of Originalist*
  *Judicial Engagement*: *A Response to Judge*
  *Harvie Wilkinson*, 56 UCLA L. REV. 1127 (2009). . . . . . . . . . . . . . . . . . . . . . . . . 18

BATF ANNUAL FIREARMS MANUFACTURE AND EXPORT REPORTS,
  available at http://www.atf.gov/statistics/afmer/ (last visited April 23, 2011). . . . . . . . . 5

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Carlisle Moody & Thomas Marvell, *Guns and Crime*,
  71 SO. ECON. J. 720 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cert. Pet. No. 07-290. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Clark M. Neily III, *The Right to Keep and Bear Arms in the States:*
  *Ambiguity, False Modesty, and (Maybe) Another Win*
  *for Originalism*, 33 HARVARD J. L. & PUB. POL'Y 185 (2010). . . . . . . . . . . . . . . . . . . 18

David Caplan, *The Right of the Individual to Bear Arms:*
  *A Recent Judicial Trend*, 4 DET. L. C. REV. 789 (1982) . . . . . . . . . . . . . . . . . . . . . . . 17

David Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev. 1 (2010)................ 23

Don B. Kates & Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide: A Review of International Evidence*, 30 Harvard J. L. & Pub. Pol'y 651 (2007)................................... 4

Florenz Plassman & John Whitley, *Comment: Confirming "More Guns, Less Crime,"* 55 Stanford L. Rev. 1313 (2003)..................... 5

Gary Kleck & Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on City Violence Rates*, 9 J. Quant. Criminology 249 (1993)......................................... 4

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995)................................... 5

Gary Kleck, Targeting Guns: Firearms and Their Control (1997)................... 4

http://licgweb.doacs.state.fl.us/stats/cw_monthly.html (last visited April 23, 2011)................................... 6

http://www.michigan. gov/documents/msp/CPL_Annual_Report_2008-2009_307251_7.pdf (last visited April 23, 2011).......................... 6

http://www.txdps.state.tx.us/administration/crime_records/chl/ConvictionRatesReport2009.pdf (last visited April 23, 2011)...................... 6

J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253 (2009)........................... 18

Jeffrey Miron, *Violence, Guns, and Drugs: A Cross-Country Analysis*, 44 J. Law & Econ. 615 (2001)............................................ 4

John Lott, More Guns, Less Crime: Understanding Crime and Gun Control Laws (3d edition, Univ. of Chicago Press 2010)................... 4

Lawrence Southwick, *Do Guns Cause Crime? Does Crime Cause Guns? A Granger Test*, 25 Atlantic Econ. J. 256 (1997)................. 4

Martin Killias, et al., *Guns, Violent Crime, and Suicide in 21 Countries*, 43 Canadian J. Criminology 429 (2001)................................... 4

vi

Maryland 2010 Census Data, http://planning. maryland.gov/msdc/
          census/cen2010/PL94-171/CNTY/18plus/2010_18up_
          Summary.pdf (last visited April 23, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

MSP, 2009 ANNUAL REPORT 30 (2010), available at
          http://msp.maryland.gov/downloads/2009_
          Annual_Report.pdf (last visited April 23, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 7

PAPERS OF JAMES MADISON
          (Robert Ruthland & Charles Hobson eds. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Robert Cottrol and Raymond Diamond, *Never Intended to be
          Applied to the White Population: Firearms Regulations
          and Racial Disparity–the Redeemed South's Legacy to
          a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307 (1995) . . . . . . . . . . . . . . . . . . . 22

TREATISE ON THE PLEAS OF THE CROWN, (Leach ed., 6th ed. 1788). . . . . . . . . . . . . . . . . . . . . . . . 17

Violence Policy Center, *Concealed Carry Killers* (2011),
          http://vpc.org/ccwkillers.htm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

Defendants' efforts on behalf of their summary judgment motion would make a fine

(though ultimately unconvincing) policy brief, if submitted before a constitutional convention

debating whether a right to bear arms should be secured as against the State of Maryland.  But

regardless of whether the Defendants think it a good idea or disaster, the Constitution is not silent

on the question of a right to bear arms. As ratified today, the Constitution secures against

Defendants a "right to keep and carry" guns for self-defense, *District of Columbia* v. *Heller*, 554

U.S. 570, 604, 626, 627 (2008); or "the right of a *law-abiding*, responsible citizen to possess and

carry a weapon for self-defense." *United States* v. *Chester*, 628 F.3d 673, 683 (4th Cir. 2011)

(emphasis original).

Starting from a position fundamentally opposed to the right to bear arms, Defendants are

unable to distinguish between regulation and abolition, and justify the latter by their asserted

need of the former. The circular syllogism is: (1) carrying handguns is a social evil, (2) denying

licenses to carry handguns eliminates the carrying of handguns (at least by law-abiding people),

(3) therefore, presuming that handguns cannot be carried is justified. This is not constitutional

analysis. It is the unchecked imposition of Defendants' personal policy preferences.

However, the "judicial power" bestowed upon this Court by Article III is limited to the

resolution of questions arising under the Constitution and laws of the United States—not, as

Defendants might prefer, generalized questions of social science or public policy. This Court

does not review the wisdom of the Legislature's actions, nor does it determine the optimal public

policy to be secured by the Constitution. It applies the law.

The parties disagree about whether the availability of firearms for self-defense is a good idea. Without question, firearms are a leading cause of statistics, and the debate about which figures are superior is not one that will ever be truly resolved, in an absolute sense. However, just as in a Free Exercise Clause case, the question is not the validity or efficacy of the religious practice, the question here is not whether the carrying of arms is a good idea—the question is whether carrying arms is constitutionally protected. Objective standards and due process—not Defendants' philosophy or personal beliefs about the value of this activity—must carry the day.

The Supreme Court has thus emphatically laid down two ultimate instructions regarding Second Amendment litigation. First, judges may not engage in any balancing inquiry to determine the content of Second Amendment rights. Like the rest of the Constitution, the Second Amendment contains the plain meaning that the Framers understood its language to possess. Text and history, not the opinions of police officers and academics, determine the content of our fundamental constitutional rights. "[H]istorical meaning enjoys a privileged interpretative role in the Second Amendment context." *United States* v. *Masciandaro*, 2011 U.S. App. LEXIS 5964 at *33-*34 (4th Cir. March 24, 2011) (citations omitted). Second, the right to bear arms is a normal part of the Bill of Rights. Courts cannot refuse to enforce this important right by deferring to its infringement, any more than courts should defer to abrogation of the First or Fourth Amendment.

To the extent Defendants raise *legal* as opposed to *policy* arguments, all of these arguments flow, as they necessarily must, from Defendants' central proposition that the Second Amendment's protection does not extend to the public carrying of handguns for self-defense. If the proposition is true, then it must also be true that Defendants may force individuals to prove a need to carry handguns for self-defense; that permitting the carrying of other arms shows

2

Defendants basically comply with the Second Amendment; and that Defendants' regulations may be presumed constitutional. Of course, in that case, none of these arguments are even necessary.

But if Defendants' central proposition is false—and it is false—then all of these secondary arguments must necessarily fail as well. For if the Second Amendment protects the public carrying of handguns for self-defense, then individuals' entitlement to that action is a right, not a privilege dispensed by Defendants; whatever else Defendants permit is irrelevant; and Defendants must bear the burden of proving that their law is somehow constitutional.

## STATEMENT OF FACTS

While Defendants correctly state that violent crime is a serious problem in Maryland, they are oddly insensitive to the very real need for effective self-defense by crime victims. Guns are presented exclusively as a source of harm, as though nobody derives any benefit from gun ownership in either peace of mind or tangible protection. Hewing to this unbalanced focus, Defendants minimize the violent and dangerous home invasion suffered by Raymond Woollard as though it were a family misunderstanding about car keys, without mentioning the fact that the intruder smashed over a dozen windows prior to entering the home, or the children on the second floor he was trying to access.

But this dispute is not relevant. The episode is merely illustrative of the sort of criminals who exist in our society, and as Defendants readily concede, of the regrettable fact that innocent people are seriously threatened by violent crime.

Indeed, most of the facts averred to by Defendants are simply irrelevant—and many are not even "facts." The self-serving statements by government officials that they have only the best of intentions in enacting and enforcing laws are as predictable as they would be relating to any

3

subject of legislation.[1] And while it is true that "[s]tudies have shown that the incidence of

handgun crime is linked to handgun availability," Def. Br. at 11, it is equally true that numerous

other studies have refute the proposition or demonstrated the exact opposite.  *See* Don B. Kates

& Gary Mauser, *Would Banning Firearms Reduce Murder and Suicide: A Review of*

*International Evidence*, 30 HARVARD J. L. & PUB. POL'Y 651 (2007); Jeffrey Miron, *Violence,*

*Guns, and Drugs: A Cross-Country Analysis*, 44 J. LAW & ECON. 615 (2001); Abstract to Martin

Killias, et al., *Guns, Violent Crime, and Suicide in 21 Countries*, 43 CANADIAN J. CRIMINOLOGY

429, 448 (2001) ("[N]o significant correlations [of gunstock levels] with total suicide or

homicide rates were found."); Lawrence Southwick, *Do Guns Cause Crime? Does Crime Cause*

*Guns? A Granger Test*, 25 ATLANTIC ECON. J. 256 (1997); Gary Kleck & Britt Patterson, *The*

*Impact of Gun Control and Gun Ownership Levels on City Violence Rates*, 9 J. QUANT.

CRIMINOLOGY 249 (1993); Carlisle Moody & Thomas Marvell, *Guns and Crime*, 71 SO. ECON. J.

720, 735 (2005) ("The estimated net effect of guns on crime... is generally very small and

insignificantly different from zero."); *see also* John Lott, MORE GUNS, LESS CRIME:

UNDERSTANDING CRIME AND GUN CONTROL LAWS (3d edition, Univ. of Chicago Press 2010).

From 1946 to 2004, gun ownership in the United States increased from 34,400 to 85,000

civilian firearms per 100,000 people, while the murder rate dropped from 6.9 to 5.5 per 100,000

individuals. Between 1973 and 2003, the civilian gun stock rose from 627 to 858 per 1000

people, while the murder rate declined 41%. *See* Murder rate from FBI, Uniform Crime Reports;

Guns per capita from Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 96-97

---

[1]One would not expect politicians and police officers to aver bad motives in enforcing laws that
they confess violate the rights of the people.

(1997), and BATF ANNUAL FIREARMS MANUFACTURE AND EXPORT REPORTS, available at

http://www.atf.gov/statistics/afmer/ (last visited April 23, 2011).

Scholarship related to the impact of permitting law-abiding individuals to carry handguns

for self-defense likewise shows the practice to be beneficial. One recent study reveals that states

which conformed their gun carry laws to constitutional standards reaped an average $2-$3 billion

crime-reduction benefit within the first five years of constitutional compliance. Florenz Plassman

& John Whitley, *Comment: Confirming "More Guns, Less Crime,"* 55 STANFORD L. REV. 1313,

1365 (2003). And some of the "scholarship" invoked to demonstrate the supposed hazards of

tolerating the right to bear arms is on its face absurd. Defendants and their amici, for example,

cites a study purportedly showing that "293 shooting deaths [were] committed by holders of

handgun permits since just May 2007." Def. Br. at 35, Brady Br., at 13 (citing Violence Policy

Center, *Concealed Carry Killers* (2011), http://vpc.org/ccwkillers.htm)). Even were this number

true, it would prove nothing absent knowing (1) whether any of these shootings were justified,

(2) the lives saved by defensive gun uses, even without firing a shot,[2] and (3) the violence rate of

permit-holders as compared to that of non-permit holders.

But this "study" does not even hold up to its title. Apparently comprised of tragedies

somehow related to permit holders, it includes a shooting committed by a *relative* of a permit

holder (a 10-year-old boy who unintentionally shot and killed his brother where the gun owner

did not properly secure his unattended gun); 84 suicides (of which 57 do not even reveal the

---

[2]"[T]here seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995).

method of death, only that a permit holder, somehow, committed suicide); cases in which people were killed *at home* owing to accidents, inebriation, or functional defects in the gun; and even various instances where the shooter was *acquitted* outright or convicted only of non-homicide offenses. The study is similar in value to one that would argue against the issuance of drivers' licenses by linking deaths involving cars to licensed drivers.

More relevant data is available from some of the 43 states that generally license the carrying of handguns for self-defense. Michigan, for example, issued 66,446 permits for the year ending June 30, 2009. In that time frame, it revoked only 353 permits. *See* http://www.michigan. gov/documents/msp/CPL_Annual_Report_2008-2009_307251_7.pdf (last visited April 23, 2011). Texas compiles detailed information tracking the proclivity of handgun carry license permit holders to commit crimes. Not surprisingly, the data shows that individuals who obtain a license before carrying a gun tend to be extremely law abiding. In 2009, of 65,561 serious criminal convictions in Texas (not necessarily involving guns), only 101— 0.1541%—could be attributed to individuals licensed to carry handguns. http://www.txdps.state.tx.us/administration/ crime_records/chl/ConvictionRatesReport2009.pdf (last visited April 23, 2011).

Perhaps the most comprehensive data comes from Florida, which reports having issued 1,953,856 handgun carry licenses since 1987. http://licgweb.doacs.state.fl.us/stats/cw_ monthly.html (last visited April 23, 2011). To date, Florida has only revoked 168 licenses for gun crimes committed after licensure. *Id.* In sum, given the extraordinary prevalence of constitutional handgun licensing regimes throughout the United States, there is simply no factual basis to support the violent fantasies imagined by Defendants and their amici of law-abiding, responsible individuals spontaneously engaging in wild west shootouts merely because their right to engage

6

in self-defense is respected. That is simply not the American experience. And if it were, the solution would be to repeal the Second Amendment, not ignore it.

The dubious use of statistics is exemplified by Defendants' assertion that over a recent four year period, Maryland approved "16,026 original or renewal [handgun carry] permits, for a rate of approval of 92.5%." Def. Br. at 9. The bulk of this number is for renewal permits. Defendants' source reveals Maryland granted only 6,771 of 7,566 original permit applications over that same time period, for an annual average under 1,693 permits. MSP, 2009 ANNUAL REPORT 30 (2010), available at http://msp.maryland.gov/downloads/2009_Annual_Report.pdf (last visited April 23, 2011). The bottom line is that for 2009, Maryland issued only 4,274 permits, *id.*, for an adult population of 4,420,588. Maryland 2010 Census Data, http://planning. maryland.gov/msdc/census/cen2010/PL94-171/CNTY/18plus/2010_18up_Summary.pdf (last visited April 23, 2011).

In other words, fewer than one-tenth of one percent of Maryland's adult population is permitted to carry a handgun for self-defense. It is within judicial notice in this community that permits to carry handguns are very rarely issued to ordinary individuals. *Cf. Bsharah* v. *United States*, 646 A.2d 993, 996 n.12 (D.C. 1994). Regardless of how high the issuance rate might be, it is indisputable that very few people even bother with the process.

In any event, the only facts that matter in this case are that Plaintiff Woollard's application for a permit to carry a handgun was denied by Defendants, who generally require that handgun carry permit applicants prove their need for a permit. These facts are not disputed. And whether this state of affairs is constitutionally permissible is purely a question of law.

7

SUMMARY OF ARGUMENT

Defendants' brief, and those of their amici, are remarkable in their treatment of adverse controlling precedent, namely, *Heller*, *Chester*, and *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010). Time and again, the briefs assert arguments flatly foreclosed by these precedents. Indeed, heavy reliance is placed on the *dissenting* opinions in these cases, and on the briefing proffered on behalf of the losing side. Respectfully, Justice Breyer was not in the majority in *Heller*, Judge Davis was not in the majority in *Chester*, and the amicus brief offered on behalf of the City of Chicago in *McDonald*, by self-described historians, contained an imagined history of the right to keep and bear arms that had been utterly rejected in *Heller* and not surprisingly, proved incompatible with the prevailing opinions in *McDonald*.

Defendants expend great effort describing what they perceive as the uniquely unacceptable harm that flows from handgun possession—an approach rejected in *Heller* and *McDonald*. They suggest the availability of long arms ameliorates the impact of the handgun regulations, another approach foreclosed by *Heller*. They suggest Justice Breyer's dissenting opinion in *Heller* was a "concurring" opinion that reflected the majority's views with respect to his interest-balancing approach, a topic that elicited exceptionally strong disagreement by the majority. Blithely disregarding *Heller*'s contrary instruction, Defendants suggest the content of Second Amendment rights must be determined by judicial evaluations of competing policy claims.

Wishing that the Second Amendment would not contain a right to carry arms, Defendants ignore the Supreme Court's definition of the Second Amendment's text, and improperly seek to limit *Heller* and *McDonald* to their facts—an outcome also at odds with *United States* v. *Miller*,

8

307 U.S. 174 (1939). Defendants repeatedly emphasize that they may ban all *concealed* carrying

of handguns, but ignore both the qualified nature of that ability, and the fact that their carrying

law goes much further, to virtually ban all handgun carry—which the same precedent condemns

as unconstitutional.

Disregarding *Heller*, *McDonald*, and *Chester*, Defendants and their amici propose

disposing of this case using what amounts to, for all intents and purposes, the rational basis test

that these precedents prohibit. And they seek to avoid having their law treated like the prior

restraint which it undoubtedly is, because prior restraint has proven most suitable in First

Amendment cases—ignoring what is at least a strong suggestion by the Supreme Court, and the

unambiguous precedent of the Fourth Circuit—that First Amendment frameworks are suitable for

use in Second Amendment cases. That these have not been invoked by courts previously in

Second Amendment cases is merely a function of the fact that the Supreme Court has only

recognized the ability to sue state and local officials for Second Amendment violations since this

past June. It is far too early to declare the Second Amendment a dead letter, but it is never too

late to dispose of Maryland's virtually complete infringement of the right to bear arms.

## ARGUMENT

## I.      POLICY ARGUMENTS DO NOT SUBSTITUTE FOR THE CONSTITUTION.

If courts could affirm any governmental decision based upon social science or policy

assessments, the Constitution would be a dead letter. In a constitutional system, the people, not

judges or government officials, make basic public policy decisions. Judicial assessment of what

is more desirable can be a very poor substitute for recognizing rights based on our nation's

historic traditions of liberty. *See, e.g. Buck* v. *Bell*, 274 U.S. 200 (1927).

Accordingly, the Supreme Court has emphatically declared that the Second Amendment's content is not up to any court's evaluation of what makes for optimal public policy. The Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 130 S. Ct. at 3050.

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all . . . Like the First, [the Second Amendment] is the very *product* of an interest-balancing by the people . . .

*Heller*, 554 U.S. at 635 (emphasis original).

It is therefore absurd for Defendants to offer as an expert a "Professor of Public Policy," representing one side of an academic debate about the social utility of guns, opining about whether the right to carry arms is a good idea. *See generally* Decl. of Phillip Cook. As the Statement of Facts presented *supra* demonstrates, Plaintiffs are equally capable of mustering a veritable militia of distinguished social scientists who disagree with Professor Cook.

Were professorial declarations relevant to the content of constitutional provisions, the next criminal case arising before this Court could include "expert" testimony explaining the social harms caused by allowing criminals a sphere of privacy against certain forms of search and seizure, various aspects of due process, or the right to counsel itself. And if the case concerned tax evasion, the defense could call an economist to explain the various policy deficiencies inherent in taxing income, the Sixteenth Amendment notwithstanding.

10

But constitutional cases are not resolved in the faculty lounge, and this Court does not referee academic debates. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. Professor Cook is certainly entitled to believe that the Second Amendment right to bear arms is disastrously dangerous. The Professor is also entitled to that same belief regarding the exclusionary rule or the right to counsel. Doubtless, virtually every aspect of the Constitution finds strong disagreement among some segment of society. But *McDonald*'s instructions bear repeating:

> Municipal respondents maintain that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety. And they note that there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 130 S. Ct. at 3045 (citations omitted).

In *Heller* and *McDonald*, the Supreme Court was flooded with data regarding the alleged evils of gun possession, and the absolutely imperative need for local government officials to enjoy an unfettered hand in regulating firearms. None of this mattered. What mattered were the words of the Constitution, as understood by those who framed and ratified it. "In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States* v. *Sprague*, 282 U.S. 716, 731 (1931)) (other citation omitted). The question of what the Second Amendment secures is a matter of text and history, not an academic debate as to who has the best statistics.

11

II.     THE SECOND AMENDMENT EXTENDS BEYOND THE HOME.

There is no need to repeat what has already been briefed at some length on Plaintiffs'

motion for summary judgment: the Second Amendment applies outside the home. *Heller* and

*McDonald* defined the right to "bear" arms as the right to "carry" them, cited numerous

precedents applying and securing the right to bear arms in public, and even noted that the Second

Amendment protects some activities, such as hunting[3] and target practice[4]—that typically occur

outside the home. Several lower courts have followed suit, indicating the right to bear arms is not

necessarily limited to the home. *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en

banc); *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010).

Indeed, the Supreme Court's application of the Second Amendment outside the home

dates back to *United States* v. *Miller*, *supra*, 307 U.S. 174, which remanded for further

proceedings the question of whether a sawed-off shotgun qualified as a constitutionally-protected

arm. The shotgun came within federal purview because it had allegedly been transported from

Claremore, Oklahoma to Siloam Springs, Arkansas, *id.* at 175— obviously outside Miller's

home, yet potentially within the Second Amendment's protection. Were the Second Amendment

limited to the home, *Miller* would have been a much shorter opinion. Accordingly, whatever the

opinion's other and ultimate merits, this Court's statement that a pro se inmate's Second

---

[3]"Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27.

[4]"The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practises in safe places the use of it*, *and in due time teaches his sons to do the same*, exercises his individual right." *Heller*, 554 U.S. at 619 (emphasis added) (citation omitted).

Amendment claim "is weak at best because the firearm was in [his] car," *Minotti* v. *Whitehead*, 584 F. Supp. 2d 750, 760 n.12 (D. Md. 2008), is contrary to Supreme Court precedent.

Nonetheless, Defendants and their amici persist in ignoring the two words appearing in the Second Amendment after "keep." Their denial is not well-grounded.

First, Defendants rest their theory on the fact that in *Heller*, the Second Amendment issue arose within a home context. Accordingly, they believe the case is limited to its facts. Under this reasoning, *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803) would be limited to cases concerning the President's delivery of judicial commissions. That is simply not how the law works. *Heller* defined the meaning of "bear arms" as doing so was necessary for the decision in that case, and endorsed at some length numerous cases upholding the right to carry guns for self-defense. *Heller* and *McDonald* both extolled the right to arms in various public settings. And of course, in *Miller*, the Court specifically addressed the Second Amendment in a public context.

Refusing to acknowledge the plain instruction of these opinions simply defies the Supreme Court's considered judgment on the topic. The Supreme Court engaged in a long discussion of what it meant, in 1791, to "bear arms," because that question lay at the heart of the District of Columbia's defense in *Heller*. Even were it not somehow a part of the holding, Plaintiffs hereby adopt and submit the Supreme Court's definition of "bear arms:"

"At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); BLACK'S LAW

DICTIONARY 214 (6th Ed. 1998)). Defendants fail to address, let alone rebut, this definition. They offer no explanation as to how the people of 1791 believed the Second Amendment right was limited to the home, or what else "bear arms" might mean if it does not mean what the Supreme Court said it means.

Amici Brady Center goes one step further in offering that "[t]he Court's holding only mentions Heller's right '*to carry [] in the home*,' id. (emphasis added), and does not mention the carrying of firearms in public at all." Brady Br. 6 (citing *Heller*, 554 U.S. at 635). This is misleading. The cited passage addresses Heller's request for relief. Heller challenged former D.C. Code § 22-4504(a) (2008), which provided that carrying a gun *in one's home* without a permit constituted a misdemeanor offense, separate and apart from the felony offense of carrying a gun in public. Former D.C. Code § 22-4506 (2008) provided for a license to carry issued at the police chief's discretion, although licenses were never issued. Heller specifically did not seek a permit to carry a handgun in public. *See Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom. Heller*. The Supreme Court's statement that Heller was entitled to the relief he sought cannot be argued as a limitation on the constitutional right at issue, which was otherwise described in the opinion as extending beyond the home.[5]

Defendants ably provide a string of citations to various precedents they claim as supporting their home-limitation theory. Almost all of these cases acknowledge that the right to carry a gun is not unlimited, or that the carrying of *concealed* handguns may be banned. On these points, there is no dispute among the parties. Plaintiffs' summary judgment brief discusses, in some detail, the general rule that all concealed carrying may be banned so long as open carrying

---

[5] Rather than issue Heller a home carry permit, the city repealed the requirement.

14

is permitted, and vice-versa. Prohibitions on the concealed carry of handguns have always been understood to be permissible as a regulation of the manner in which people might exercise the right to bear arms—not as informing the complete abolition of the right.

Indeed, the post-*McDonald* case upon which Defendants most heavily rely— *Peruta* v. *County of San Diego*, 2010 U.S. Dist. LEXIS 130878 (S.D. Cal. Dec. 10, 2010)—is actually based on this very distinction. Far from supporting Defendants' position, *Peruta* supports Plaintiffs. It warrants careful study.

As Plaintiffs noted, the *Peruta* court had *rejected* the claim that the Second Amendment right to carry a gun is limited to the home: "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta*, 678 F. Supp. 2d at 1051. The court re-emphasized this point in its subsequent opinion, cited by Defendants:

> in its order denying Defendant's motion to dismiss, this Court emphasized that not *all* concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it relied upon instruct that concealed weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme.

*Peruta*, 2010 U.S. Dist. LEXIS 130878 at *18 (emphasis in original). And "the government's overall scheme" in California differs from that of Maryland's in at least one critical respect:

> Here, to the extent that Penal Code sections 12025 and 12050 and Defendant's policy burden conduct falling within the scope of the Second Amendment, if at all, the burden is mitigated by the provisions of [Cal. Penal Code] section 12031 *that expressly permit loaded open carry for immediate self-defense.*

*Peruta*, at *19 (emphasis added). California Penal Code § 12031(a) does *not* prohibit individuals from carrying handguns, without a license, provided they do so openly and provided that, in incorporated areas or prohibited portions of unincorporated areas, the handgun is unloaded (although ammunition may be separately carried). Carrying handguns is expressly permitted at

15

campsites. Cal. Penal Code § 12031(l). And open carrying of handguns is also allowed to individuals with an immediate need for self-defense, including those who reasonably fear an individual against whom a restraining order has been issued. Cal. Penal Code § 12031(j).

While Plaintiffs would strongly disagree that the open carrying of an unloaded handgun provides individuals with an effective means of self-defense in case of emergency (or is even a good idea, considering that the open display of *unloaded* firearms may make one a tempting robbery target), the fact is that none of the various allegedly saving exceptions of the California law are available here.[6] In California, unlike in Maryland, anyone who can legally possess a handgun can openly carry it without a permit, albeit usually unloaded (and subject to sensitive place restrictions of the type not here at issue). In Maryland, the *only* way to legally carry a handgun is to first obtain a license of the type not issued to even one tenth of one percent of the adult population. The *Peruta* court might well have struck down Maryland's law.[7]

Defendants' cursory references to English history are badly misplaced. The notion that all limitations contained within the English Declaration of Rights must be transmitted to the Second Amendment, Def. Br. at 25-26, cannot stand. The Framers believed that the American

---

[6]The *Peruta* plaintiffs also failed to invoke the prior restraint arguments raised by Plaintiffs in this case.

[7]Defendants claim that no license is needed to *transport* a handgun from place to place, provided it is unloaded and locked in a container. That much is an inherent ancillary consequence of handgun ownership. After all, if one may "keep" a handgun at home, there must be a way to transport it home from the store, and to and from other homes, repair facilities, and gun ranges. But the right to "bear" arms is only satisfied if the handgun is practically available for self-defense, as the right is secured "for the purpose . . . of being armed *and ready for offensive or defensive action in a case of conflict with another person*." *Heller*, 554 U.S. at 584 (citation omitted); *see also Heller*, 554 U.S. at 630 (striking down requirement that firearms "be rendered and kept inoperable at all times. This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional.").

Constitution must do a better job of preserving liberty than did its English predecessor. James

Madison's notes for his floor speech introducing the Bill of Rights specifically referenced

various deficiencies in the English Declaration that our Constitution would improve. Among

these was the reference, "arms to protestts," 12 PAPERS OF JAMES MADISON 193 (Robert

Ruthland & Charles Hobson eds. 1977), doubtless a reference to the fact that the English right

was secured to Protestants exclusively—a limitation absent from the Second Amendment.

In any event, nothing in the English experience limited the right to arms to the home.

Defendants' invocation of the 1328 Statute of Northampton is unavailing. By the time of the

American Revolution, English courts had long limited that provision to prohibiting the carrying

of arms only with evil intent, "in order to preserve the common law principle of allowing

'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear

Arms: A Recent Judicial Trend*, 4 DET. L. C. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng.

Rep. 330 (K.B. 1686)).  "[N]o wearing of arms is within the meaning of this statute, unless it be

accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of

an intention to commit an[ ] act of violence or disturbance of the peace." 1 TREATISE ON THE

PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788).

Finally, there is the matter of the Maryland Court of Appeals' declaration that "if the

Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so

more plainly." *Williams* v. *State*, 417 Md. 479,  496, 10 A.3d 1167, 1177 (2011). This statement

appears somewhat defiant of the Supreme Court's existing opinions, which are expected to

provide guidance to the lower courts in resolving legal questions. The Supreme Court is most

certainly not the court of first resort in resolving federal constitutional questions, and it probably

does not expect that there would be a Second Amendment exception to this rule.[8]

But whatever rules govern Maryland's courts, the jurisdictional rules in federal courts are different. As stated memorably by the Supreme Court long ago,

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given . . . All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). There is simply no question that this Court has jurisdiction over the claim pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983. The Court cannot decline to hear this case simply because it involves the Second Amendment, any more than it could decline to hear other constitutional cases over which it has jurisdiction.

Plaintiffs are mindful that Judge Wilkinson, joined by Senior District Judge Duffy, recently endorsed *Williams*' reasoning in *Masciandaro*, 2011 U.S. App. LEXIS 5964 at *45-*46. Judge Wilkinson is, of course, a noted advocate of what he would term "judicial restraint," and invoking this reasoning, has expressed the view that *Heller* was wrongly decided. J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253 (2009).[9] But *Masciandaro* does not directly conflict with *Heller*, or *Chester*, and it does not require this Court to renounce its jurisdiction.

---

[8]*Williams* is somewhat inapposite in that the defendant in that case was charged with carrying a handgun without a license to do so. Plaintiffs here do not challenge Maryland's ability to require a permit, or to punish people for not having one.

[9]For contrary views, *see* Alan Gura, *Heller and the Triumph of Originalist Judicial Engagement: A Response to Judge Harvie Wilkinson*, 56 UCLA L. REV. 1127 (2009); Clark M. Neily III, *The Right to Keep and Bear Arms in the States: Ambiguity, False Modesty, and (Maybe) Another Win for Originalism*, 33 HARVARD J. L. & PUB. POL'Y 185 (2010).

*Masciandaro* concerned the since-repealed prohibition on the possession of firearms in national parks. Applying intermediate scrutiny to the Second Amendment challenge, the Fourth Circuit affirmed Masciandaro's conviction, finding that guns could be excluded from national parks. Judge Wilkinson offered that because the regulation would be constitutional regardless of the analysis, there was no need to explore whether the Second Amendment extends beyond the home, a question posing

> a vast terra incognita that courts should enter only upon necessity and only then by small degree. There is no such necessity here. We have no reason to expound on where the *Heller* right may or may not apply outside the home because, as Judge Niemeyer ably explains, intermediate scrutiny of any burden on the alleged right would plainly lead the court to uphold the National Park Service regulation.

*Id.* at *46-47 (Wilkinson, J.).

Plaintiffs disagree with the ultimate outcome in *Masciandaro*—as did, apparently, the Congress when it repealed the provision there at issue. But alas, the instant case does not present a "sensitive place" question. Accordingly, there is, here, a "necessity" to determine the Second Amendment's application outside the home. The "necessity," to be sure, exists "to a small degree"—Plaintiffs do not here question any of Maryland's laws regarding the time, place, or manner of carrying handguns. But this Court cannot avoid discussing the right to bear arms outside the home, as a general matter, as that is the only issue in the case.

This Court is not bound by *Williams*, or by the various other sundry courts in the land (usually state courts) that have simply refused to examine this aspect of the Second Amendment. This Court is bound by Fourth Circuit precedent such as *Chester* and, now, *Masciandaro*. The latter's dicta represents the high-water mark, in this circuit, of so-called judicial minimalism. And even there, allowance is made for the fact that some cases will of "necessity" reach the issue

19

of whether the right to bear arms extends beyond the home. And necessary or not, the Fourth

Circuit had no trouble in *Chester* describing the Second Amendment right "to possess *and carry*

*a weapon for self-defense.*" *Chester*, 628 F.3d at 683 (emphasis added).

In sum, the Supreme Court has defined the right to bear arms as extending beyond the

home, and has even applied it in that context over sixty years ago in *Miller*. Even had it not done

so, the Supreme Court has instructed that the Second Amendment being a normal part of the

Constitution, it must be given the meaning its Framers understood at the time of ratification.

Regrettably, some courts, such as Maryland's high court, have defied this instruction and refused

to consider the issue; other courts, such as the Southern District of California, have treated the

matter with more care. Fourth Circuit dicta urges caution, but admits that the issue is at times

unavoidable. And for all their policy objections, Defendants and their amici cannot offer any

explanation as to why or how the Second Amendment would be limited to the home,

demonstrating only the unremarkable proposition that the carrying of arms in public may be

regulated. But regulations impacting constitutional rights must meet constitutional standards.

III.    THE ALLEGED ABILITY TO CARRY RIFLES AND SHOTGUNS DOES NOT
        JUSTIFY DEFENDANTS' ARBITRARY DENIAL OF THE RIGHT TO CARRY
        HANDGUNS.

Defendants suggest that their handgun restrictions pass Second Amendment analysis

because Maryland law "permit[s] . . . anyone who can lawfully possess a long gun to wear and

carry it, concealed or openly, anywhere the holder of a handgun carry permit could carry a

handgun." Def. Br. at 4. A separate heading is dedicated to the proposition that "Maryland Does

Not Require a Permit to Wear and Carry a Long Gun Outside the Home." *Id.* at 7. Thus,

Defendants's licensing scheme is allegedly constitutional because "[i]t is limited to handguns, the primary category of arms involved in violent criminal activity." *Id.* at 42.[10]

In any event, it is difficult to imagine that individuals slinging loaded shotguns and rifles through the streets of Baltimore would not attract negative police attention. And while Plaintiffs have no desire to carry such weapons in public, other people who feel strongly about the right to bear arms—and who enjoy carrying arms at least as much for reasons of political expression as for self-defense—have recently made spectacles of themselves carrying long arms in a variety of public settings throughout the country. Plaintiffs are surprised that Defendants would welcome this type of activity, and otherwise take no position on its legality.

However, as a constitutional substitute for the carrying of handguns, the argument is unavailing. As early as 1914, in upholding a ban on the possession of hunting rifles by aliens, the Supreme Court acknowledged that "pistols . . . may be supposed to be needed occasionally for self-defence." *Patsone* v. *Pennsylvania*, 232 U.S. 138, 143 (1914). The long-arm-as-substitute argument was first raised by the District of Columbia in defense of its handgun ban. The D.C. Circuit labeled the argument "frivolous." *Parker*, 478 F.3d at 400. "It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined – as we have done – that handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban them." *Id.* (citation omitted).

Undeterred, District of Columbia officials presented the Supreme Court with the following question on certiorari: "Whether the Second Amendment forbids the District of

---

[10]Interestingly, the State takes sometimes takes a different position regarding the legality of carrying concealed long guns. *See* Exh. A, Letter from Asst. Atty. Gen. Branton to Del. Miller, Dec. 4, 2009 (arguing that the carrying of concealed long guns is illegal).

21

Columbia from banning private possession of handguns while allowing possession of rifles and

shotguns." Cert. Pet. No. 07-290. Heller successfully challenged this question as not accurately

reflecting the issues in the case, and the Supreme Court adopted a very different "Question

Presented" along the lines proposed by Heller, namely, whether the city's laws violated the

Second Amendment.

> On the merits, the Supreme Court rejected the alternative arms argument.

> It is no answer to say . . . that it is permissible to ban the possession of handguns so long
> as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we
> have observed, that the American people have considered the handgun to be the
> quintessential self-defense weapon.

*Heller*, 554 U.S. at 629. The Supreme Court then provided a list of reasons why a handgun might

be more suitable for home self-defense than a long arm, and concluded, "[w]hatever the

reason, handguns are the most popular weapon chosen by Americans for self-defense in the

home, and a complete prohibition of their use is invalid." *Id.*

The same concept applies with even greater force in considering the right to bear arms for

self-defense outside the home. Carrying long arms for ordinary self-defense is simply

impractical, but more the point, handguns are protected by the Second Amendment. The right to

their possession and use may be regulated, to be sure, but the alleged availability of other arms

does not diminish the right to handguns.[11]

---

[11]Defendants also correctly note that 19th-century courts, primarily in the South, approved of
bans on the carrying of specific types of handguns. These laws "render[ed] safe the high quality,
expensive, military issue handguns that many former Confederate soldiers still maintained but
that were often out of financial reach for cash poor freedmen." Robert Cottrol and Raymond
Diamond, *Never Intended to be Applied to the White Population: Firearms Regulations and
Racial Disparity–the Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L.
REV. 1307, 1333 (1995) (footnote omitted). Of course Maryland can ban any arm that is not
within *Heller*'s categorical test for delineating protected Second Amendment arms, but that is not

IV.     THE "REASONABLE REGULATION" STANDARD IS UNAVAILABLE IN CASES
        CONSTRUING FUNDAMENTAL RIGHTS.

Defendants posit that their regulations should be governed by a so-called "reasonable

regulation" standard, allegedly based on state law cases, pursuant to which "a government's

ability to regulate the right to bear arms under its police power is constitutional if the exercise of

that power is reasonable." Def. Br. at 29. Apparently recognizing that this "anything goes" level

of deference is foreclosed by Fourth Circuit precedent, Defendants "expressly preserve for

appellate review" this "contention," and focus "the remainder of [their] brief . . . on the standard

of review analysis employed by the majority in *Chester*." *Id.* Amici Brady Center demonstrate

less concern with the current state of Fourth Circuit law, and dedicate most of their brief, as they

have unsuccessfully done in numerous other cases, to extolling this so-called "reasonable

review" standard.

In the intervening time between the filing of Defendants' brief and this writing, the

Fourth Circuit handed Defendants yet another obstacle in their quest for a deferential "reasonable

regulation" standard of review. In *Masciandaro*, the Fourth Circuit explicitly held that strict

scrutiny would be applied to Second Amendment cases arising within the home, and intermediate

scrutiny applied to cases raising Second Amendment issues outside the home. *Masciandaro*,

2011 U.S. App. LEXIS 5964 at *34-*35.

Owing to Defendant's apparent concession—and, respectfully, the frivolity of the

argument—Plaintiffs will not dwell on this topic. Although Plaintiffs disagree with Defendants'

assessment of how state courts evaluate right to arms provisions, *see, e.g.* David Kopel &

---

the issue here, where the law relates to *all* handguns—a broad, protected category of arms.

Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1 (2010), having federal courts defer to state authorities on the question of how to best secure a federal constitutional right contradicts the very logic of the Fourteenth Amendment, which was ratified precisely because state courts were not upholding basic civil rights, including particularly the right to arms.

Brady seeks to fashion a completely deferential standard because "[t]he exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech." Brady Br. at 15. But *McDonald* rejected the notion that Second Amendment's supposedly unique dangerousness warrants reducing its protection. *McDonald*, 130 S. Ct. at 3045. Undeterred, Brady asserts strenuously that the dangerousness of the Second Amendment warrants supine deference to legislative judgments. Belying any claim that this is not rational basis by another name, Brady states that every law would be upheld unless it actually "eviscerates," "render[s] 'nugatory,'" or "results in the effective 'destruction' of a Second Amendment right." Brady Br. at 19 (citations omitted). But *Heller* speaks to this, rejecting the presumption of constitutionality "when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments." *Heller*, 554 U.S. at 629 n.27 (quoting *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152, n. 4 (1938)).[12]

Some of Brady's other claims are simply incredible. In particular, the unsupported assertion that "[c]ourts have always looked with a more wary eye on laws that impose restrictions

---

[12]Of course, even under this incredibly deferential standard, Plaintiffs would still prevail. It is hard to argue that a law that results in less than one tenth of one percent of the adult population being able to enjoy the constitutional right does *not* "result in the [right's] effective destruction."

on broad classes of people than laws that require individual determinations," Brady Br. at 20, could not be more erroneous. Perhaps Brady refers to the earliest origins of schemes such as Maryland's, where the police's individual determination of one's suitability to have a gun permit was code for Jim Crow. *See, e.g. Watson* v. *Stone*, 4 So. 2d 700, 703 (Fla. 1941) (Buford, J., concurring) ("The statute was never intended to be applied to the white population and in practice has never been so applied . . . there has never been, within my knowledge, any effort of enforce the provisions of this statute as to white people."). It is much easier to sustain a law barring a "broad class of people" that are clearly and objectively defined, i.e., "felons and the mentally ill," *Heller*, 554 U.S. at 626, than a law vesting unbridled discretion to make inherently arbitrary and capricious "individual determinations."

Respectfully, the argument that virtually all gun laws must be constitutional, and that the Second Amendment is uniquely unworthy of protection among the Bill of Rights, was untenable even before *Chester* and *Masciandaro*. It now stands firmly foreclosed.

## V.    DEFENDANTS' DEMAND THAT INDIVIDUALS PROVE THEIR NEED TO EXERCISE A *RIGHT* IS UNCONSTITUTIONAL.

Defendants and their amici maintain that even if there exists a constitutional right to carry handguns for self-defense in public, it would be permissible for them to deny that right to anyone who does not prove, to their satisfaction, a sufficient need to do so. The argument is basically incongruent with the very concept of rights. And it fails, regardless of whether it is analyzed as a matter of prior restraint; means-ends level of scrutiny; or equal protection. Again, there is no need to recount here all that has been briefed on these topics on Plaintiffs' motion for summary judgment. Only short responses to Defendants and their amici are warranted.

25

A.      The Prior Restraint Doctrine Is Most Readily Applicable.

Defendants and their amici labor mightily to avoid application of prior restraint standards, because there is simply no defending their completely arbitrary non-standards utilized in issuing, or not issuing, handgun carry permits.

Applying a means-ends level of scrutiny to test Defendants' law is not the most logical course of action. Such levels of scrutiny, whatever they may be in a particular case, are only useful in evaluating laws that restrict a constitutional right upon the existence of some specific condition. In such cases, a court may examine the condition and weigh it against the right at issue through whichever scrutiny-lens is most apt.  In the Second Amendment context, a felon disarmament law, or some condition upon the purchase or sale of firearms, would fit comfortably into this sort of analysis.

But here, the issue is whether Defendants may bar individuals from exercising the right at all by use of a permitting scheme.  This comes literally within the definition of a prior restraint—there is no better, indeed, there may be no other, logical interpretive tool. After all, the right to carry firearms is a "freedom which the Constitution guarantees," and "an ordinance which . . .  makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official" is "an unconstitutional censorship *or* prior restraint upon the enjoyment of those freedoms." *Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted) (emphasis added).

Of course it is true that prior restraints have, until now, mostly been adjudicated in the context of the First Amendment. But that is only because Second Amendment law is in its infancy. Defendants' protest that prior restraint doctrine has not yet been applied to the Second

Amendment does not prove much, considering that *McDonald*—and with it, Supreme Court recognition that state and local laws are even subject to the Second Amendment—is not even a year old. Nonetheless, here is the current state of affairs in this circuit: "[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment." *Chester*, 628 F.3d at 682 (citations omitted); *cf. Masciandaro*, at *32 ("[A]s has been the experience under the First Amendment, we might expect that courts will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented."). Defendants argue against this position by invoking Judge Davis's opinion in *Chester*—but Judge Davis was rejecting the panel majority's views on the topic.

Of course, the Fourth Circuit is hardly alone in utilizing the First Amendment as a guide for the Second. "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Parker*, 478 F.3d at 399 (citation omitted).

> Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.

*United States* v. *Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010).

The First and Second Amendment parallels have been observed by courts dating to the earliest days of our nation. *See Commonwealth* v. *Blanding*, 20 Mass. 304, 314 (1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its

27

abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction."); *Republica* v. *Oswald*, 1 U.S. (1 Dall.) 319, 330 n.* (Pa. 1788) ("The right of publication, like every other right, has its natural and necessary boundary; for, though the law allows a man the free use of his arm, or the possession of a weapon, yet it does not authorize him to plunge a dagger in the breast of an inoffensive neighbour."). The analogy is unsurprising: the First and Second Amendments are the only provisions of the Bill of Rights that secure some substantive individual conduct—speech, worship, the keeping and bearing of arms—against government infringement.

It is no answer for Defendants and their amici to claim that First Amendment frameworks cannot be used in Second Amendment cases because the First Amendment secures different values. Of course the two amendments relate to different subjects. But the issue is whether the First Amendment frameworks are practical in a Second Amendment context. Recognizing that First Amendment frameworks are designed to ferret out unconstitutional interference with a sphere of specifically enumerated individual autonomy, the Supreme Court, the D.C. Circuit, the Third Circuit—and the Fourth Circuit—have expressly adopted these frameworks as a guide in Second Amendment cases.

Nothing in Defendants' brief, or that of their amicus Legal Community Against Violence, even argues that prior restraint analysis is practically not suited to what is plainly Defendants' prior restraint. They simply do not like the result inextricably yielded from such application. Claiming that the First Amendment secures democratic political values hardly differentiates it from the Second Amendment, which secures institutions "necessary to the security of a free

state." U.S. Const. amend. II. "[W]hen the able-bodied men of a nation are trained in arms and

organized, they are better able to resist tyranny." *Heller,* 554 U.S. at 598.

> The Second Amendment is a doomsday provision, one designed for those exceptionally
> rare circumstances where all other rights have failed--where the government refuses to
> stand for reelection and silences those who protest; where courts have lost the courage to
> oppose, or can find no one to enforce their decrees. However improbable these
> contingencies may seem today, facing them unprepared is a mistake a free people get to
> make only once.

*Silveira* v. *Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of

rehearing en banc), *overruled*, *Heller*.

The fact that states are allowed to ban certain forms of gun carrying, e.g., concealed

carrying, hardly indicates that prior restraint doctrine is inapplicable. States are also allowed to

ban certain manners of speech, e.g., noise or sign placement restrictions. In the First Amendment

context, the failure to permit *all* forms of speech at all times does not make the prior restraint

doctrine unworkable. It indicates that the doctrine is practical.

As for Defendants' and its amici's  objections to the consequence of having overbreadth

doctrine extended to the Second Amendment, this argument was raised by Judge Davis in

*Chester*—and it failed to persuade the panel majority. Indeed, the Supreme Court appears to have

finally confirmed its adoption of the "plainly legitimate sweep" standard as an alternative to the

"no set of circumstances" standard in overbreadth cases. *United States* v. *Stevens*, 130 S. Ct.

1577, 1587 (2010) (offering that neither standard comes from speech cases) (citations omitted).

In any event, overbreadth analysis has not been the exclusive province of the First Amendment

for some time. For example, abortion laws are facially invalid where they impose an undue

burden on abortion access, not in *all* cases, but "in a large fraction of the cases." *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 895 (1992).

Defendants' law is a prior restraint, and considering *Chester*'s instruction to use applicable First Amendment frameworks, it should be analyzed as such. As Defendants and their amici apparently recognize, doing so makes short work of their requirement that individuals prove a "good and substantial reason" to exercise a constitutional right. That standard is plainly among the impermissible "illusory 'constraints'" on licensing discretion amounting to "little more than a high-sounding ideal." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 769-70 (1988).

Indeed, the Supreme Court long ago rejected the constitutionality of an ordinance demanding "good character" as a prerequisite for a canvassing license. *Schneider* v. *New Jersey (Town of Irvington)*, 308 U.S. 147, 158 (1939). Absent further definition, courts typically reject all forms of "moral character" standards for the licensing of fundamental rights. *MD II Entertainment* v. *City of Dallas*, 28 F.3d 492, 494 (5th Cir. 1994); *Genusa* v. *Peoria*, 619 F.2d 1203, 1217 (7th Cir. 1980); *N.J. Envtl. Fed'n* v. *Wayne Twp.*, 310 F. Supp. 2d 681, 699 (D.N.J. 2004); *Ohio Citizen Action* v. *City of Mentor-On-The-Lake*, 272 F. Supp. 2d 671, 682 (N.D. Ohio 2003); *Tom T., Inc.* v. *City of Eveleth*, 2003 U.S. Dist. LEXIS 3718 at *14-15 (D. Minn. March 11, 2003); *R.W.B. of Riverview, Inc.* v. *Stemple*, 111 F. Supp. 2d 748, 757 (S.D.W.Va. 2000); *Elam* v. *Bolling*, 53 F. Supp. 2d 854, 862 (W.D.Va. 1999); *Ohio Citizen Action* v. *City of Seven Hills*, 35 F. Supp. 2d 575, 579 (N.D. Ohio 1999); *Broadway Books, Inc.* v. *Roberts*, 642 F. Supp. 486, 494-95 (E.D.Tenn. 1986); *Bayside Enterprises, Inc.* v. *Carson*, 450 F. Supp. 696, 707 (M.D. Fla. 1978).

Defendants' "good and substantial reason" requirement, Md. Public Safety Code § 5-306(a)(5)(ii), is plainly an unconstitutional prior restraint and must be enjoined accordingly.

   B.      A Means-Ends Standard of Scrutiny Defeats the "Good and Substantial Reason" Requirement.

*Masciandaro* correctly noted that a time, place, and manner type restriction for carrying handguns outside the home would, consistent with the First Amendment, pose a question of intermediate scrutiny. Plaintiffs are less sure of whether a separate "sensitive place" doctrine, of uncertain dimension, might be a better fit to test prohibitions on carrying handguns in specific places. But in either event, this case, unlike *Masciandaro*, does not question a restriction on carrying guns into any specific place. Strict scrutiny would thus appear a more suitable test.

   However, even if intermediate scrutiny were the correct standard, the "good and substantial reason" pre-requisite to the exercise of a fundamental right would fail for the simple reason that there is no legitimate governmental interest at stake.

   To be sure, Maryland has a compelling governmental interest in regulating firearms in the interest of public safety. But pounding the table on this obvious proposition is beside the point, because Maryland lacks any governmental interest, much less a compelling or important one, in preventing people from exercising constitutional rights. If there is a right to carry a handgun for self-defense, Defendants cannot deny that right to anyone on grounds that the right is too dangerous to permit. The very idea that individuals enjoy a right means that the state lacks an interest in preventing people from enjoying it.

   Had this case concerned some actual regulation of the right to bear arms, Defendants would be in a different posture. For example, Defendants repeatedly insist that they may ban the

31

concealed carrying of handguns, and on this point, they are correct—to ban the concealed carrying of guns, without more, is to regulate the manner in which they are carried—and to do so in a specific way that has been approved by precedent for many years. And Defendants are correct that they can ban specific handguns, although the 19th-century racially motivated classifications would now be cabined by *Heller*'s common use test for protected arms.

But here, Defendants and their amici do nothing more than offer reasons why the right to bear arms is a bad idea, and having asserted that this right is too dangerous to tolerate, Defendants conclude that their arbitrary denial of the right to anyone who cannot "prove" a "good and substantial reason" for wanting to exercise their right provides a good fit with their alleged interest. The argument is specious. Using this reasoning, Defendants can restrict the exercise of any constitutional right to fewer than one-tenth of one percent of the population.

Finally, little is required to respond to Defendants' equal protection arguments, premised on the claim that the Equal Protection Clause does not provide an independent source of protection for fundamental rights, and ultimately, on the notion that there is no fundamental right to keep and bear arms. The Fourteenth Amendment's text resolves the first argument. *McDonald* resolves the latter.

CONCLUSION

Defendants' arbitrary denial of Second Amendment rights must be enjoined. Defendants'

motion for summary judgment should be denied. Plaintiffs' motion for summary judgment

should be granted.

Dated: April 25, 2011    Respectfully submitted,

Alan Gura       Cary J. Hansel
Gura & Possessky, PLLC    Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405  6404 Ivy Lane, Suite 400
Alexandria, VA 22314    Greenbelt, MD 20770
703.835.9085/Fax 703.997.7665  301.220.2200/Fax 301.220.1214

By: /s/ Alan Gura     By: /s/ Cary J. Hansel
   Alan Gura       Cary J. Hansel

            Attorneys for Plaintiffs