**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| RAYMOND WOOLLARD, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:10-cv-02068-JFM |
| v. | : | |
| | : | |
| TERRENCE SHERIDAN, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**BRIEF OF *AMICUS CURIAE* LEGAL COMMUNITY AGAINST VIOLENCE
IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Jonathan L. Marcus (Bar ID #12693)
Elizabeth-Ann D. Katz (Bar ID #17878)
Matthew S. Krauss
Jonathan D. Cohen
COVINGTON & BURLING, LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  202-662-6000
Fax: 202-662-6291
jmarcus@cov.com

March 22, 2011

*Counsel for* Amicus Curiae *Legal
Community Against Violence*

# <u>TABLE OF CONTENTS</u>

Page(s)

Table of Authorities ....................................................................................................... ii

I.    Preliminary Statement ........................................................................................... 1

II.    Statement of Interest ............................................................................................ 1

III.    Introduction ......................................................................................................... 2

IV.    Discussion ........................................................................................................... 2

      A.    Substantive First Amendment jurisprudence and its prior restraint doctrine have no place in Second Amendment law. ........................................................ 2

            1.    Because the values underlying the First and Second Amendments are entirely different, conflating the two doctrinally is unwarranted.......... 3

                  a)    *The First Amendment is essential to democratic governance.* ....................................................................... 3

                  b)    *The Second Amendment protects a private right to self-defense in the home.* ...................................................... 5

            2.    The First Amendment's rule against prior restraints is particularly ill-suited for incorporation into Second Amendment law.......................... 7

      B.    Application of the "prior restraint" framework is unwarranted under Supreme Court and Fourth Circuit precedent. ..................................................... 13

V.    Conclusion ........................................................................................................ 16

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abrams v. United States*,
    250 U.S. 616 (1919)................................................................................4

*Alexander v. United States*,
    509 U.S. 544 (1993)................................................................................8

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963)................................................................................9

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)..............................................................................11

*Bronson v. Bronson*,
    23 A.D. 3d 932 (N.Y. App. Div. 2005) ................................................10

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940)................................................................................7

*Carroll v. President & Commissioners of Princess Anne*,
    393 U.S. 175 (1968)................................................................................7

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942)................................................................................7

*Citizens United v. Federal Election Commission*,
    130 S. Ct. 876 (2010)....................................................................3, 4, 6, 8

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ................................................................5

*Crawford v. Washington*,
    541 U.S. 36 (2004)................................................................................9

*Crawford-El v. Britton*,
    523 U.S. 574 (1998)..............................................................................15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................... passim

*First National Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)................................................................................3

*Garrison v. Louisiana*,
   379 U.S. 64 (1964)................................................................................................3

*Hill v. Colorado*,
   530 U.S. 703 (2000)..............................................................................................8

*Imaginary Images, Inc. v. Evans*,
   612 F.3d 736 (4th Cir. 2010) ...............................................................................3

*In re Factor*,
   2010 WL 1753307 (N.J. Sup. Ct. App. Div. Apr. 21, 2010) ...............................10

*Jordan v. Jackson*,
   15 F.3d 333 (4th Cir. 1994) ................................................................................12

*Kelo v. City of New London, Connecticut*,
   545 U.S. 469 (2005)............................................................................................10

*Lamont v. Postmaster General*,
   381 U.S. 301 (1965)..............................................................................................5

*Louisiana v. United States*,
   380 U.S. 145 (1965)............................................................................................13

*McConnell v. Federal Election Commission*,
   540 U.S. 93 (2003), *overruled*, *Citizens United v. Federal Election Commission*, 130
   S. Ct. 876 (2010).................................................................................................4

*McDonald v. City of Chicago*,
   130 S. Ct. 3020 (2010)..........................................................................................1

*Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies*,
   312 U.S. 287 (1941)..............................................................................................7

*New York State Board of Elections v. Lopez Torres*,
   552 U.S. 196 (2008)..............................................................................................3

*Near v. Minnesota*,
   283 U.S. 697 (1931)..........................................................................................7, 8

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976)........................................................................................7, 16

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)........................................................................................3, 4

*News & Observer Publishing Co. v. Raleigh-Durham Airport Authority,*
  612 F.3d 301 (4th Cir. 2010) ................................................. 3

*Nordyke v. King,*
  563 F.3d 439 (9th Cir. 2009), *vacated,* 611 F.3d 1015 (9th Cir. 2010) (en banc) .................. 1

*People ex rel. Darling v. Warden of City Prison,*
  139 N.Y.S. 277 (App. Div. 1913) ............................................. 10

*Plaut v. Spendthrift Farm, Inc.,*
  514 U.S. 211 (1995) ........................................................ 10

*Police Department of Chicago v. Mosley,*
  408 U.S. 92 (1972) ......................................................... 4

*Red Lion Broadcasting Co. v. Federal Communications Commission,*
  395 U.S. 367 (1969) ........................................................ 4

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) ........................................................ 14

*Robertson v. Baldwin,*
  165 U.S. 275 (1897) ........................................................ 9

*Roth v. United States,*
  354 U.S. 476 (1957) ........................................................ 5

*Schall v. Martin,*
  467 U.S. 253 (1984) ........................................................ 12

*Snyder v. Phelps,*
  131 S. Ct. 1207 (2011) ................................................. 4, 5, 15

*Southeastern Promotions, Ltd. v. Conrad,*
  420 U.S. 546 (1975) ..................................................... 9, 11

*Staub v. City of Baxley,*
  355 U.S. 313 (1958) ........................................................ 13

*Thom v. Melvin,*
  No. E-08-073, 2009 WL 2365996 (Ohio Ct. App. July 31, 2009) .................. 10

*United States v. Associated Press,*
  52 F. Supp. 362 (S.D.N.Y. 1943), *aff'd,* 326 U.S. 1 (1945) ................... 5

*United States v. Barton*,
  --- F.3d ----, No. 09-2211, 2011 WL 753859 (3d Cir. Mar. 4, 2011) ................................12, 15

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) .........................................................................................13, 15

*United States v. Emerson*,
  270 F.3d 203 (5th Cir. 2001) ...............................................................................................11

*United States v. Grace*,
  461 U.S. 171 (1983).............................................................................................................15

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010), *cert. den.*, 131 S. Ct. 958 (2011)................................................15

*United States v. Salerno*,
  481 U.S. 739 (1987)..............................................................................................................12

*United States v. Skoien*,
  587 F.3d 803 (7th Cir. 2009), *vacated*, 614 F.3d 638
  (7th Cir. 2010) (en banc)......................................................................................................15

*Virginia v. Hicks*,
  539 U.S. 113 (2003).................................................................................................................8

*Willis v. Town of Marshall, North Carolina*,
  426 F.3d 251 (4th Cir. 2005) ..................................................................................................5

*Young v. Hawaii*,
  No. 08-00540, 2009 WL 874517 (D. Haw. Apr. 1, 2009).....................................................10

STATUTES

18 U.S.C. § 922(g)(8) ...............................................................................................................11

MD. CODE ANN., PUB. SAFETY § 5-306(a)(5)(ii)....................................................................2, 12

OTHER AUTHORITIES

WILLIAM BLACKSTONE, COMMENTARIES...................................................................................8

Brief of *Amici Curiae* Major American Cities et al.
  in Support of Petitioners, *District of Columbia v. Heller*,
  540 U.S. 570 (2008) (No. 07-290)..........................................................................................6

DENNIS A. HENIGAN, LETHAL LOGIC (2009) ............................................................................10

v

Elena Kagan, *Private Speech, Public Purpose: The Role
of Governmental Motive in First Amendment Doctrine*,
63 U. Chi. L. Rev. 413 (1996) ............................................................................4

Ian Ayres & John J. Donohue, *More Guns, Less Crime Fails Again:
The Latest Evidence from 1977-2006*, 6 Econ. Journal Watch 218 (May 2009)................10

John J. Donohue, *The Impact of Concealed-Carry Laws*, in Evaluating Gun Policy:
Effects on Crime and Violence (Jens Ludwig & Philip J. Cook eds., Oxford 2003) ........10

Josh Sugarmann, Every Handgun Is Aimed at You:
The Case for Banning Handguns (2001)..............................................................6

Megan O'Matz, *In Florida, It's Easy to Get a License to Carry a
Gun*, South Florida Sun-Sentinel, Jan. 27, 2007 ...............................................10

United States Department of Health & Human Services., Center for Disease Control &
Prevention, National Center for Injury Prevention, Web-Based Injury Statistics Query
& Reporting System (WISQARS), *WISQARS Injury Mortality Reports, 1999-2007*
(2010), at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html......................................6

United States Department of Health & Human Services, Centers. for Disease Control &
Prevention, National Center. for Injury Prevention & Control, Web-Based Injury
Statistics Query & Reporting System (WISQARS), *WISQARS Nonfatal Injury
Reports* (2010), at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html. ..........................6

United States Department of Justice, Bureau of Justice Statistics, *Key Facts at a Glance:
Crimes Committed with Firearms, 1973-2007*, at
http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm. .............................................6

William C. Rempel & Richard A. Serrano, *Felons Get Concealed
Gun Licenses Under Bush's 'Tough' Gun Law*, L.A. Times, Oct. 3, 2000 ...........................10

**BRIEF OF *AMICUS CURIAE* LEGAL COMMUNITY AGAINST VIOLENCE
IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I.      Preliminary Statement

*Amicus Curiae* Legal Community Against Violence ("LCAV") hereby submits this brief in support of defendants' cross-motion for summary judgment and in opposition to plaintiffs' motion for summary judgment.  The brief responds to plaintiffs' novel argument that the "prior restraint" doctrine of the First Amendment has equal force under the Second Amendment.  No court has ever applied the prior restraint doctrine in this context, and there is no sound basis for doing so here.  The First Amendment is animated by very different principles than those underlying the Second, and the regulation of speech has consequences vastly different from the regulation of guns.  These differences support the constitutionality of Maryland's law regulating the issuance of handgun carry permits.

## II.     Statement of Interest

LCAV is a national law center dedicated to preventing gun violence.  The organization was founded by concerned lawyers after an assault-weapon massacre at a San Francisco law firm in 1993.  Today, LCAV provides legal and technical assistance in support of gun-violence prevention.  LCAV tracks and analyzes federal, state, and local firearms legislation, as well as legal challenges to firearms laws.  LCAV has served as *amicus* in a variety of firearm-related cases, including those challenging the constitutionality of state and local laws under the Second Amendment.  *See, e.g.*, *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) (en banc).  LCAV supports strong laws to reduce gun

violence, including those regulating the carrying of handguns in public. To this end, LCAV publishes model laws, provides drafting assistance to federal, state, and local legislators, and testifies at public hearings.

## III.    Introduction

Plaintiffs ask the Court to take the extraordinary step of extending the substantive doctrine of "prior restraint" from the First Amendment to the Second. This application of the doctrine overlooks the significantly different interests protected by the First and Second Amendments. It also disregards a history of lawful restrictions on the possession and carrying of firearms, including permitting schemes similar to the one challenged here. The history of these restrictions and the compelling public safety interests that they serve do not support incorporating the prior restraint doctrine into the realm of gun control laws. Moreover, the governing law in the Supreme Court and the Fourth Circuit neither requires nor supports plaintiffs' proposed extension of the doctrine.

## IV.    Discussion

### A.    Substantive First Amendment jurisprudence and its prior restraint doctrine have no place in Second Amendment law.

The State of Maryland—like most states—requires a permit for the carrying of handguns in public. A person seeking to carry a handgun in public must show that he or she has a "good and substantial reason" for doing so. MD. CODE ANN., PUB. SAFETY § 5-306(a)(5)(ii). In an effort to subject Maryland's statute to strict scrutiny, plaintiffs compare the law to a prior restraint on speech and argue that the prior restraint doctrine of the First Amendment should be annexed to the Second. (Pls.' Mem. 2, 6, 12-17). This argument lacks merit.

      **1.**      **Because the values underlying the First and Second Amendments are entirely different, conflating the two doctrinally is unwarranted**.

      *a)*      *The First Amendment is essential to democratic governance.*

The First Amendment embodies a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). This "profound national commitment" reflects two basic ideas: first, that open public debate is "indispensable to decisionmaking in a democracy," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978); and second, that a democratic society benefits from "an open marketplace where ideas, most especially political ideas, may compete without government interference." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008).

"The First Amendment's pride of place in our constitutional order is a reflection of how essential the institution of free speech is to a democratic society." *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 743 (4th Cir. 2010). As the Supreme Court recently explained, "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted); *see also Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). Or as Judge Wilkinson has put it, "An informed citizenry is at the heart of this democracy, and narrowing the arteries of information . . . will only serve to impair our country's coronary health." *News & Observer Publ'g Co. v.*

*Raleigh-Durham Airport Auth.*, 612 F.3d 301, 304 (4th Cir. 2010) (concurring in the denial of rehearing en banc).

A spirited debate on matters of public concern "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. Unsurprisingly, that kind of speech is particularly vulnerable to governmental regulation or censorship, and the courts have developed First Amendment doctrine with an eye toward preventing such abuses. *See generally* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L. REV. 413 (1996). Thus, courts apply heightened scrutiny to viewpoint- and content-based restrictions that target disfavored speech, *see Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), and to the regulation of speech on matters of public concern, *see, e.g.*, *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011). Because so many rules of First Amendment analysis are designed to protect the government's critics, judges have observed that "the right to criticize the government" is at "the heart of what the First Amendment is meant to protect." *McConnell v. FEC*, 540 U.S. 93, 248 (2003) (Scalia, J., concurring in part and dissenting in part), *overruled by Citizens United v. FEC*, 130 S. Ct. 876 (2010).

Related to the idea that the First Amendment allows the open discussion and criticism of government necessary to democracy is the principle that the First Amendment allows "an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969); *see also Sullivan*, 376 U.S. at 269-70; *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political

and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484 (1957), and "it presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection."  *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.), *aff'd*, 326 U.S. 1 (1945).

In the marketplace of ideas, more competition is generally viewed as better—not only for the speaker but also for the speaker's potential audience.  "[W]here there is a protected right of speech, there is likewise a protected right to receive the speech." *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 260 (4th Cir. 2005); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("It would be a barren marketplace of ideas that had only sellers and no buyers."); *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring) ("[T]he right to hear and the right to speak are flip sides of the same coin.").  Only if ideas are aired openly can the public benefit from their wisdom or judge their wisdom to be lacking, and any such judgment will only be aided by more information.

> b)    *The Second Amendment protects a private right to self-defense in the home.*

The Second Amendment does not embody the public values that animate First Amendment doctrine.  The Second Amendment protects an essentially private interest: the right to possess and carry a handgun in the home for purposes of self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  While "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" is the focus of the Second Amendment, *id.*, it is the public arena that is critical to the exercise of First Amendment rights, *Phelps*, 131 S. Ct. at 1218.  It is thus the freedoms protected by the First Amendment, not the Second, that allow the People to

retain ultimate control of our democracy and to exchange the ideas that drive progress and deliver prosperity.

Because the exercise of First Amendment rights strengthens democracy, "it is our law and our tradition that more speech, not less, is the governing rule." *Citizens United*, 130 S. Ct. at 911.  More guns, by contrast, has not been the governing rule, nor should it be.  Over 100,000 people were injured or killed by firearms in 2007, when firearm-related deaths averaged more than 85 per day.[1]  Baltimore suffered substantial gun violence that year, with 232 firearm-related homicides and 650 non-fatal shootings, costing Baltimore hospitals tens of millions of dollars.  Brief of *Amici Curiae* Major American Cities et al. in Support of Petitioners at 6, 8, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290).  All told, firearms played a part in more than 385,000 crimes in the United States in 2007 and nearly seventy percent of all murders.  U.S. Dep't of Justice, Bureau of Justice Statistics, *Key Facts at a Glance: Crimes Committed with Firearms, 1973-2007*, at http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm.  Firearms also pose a special danger to law enforcement personnel: more than ninety percent of officers who were killed while responding to felonies were killed with firearms.  JOSH SUGARMANN, EVERY HANDGUN IS AIMED AT YOU: THE CASE FOR BANNING HANDGUNS 79 (2001).  An expansive right to bear arms simply

---

[1] U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention, Web-Based Injury Statistics Query & Reporting System (WISQARS), *WISQARS Injury Mortality Reports, 1999-2007* (2010), at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html; U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention & Control, Web-Based Injury Statistics Query & Reporting System (WISQARS), *WISQARS Nonfatal Injury Reports* (2010), at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html.

would not carry the same public benefits that accompany a robust First Amendment and, as the statistics demonstrate, would be apt to produce grave harms.[2]

The very different values underlying the First and Second Amendments counsel against conflating the doctrines that implement the two provisions.  Given the fundamental differences between the Amendments, with one protecting largely public values and the other principally serving private interests, the Court should reject plaintiffs' attempt to equate them.

> **2.    The First Amendment's rule against prior restraints is particularly ill-suited for incorporation into Second Amendment law.**

The prior restraint doctrine is part and parcel of the First Amendment principles discussed above and is designed to protect them by invalidating attempts at government censorship.  As such, the doctrine has no place under the Second Amendment.

It has long been maintained "that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *cf. Near v. Minnesota*, 283 U.S. 697, 713 (1931) ("[I]t has been generally, if not universally, considered that it is the chief purpose of the guaranty [of freedom of speech] to prevent previous restraints upon publication.").  Indeed, "[t]he doctrine of prior restraint has its roots in the 16th- and 17th-century English system of censorship.  Under that system, all printing presses and printers were licensed by the government, and nothing could

---

[2] If the Court were to determine that First Amendment doctrine sheds light on the Second, the most probative cases would surely be those that recognize "special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment."  *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180 (1968) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *Milk Wagon Drivers Union of Chi., Local 753 v. Meadowmoor Dairies*, 312 U.S. 287, 294 (1941); *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)).

lawfully be published without the prior approval of a government or church censor." *Alexander v. United States*, 509 U.S. 544, 553 n.2 (1993). The English common law responded with the rule that "prior restraints of the press were not permitted, but punishment after publication was." *Id.* at 553; *see* 4 WILLIAM BLACKSTONE, COMMENTARIES at *151, *152 ("The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published."). This prohibition became so well established that the Supreme Court in 1931 observed "that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose previous restraints upon publication." *Near*, 283 U.S. at 718.

Prior restraints threaten the two principal public interests advanced by the First Amendment: protecting the democratic process and fostering a marketplace of ideas. First, "[i]n its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents." *Alexander*, 509 U.S. at 566. Such "restrictions imposed by official censorship," *Hill v. Colorado*, 530 U.S. 703, 734 (2000), like other content-based restrictions, are susceptible to abuses incompatible with a representative government.

Second, prior restraints restrict the marketplace of ideas. Comparing campaign finance restrictions to a prior restraint, the Supreme Court recently explained that "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech— harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Citizens United*, 130 S. Ct. at 895-96 (quoting *Virginia v. Hicks*, 539 U.S.

113, 119 (2003)).  In keeping with the First Amendment's principle that more speech is generally

better, the prior restraint doctrine embodies "a theory deeply etched in our law: a free society

prefers to punish the few who abuse rights of speech after they break the law than to throttle

them and all others beforehand."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559

(1975).

The specific threats that the prior restraint doctrine is designed to address do not

arise under the Second Amendment, which, as discussed above, protects a private right to self-

defense in the home.  Moreover, there is a rich history of "presumptively lawful" restrictions on

gun possession and carrying.  *Heller*, 554 U.S. at 627 n.26.  This history confirms that the prior

restraint doctrine—which subjects a broad array of restrictions on First Amendment rights to "a

heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372

U.S. 58, 70 (1963)—is unique to the First Amendment.

For example, laws prohibiting individuals outright from carrying concealed

weapons have been upheld since the nineteenth century.  *See Robertson v. Baldwin*, 165 U.S.

275, 281-82 (1897) ("[T]he right of the people to keep and bear arms (article 2) is not infringed

by laws prohibiting the carrying of concealed weapons."); *Heller*, 554 U.S. at 626 (noting that

most nineteenth-century courts that considered the constitutionality of bans on the carrying of

concealed weapons upheld them under the Second Amendment or state analogues).[3]  By the

---

[3] As defendants discuss more fully in their brief (pp. 24-27), laws banning the open carrying of firearms in public also date back to the nineteenth century, and many of them were upheld under the federal and state constitutions.  The Supreme Court has routinely noted the relevance of state court decisions to understanding the meaning of the federal Constitution.  *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 49 (2004) ("Early state decisions shed light upon the original understanding of the common-law right [to (continued…)

early 1900s, states began shifting from prohibitions on carrying concealed weapons to discretionary licensing regimes for carrying concealed weapons.[4]  These discretionary licensing laws, like the prohibitions on concealed-carry, have been upheld in the face of constitutional challenges.  *See, e.g.*, *Young v. Hawaii*, No. 08-00540, 2009 WL 874517, at *1, *5 (D. Haw. Apr. 1, 2009); *In re Factor*, 2010 WL 1753307, at *4 (N.J. Sup. Ct. App. Div. Apr. 21, 2010) (unpublished); *People ex rel. Darling v. Warden of City Prison*, 139 N.Y.S. 277, 280 (App. Div. 1913) (rejecting a challenge to one such statute).[5]

---

confront witnesses].”); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 223 (1995) (“The state courts of the era showed a similar understanding of the separation of powers, in decisions that drew little distinction between the federal and state constitutions.”); *cf. Kelo v. City of New London, Conn.*, 545 U.S. 469, 512 (2005) (Thomas, J., dissenting) (“[S]everal early state constitutions at the time of the founding likewise limited the power of eminent domain to ‘public uses.’ Their practices therefore shed light on the original meaning of the same words contained in the Public Use Clause.” (internal citation omitted)).

[4] More recently, many states have adopted non-discretionary licensing schemes. *See* DENNIS A. HENIGAN, LETHAL LOGIC 125-26 (2009).  These mandatory regimes endanger the public.  Some studies examining the effect of “shall issue” laws have found that these laws are associated with an increase in crime.  JOHN J. DONOHUE, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE (Jens Ludwig & Philip J. Cook eds., Oxford 2003); Ian Ayres & John J. Donohue, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 ECON. JOURNAL WATCH 218 (May 2009).  Another study demonstrated that, between 1995 and 2000, Texas incorrectly issued concealed-carry permits to more than 400 criminals under its non-discretionary regime.  William C. Rempel & Richard A. Serrano, *Felons Get Concealed Gun Licenses Under Bush’s ‘Tough’ Gun Law*, LA. TIMES, Oct. 3, 2000, at A1.  And a similar study of Florida’s non-discretionary regime found that, over the course of six months, the state issued gun permits to more than 1,400 individuals who had pleaded guilty or no contest to felonies, 216 persons with outstanding warrants, 128 subject to active domestic violence injunctions, and 6 registered sex offenders.  Megan O’Matz, *In Florida, It’s Easy to Get a License to Carry a Gun*, SOUTH FLORIDA SUN-SENTINEL, Jan. 27, 2007, at 1A.

[5] Judicial restrictions on gun ownership have also been upheld.  *See, e.g.*, *Thom v. Melvin*, No. E-08-073, 2009 WL 2365996, at *3 (Ohio Ct. App. July 31, 2009) (trial court may, in its discretion, impose a condition on subject of a civil protection order prohibiting that person from possessing, using or purchasing any deadly weapons for the duration of that order); *Bronson v. Bronson*, 23 A.D. 3d 932, 933 (N.Y. App. Div. 2005) (“Although the order of protection was not specifically requested, [the] Family Court was well within its authority to have devised this no-contact order which included a restraint on petitioner’s access to firearms.”).  Similarly, federal law prohibits the transportation or possession of firearms or ammunition by an individual who is subject to a court order designed to protect his or her (continued…)

The Supreme Court reiterated the presumptive lawfulness of several longstanding forms of gun regulation in *Heller*, emphasizing that its holding cast no doubt on "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27.

The history of "presumptively lawful" restrictions on the possession and carrying of firearms should counsel against treating Maryland's permitting scheme as a presumptively unlawful prior restraint. That history reflects a longstanding recognition of the extreme danger guns pose to public safety. While a free society may prefer to punish those who abuse rights of speech after they break the law rather than silence them in advance for fear of such abuse, *see Conrad*, 420 U.S. at 559, that society should prefer to prevent gun violence before it occurs. Regulating gun use, unlike regulating speech, neither undermines the democratic process nor harms society as a whole by shrinking the marketplace of ideas. Moreover, the costs of failing to regulate the possession and carrying of guns in public are almost invariably higher than the costs of permitting unprotected speech. All too often, the price of gun crime is death.

The calculus under the First Amendment—that allowing some unprotected speech is an acceptable price to pay to avoid the suppression or chilling of protected speech—is reflected not only in the prior restraint doctrine, but in the overbreadth doctrine as well. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("[I]t has been the judgment of this Court that

---

intimate partner or child. *See* 18 U.S.C. § 922(g)(8). That law has survived scrutiny under the Second Amendment in decisions that do not so much as reference the prior restraint doctrine. *See, e.g.*, *United States v. Emerson*, 270 F.3d 203, 260-64 (5th Cir. 2001).

the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes."). Because that calculus is unique to the First Amendment, the Supreme Court has "repeatedly observed" that the overbreadth doctrine is not recognized "outside the limited context of the First Amendment." *Jordan v. Jackson*, 15 F.3d 333, 343-44 (4th Cir. 1994) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987), and *Schall v. Martin*, 467 U.S. 253, 269 n.18 (1984)); *see also United States v. Barton*, No. 09-2211, 2011 WL 753859, at *3 n.3 (3d Cir. Mar. 4, 2011) (holding that overbreadth doctrine does not apply in the Second Amendment context). For the same reasons, the prior restraint doctrine should not apply outside the First Amendment either.

In sum, Second Amendment law should not borrow First Amendment doctrine generally or prior restraint doctrine in particular. Setting aside plaintiffs' misguided attempt to conflate these two distinct bodies of law, they offer no reason why the limited and targeted discretion afforded defendants under Maryland's handgun-carrying law is constitutionally improper. Truly unfettered discretion may be suspect when applied to prior restraints on speech, but plaintiffs have not explained why, in light of the different nature of the rights the First and Second Amendment protect, the long history of lawful restrictions on gun possession and carrying under the Second Amendment, and the compelling public safety concerns presented by gun carrying, Maryland may not require those seeking to carry a deadly weapon into the public space to provide a "good and substantial" reason for needing to do so. MD. CODE ANN., PUB. SAFETY § 5-306(a)(5)(ii).

**B.**     **Application of the "prior restraint" framework is unwarranted under Supreme Court and Fourth Circuit precedent.**

In urging the Court to import the prior restraint doctrine into Second Amendment law, plaintiffs rely primarily on the Supreme Court's decisions in *Staub v. City of Baxley*, 355 U.S. 313 (1958), and *Heller*, and the Fourth Circuit's decision in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).   None of these cases, nor any others cited by plaintiffs, supports their innovation.

Plaintiffs first argue that the Supreme Court in *Staub* explained that the prior restraint doctrine applies generally to "freedoms which the Constitution guarantees."   (Pls.' Mem. at 12-14 (quoting *Staub*, 355 U.S. at 322)).   Of course, the "freedoms" referenced in *Staub*—and in every other application of the prior restraint doctrine known to *amicus*—are the First Amendment's freedoms of speech and of the press.   *See Staub*, 355 U.S. at 314 n.1 (quoting the ordinance at issue in *Staub*); *id.* at 322-24 (citing cases involving prior restraints on speech or the press).   The Court in *Staub* did not, by speaking in general terms, expand the prior restraint doctrine beyond its traditional scope and beyond the facts of that case.[6]

Plaintiffs also suggest that *Heller* is a case in which the Supreme Court applied the prior restraint doctrine in the Second Amendment context.   (Pls.' Mem. at 13, 16).   That is incorrect.   The plaintiff in *Heller* challenged the District of Columbia's licensing requirement insofar as it prohibited him from carrying an unlicensed firearm *in the home*.   *See* 554 U.S. at

---

[6] The only decision plaintiffs cite that involved neither the First nor the Second Amendment is *Louisiana v. United States*, 380 U.S. 145 (1965).   In that case, the Court invalidated a state statute that required voters to demonstrate their understanding of the state and federal constitutions and that was used to deny black people the right to vote.   *See id.* at 152-53.   The Court neither referenced the prior restraint doctrine nor cited any case that applied it.

576. At oral argument before the Supreme Court, however, the plaintiff conceded that the licensing law was "permissible so long as it is not enforced in an arbitrary and capricious manner," and the District acknowledged that it would grant the plaintiff a license so long as he was not a felon or insane. *Id.* at 631 (internal quotation marks omitted). The *Heller* opinion therefore expressly did "not address the licensing requirement." *Id.* Only against the backdrop of the parties' concessions can one understand the Court's conclusion that, "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and issue him a license to carry it in the home." *Id.* at 635. Read in context, this passage plainly does not support plaintiffs' assertion that the *Heller* Court "summarily applied established prior restraint principles" (Pls.' Mem. at 13), to invalidate the licensing requirement.

Indeed, if anything can be gleaned from *Heller*'s references to the First Amendment, it is that the substantive doctrines under the First and Second Amendments are not the same. While *Heller* observed that neither the right to keep and bear arms nor the right of free speech is "unlimited," 554 U.S. at 595, the Court's non-exhaustive list of "presumptively lawful" limits on the right to keep and bear arms highlights that the limitations on the exercise of these two rights are different. *Compare id.* at 626-27 & n.26 (identifying "prohibitions on the possession of firearms by felons and the mentally ill" and "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as "presumptively lawful regulatory measures"), *with Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578 (1980) ("[A] trial courtroom also is a public place where the people generally—and representatives of the media—have a right to be present, and where their presence historically has been thought to

enhance the integrity and quality of what takes place."), *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998) (recognizing that the First Amendment shields prisoners from "retaliation for protected speech"), *and Phelps*, 131 S. Ct. at 1218 ("[A] public place adjacent to a public street . . . occupies a 'special position in terms of First Amendment protection.'") (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)).

   Finally, plaintiffs rely on several cases, including the Fourth Circuit's decision in *Chester*, in which circuit courts have "look[ed] to the First Amendment as a guide in developing a standard of review for the Second Amendment." 628 F.3d at 682 (citing *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010), *cert. den.*, 131 S. Ct. 958 (2011), and *United States v. Skoien*, 587 F.3d 803, 813-14 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010) (en banc)). Whatever utility the First Amendment might have in determining the standard of review, its usefulness stops there. The Third Circuit appears to have recognized as much when, after looking to the First Amendment for guidance in *Marzzarella*, 614 F.3d at 89 & n.4, it declined to apply the First Amendment's overbreadth doctrine to cases involving the Second Amendment. *See Barton*, 2011 WL 753859 at *3 n.3. In any event, none of the cases cited by plaintiffs supports importing First Amendment doctrine wholesale into the Second Amendment context.

**V.      Conclusion**

For the foregoing reasons, the Court should reject plaintiffs' attempt to apply the prior restraint doctrine to Maryland's law regulating the carrying of handguns in public. Because the law is not a prior restraint on speech, it is not "presumptively unconstitutional." *Stuart*, 427 U.S. at 558. On the contrary, it is a valid measure enacted to protect the citizenry from the extreme danger created by the possession of guns in public.

Respectfully submitted,

_____/s/ Jonathan L. Marcus_____
Jonathan L. Marcus (Bar ID #12693)
Elizabeth-Ann D. Katz (Bar ID #17878)
Matthew S. Krauss
Jonathan D. Cohen
COVINGTON & BURLING, LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  202-662-6000
Fax: 202-662-6291
jmarcus@cov.com

March 22, 2011

*Counsel for* Amicus Curiae *Legal Community Against Violence*

16