```
 1              IN THE UNITED STATES DISTRICT COURT

 2     FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

 3     RAMOND WOLLARD,

 4                    Plaintiff

 5                                      CIVIL NO.

 6       v.                            L 20-2068

 7     Second Amendment Foundation, Inc.   July 21, 1011

 8                    Defendant

 9     _____/

10                  TRANSCRIPT OF MOTIONS HEARING

11           BEFORE THE HONORABLE BENSON E. LEGG,

12              UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     On behalf of the Plaintiff:

15     Alan Gura, Esquire

16

17
18

19     On behalf of the Defendant:

20     Matthew J. Fader, Esquire

21

22

23     Reported By:

24     Jacqueline Sovich, RPR, CMR, FOCRR

25     Official Court Reporter
```

```
 1                    (PROCEEDINGS)
 2              THE COURT:  This is a hearing in the case of Wollard,
 3    et al, versus Sheridan, et al.  I thank counsel for their very
 4    fine briefs, which were enjoyable to read and laid out the
 5    issues.
 6              Essentially, this case tests whether Maryland's
 7    regulatory system requiring a citizen, even a law-abiding
 8    citizen with a good record, to demonstrate a good and
 9    substantial reason for carrying a handgun outside the home
10    violates the Second Amendment to the United States
11    constitution.
12              The principal Supreme Court cases governing this area
13    are Heller and McDonald.  There are two highly instructive, but
14    not ultimately deciding Fourth Circuit cases, Chester and
15    Masciandaro.  And there has been a recent Seventh Circuit case
16    of interest, the Ezell case.
17              One of the primary threshold issues is whether there
18    is a principal of constitutional avoidance that decides this
19    case without the necessary either to recognize a Second
20    Amendment right outside the home or to begin the process of
21    defining that right.
22              This issue focuses us on the disagreement between
23    Judges Niemeyer and Wilkinson in the Masciandaro case.  Judge
24    Niemeyer writing for himself ruled that a Second Amendment
25    right to carry a firearm outside the home does exist and is
```

1    subject to intermediate scrutiny.  The law passed, however,

2    because Mr. Masciandaro had the handgun in his car in a public

3    park.

4         Judge Wilkinson writing for himself and Judge Duffy

5    held that the constitutional issue could be avoided, that the

6    panel did not need to decide if one has a Second Amendment

7    right to possess a handgun outside the home.  Because if such a

8    right did exist, the restriction at issue in Masciandaro would

9    be subject to intermediate scrutiny and would pass intermediate

10   scrutiny.

11        So those are the essential issues in a letter of July

12   18, 2011, I posed a number of questions to counsel.  During

13   your presentations, please answer the questions, but you're

14   free to roam elsewhere.  The key questions identified at the

15   end of the letter are to the regulations here at issue satisfy

16   intermediate scrutiny and what is the nature and extent of the

17   State's interest in the regulations?

18        How do these regulations -- how are these regulations

19   tailored to advance the state's interest?  And if challenged,

20   the regulations would not satisfy intermediate scrutiny, does

21   the Second Amendment right extend outside the home at all?

22        Good.  So why don't I begin first with plaintiff's

23   counsel.  And who will be arguing for the plaintiff?

24        MR. GURA:  Good morning, Your Honor.  I will, Alan

25   Gura for the plaintiff.  And also seated with is Carrie Hansel,

1    my co-counsel, and the plaintiff, Mr. Raymond Wollard.

2              THE COURT:  Good morning to all.  Before you begin,

3    let me have counsel for the defense introduce themselves as

4    well, if you would, please.

5              MR. FADER:  Good morning, Your Honor.  Matt Fader for

6    the defendants.  With me at counsel table is Dan Friedman and

7    Steve Ruchman.

8              THE COURT:  Good morning.  Good.  Mr. Gura, are you

9    going to argue, sir?

10             MR. GURA:  Yes, Your Honor.

11             THE COURT:  And you can either use the podium or you

12   can stand in place.  If you're going to stand in place, I would

13   simply ask that you pull the microphone close.  Good.  That

14   should suffice.

15             MR. GURA:  Thank you, Your Honor.

16             Your Honor, I probably speak for both sides in

17   starting by thanking the Court for the Court's letter of July

18   18.  It's always helpful to counsel to see where the Court's

19   concerns lay, and it gives us a good blueprint to shape our

20   arguments so that we have the most efficient use of our time

21   here.

22             And having said that, I would like to start by going

23   down the list of items provided by the Court and providing our

24   views with respect to some of these issues and questions.

25             The Court starts by noting four opinions that are

1    said to not be in serious dispute.  I would like to address

2    some of those points ever so briefly.

3         At first, the Court says that -- and I'm reading here

4    from the letter the Court of the Second Amendment protection as

5    articulated in Heller and McDonald encompasses the right of

6    law-abiding individuals to possess handguns in the home for

7    self-defense.

8         Your Honor, the plaintiffs would dispute that the

9    core right protected by the Second Amendment is limited to the

10   home.  The Second Amendment's text speaks of the right to keep

11   and bear arms.  There's no distinction amongst the two rights.

12   They're both covered by the Second Amendment.

13        And, in fact, the Fourth Circuit has held in Chester

14   in reducing the level of scrutiny for the criminal defendant in

15   that case.  The Court held that the core right protected by the

16   Second Amendment is the right of law abiding responsible

17   citizens to possess and carry a weapon for self-defense.

18        THE COURT: Good.  If I could just stop you for a

19   minute?  There's a statement in the Masciandaro case, in which

20   Judge Niemeyer's discussing Chester, and he writes that we have

21   held that intermediate scrutiny should be applied when

22   reviewing a Second Amendment challenge, which prohibits the

23   possession of firearms by a person convicted of a misdemeanor

24   crime of domestic violence.

25        He goes on to say that although Chester asserts his

1    right to possess a firearm in his home for the purpose of

2    self-defense, we believe that his claim is not within the core

3    right identified in Heller, the right of a law-abiding

4    responsible citizen to possess and carry a weapon for

5    self-defense.

6         By virtue of Chester's criminal history as a domestic

7    violence misdemeanant, accordingly, we conclude that

8    intermediate scrutiny is more appropriate than strict scrutiny

9    for Chester and similarly situated persons.

10        It appears to me that at least Judge Niemeyer

11   recognizes a Second Amendment right that operates outside the

12   home.  But he says that, so far, the Supreme Court in Heller

13   and McDonald has only explicit specifically recognized a core

14   right inside.  That's what I was trying to say in that first

15   paragraph.  And I'm simply looking at the case law as it

16   exists.

17        So inside the home, law abiding person, good record,

18   et cetera, the constitution guarantees a person the right to

19   possess a handgun inside the home.

20        But outside the home, it's, who knows?  So is that

21   right?

22        MR. GURA:  No, Your Honor.  We would disagree with

23   that.  In Heller, one of the key issues in the case was the

24   meaning of the term bear arms.  The District of Columbia had an

25   argument that the term bear arms and had a collectibles

1    connotation.  It meant soldier or go off into battle, and that

2    was an inherit limitation on the character of the right.  And

3    in order to address that concern, the Supreme Court had to

4    define the meaning of the term bear arms, and it explained that

5    to bear arms meant to carry them.

6         It then went on to explain that the right was not

7    limited, there are time, place, and manner restrictions that

8    are appropriate, sensitive place type questions that will

9    arise.  The extent that it acknowledged in Heller that at right

10   would be extending beyond the home as we've noted and,

11   respectfully, that part of the Court's discussion of the

12   meaning of the term bear arms was required for the holding.  It

13   was part of the Court's rationale.

14        Moreover, the Court also instructed at the very

15   beginning of the Heller opinion that we interpret the Second

16   Amendment by looking to see what the words and phrases in that

17   text meant to the people who ratified it.  How was this

18   language understood by the voters?

19        So even if the Supreme Court's historical description

20   of the term bear arms was not part of the Court's essential

21   holding, which we would dispute, but even if that were the

22   case, nonetheless, we would then assert under the rule of

23   Heller that says we need to look at the original meaning of the

24   language, that the Supreme Court's definition is a correct one,

25   and defendants have not offered an alternative definition for

1    the term bear arms.  They argue that Heller is limited to the

2    home because that's the context in which the case arose, but

3    what I don't see in the other side's very excellent pleadings

4    is any alternative meaning of the term.

5          So we would argue that bear arms means to carry them.

6    The Supreme Court has held as much, and that is a core right at

7    least when it's exercised by law-abiding people.  That does not

8    mean that every restriction on the right to bear arms is going

9    to be subject to strict scrutiny.

10          This leads me to the second --

11          THE COURT:  Before we move on, let me see if quote a

12    passage from Judge Niemeyer to see if you're in agreement that

13    this essentially expresses his views about Heller.

14          He says that the Second Amendment right were confined

15    to self-defense in the home, the Court, meaning the Supreme

16    Court, would not have needed to express a reservation for

17    sensitive places outside the home.  But the Heller court

18    describes as the general pre-existing right to keep and bear

19    arms for participation in militias, for self-defense, and for

20    hunting is thus not strictly limited to the home environment,

21    but extends in some form to wherever those activities or needs

22    occur.  Just as other amendments apply generally to protect

23    other individual freedoms.

24          But I would not conclude that the right is

25    all-encompassing such as it extends to all places or to all

1    persons as explicitly recognized in Heller.  The complex

2    question of where it, meaning the Second Amendment right, may

3    apply outside the home and what persons may invoke it is,

4    however, not one that we need to fully answer, because it

5    appears sufficiently clear that, in this case, Masciandaro's

6    claim of self-defense was asserted by him as a law-abiding

7    American citizen sleeping in his automobile in a parking area

8    does implicate the Second Amendment both be it subject to

9    lawful limitations.

10        So are you on board with Judge Niemeyer's analysis

11   that there is a Second Amendment right to bear arms outside the

12   home?  But that right is subject to certain limitations and

13   would be measured by intermediate scrutiny.

14        MR. GURA:  We are largely in agreement with that.  In

15   fact, we are always entirely in agreement with that.  The only

16   reservation I would make, Your Honor, is that Masciandaro was

17   subject to intermediate scrutiny because it was a time place

18   and manner case.  The case actually concerned place.  In a

19   national park.

20        And traditionally time, place, and manner is a form

21   of intermediate scrutiny.  And so of course if the government

22   is going to have a sensitive place restriction, we disagree

23   with the final outcome in that case, but the premise that is

24   that time, place, manner analysis would apply in the Second

25   Amendment that's been recognized at least in the First

1   Amendment context as the form of intermediate scrutiny, that,
2   yes, we would agree with.  We are not alleging that there is an
3   absolute right to carry guns, everywhere at all times, in any
4   manner, by all people.

5        The difference, though, between our case and the
6   Masciandaro case is that here we don't have a time, place, or
7   manner restriction.  The issue here is whether people can
8   exercise the right at all.  And if the State of Maryland wishes
9   to in fact and in fact they have enacted various restrictions
10  on time place and manner, then we leave that to another day.
11  That's simply not a part of our claim.

12       So it's important to note, Your Honor, if I may
13  return to the Court's list of ideas on this point at least,
14  that --

15       THE COURT:  Good.  If I could just stop you for a
16  moment.  I was looking in your statement of facts, that I
17  thought did a very good job of framing the issue.

18       MR. GURA:  Thank you.

19       THE COURT:  Let me see if I can find it.

20       You say that when individuals enjoy a constitutional
21  right to engage in some activity, a license to engage in that
22  activity cannot be conditioned on the government's
23  determination of their meaning the citizen's need to exercise
24  that right.

25       Defendants imposed this classic form of

1    unconstitutional prior restraint against the fundamental

2    individual right toe keep and bear arms.  They must enjoined

3    from doing so.

4              So if we look at the assertion, I believe that you've

5    told me that time, place, manner restrictions can be okay

6    governed by intermediate scrutiny.  I would assume also that

7    limitations on type of weapon, no sawed-off shotguns, no guns

8    with obliterated serial numbers, no automatic weapons and the

9    like would also pass muster.

10             And, finally, a limitation on who may carry a firearm

11   outside of the house and who restrictions would prohibit, for

12   example, felons, Chester, misdemeanor, certain misdemeanants,

13   people who have history of alcohol abuse, people who have

14   mental health problems.

15             So that it would seem to me sensible in a regulatory

16   scheme that one would have to apply, you'll have to tell me at

17   some point whether you're attacking the whole need to apply

18   system that Maryland has.

19             Two, it seems to me reasonable to restrict the type

20   of weapons.  And then you have time, place, and manner, can't

21   have a firearm near a school, in the airport, in a court

22   building, et cetera.

23             As I understand the core of your argument, it's that

24   the plaintiff passes muster under any kind of examination of

25   his background as a law abiding citizen, U.S. Naval Veteran, no

1    criminal record, no mental health problems, no alcohol

2    problems, nothing in his conduct that would target him as a

3    person who should not possess a firearm.

4         At one time, the state permitted him to carry a

5    firearm outside the house because of the threat posed by his

6    either present or former son-in-law who had a drug problem, and

7    who invaded the house.

8         The state has now determined that that threat is no

9    longer current, is too remote to justify the plaintiff having a

10   firearm outside the house.  So your attack is really on the

11   requirement that the law-abiding citizen produce a good and

12   sufficient reason, and the state's claimed right to review that

13   reason to see if it is good and substantial in their view, is

14   that the essence of it?

15        MR. GURA:  That is correct, Your Honor.  Our

16   contention is that if you have the right to do something, you

17   do not have to prove to the state your entitlement to engage in

18   the right.

19        While we would agree with the Court's description of

20   Mr. Wollard as a fully qualified individual to exercise his

21   Second Amendment rights, the real issue there is not so much

22   our view of Mr. Wollard, but the fact that the state has not

23   identified any specific reason why he should be prevented from

24   exercising his constitutional rights, if he -- if he had

25   something in his background, if something turned up and the

1   state wished to point to some reason, for denying Mr. Wollard a

2   permit, then the Court could evaluate the basis of the denial,

3   whether or not it's constitutionally sufficient, and that would

4   be a very different kind of case than the very narrow kind of

5   case that we have brought.

6          So we don't --

7          THE COURT:  Let me just stop you then to see if this

8   is accurate.

9          So that, under your view of the constitution, the

10  state has the right to require an application, to review the

11  applicant, but if the applicant shows up at the license window,

12  applies, there is a review, the state goes down the checklist,

13  no criminal record, no mental health problems, good and

14  law-abiding, and so on and so on, that the state must issue the

15  carry permit and cannot ask why do you want to carry a gun?

16         MR. GURA:  That is correct, Your Honor.  Not any more

17  than the state would be able to ask why do you want to have a

18  demonstration, why do you want to assemble, why do you want to

19  speak?

20         All we are saying, Your Honor, is that the state in

21  licensing and regulating this activity, needs to do so if it

22  wants to license and regulate it, it needs to do so according

23  to specific objective standards that meet some constitutionally

24  sufficient justification.

25         And all of the standards that Your Honor has noted,

1   criminal background check, for example, easily pass

2   constitutional examination.

3           And in fact, Mr. Wollard has been required to go

4   through a background check.  He was required to obtain

5   training.  We don't challenge any of that.  And if the state

6   wants to come up with any number of other objectively

7   delineated requirements, they can be evaluated by a court, then

8   that will be fine with us, and providing that all those

9   requirements are constitutionally sufficient, then that's not a

10  problem.

11          The only --

12          THE COURT:  Let me just stop you for a minute, then.

13          MR. GURA:  Sure.

14          THE COURT:  To test what you just said.  So that if I

15  were to agree with you in this case, and find in your favor, I

16  would not be recognizing an unlimited right of United States

17  citizens who passed background checks and who were carrying

18  reasonable handguns to carry those handguns anywhere they

19  wanted at any time.  The state would still retain the ability

20  through legislation or regulation to impose reasonable time,

21  place, and manner restrictions, and those restrictions could be

22  tested one-by-one in later proceedings.

23          This case tests only the constitutional ability of

24  the state to turn down the application because the plaintiff

25  has not come forward with the good and sufficient reason for

1    wanting to carry a gun.

2             So I'm not being asked to recognize a sweeping

3    wholesale anything goes right to carry handguns anywhere people

4    want to.

5             MR. GURA:  That's correct, Your Honor.  We are not

6    making that kind of claim.  And it's absolutely not part of our

7    complaint.

8             Your Honor, with respect to the Court's

9    identification of the issue of whether or not intermediate

10   scrutiny is appropriate, when considering legislation

11   regulating conduct outside the core area, but still within the

12   scope of the Second Amendment right, our answer would be not

13   always.

14            And we point to the recent case of Ezell versus City

15   of Chicago, which the Court noted in its letter as a very good

16   example of that.  In Ezell, the issue was the right of people

17   to operate and access a gun range for the purpose of engaging

18   in traditional shooting activity for safety reasons, to improve

19   their proficiency with firearms.  And also we made allegations

20   in that case, forced our traditional sporting and recreational

21   uses of gun ranges.  The Seventh Circuit applied higher than

22   intermediate scrutiny to the related ancillary right they held

23   of practicing with a firearm.

24            We alleged that the right to practice with a firearm

25   is a core right of the Second Amendment, the Seventh Circuit

1    seemed to note it might not be necessarily at the core, but

2    it's very close to the core.

3              In any event, what the Seventh Circuit held was they

4    would apply a standard of scrutiny to this activity higher than

5    intermediate scrutiny.  The Skoien case in the Seventh Circuit

6    was like Chester, a domestic violence misdemeanant case where

7    in that case, in Skoien, the law survived intermediate

8    scrutiny.

9              In Ezell, however, the Seventh Circuit said here we

10   are dealing with law-abiding people.  The right of law-abiding

11   people to train with firearms is very close to the core of the

12   Second Amendment.  And so even if not quite strict scrutiny

13   would apply to the regulation at issue, it would be higher than

14   the intermediate standard.

15             THE COURT:  Sort of advance the intermediate

16   scrutiny.

17             MR. GURA:  That's correct.  And we see this also in

18   other areas, for example, in the First Amendment, most people

19   --

20             THE COURT:  If I could just --

21             MR. GURA:  Sure.

22             THE COURT:  Strict scrutiny seems to be sort of the

23   death sentence for the regulation.  So what advanced

24   intermediate scrutiny would do, it would elevate the scrutiny

25   beyond intermediate, but not doom the regulation to an untimely

1   death.  So it's sort of the regulation can be upheld, but you

2   have to have a really good reason rather than just a good

3   reason.

4          MR. GURA:  We would claim actually, Your Honor,

5   there's been some studies that apply strict scrutiny in

6   constitutional cases, and they're not always a death sentence

7   for the regulation.

8          And I can think of any number of Second Amendment

9   regulations that would survive even strict scrutiny.  For

10  example, a ban on violent felons from having firearms.

11  Obviously, there's a very compelling state interest there to

12  keep dangerous people from having guns.

13         THE COURT:  In the federal system, any felon, one of

14  the most frequently encountered federal crimes is 922(g), the

15  possession of a firearm by a prohibited person, defined as a

16  person who, I know the elements by heart, has been convicted of

17  a crime punishable by imprisonment for 365 days or more.  That

18  person, that's the definition of a felony, and it's illegal for

19  such a person to possess a firearm, so you don't have been

20  violent, you can be the crime could have been a non violent

21  crime.

22         MR. GURA:  Courts have questioned whether or not

23  922(g) is overbroad or sufficiently tailored.  We would only

24  offer it's not really part of this lawsuit that plainly at

25  least when you're speaking about violent felons, there's no

1    dispute strict scrutiny would not threaten 922(g) in at least

2    that context.

3          So we don't think that strict scrutiny is necessarily

4    fatal to everything, nor do we think that immediate scrutiny

5    means that the government wins.  In fact, intermediate scrutiny

6    requires the government not the plaintiff in this case to

7    justify its law.  The burden is always with the government

8    whenever you are dealing with fundamental rights.

9          But all the same, the fact is that we see in many

10   constitutional areas courts adopting either strict scrutiny or

11   very other stringent forms of high review to the exercise of

12   rights beyond the Court.

13         In the First Amendment free speech area, most of the

14   people would agree that political speech lies at the core of

15   the First Amendment.  Yet, we just saw this term, the Supreme

16   Court strike down regulations, content-based regulations on

17   violent video games, not all of which are necessarily

18   political.  It was enough that this was a content-based

19   restriction on speech.

20         In the Second Amendment right, we do have some laws

21   in some places that are being challenged where the government

22   has decided to ban gun sales.  Well, we would claim if you have

23   a right to have a gun, you should be able to purchase it

24   somewhere.

25         The Second Amendment protects more than the right to

1    manufacture a gun in one's home, and so if the right to

2    purchase and sell firearms is protected by the Second

3    Amendment, we think that we would like as in Ezell, we would

4    see higher levels of scrutiny applied to those kinds of cases.

5         In this case, however, we're dealing only with a

6    right that is literally spelled out in the actual text of the

7    Second Amendment.  Bear arms.  And so at that point --

8         THE COURT:  And that's because of the Supreme Court

9    in Heller decided the dispute whether the Second Amendment

10   applies only to a public right of the public to bear arms in

11   connection with a well-regulated militia, the Supreme Court

12   found that the right to bear arms was individual for the

13   traditional purposes of self-defense, hunting and the like, and

14   that the self-defense had two components.  One component was to

15   protect the person against other people acting unlawfully, and

16   the second element of self-defense was to protect oneself

17   against I guess a repressive government acting

18   unconstitutionally.

19        MR. GURA:  Yes.  We would also add, Your Honor, to

20   Heller, there's another Supreme Court opinion, which is

21   relevant in this analysis, and that is of course U.S. versus

22   Miller from 1939.

23        Miller, of course, is a heavily disputed case, but

24   what nobody disputes is that it was a Second Amendment case

25   where the Supreme Court tried to discern whether or not a

1    sawed-off shotgun was a protected arm for purposes of the

2    Second Amendment.

3          What's interesting about Miller for our purposes is

4    that Mr. Miller was apprehended and indicted because he was

5    carrying the shotgun along the highways of Oklahoma and

6    Arkansas in his car.  Clearly that case arose outside the home,

7    and nobody ever thought to stop and question whether or not the

8    Second Amendment applied.

9          You know, the Second Amendment, nobody stopped to

10   question whether or not the Second Amendment applied simply

11   because the firearm in that case was carried outside the home.

12         In any event, returning to some of the Court's stated

13   concerns, we would agree.

14         THE COURT:  If I just could make one another point --

15         MR. GURA:  Yes.

16         THE COURT:  -- sort of implicated by the Miller case,

17   although Miller involves a sawed-off shotgun, the licensing

18   system in this case applies only to handguns, so that a citizen

19   has the right to carry a long arm including a shotgun, any

20   loaded or unloaded anywhere they want to go and to have it in

21   their car, not any -- they can't take it in the ballpark, but

22   they can carry it around.

23         And under the regulatory system, the law, people who

24   run businesses have to carry cash, you know, from their

25   business someplace else, or in their business are regularly

1    given the ability to carry or to wear a handgun.

2         But the essential point is that the system here

3    really applies -- that the problem is it applies to handguns

4    and that people outside the home can carry long arms, and a

5    person can carry a handgun in his or her car provided that the

6    handgun is unloaded and that the ammunition is in a separate

7    container.

8         So that you can take your unregistered -- or that you

9    can take your handgun to the firing range, for example, you

10   have to have it unloaded in your car, and the ammunition has to

11   be someplace else.  So this is a really a handgun case rather

12   than a long arm case.

13        MR. GURA:  Your Honor, this is a Second Amendment

14   case, and this exact argument that we see from the defense in

15   this case was an argument that was raised in Heller and then in

16   McDonald, and it was rejected both times by the Supreme Court

17   in Heller.  It was also rejected by the D.C. Circuit.

18        The argument that posed by the defendants is that

19   because people still have a right to carry long guns, their

20   self-defense interests are protected.

21        That sort of analysis is rejected.  We don't prevent

22   people from having their constitutional right exercised in one

23   manner simply because we allow it in another.  For example, we

24   don't tell people that you can't carry any kind of firearm

25   because you can carry a sword or a baton.  We don't tell people

1    that they shouldn't be upset that their religion has been

2    banned because they may still worship other gods.

3         But so long as the traditional expectation as its

4    understood with respect to the right is the people have the

5    right to engage in some activity, here self-defense with a

6    handgun, that has to be respected by the government.

7         Now, of course, there can be regulations placed on

8    the type of weapons that are carried.  Some weapons would not

9    be within the traditional understanding of what's protected by

10   the Second Amendment.

11        And in addition, sometimes even a weapon that might

12   be protected by the Second Amendment is carried in a manner

13   that the government has the right to prohibit.

14        One case that made this very clear was the Third

15   Circuit's opinion in the Marcella decision where the issue

16   there was the possession of a handgun that had an obliterated

17   serial number.  The Third Circuit held that, while the handgun

18   was functionally indistinguishable whether it has a serial

19   number or not, it's still a handgun, it would work the same.

20        That was a manner case, because you don't have the

21   right to possess a handgun in the manner of having an

22   obliterated serial number.

23        With respect to something like a sawed-off shotgun,

24   the question at issue in Miller, that's more a question of

25   whether the arm itself is a protected arm within the meaning of

1   the Second Amendment.

2         However, the one thing that is very clear from Heller

3   and from McDonald as well is that once a person has the

4   entitlement or the right to a particular type of firearm, in

5   those cases, handguns, it is not an answer to say that, well,

6   you can have some other kind of firearm.  And especially when

7   we're talking about the right to carry a weapon in

8   self-defense, it is not practical to walk around the streets of

9   Baltimore or Annapolis with a rifle or a shotgun.  That is not

10  an appropriate defensive weapon, for most normal people at

11  least.  I'm not sure anybody would, in the ordinary course of

12  life, walk around with a rifle to fend off a sudden criminal

13  attack.  That's simply impractical.

14        Nor is it practical to walk around with any kind of

15  firearm that happens to be locked in the container and

16  unloaded, perhaps even inaccessible in a different compartment

17  of one's vehicle.  Those are not the kinds of activities that

18  enable people to exercise the right of self-defense.

19        Heller, of course, had this issue specifically

20  because the District of Columbia there required handgun, that

21  all firearms in the home at all times be kept in an inoperable

22  condition, and there was not even an exception for home

23  self-defense.

24        And, of course, the Supreme Court dispensed with

25  that.  If you have the right to have a firearm, you have the

1    right to have a firearm that works and is accessible to you

2    under normal circumstances.

3         So the fact that people can have rifles or shotguns,

4    it's very interesting, but that's not really a defense to the

5    claim of the right to have a handgun for self-defense.

6         We would agree with the Court that this case does not

7    implicate any of the presumptively lawful regulatory measures

8    listed until Heller.  Notably among that list of presumptively

9    lawful regulatory measures are sensitive place restrictions.

10        As we've noted already, this is not a sensitive place

11   type issue as the Masciandaro case was.  And, finally, the

12   Court observed at least in those first four points the Court

13   was wondering whether it should consider the regulatory scheme

14   as a whole rather than analyzing only the challenged portions

15   of the law.  And I think, Your Honor, we have gone over that.

16   We are only targeting this one very narrow specific provision

17   of the regulatory scheme.

18        If we were to prevail, the State of Maryland can

19   still deny people permits and arrest people who don't have the

20   permits.  The only thing they can't do is deny the permits for

21   this very specific reason of not proving a good and sufficient

22   reason according to the state's idea of whether people should

23   have the right.

24        Moving on to the Court's other concerns in the

25   letter, the Court asked whether regulations here at issue would

1    satisfy intermediate scrutiny.  And with respect to that

2    question, the Court asked what is the nature and extent of the

3    State's interest in the regulation?  And how are these

4    regulations tailored to advance the state's interest?

5         We don't believe, Your Honor, that intermediate

6    scrutiny is applicable, at least to the Second Amendment

7    portion of our claim.  We don't believe that any means and

8    standard of review is applicable to the Second Amendment

9    portion of the claim, because while the state has the profound

10   interest in public safety and, according to that interest, it

11   may regulate the carrying of handguns and public and restrict

12   certain people from doing so entirely, the state has no

13   interest at all, no legitimate interest in preventing people

14   from exercising their right.

15        What we see from the state here is an objection to

16   the idea of carrying handguns.  They view this as inherently

17   dangerous and unacceptable activity that requires some

18   justification in order for it to be permitted.

19        They are entitled to that view.  I understand many

20   people may feel that way, but the constitution reflects and

21   memorializes a different understanding of what people's rights

22   are.

23        And to the extent the state has an interest in making

24   sure that the wrong people don't carry guns or that people

25   don't carry the wrong guns, or that people are going to carry

1    guns in dangerous places or in dangerous manners, the state's

2    regulation that we're challenging does not address any of those

3    concerns at all.  There is no relationship at all between

4    forcing people to justify the right to bear arms and any kind

5    of tailoring that's aimed at some specifically identified evil.

6    We do believe --

7             THE COURT:  The point there is that if we were all at

8    the constitutional convention, or having a new constitutional

9    convention and we were all delegates, we might decide in this

10   highly urbanized environment where most people don't hunt, that

11   it's a bad idea for people to have the right to bear arms or at

12   least handguns.

13            And one of the problems with the bearing of handguns

14   is that, in our society, which is crowded, we're

15   constitutionally running into each other, and there are of

16   instances particularly driving cars where people get mad at one

17   another, and if there's a firearm handy, then the event may end

18   up tragically.

19            But as you point out, we're not -- we have to assume

20   the state's interest is not measured by what is the best policy

21   or what we would do if we were constitutional delegates.  We

22   must uphold the constitution as interpreted by the Supreme

23   Court, which says that people do have a Second Amendment right

24   to keep and bear arms.  So that decision has already been made.

25   So whether that's a wise policy or an unwise policy is not ours

1   to determine.  It is what it is.

2          MR. GURA:  That's correct, Your Honor.  And McDonald

3   makes that very clear, because the City of Chicago asserted

4   where an urban environment, we have problems, guns before,

5   we're different here in Chicago than might work in other

6   places.  And the Supreme Court was very emphatic in noting that

7   every provision of the Bill of Rights is said to have negative

8   impact on police and prosecutors.

9          If we were going to revise the bill of rights to

10  enhance the government's ability to fight and punish and deter

11  crime, we probably wouldn't start, I would say we would

12  probably not start with the Second Amendment.  My guess is that

13  the Fourth Amendment would be in for substantial revision in

14  that kind of a constitutional convention.

15         More recently in Ezell, of course, the Seventh

16  Circuit followed that signal by holding that the fact that

17  people could go outside of Chicago to exercise their Second

18  Amendment rights to practice with guns was irrelevant.  We

19  don't restrict constitutional rights on the basis of mere

20  geography.  The fact that you can do it somewhere else is not a

21  defense.

22         Chicago has now been twice held by appellate courts

23  to be a part of the United States, and we would submit that

24  Maryland also is part of the United States.  All of it.  And so

25  the Second Amendment applies here whether people would think

1      it's a good idea or a bad idea.  We simply are not in a

2      position to litigate that question.

3           THE COURT:  One of the factors to take into

4      consideration, my understanding is that the police are very

5      much in favor of the regulatory system.  It's the ideal age of

6      being a policeman being in Great Britain when I was growing up

7      and the Bobbies didn't even carry guns because nobody else had

8      guns.  Being a law enforcement officer is very, very dangerous

9      reason difficult job, particularly if you're not the only one

10     carrying a gun.

11          So but your view would be that that may be a valid

12     point, but it can't carry the day in the face of the Second

13     Amendment.

14          MR. GURA:  Not only that, Your Honor, but also in my

15     experience, at least, there are many police officers and

16     prosecutors who support people's ability to carry firearms in

17     public.  There are many law enforcement officials who believe

18     that it's actually a public good, that it deters crime, that it

19     helps the police, because the police cannot be everywhere.  The

20     police are not of the uniform opinion just like other

21     individuals in our society are not of uniform opinion.  Police

22     are people, too, and they have all kinds of ideas and thoughts

23     about this.

24          THE COURT:  Good.  So if we're going down the list,

25     what do I do about the debate between Judge Wilkinson and Judge

1    Niemeyer?  Is this a case in which there is a principal of

2    constitutional avoidance?

3              MR. GURA:  No, Your Honor.  I'm not sure how we could

4    avoid the constitutional question here, because it's the only

5    question that's been raised.  At least in Judge Wilkinson's

6    opinion, Judge Wilkinson acknowledged that there would be cases

7    where the right would have to be examined outside the home.

8              Of course, Judge Wilkinson wishes to be cautious.  He

9    doesn't wish courts to jump into that territory if it's not

10   necessary to do so.

11             But Judge Wilkinson did not go so far as to suggest

12   that the Supreme Court is a court of first impression --

13             THE COURT:  Right.

14             MR. GURA:  -- when it comes to these issues.  And to

15   the extent that his opinion would be read that way, the Supreme

16   Court's many expressions of frustration along those lines

17   should be controlling.

18             The Supreme Court relies upon and expects the lower

19   federal courts to develop the law so that it can be in a

20   position to review issues if the courts are to refuse their

21   jurisdiction, the Supreme Court would be very busy, and it

22   would be converted into a very different type of tribunal.

23             So even Judge Wilkinson, who obviously is at the

24   maximal point of caution and reticence, acknowledges there are

25   going to be some cases.  We submit that if this is not a case

1    where the right outside the home has to be examined, we don't

2    know what is.  And in that particular case, Masciandaro, again,

3    they were able to avoid the core issue by saying it's a time,

4    place, and manner issue.  And then they resolved the time,

5    place, and manner issue, but we don't have that option here.

6        THE COURT:  He says -- Judge Wilkinson says there is

7    no such necessity here, and I was thinking about the only way I

8    can avoid it is to say there is a reading of Judge Wilkinson's

9    majority opinion, which says that the Second Amendment's right

10   outside the home recognized, if at all, in the first instance

11   by Supreme Court, which would then mean that I would write an

12   opinion if I agreed with the plaintiff that I think that the

13   Second Amendment does extend outside the home, and the

14   plaintiff can win.

15       But I can't recognize such a right, the case would

16   then go up to the Fourth Circuit.  The Fourth Circuit would say

17   we can't recognize such a right, either, and the case would

18   then go up to the Supreme Court essentially undeveloped.

19       So while I think that Judge Wilkinson is absolutely

20   correct on the basis of the Masciandaro opinion, where there is

21   a way to avoid the constitutional issue, it must be taken, but

22   here it's a lot harder to see the end run.

23       MR. GURA:  That's correct, and we don't see it.  And

24   I don't believe that the defendants have offered an

25   alternative, either, to addressing Second Amendment issue.

1     They, of course, believe that we don't prevail, and they have

2     reasons for arguing that, but I haven't read any of their

3     briefs.

4               And, of course, they can correct me in a moment if

5     they see some other vision of avoiding the core question, which

6     is, of course, a different question than whether or not we

7     prevail.

8               Beyond the constitutional avoidance issues, the Court

9     also asked us about the application of First Amendment doctrine

10    and whether or not to what extent is First Amendment doctrine

11    properly applied in the Second Amendment context is it merely

12    instructive in determining the level of scrutiny applicable to

13    the circumstances or do concepts such as prior restraint and

14    overbreadth apply as well?

15              Your Honor, we would contend that other concepts

16    apply as well.  The reason that courts include the Fourth

17    Circuit, but by no means only the Fourth Circuit as we've seen

18    throughout the country, the reason the courts repeatedly look

19    to the First Amendment when developing Second Amendment

20    doctrine because these amendments are actually quite similar in

21    their function.  They both secure the right to engage in some

22    sort of activity that the government cannot fully intrude into.

23              THE COURT:  And sometimes unpopular rights.

24              MR. GURA:  That's correct.  And so you see the time,

25    place, and manner analysis, which is different than content

1    analysis.  And of course you see prior restraint analysis,

2    which answers a very different kind of question.

3         This is a classic prior restraint case.  And we don't

4    even need to go into the Second Amendment cases that have drawn

5    from the First Amendment.  We need only go as far as Staub

6    versus City of Baxley, where the Supreme Court announced that

7    wherever you have a freedom that the constitution secures, and

8    the ability to enjoy that freedom is subject to the will of the

9    licensing official, then you have a prior restraint.

10         THE COURT:  So sort of the, well, you want to speak,

11    what is it that you want to say?

12         MR. GURA:  That's right.  Or is your speech going to

13    be harmful to society?  Or are you a morally appropriate person

14    to offer these opinions or to engage in this conduct?

15         And in Staub,, the Court laid out a definition of

16    prior restraint.  And in fact the term prior restraint was

17    distinguished from censorship.  The Court said censorship or

18    prior restraint.  So it's not merely an issue of content-based

19    restrictions.

20         Here we have a freedom of the constitution guarantees

21    the right to carry handgun in public for self-defense.  If the

22    government wishes to regulate that, that's fine, they can

23    regulate that.  But the regulation basically leaves it not

24    unbridled discretion bound by no standards whatsoever of the

25    official to determine whether it's a good idea for the person

 1    to do that.  We contend that is a classic form of prior
 2    restraint.
 3         And all we are asking is for the government to simply
 4    adhere to objectively defined standards that can be evaluated
 5    both in terms of what they require as well as in the way in
 6    which they are applied.
 7         The First Amendment is a wonderful guide here as it
 8    is in so many other ways.  We've seen the Court in Chester and
 9    then late in Ezell also apply overbreadth analysis or at least
10    reject the no set of circumstances analysis using First
11    Amendment grounds.  Again, that's appropriate in the Second
12    Amendment, because there will always be people who should not
13    have guns.  Therefore, any gun law that one might imagine can
14    be properly applied to at least one individual.
15         But that's not to say that all gun laws are
16    constitutional simply because you can always find an instance
17    where they're properly applied.  That's a First Amendment
18    doctrine.
19         The Supreme Court applied that kind of thinking when
20    in Heller the Court held that assuming there's no disqualifying
21    feature that Mr. Heller has, he must be issued a license to
22    have his handgun.
23         And likewise here.  Yes, there are going to be people
24    who will not be able to carry handguns even if we prevail.  But
25    that doesn't mean that because some people may not have guns,

1    all people can be barred from having guns.  Again, that's a

2    First Amendment concept that works quite well in the Second

3    Amendment area as well.

4         And finally, Your Honor, to address Your Honor's

5    concerns, Your Honor asked about the appropriate role of social

6    science data in determining whether the state's carry law

7    passes constitutional muster.  This is an area where the briefs

8    have been I think quite clear on both sides.

9         The state offers that this is very dangerous

10   activity, and they have an array of social scientists who will

11   attest to that.  We have cited some contrary evidence, but we

12   don't rely on that necessarily because we think that that's

13   wholly irrelevant.

14        If there were a question about a specific regulation,

15   then we could talk about perhaps social science.  For example,

16   if this were a case about whether certain kinds of felons or

17   misdemeanants to have firearms, then the government could be

18   expected to come in and say, look, here is a recidivism rate,

19   people who have been violent before will be violent again.

20   This is actually a useful law.  It has a good fit with the

21   public policy, and the Court might be able to evaluate that

22   sort of data.

23        But the Court in Heller and McDonald cautioned that

24   the content of the Second Amendment is not to be determined on

25   the basis of social science.  It is not up to the Court's

1    evaluation of empirical evidence that federal courts are not

2    necessarily ill-suited to referee, that every single thing

3    that's secured in our constitution is going to be controversial

4    from a social policy standpoint.  That ranges from the

5    exclusionary rule to the income tax and of course free speech,

6    the right to bear arms.

7           There's nothing that we cannot point to some social

8    science that would claim it's a bad idea that it should not be

9    permit the --

10          THE COURT:  I would assume then, if you think about

11   the Second Amendment or any right, there is a process of line

12   drawing, and that social science can be relative and helpful on

13   one side of the line.

14          For example, assume that all firearms were legal,

15   everybody could carry a firearm, state passes a regulation

16   saying you can't carry a firearm with an obliterated serial

17   number.

18          So there would the question would be, well, why not?

19   What's the reason for that?  And then there would be -- there

20   could be appropriately a great deal of evidence from law

21   enforcement, social scientists everywhere as to why that is a

22   bad idea, and the general bad idea is that serial numbers help

23   track firearms, criminals like unregistered firearms because

24   they can't be tracked.  There's a black market for firearms.

25   Legitimate people don't need unregistered and untrackable

1    firearms.  And then the answer then is that, yes, the state can

2    prohibit unregistered or firearms with obliterated serial

3    number.

4         But while the right may be compressed, there is a

5    certain point at which it can be compressed no further.  So the

6    way I was thinking about it is that social science, not off

7    limits, relevant and useful, but there comes a point where

8    social science cannot be used to obliterate the right or read

9    it out of the constitution.

10        It would be, for example, let's assume you had one of

11   the Bill of Rights amendments would say either that the right

12   of abortion may not be abridged, or that the right, or that

13   abortion may not be tolerated.  There would be a great deal of

14   passionate debate on either side of that issue and a great deal

15   of social science statistics, health statistics, recidivism

16   rates, et cetera, but ultimately, the constitutional language

17   has to control despite the social science.

18        MR. GURA:  That's correct, Your Honor.  And there's

19   one very clear example of what the courts do all the time, and

20   that is in the First Amendment with respect to adult zoning

21   standards, the Court has held that people have a First

22   Amendment right to establish these establishments.  They cannot

23   be completely forbidden, but they can be zoned for their

24   secondary effects.

25        So we also have cases, there have been some in this

1    court in this circuit, and there are some everywhere, where

2    social science plays a role in justifying the restriction,

3    whether it's as to hours or locations or concentration, or

4    set-offs.

5          But overriding all of the social science dispute as

6    to whether or not those zoning standards and other kinds of

7    regulations are appropriate, there's always the one caveat that

8    exists in City of Lanham versus Playtime Theater, which is

9    whatever else the government does, it can't use this regulatory

10   power to completely bar the operation of these establishments.

11   There has to be some practical way for people to engage in

12   them, in their constitutional rights.

13         And there, of course, we have an activity, which many

14   would claim perhaps lies at the periphery of the First

15   Amendment.  And so, of course, here we would say, yes, there

16   might be a role for social science to play in assessing

17   regulations, but it cannot alter the definition of the core

18   right simply because the government thinks it's a bad idea.

19         THE COURT:  Good.  Thank you.

20         Why don't we take a 15-minute recess, and then I'll

21   hear from you, Mr. Fader.

22         (Recess)

23         THE COURT:  Thank you.  Please be seated.

24         Mr. Fader, I'm all ears, sir.  I'm happy to hear from

25   the state.

1              MR. FADER:  Thank you very much.

2              THE COURT:  If you could just address the two, or the

3    one preliminary issue first, and then you can go in any order

4    that you wish, and that is, is there a ground of constitutional

5    avoidance?

6              MR. FADER:  Thank you, Your Honor.  Actually, I was

7    going to begin by addressing sort of the framework of the

8    Masciandaro case, which I think directly addresses that

9    question.  I think there is a framework for a constitutional

10   avoidance depending on how Your Honor answers the question that

11   the Fourth Circuit directed districts courts to answer first.

12             The Chester decision set out two questions that

13   courts are supposed to ask in looking at the Second Amendment

14   challenges, one being is it within the scope of the Second

15   amendment?  And the second being if it is, does it satisfy the

16   appropriate level of means and scrutiny?

17             In Masciandaro, the Fourth Circuit directed basically

18   the order in which courts are supposed to address those

19   questions, and because the first question involves a serious

20   constitutional issue, that, as Judge Wilkinson noted, could

21   have very serious implications for public safety, the Court

22   said we're going to switch the order that Chester used and

23   direct you to first address, assuming it falls within the scope

24   of the Second Amendment, does it satisfy the level of means and

25   scrutiny that would apply to it, if it were in that scope?

1              If the Court finds that the answer is yes, as the

2    Court did in Masciandaro, then the answer is, yes, it would

3    satisfy that.  We don't need to go to the second question,

4    which is the scope question.

5              Only if the answer to that first question is to -- it

6    does not satisfy intermediate scrutiny, if you assume the

7    Second Amendment applies, do you then go to the second question

8    and ask does it apply?  Does it fall within the scope?

9              So I would submit that the direction from the Fourth

10   Circuit to this Court is first assume that this regulation does

11   regulate conduct falling within the scope of the Second

12   Amendment apply the appropriate standard of scrutiny, and only

13   if Your Honor's answer to that question is no, it would not

14   satisfy that level of scrutiny, do you then go to the other

15   question of the scope of the Second Amendment and whether the

16   act falls within the scope.

17             I'll certainly address both of those issues today,

18   but I think that that is the framework that Masciandaro sets

19   up, and it does provide you only go to that second step if you

20   resolve the first one against the state.

21             THE COURT:  So that essentially, then, if the Court

22   is inclined to or will uphold the regulation, then it can avoid

23   the constitutional issue at this procedure.

24             If the Court is inclined to strike down the

25   regulation, then the Court has to find the right in the

1    constitution first and then find it's been unconstitutionally
2    burdened?
3              MR. FADER:   Right.   And find that the activity at
4    issue falls within the scope of the Second Amendment.
5              THE COURT:   Good.
6              MR. FADER:   Yes.   I also, in that context, Your
7    Honor, wanted to point to a couple other things out about the
8    Masciandaro opinion and what it directs courts to do in
9    assessing these challenges.
10             I agree with Your Honor's reading of Judge
11   Wilkinson's decision.   It certainly doesn't say courts should
12   never address that second question.   It just sets the order in
13   which they're to address it.
14             And Mr. Gura made a couple statements about the
15   Masciandaro case that I respectfully disagree with.   One is
16   that it's a sensitive place case or a time, manner, restriction
17   case.   It is not.   In fact, the government made the argument to
18   the Fourth Circuit that it was a sensitive place case.   The
19   government said a national park is a sensitive place, and so
20   you should treat this to fall within that presumptively lawful
21   regulation according to the Heller decision.
22             And in the Fourth Circuit's decision, they
23   specifically declined to rule on that issue of whether a
24   national park was a sensitive place, which is the time, manner,
25   place regulation issue.

1          And at page 473 of the Masciandaro decision, just

2     right at the end of subsection D, the Court said we need not,

3     however, resolve the ambiguity in the sensitive places language

4     in this case, because even if Dangerfield Island is not a

5     sensitive place, as Masciandaro argues, the regulation at issue

6     still passes constitutional muster under the intermediate

7     scrutiny standard.

8          So the Fourth Circuit in that case specifically said

9     we're not going to apply a time, manner, place.  We're not

10    going to apply this sensitive place issue, which was the basis

11    for district court's decision there, because we don't need to,

12    because it satisfies intermediate scrutiny regardless.

13         I'd also point out, Your Honor, that the basically,

14    based on that same issue, Masciandaro was not saying we're

15    going to apply an intermediate scrutiny standard because this

16    was time, manner, place, or because this is sensitive -- a

17    sensitive place issue.

18         THE COURT:  If I could just stop you for a minute.

19         Rogan, can you find that language here?

20         It's one of the sort of unintended consequences of

21    going from books to the computer, you can never find your place

22    in the opinion.

23         (Pause.)

24         MR. FADER:  It's even more difficult in this case,

25    Your Honor, because Masciandaro, when we were briefing it,

1   hadn't yet made its way in the Federal Reporter.  We were

2   dealing with one set of page references and then another one

3   now.

4          THE COURT:  Good.  So the text says, then, that we

5   need not, however, resolve the ambiguity in the sensitive

6   places language in this case, because even if Dangerfield

7   Island is not a sensitive place, as Masciandaro argues, the

8   section, the rule still passes constitutional muster under the

9   intermediate scrutiny standard.

10          In reaching this result, we conclude, first, that the

11  government has a substantial interest in providing for the

12  safety of individuals who visit and make use of the national

13  parks, including Dangerfield Island.

14          Although the government's interest need not be

15  compelling under intermediate scrutiny cases, sometimes

16  describes the government's interest in public safety in that

17  fashion.

18          As the District Court noted, Dangerfield Island a

19  national park area with a large number of people, including

20  children congregating.  Such circumstances justify reasonable

21  measures to ensure secure public safety.

22          So as I read the opinion, I didn't read it to mean

23  that public park equals airport, school, et cetera.  I read it

24  to mean that public park is just simply a place where large

25  numbers of people including children congregate and therefore

1    the rule passes intermediate scrutiny.

2          So that it is a time, place, and manner restriction

3    that is legitimate, but the legitimacy comes not from the parks

4    or the places, status as public park, but as a place where

5    people congregate.

6          Is that right?

7          MR. FADER:  I think that is right, Your Honor,

8    because the Court -- the point I was trying to make initially

9    is the Court did not choose intermediate scrutiny because this

10   was a sensitive place or a time, manner, and place restriction.

11   The Court chose intermediate scrutiny as it specifically said,

12   because this was regulated conduct outside of the home.

13         THE COURT:  Right.  So outside the home, we use

14   intermediate scrutiny, we apply intermediate scrutiny, and we

15   find that the regulation satisfies intermediate scrutiny

16   because there are a lot of people around.

17         MR. FADER:  Exactly.  And in that scrutiny analysis,

18   the Court looked at the only place at issue, which was a

19   national park, and found that the government had reason to do

20   that in one of its factors in deciding that was that there were

21   a lot of people around.

22         THE COURT:  There are legitimate issues about parks

23   -- this is sort of an aside.  And if the police are walking

24   around Baltimore City, and they see somebody sitting out on the

25   sidewalk with a cooler, the police probably can't say I want

1    you to open up the cooler, you have to, because I want to see

2    if there's beer inside, because you look like you're 18, but it

3    would seem to me that, in a national park, a public park, that

4    the police probably would have that right, because going into

5    the park is a privilege that can be regulated.

6            But that's really another issue.

7            So it passed intermediate scrutiny not because it was

8    a public park, but because of the character of the area and the

9    number and type of people who frequent it.

10           MR. FADER:  Those were certainly factors that the

11   Court used in deciding that in that case, that it easily passed

12   the intermediate scrutiny standard.

13           THE COURT:  Good.

14           MR. FADER:  And then, Your Honor I will turn to -- I

15   agree with Mr. Gura that your letter is certainly a very good

16   guidance for us, and we appreciate that.  I also want to go

17   down and address those points as you have listed them.

18           THE COURT:  Good.  Thank you.

19           MR. FADER:  First of all, with respect to the

20   statement of the Court right, I think Your Honor is correct,

21   and I think that Masciandaro dictates that the core of the

22   Second Amendment protection is in fact the right of law-abiding

23   individuals to possess handguns in the home for self-defense.

24           And Masciandaro specifically said that whatever the

25   scope is outside of that is what was left open by the Supreme

1    Court, but that was a matter of unanimous agreement among the

2    three judges.  The only disagreement was whether to resolve it

3    in that case.

4         With respect to the second point, whether

5    intermediate scrutiny is appropriate, as we said in our brief,

6    the state does actually take the position that the more

7    appropriate level of scrutiny to apply to this is the

8    reasonable regulation level of scrutiny.  However, we

9    understand that the Fourth Circuit's opinion in Masciandaro

10   certainly governs what this Court's analysis needs to be.

11        And in that case, the Court did say that regulations

12   of conduct outside the home are subject to intermediate

13   scrutiny.  So we've preserved that issue for appeal, but

14   understand that intermediate scrutiny will guide this Court's

15   decision.

16        THE COURT:  Good.

17        MR. FADER:  With respect to the third point, we agree

18   that this case does not implicate any of the specifically

19   listed presumptively lawful measures.  And this is a matter

20   that I guess a lot of different courts and commentators have

21   looked at what really are five separate points in the Supreme

22   Court's decision in Heller, where the Court was discussing

23   specifically the fact that the Second Amendment is not a right

24   of everyone to carry any type of firearm in any place they

25   want.

1        And the Court then went and listed five different

2   examples of how it's not an absolute right.

3        THE COURT:   Nonexclusive examples.

4        MR. FADER:   Nonexclusive examples, exactly.   But it

5   characterized them in sort of three different groups.   One

6   group was three presumptively lawful measures, which is the

7   group Your Honor listed in the third bullet point of your

8   letter.

9        Another group was by itself a statement in the Second

10  Amendment would only address laws dealing with firearms that

11  are in common use at the time.   And they reference the Miller

12  case that wasn't stated as a presumptively lawful measure, but

13  it was another exception, if you will, to the Second Amendment

14  that it doesn't reach protection of weapons not in common use

15  at the time.

16        The first issue that the Court pointed to, though in

17  discussing why the Second Amendment is not absolute, is the

18  fact that state courts for a long time have approved of bans on

19  the concealed carry of firearms.   It didn't say that was a

20  presumptively lawful measure.

21        In fact, it seemed to by virtue of its place in the

22  discussion elevated above that as the type of law that courts

23  have regularly found to be constitutional.

24        And in fact in the Supreme Court's own decision in

25  Robertson, in 1897, the Supreme Court noted that concealed

1    carry bans do not offend the Second Amendment.

2          THE COURT:  One of the things that's interesting in

3    this Second Amendment area is that here in 2011, one would

4    expect that this issue would have been definitively resolved by

5    the Supreme Court years and years ago, and it's sort of

6    striking that this is an area of constitutional jurisprudence

7    where there is not much there.

8          MR. FADER:  And in fact I think a lot of people

9    thought it was definitively resolved by the Supreme Court many

10   years ago in the Miller case.  Obviously, the Supreme Court

11   found that the right was tied to militia service.  And the

12   reason we're -- obviously Heller changed the landscape, and

13   that's why we found ourselves in this position without that

14   type of guidance.

15         But that is certainly a very interesting distinction,

16   and that's why Courts have been looking to other sources.  And

17   that's why I will get to the First Amendment later, but that's

18   why courts are looking to borrow from other constitutional

19   doctrines to try to find a path here, but that's exactly right.

20         But I would suggest, obviously, the Maryland statute

21   deals with both concealed carry as well as open carry.  But in

22   considering the statute, I think that, although the three

23   presumptively law regulations are not implicated by this

24   statute, the Court's statement immediately before about bans on

25   concealed carry being constitutional I think is relevant,

1   because the Maryland statute does address both things, and

2   that's relevant not concealed carry aspects of Maryland's law,

3   which doesn't go nearly so far as a ban, but is much more

4   permissive than that.

5          THE COURT:  One of the things that's interesting, and

6   I was thinking about in getting ready for the hearing, is what

7   is the reason why open carry, such as open carry of a shotgun

8   or a long gun is easier to accept by the state intuitively than

9   concealed carry?  The person -- if you have a person who is

10  carrying around a shotgun, he's a lot more dangerous than a

11  person who's carrying around, you know, a 38 revolver because

12  of the fire power of the shotgun.

13         Is it because law enforcement and other people can't

14  see person is carrying a concealed weapon when they're

15  interacting with them?

16         What is the rationale that says that concealed carry

17  is somehow bad while open carry is a lot better?  And I had a

18  hard time just sort of teasing out the answer other than it

19  makes intuitive sense.

20         MR. FADER:  Are you asking about that as far as the

21  state's position specifically in this lawsuit or historically I

22  explain it how it's developed?

23         THE COURT:  Yes, that would be perfect.

24         MR. FADER:  Okay.  My understanding of how that's

25  developed historically, Your Honor, is that some of the cases

1      actually describe it as an issue of what's manly or not manly.

2      Some of the cases specifically use that type of language and

3      describe it as if you're carrying a concealed weapon, then

4      you're not allowing the other person a fair chance to defend

5      themselves, and that's something that only a criminal would do,

6      to be hiding it so the other person couldn't see it coming, if

7      you will.

8              Whereas open carry, you're giving the other person a

9      fair shot.  And that's --

10             THE COURT:  When both of you walk out on either ends

11     of the dusty street and confront each other.

12             MR. FADER:  Yeah.  There's actually a case from the

13     mid 19th century, dissent sort of laments the days when people

14     could settle their issues with a gunfight rather than have

15     these restrictions on guns, that the majority was upholding

16     that case.

17             But I think that's the historical evolution of it is,

18     it wasn't even law enforcement so much, although that would

19     have been much more of an issue today, it was the private

20     confrontation and the idea that the one person wasn't showing

21     their hand, if you will, and getting an unfair advantage.

22             THE COURT:  Are any of the reasons that you've teased

23     out from historical level not anachronistic when applied today?

24             MR. FADER:  There's the law enforcement rationale

25     certainly.

1     THE COURT:  Right.  That's clear.

2     MR. FADER:  A big issue.

3     THE COURT:  Then that is clear because when law

4 enforcement comes on the scene, they have to get a handle on,

5 make assessments about these very fluid situations.  And one

6 thing they want to know is are those people armed or not?  So

7 that is absolutely clear.

8     But I was thinking about the fair fight or anything

9 that might appeal to somebody and, you know, the 18th or 19th

10 century that really doesn't appeal to us anymore, other than

11 law enforcement, is there a good reason that applies today?

12     MR. FADER:  As far as the distinction between

13 concealed and open?

14     THE COURT:  Yes.

15     MR. FADER:  I think that is the primary one, Your

16 Honor.

17     THE COURT:  Good.

18     MR. FADER:  With respect to the fourth bullet point

19 on this the Court should consider the regulatory scheme as a

20 whole, Mr. Gura addressed that, and it's also my understanding

21 that their challenge is limited to only this issue of good and

22 substantial reason requirement, and it doesn't go beyond that.

23     However, I think the Court's also right that in

24 addressing a specific element of the statute, you obviously

25 need to consider the entire statutory scheme, because that

1    particular element isn't there by itself, and it needs to be

2    considered in light of what the statute covers and doesn't

3    cover and the scope of the statute.  So I think --

4              THE COURT:  The entire statutory scheme, if you look

5    at it as a whole, is a very reasonable scheme because you have

6    the application, the application is acted upon, the person is

7    investigated.

8              If a person is turned down, there is a right to

9    appeal to a review board.  The review board is not a rubber

10   stamp.  They affirm the superintendent or the police only about

11   54 percent of the time.  And if a person is turned down by the

12   appeals board, there is a right to appeal in the Circuit Court

13   of the applicable county.

14             The scheme does not prevent people, as I mentioned,

15   was talking about with Mr. Gura from carrying a firearm or a

16   handgun outside the house, for example, to target practice, you

17   just have to separate so you're not -- the law doesn't create

18   an island of your house, which is where the only place that you

19   can have a firearm, and there is also the right to carry the

20   long gun around for protection.

21             So that this is not -- it does not -- Maryland's

22   regulatory scheme does not have the earmarks of a system that

23   is intended to stamp out gun possession and ownership by the

24   process of regulating it into oblivion.  So it all looks pretty

25   reasonable to me.

1          MR. FADER:  And I think the point there is while you

2     need to consider this in the context of the overall statute,

3     any decision would be rendered just with respect to that.

4          THE COURT:  There's one issue.

5          MR. FADER:  Right.  And with that, Your Honor, I

6     would like to turn to the key questions that Your Honor raised,

7     the first being do the regulations here at issue satisfy

8     intermediate scrutiny?

9          And this sub question Your Honor asked what's the

10    nature and extent of the state's interest in the regulations?

11    The state's interest, Your Honor, is in protecting the public

12    safety and especially in protection from handgun violence.

13    That's the -- that is recognized I think universally in the

14    courts as a compelling interest, and it was conceded in

15    briefing by the plaintiffs that the government has a compelling

16    interest in regulations to address handgun violence.

17         In the next sentence, the plaintiff said but that

18    doesn't really apply here, because there can be no compelling

19    government interest in preventing people from exercising a

20    constitutional right.  And that becomes a circular argument

21    that they're making that says you have a compelling interest in

22    protecting the public and the public safety, but we're just

23    going to deem it to be the case that, whenever you're

24    exercising a constitutional right, you can't have a cognizable

25    public safety issue arise from that.

1          And I respectfully suggest that's simply not the

2     case.  The First Amendment jurisprudence is obviously replete

3     with examples of people trying to exercise the right to speech

4     in a way that is injurious to public safety.  It's why you have

5     the fighting words exception in the First Amendment.  It's why

6     you can't scream fire in a crowded theater, that there are --

7     there are public safety, certainly allowed to take, to assess

8     public safety in deciding that whether a constitutional, in

9     deciding a challenge based on a constitutional right.

10          THE COURT:  One of the things to think about when I'm

11     deciding the case does have to do with the issue that you

12     pointed out concerning the Masciandaro case and the status of

13     Dangerfield Island, because, as you pointed out, the case did

14     not turn on Dangerfield Island's status as a national park

15     area, but as an area where a large number of people including

16     children congregate for recreation, such circumstances justify

17     reasonable measures to secure public safety, and one can say

18     that such an area equals downtown.

19          So that one argument from your standpoint is that

20     Masciandaro allows prohibition of handguns in any area where a

21     large number of people including children congregate for

22     regulation, or for recreation, and that it's impossible to

23     allow or to have a regulatory system where handgun carrying is

24     confined only to areas that don't sound like that.

25          MR. FADER:  I think that's right, Your Honor.  And in

1    fact the Maryland statutory scheme is not limited to allowing
2    possession of handguns in the home.  That's -- obviously, that
3    was the issue in Heller, that was the issue in McDonald, where
4    the Court said that they were, you know, among the most
5    restrictive gun laws that had been passed in history.
6         The Court simultaneously said that we should not
7    expect that any of other decisions upholding gun regulations
8    that had come in the past would have changed, based on the
9    Court's new interpretation of the Second Amendment.
10        The Court wasn't wholesale getting rid of decisions
11   that had upheld various regulations in the past.  And one of
12   the things -- one of the issues that plaintiffs have pointed
13   out in their briefs were there were references in the Heller
14   case to recognition by some other states or some other courts
15   in the past of other places where people could possess
16   firearms.
17        The Pennsylvania state constitution provided its
18   right apply to hunting as well as self-defense.  Well, the
19   Maryland and of course the recent Ezell case said there is a
20   right to possess for target practice.
21        The Maryland statutory scheme allows all of that and
22   more.  The Maryland statutory scheme does not restrict the use
23   or the wear and carry of the hands guns without a permit.
24   There's no need to obtain a permit for hunting, for target
25   practice, formal or informal, for target shooting, for

1    trappings, for dog obedience classes.  There are a number of

2    things that are specifically carved out that really encompass

3    pretty much every example that the courts have used of other

4    places wherein -- where courts historically have said people

5    may have a right to have a firearm.

6         The Maryland statute doesn't only apply within the

7    home, not even only apply within the business, but it reaches

8    all of those other uses as well, and I think that's very

9    important, a very important issue in both of the key questions

10   that Your Honor has posed.

11        It's an important issue in whether the statute meets

12   intermediate scrutiny, because it addresses the extent to

13   which, if you assume that there is -- that the Second Amendment

14   applies outside the home, it addresses the extent of the burden

15   that would be applied, because it is expressly permissive with

16   respect to other areas that also addresses the issue of whether

17   the Maryland statute is reasonably adapted to the government's

18   interests.  It's not overly restrictive.  It allows all of

19   those areas where traditional firearms would have been allowed

20   and expected to be allowed.

21        It's also very relevant to the scope inquiry, because

22   I think the first question in the scope is does the Second

23   Amendment address conduct outside of the home?  That's the

24   question that was left open by Heller, and it's a very broad

25   question.

1          But that's not the only question, because even if it

2     does -- even if the Second Amendment does apply to some conduct

3     outside the home, the question is then to what?

4          And it's certainly conceivable that if the Supreme

5     Court were to find that it addresses some conduct outside the

6     home, such as hunting or target practice, that those things, of

7     course, Maryland law allows.

8          So the scope could reach those things and still not

9     implicate the constitutionality of this statute.

10          But I think it's important for --

11          THE COURT:  I think one of the -- I think that's

12     right.  My read, I haven't made a final decision, but reading

13     Judge Niemeyer's opinion, I thought that he did a good job of

14     sifting through the cases and the statements and the dicta and

15     reaching a very reasonable conclusion that the Second Amendment

16     does operate outside the home but in a way in context

17     explicated by the Supreme Court.

18          So if there is a way around, then I would not make

19     that holding.  But if there is no way around, that's likely to

20     be the holding, which would then place us squarely in the

21     posture of examining the good reason requirement in the

22     Maryland statute.

23          It's clear from the language in the Masciandaro case

24     that the police can -- you can regulate firearms in an area

25     that has the characteristics stated in Masciandaro.  The

1    question then is why does requiring a good reason, in addition

2    to a background check, why does that make it less likely that

3    they're going to be problems in these crowded areas?  And is

4    there an answer to that?

5                MR. FADER:  We think so, Your Honor.  And it gets to

6    -- the way I look at this issue of the state's interest is sort

7    of twofold as far as deciding what the state's interest is, and

8    that's, first of all, the nature of the problem; and, secondly,

9    the benefits that the state is attempting to achieve from this

10   legislation.

11               And I'd suggest, Your Honor, we don't have to go into

12   all the statistics.  It's clear Your Honor has reviewed all of

13   that.  But handgun violence especially is a very serious issue

14   and a devastating issue to communities in the State of

15   Maryland, and that's the core of the problem.

16               In the statute, the General Assembly along those

17   lines made specific findings that it codified into the statute

18   as to why it was taking the step of implementing this specific

19   statutory scheme.

20               And those findings indicate that, with the

21   regulations that were in place at the time, there was an

22   alarming increase in handgun violence that the Court -- that

23   the General Assembly found based on the testimony that it

24   reviewed and the reports that it was provided that the laws

25   then in force had not been effective in curbing the more

1    frequent use in handguns in perpetrating crime and that these

2    further regulations were necessary and necessary to preserve

3    the peace and tranquility of the state and to protect the

4    rights and liberties of its citizens.

5             THE COURT:  Right.  If I could just stop for a

6    minute.  In thinking about this, it's hard to -- if you think

7    about the regulatory scheme and the parts of it that Mr.

8    Wollard satisfies, you know, he checks every box, type of

9    person, type of gun, until we get to the good reason

10   requirement.  So that I want to ask, how does the good reason

11   requirement make the public safer?  And the only thing that I

12   can think of is that requiring a good reason reduces the number

13   of permits that will be issued by the state and therefore

14   reduces the number of people, who are going to be law-abiding

15   people I might add, who are going to be carrying firearms.

16            So that the question then is, is that permissible?

17            The other point is, despite all these statistics,

18   it's not the Mr. Woollards of the world who are shooting all

19   these people.  You know, it's the people who are using

20   committing crimes, and we see them all the time in this court,

21   and it's almost never that Mr. Wollards of the world, it's the

22   people who are not permitted to possess firearms in the first

23   place usually because either because they're felons or because

24   they're using a firearm to commit a crime.

25            So the issue then is rationing the constitutional

1    right legitimate for protecting people in these, you know,

2    crowded areas?  And it's a tough question to answer.

3           MR. FADER:  Right.  And of course the same rationing

4    the constitutional right of course based on what the scope of

5    the right is, and that's a separate question.  But as to the

6    issue of what benefit the state gets out of it is as far as

7    protecting public safety by having a good and substantial

8    reason requirement, we have submitted a number of reasons why

9    that happens.

10           And one of the reasons is because it does in fact

11    keep people guns out of the hands of criminals when even

12    law-abiding citizens are out and about carrying their firearms,

13    they become the target for criminals to take the gun away.

14           We in fact know from the very facts of Mr. Wollard's

15    case where he pulled a gun on somebody who was invading his

16    home, and that individual took the gun away from him, and

17    fortunately he didn't aim it anybody else in the house other

18    than himself, himself being the intruder, but guns are

19    reasonably easily taken away from people when they're carrying

20    them.

21           THE COURT:  If I could, because it just occurred,

22    also, if a person has a carry permit, highly likely they're

23    going to keep it a lot of the time in their glove compartment

24    or somewhere in the car, so you have the phenomenon, you have

25    increased break-ins now to steal your GPS, and if people know

1    that there are going to be firearms in more cars, then more

2    guns are going to be stolen.

3         MR. FADER:  That's absolutely right, Your Honor.  And

4    that is part of the declarations of some of the law enforcement

5    officers that we submitted that talked about not only in their

6    experience would that happen with private citizens who would

7    have their guns in their glove compartments, but in fact it

8    happens with police officers.  Police officer's homes have been

9    targeted because criminals know there will be guns there.

10   Police officer's cars have been targeted because they know

11   there will be guns there.  That would happen even more if more

12   private citizens had their guns, and that's an issue of very

13   serious concern to law enforcement and another reason why this

14   requirement does benefit public safety, by having this

15   requirement in place.

16        It also, and again as detailed in the declarations of

17   the law enforcement officers we submitted, prevents harm to

18   innocent bystanders from interjecting additional guns into

19   confrontations where confrontations before might not have

20   become deadly, now it potentially would.

21        I'd also suggest, Your Honor, that especially with

22   some of the more lenient shallow issue regimes out there, it's

23   not the case that somebody who qualifies for a permit based on

24   meeting those objective factors won't use that gun for criminal

25   activity.

1          We saw last year here in Maryland where the holder of

2     a Virginia conceal carry permit opened fire in Johns Hopkins

3     Hospital, shot the doctor who was treating his mother, then

4     killed his mother and himself.  He was the holder of a permit

5     that was issued in Virginia because he checked off all those

6     boxes.

7          And we cited to the website that keeps a record of

8     those things, the violence policy center's website that I think

9     the updated figures are since I think May of 2007, 311

10     homicides by holders of permits and 11 of law enforcement

11     officers by holders of permits.

12          Mr. Gura pointed out that something less than a third

13     of those were actually suicides, but you're still left with

14     more than 200 cases since early 2007 of people who get these

15     permits, because they meet the objective boxes then using the

16     guns to commit crimes.

17          THE COURT:  Well, one of the imponderables in this

18     area sort of reiterates the question that might be raised about

19     drug use.  If drugs were legalized, how much would drug use

20     increase?  Would it be five percent, ten percent, a hundred

21     percent?  Or would it be a useful experiment to know what the

22     answer to that question is?

23          And you can sort of translate it into this issue, if

24     we eliminated the good reason requirement, how many more people

25     are going to get gun permits?  Intuitively you would think that

1    not that many people, but you know, but who knows?  And what

2    are the statistics?  I know there are other states that are

3    very easy to get a carry permit, I think Texas is one,

4    Colorado's another.

5             Do you know what the statistics are in Texas?

6             MR. FADER:  It's hard in some of these cases, Your

7    Honor, to compare because it's not necessarily apples and

8    oranges.  Texas is a case where actually fewer than two percent

9    of the population has a permit.  But in Texas, you only need a

10   permit to carry concealed.  You don't need a permit to carry

11   open is my understanding.  So it's apples and oranges, if you

12   will, because if everybody can get a permit to carry open or

13   concealed.

14            In Maryland, I don't know how you assess that.  It's

15   also obviously a completely different landscape as far as the

16   people and the number of urban centers and the population

17   density and things like that.

18            So I did the math actually based on information on

19   the Texas public available information in their web site.  I

20   think it's something along the lines of 1.8 percent of the

21   Texas population has a permit to carry concealed.  But I don't

22   know what that would translate into if you had to have a permit

23   there to carry open as well.

24            THE COURT:  1.8, but it's still a lot of people.

25            MR. FADER:  And Texas certainly has a lot more than

1    as well, but, yes.

2         THE COURT:  So if you forget what the population is

3    in Maryland, 1.8 had a concealed permit, then it's still --

4    it's a fair number of people.  Now, they're not always going to

5    be carrying their firearms, but I guess I'm sort of rambling

6    here, but sort of my gut, it's not an issue to be taken into

7    consideration in deciding the case, because it's irrelevant to

8    the constitutional issues, but I think that your hunch is that,

9    if you eliminated the good reason requirement, you wouldn't

10   have a run on the police department, you wouldn't have hundreds

11   of thousands of people apply.  You probably would have a tick

12   upward, but not too much.

13        MR. FADER:  And I don't think we know the answer to

14   that question, Your Honor.  And we don't have the data to

15   support.  The data we do have says that well over 90 percent of

16   the people who apply for the permits have been given them.  We

17   don't know how many more people would be inclined to apply if

18   the requirement weren't there, but that's the data that we do

19   know.

20        As far as social science, Your Honor, and I think

21   it's appropriate to address that here, because we also know

22   from the social science and from the report we submitted from

23   an expert in handgun violence issues is that the prevalence of

24   guns has been shown to increase the death rate from other

25   crimes, like assault and battery.

1        When the population, civilian population, has more

2   guns, criminals tend to carry more guns and other crimes tend

3   to result in death when they night not otherwise reach that

4   lethal level.

5        Obviously, there are reports and studies that Mr.

6   Gura has also cited that claim to come to a different

7   conclusion.  But I think the point of the social science that

8   we introduced goes to looking at whether the state's interest,

9   the substantial governmental interest, that needs to be

10   evaluated as part of the intermediate scrutiny standard is a

11   legitimate interest or is it pretextural?

12        And I think Your Honor explained from the makeup of

13   the statute why that gives a very good indication that this is

14   not a pretextural statute designed to get rid of gun rights,

15   because it certainly doesn't do that.

16        But the existence of the social science to support

17   the notion that these kinds of laws do in fact aid in achieving

18   the government's interest in public safety and reducing handgun

19   violence, that's where the social science comes in.  It doesn't

20   stand by itself.  It's not essential, but it is important in

21   looking at what the government's interest is and why the

22   government is supporting and why the General Assembly passed

23   the legislation in the first place.

24        And in fact this is an issue of again if we're

25   assuming that the Second Amendment applies outside the home,

1      the question then becomes how you analyze the government's

2      interest outside the home.  I think it's important to recognize

3      what the Fourth Circuit recognizes, which is outside the home

4      is a different place than inside the home.  It's a different

5      place for a number of reasons, but the majority in Masciandaro

6      said, as we move outside the home, firearms rights have always

7      been more limited, because public safety interests often

8      outweigh individual interests in self-defense.

9            So I don't think you can point to the recognition of

10     a Second Amendment right in the home and the fact that the

11     Heller court said under any level of scrutiny an absolute ban

12     on possession of handguns in the home is unconstitutional, and

13     assume that the same analysis applies outside the home, which I

14     think is what Mr. Gura was saying we don't have to even think

15     about the level of scrutiny we just apply the constitutional

16     provision as it's written.

17           I think the Fourth Circuit in Masciandaro has said

18     you have to apply a level of scrutiny, and that level is

19     intermediate scrutiny, so I think the Fourth Circuit has

20     foreclosed that as an option.

21           In addition to that, the Fourth Circuit has clearly

22     noted that the interests are different outside the home than

23     they are in.  Public safety is much more of an issue outside

24     the home, much more of an issue within the state's prerogative

25     and the General Assembly's concern when it was passing this law

1    than it is inside the home.  And that's what leads us to look

2    at the factors differently and to consider the public safety

3    rationale that we've just talked about the reasons why making

4    sure that only people who have a good reason to have a gun are

5    actually wearing them around in public in these crowded areas,

6    why that really does have an impact on public safety?

7           As far as how the regulations are tailored to advance

8    the state's interest, which is the second part of the

9    intermediate scrutiny question, I'd like to start with a

10   terminology point, because tailored is I think usually used in

11   the sense of a strict scrutiny standard, is it narrowly

12   tailored not government's compelling interest?

13          And in the intermediate scrutiny standard, the Fourth

14   Circuit has applied the in Masciandaro.  They said is the

15   regulation reasonably adaptable to the government's or adapt to

16   the government's substantial interest?

17          And in Chester, they use a slightly different

18   formulation of is it a reasonable fit to the government's

19   substantial interest?

20          That's the terminology, and I think it's a

21   terminology that's important in looking at how the Court is

22   supposed to analyze this.  It doesn't need to be a perfect fit.

23   Your Honor was suggesting the cities might be more directly

24   analogous to the park in the concentration of people, and

25   although they might be more analogous to the park, we don't

1    need to have an intermediate scrutiny a precise fit to the

2    governmental interests.  We need to have a reasonable fit to

3    it.

4         And moving on from that point, I think that the

5    state's interest is a reasonable fit.  It is reasonably adapted

6    to the government interest.  And part of that is what I was

7    discussing before about all of the uses of a handgun that are

8    not subject to a permit in Maryland, that apply outside of the

9    home, such as hunting and target practice and target shooting

10   and trappings and those things that show that the interest is

11   in fact -- that the burden of the regulation is narrow, because

12   it doesn't apply to any of those places that courts have really

13   identified as being places where historically you'd expect to

14   have a gun.

15        THE COURT:  Well, in this case, Mr. Wollard's

16   original reason for obtaining the permit was because of the

17   presence three miles away of an individual who had invaded his

18   house.  What happens if the person comes in and says I want a

19   permit to carry because I live in an area of let's say West

20   Baltimore or East Baltimore, high murder rate, drug dealers,

21   dangerous, so I wouldn't need handgun if I lived out someplace

22   elsewhere.  It's more, you know, if there weren't so many

23   people, armed people I wouldn't want in my area of East

24   Baltimore.

25        Does the state give that person a permit, or does the

1    state say you can't have a permit because it's too crowded an

2    area?

3            We know what the state is, in a sense, it's

4    irrelevant, but I would be interested to know what has the

5    state done when that is the good reason that is asserted?

6            MR. FADER:  I think the guidance that we have

7    generally on that, of course, that's not an as applied

8    challenge that we have here, but the appellate decisions from

9    the Maryland state courts have indicated that good and

10   substantial reason means a reason beyond mere anxiety or a

11   reason that everybody else around you shares, there should be a

12   specific reason why you instead of the person who lives next to

13   you.

14           THE COURT:  So I live in a high crime area isn't

15   going to work.

16           MR. FADER:  Again, we don't have that specific

17   factual context, but I think that's a fair reading of the

18   decision.

19           THE COURT:  But if what would work is I own a

20   convenience store in a high-crime area, and I have to take the

21   cash receipts to the bank every night, that works in just about

22   every case unless the person's prohibited for some reason.

23           MR. FADER:  The Maryland State Police have

24   established four different categories in order to assess

25   whether somebody has a good substantial reason.

1           THE COURT:  One covers judicial officers, I notice.

2           MR. FADER:  It does, Your Honor, along with anybody

3   else who has a job where they can take people's civil liberties

4   away is that category.  But one is also the business owner who

5   carries items of street value, and so they have a process of

6   determining who falls into what category.

7           But because of the way that Maryland treats gun use,

8   even without a permit within the state, this is not even a

9   remotely similar law to the laws that were struck in Heller or

10  in McDonald, or even in Ezell.

11          Ezell, of course, addressed target practice, which is

12  specifically allowed under Maryland's law.  And I also would

13  just comment again some of the discussion of Ezell before,

14  Ezell didn't recognize a freestanding right to engage in target

15  practice on its own such there is a recognition of a general

16  Second Amendment right outside of the house.

17          The basis on which the Ezell court ruled was that if

18  you're going to have a right to have a handgun in your home for

19  self-defense, you have to be able to effectively exercise that

20  right.  If you can't practice shooting with the gun, then you

21  can't effectively exercise that right?

22          Although Ezell did rule that, in that case, there is

23  likelihood of success on the merits in showing that you had a

24  right to engage in target practice.  It wasn't because there

25  were finding a grant a right outside the home it was

1    specifically tied to the right inside the home, and it was

2    ancillary to that right.  And that's how they got to that, not

3    quite, but closer to strict scrutiny standard, because it

4    really did implicate the right in the home.

5              THE COURT:  Do you agree with the recognition of the

6    advanced immediate scrutiny category, something that's between

7    strict and intermediate?  Or do you think that they really,

8    they should have applied another standard?  It's either

9    intermediate or strict.

10             MR. FADER:  Well, and this is what I was going to get

11   into the First Amendment discussion, but I will do it now.

12   Intermediate scrutiny is frankly a flexible standard.  Courts

13   have treated it as a flexible standard.

14             What I think the Ezell court did is applied immediate

15   scrutiny but higher up on the intermediate, I don't think

16   there's a separate category for advanced intermediate.

17             But that's one of the things, frankly, that the

18   courts that have been applying First Amendment jurisprudence

19   have adopted most of all from the First Amendment is its

20   flexibility in saying, okay, where on the scale does this law

21   lie as far as burdening the right?

22             And even within the intermediate scrutiny standard,

23   if it's intermediate scrutiny, but it's a really heavy burden,

24   then you go up the scale.  And if it's intermediate scrutiny,

25   but it's a lighter burden, then you go down the scale.

1          That's where I think you need to consider the

2     Maryland regulation as a whole and say unlike Heller, the laws

3     of McDonald and Ezell, this regulation is very permissive with

4     respect all the places where you would usually expect to be

5     able to have a handgun without a permit, and it allows all of

6     that.

7          THE COURT:  If you think about the standard, then

8     it's sort of visual or mechanistic terms, at some point,

9     there's a click, and you're up to strict scrutiny.

10         But before you get to that click, there is a very

11    flexible, flexibly applied intermediate scrutiny.  And the

12    Seventh Circuit case was simply a case that was at the upper

13    end of that standard.

14         MR. FADER:  I think that's correct.

15         THE COURT:  We're going to have to end soon, if you

16    have any final points to make, I would appreciate them.  And

17    before left I want Mr. Gura to answer the question about does

18    Masciandaro say where you have an area where you have a large

19    number of people including children and they congregate for

20    regulation, can you then ban handgun, carrying handguns in that

21    area?

22         But before we get there, Mr. Fader, do you have

23    anything else?

24         MR. FADER:  Your Honor, just very briefly on the

25    scope point, I want to point out there is no other court that

1   has ever held that the scope of the Second Amendment extends

2   beyond the home with the limited exception of Ezell, which

3   itself was only tied to the right within the home, not outside

4   of it.

5            And I also did just want to address briefly that a

6   lot of what we're talking about here with this law are choices

7   that the Maryland legislature could have made when it did this.

8   We're not here to decide policy, neither of the parties want

9   Your Honor to be making policy.  But the issue is did the

10  General Assembly make a permissible choice within the

11  constitutional framework that we now have when it passed this

12  law?

13           For all the reasons we've stated in our brief and

14  before you, the state certainly believes that it can.  And the

15  issue is not whether a different choice could have been made.

16  The issue is not whether there is a better choice or even a

17  specifically more narrowly tailored choice because the interest

18  in intermediate scrutiny need not be permit, it might only be

19  reasonable.  We would submit this was certainly a reasonable

20  choice for the Maryland legislature to make and that the

21  plaintiffs attempt to force Maryland to adopt the policy of

22  other states that had issued -- that have decided to come shall

23  issue, mostly within the last 20 to 30 years is not appropriate

24  then the Second Amendment simply did does not command that to

25  happen.

1          THE COURT:  Thank you, Mr. Fader.  I appreciate it

2     and all the hard work you and opposing counsel did in the case.

3          Mr. Gura, if you could just address that one issue?

4          MR. GURA:  Yes, Your Honor.  Masciandaro does seem to

5     state that the defendant in that case was constitutionally

6     convicted of having a gun in a park, because the park was a

7     place that had those characteristics in it, and so it is

8     clearly a place case.  And this case is not the place case.  We

9     look at the form that the state requires of people to fill out

10    in applying for a carry permit.  There's no question about

11    where they would carry the gun.

12         The regulation at issue here does not relate to any

13    particular places, it's simply a right to carry a gun in

14    Maryland.  The place is the entire state.  And we while we

15    don't agree with the ultimate conclusion in Masciandaro, we do

16    agree that there will be places from which even licensed

17    individuals can be barred from having handguns, but that's not

18    the kind of case that we're in.

19         THE COURT:  So that there might, for example, be the

20    state might say, for example, that you can't carry the gun in

21    Baltimore City or Prince George's County or somewhere else, but

22    that's not this case, because this case, in this case, Mr.

23    Wollard was not permitted to carry the concealed handgun

24    anywhere no matter how populated or rural.

25         MR. GURA:  Your Honor, while we would not agree with

1    those laws, at the very least, if those were the kind of laws

2    at issue, we would be having a very different kind of argument.

3           It's also important to note again, as opposing

4    counsel observed, the law here doesn't make a distinction

5    between concealed and open carrying.  And, again, I wish to

6    stress to the Court, as I believe we did in the briefs, we

7    don't really have a say in that as plaintiffs, and neither

8    would the Court, if the state wanted to allow only open

9    carrying or only concealed carrying for whatever reasons it

10   felt it wished to have those policies, we could not challenge

11   that.

12          Texas was noted.  Actually, open carrying is not

13   allowed in Texas.  We do have the statistics, though about what

14   happens there with concealed carry, that's in our reply brief.

15   Just to note in a published opinion on the Internet from the

16   Texas Department of Public Safety publishes the figures for how

17   many crimes are committed by permits holders, and I believe

18   that for 2009, the last year for which we found records out of

19   65,561 serious criminal convictions, in the State of Texas,

20   it's a big state, only 101, or 0.1541 percent could be

21   attributed to individuals who possessed handgun carry licenses.

22          I think the crux of the matter boils down to what the

23   Court noted, which is does the state have the ability to ration

24   the right to bear arms in the interest of public safety?  And

25   we would claim that there is never a legitimate interest in

1   rationing a constitutional right for its own sake simply

2   because the state believes that the right is a bad idea or is

3   dangerous to public safety.

4          We are told that our arguments are circular when we

5   state that the state has a legitimate compelling interest in

6   public safety, but not an interest in barring people from

7   bearing guns.

8          Well, our arguments are only circular if the right to

9   bear arms is inherently against the public interest.  If it is,

10   as opposing counsel said, in inviting juries to public safety,

11   the fighting words doctrine was cited, yelling fire in a

12   crowded theater was cited.

13          Those are classic forms of unprotected speech,

14   because they're not traditionally within the kind of speech

15   that was protected in this country.

16          Fighting words may be obviously a bad policy to

17   allow.  They are also not a form of protected speech.

18          Carrying handguns for self-defense is a form of

19   Second Amendment activity and whatever else, the State of

20   Maryland does not prohibit.  Of course, we concede the State of

21   Maryland's laws are on a whole much better than those of

22   Chicago, although that's not much of a standard, all the same,

23   the issue here is not about the right to go to a gun range.

24   The issue here is the right to carry a gun in public for

25   self-defense, and that is what has been tested/

1         THE COURT:  Thank you, counsel.  I'm going to have to
2    leave.  I'm not inviting more briefing, but what I would like
3    both sides to think about it, discuss it between yourselves, if
4    there is something that you would like to file in light of the
5    questions that have been, the discussion we had this morning,
6    I'd be happy to have it.  Simply let me know what the briefing
7    schedule is going to be.
8              I'm going to be away next week.  I'm not probably
9    going to get an opportunity to start working on this decision
10   in earnest for let's say the next three weeks to a month.  So
11   if you want to file anything else, just send me a letter with
12   the filing schedule, and I'd be happy to read it.
13             But I'm certainly not urging you to do anymore work.
14   Your briefs were really excellent, and I really enjoyed reading
15   them.  Good.  Thank you.
16         MR. GURA:  Thank you, Your Honor.
17         MR. FADER:  Thank you, Your Honor.
18              (PROCEEDINGS CONCLUDED)
19
20             I, Jacqueline Sovich, RPR, CM, do hereby certify
     that the foregoing is a correct transcript from the
21   stenographic record of proceedings in the above-entitled
     matter.
22

23   _____

24   Jacqueline Sovich                        DATE
     Official Court Reporter
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25