IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAYMOND WOOLLARD, *et al.*, | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Case No. 1:10-cv-2068-BEL |
| MARCUS BROWN, *et al.*, | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
FOR STAY PENDING APPEAL**

DOUGLAS F. GANSLER
Attorney General of Maryland

DAN FRIEDMAN (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

MATTHEW J. FADER (Fed. Bar # 29294)
STEPHEN M. RUCKMAN (Fed. Bar # 28981)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906
Fax. 410-576-6955
mfader@oag.state.md.us
sruckman@oag.state.md.us

April 19, 2012                            Attorneys for Defendants

## INTRODUCTION

Pursuant to the Court's March 30, 2012 Order (ECF No. 63), the defendants submit this supplemental brief in support of their motion for stay (ECF Nos. 54, 67), and to address three questions posed by the Court during the March 22, 2012 conference call.[1]

The Court should enter a stay pending appeal because of:

(1) the compelling public interest in public safety that the General Assembly determined, and law enforcement officials have confirmed, is served by the good and substantial reason requirement, *see* ECF No. 54 at 11-13; *see also* Defendants' Memorandum in Support of Cross-Motion for Summary Judgment (ECF No. 26) at 10-16, 34-38; Bealefeld Decl. (ECF No. 26-5); Sheridan Decl. (ECF No. 26-6); Johnson Decl. (ECF No. 26-7); Cook Decl. (ECF No. 26-4);

(2) the resulting irreparable harm if the good and substantial reason requirement cannot be enforced, *see* ECF No. 54 at 17-19;

(3) the likelihood of success on the merits, *see* ECF No. 54 at 13-17; and

(4) the balance of the equities, *see* ECF No. 54 at 18-19.

With respect to the balance of the equities, Maryland law already protects the core Second Amendment right, namely "'self-defense in the home by a law-abiding citizen.'" Memorandum Opinion, ECF No. 52, at 8 (quoting *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011)). That core right is not at issue here. *Id.* at 9. Moreover, Maryland law allows the wearing and carrying of handguns without a permit in the home and many other locations, *see* ECF No. 26 at 6-7, 33-34, and further generally allows the

---

[1] At the end of the March 22 call, the Court asked whether Mr. Woollard could get a permit even if other relief were stayed. The defendants note that the injunction (ECF No. 63) contains two paragraphs, one generally prohibiting enforcement of good and substantial reason and the second prohibiting consideration of good and substantial reason with respect to Mr. Woollard's application. It is within the Court's discretion to grant a stay of the first paragraph, but not the second. In that case, MSP would promptly process Mr. Woollard's application.

open wearing and carrying of long guns in public, *see* ECF No. 26 at 7.  Thus, staying the injunction pending appeal would neither interfere with a core constitutional right nor prevent citizens from keeping and bearing firearms for self-defense either inside or outside the home.  The equities to be balanced, therefore, are the plaintiffs' desire to wear and carry, in public, a particular type of firearm—which happens to be the type of firearm most frequently used in criminal activity, *see* ECF No. 26 at 10-14—against the State's significant interest in protecting its citizens from harm flowing from the public carry of that particular weapon by individuals without good and substantial reason to do so.

I.  **The Failure to Enter a Stay Could Result in Harm to Individuals Eligible to Receive a Permit Under Existing Maryland Law.**

The first question posed by the Court is what would happen if the injunction were not stayed pending appeal, but the Fourth Circuit later reversed.  If the injunction were not stayed, and the Maryland State Police ("MSP") was therefore precluded from enforcing the good and substantial reason requirement, MSP will not necessarily know who among those receiving permits while the injunction is in effect (the "Interim Period") have good and substantial reason.  If the Fourth Circuit were later to reverse, all permits that had been issued to individuals who had not demonstrated good and substantial reason during the Interim Period would be inconsistent with valid Maryland law.  MSP, a law enforcement agency, would therefore be required to revoke those permits.  Ex. A, Declaration of Marcus Brown, April 18, 2012 ("Brown Decl."), ¶ 5.

In this scenario, the greatest impact of denial of a stay would fall on individuals *with* good and substantial reason to wear and carry a handgun in public, those individuals

who, by definition, have the greatest need for a permit.  Although MSP would process applications received from individuals whose permits were revoked as soon as reasonably practicable, there would almost certainly be delays for individuals with good and substantial reason as a result of the likely glut of applications to process.  *Id.* ¶ 11.

One particular category of individuals who would be impacted includes those whose good and substantial reason is employment-related, such as security guards, armored car drivers, private detectives, special police officers, and people who need to transport valuable goods for their businesses.[2]  *Id.* ¶ 9.  Because some of these individuals are required to have a permit as a condition of their employment, revocation of permits could lead to a loss of that employment.  *Id.* ¶ 10.  Similarly, in the absence of a stay, MSP would not necessarily know which permit recipients fell into other categories of individuals currently eligible for permits, including those who obtain permits because of a demonstrable need for personal protection.  *Id.* ¶ 13.  For these individuals, the absence of a permit pending the reapplication process could have safety implications.  *Id.* ¶ 14.

If there is no stay, MSP would attempt to mitigate these potential consequences by asking, during the Interim Period, that applicants who have good and substantial reason voluntarily provide it and cooperate with MSP's investigation.  *Id.* ¶ 6.  MSP would not deny permits to individuals who decline to provide any such reason, but would keep records so that if the Fourth Circuit reverses, MSP would not be required to revoke permits of individuals who had demonstrated good and substantial reason.  *Id.*  However,

---

[2] There are currently 5,091 permits issued to security guards, armored car drivers, private detectives and special police officers, and 896 permits issued to people who transport valuable items in the regular course of business.  Brown Decl. ¶ 9.

3

in light of the strong feelings surrounding this issue, MSP nonetheless expects that a significant number of applicants who have good and substantial reason may decline to provide it during the Interim Period as a matter of principle. *Id.*

Individuals who lack good and substantial reason would not be eligible for a permit if the Fourth Circuit reverses. Although MSP expects that many such individuals would comply with its directions and return their permits, MSP anticipates that some will not comply. *Id.* ¶ 15. Because it would be impractical for MSP to track down and recover all of the permits that would not be returned, a number of permits would remain in circulation that would appear facially valid, but that had been revoked. *Id.* Police would therefore be significantly hindered in their ability to enforce the law.

Finally, a failure to stay the injunction pending appeal would adversely affect the processing of permit applications for individuals who have good and substantial reason. MSP resources for processing permit applications are already strained, and would become much more so if a large number of new permit applications need to be processed. *Id.* ¶ 16.[3] As a result of the need to comply with State policies with respect to creating new positions, as well as the need to train and certify new employees, it would take a minimum of several months, and possibly much longer, to add a new position to assist with processing applications. *Id.* ¶ 17. Even if new positions are added, processing times

---

[3] Even if MSP is not required to investigate good and substantial reason, it is still required to investigate whether an applicant satisfies the other requirements of Md. Code Ann., Pub. Safety § 5-306(a), including whether the applicant has exhibited a "propensity for violence or instability." As a result, processing applications will not take significantly less time.

4

would likely increase, a problem that would particularly affect those who, under existing law, have a demonstrable reason to wear and carry a handgun in public. *Id.* ¶ 17.

## II.  Evidence Regarding the Impact of "Shall Issue" Laws Supports a Stay.

The defendants previously presented evidence, *inter alia*, as to the problem of handgun violence in Maryland, the conclusions of law enforcement that the good and substantial reason requirement is an important component of the effort to stem that violence, and the importance of the good and substantial reason requirement to public safety. *See generally* ECF No. 26 at 10-16, 34-37. The question now posed by the Court is whether there is data demonstrating the impact on crime of the adoption of "shall issue" handgun permit laws elsewhere. The answer is yes, subject to caveats.

Identifying causal trends in crime data is notoriously difficult in any circumstance because of the multiplicity of variables that impact crime and the different effects of those variables in different places and on different people.[4] While some have claimed that the passage of "shall issue" laws has actually decreased crime, the studies on which those claims are based failed to consider important variables that contribute to crime rates and have failed to hold up under scrutiny.[5] The most prominent such study claiming that "shall issue" laws decrease crime rates is a 1997 study by John Lott and David Mustard.

---

[4] *See, e.g.*, Alfred Blumstein & Joel Wallman, eds., THE CRIME DROP IN AMERICA, 2 (2006) (extensive analysis of potential factors leading to national drop in crime "leads to the conclusion that there is no single explanation but that a variety of factors, some independent and some interacting in a mutually supportive way, have been important.").

[5] *See, e.g.*, National Research Council, FIREARMS & VIOLENCE: A CRITICAL REVIEW, 150-51 (2004) ("NRC Report") (excerpts at Ex. B); Ex. C, Daniel Webster and Jens Ludwig, *Myths About Defensive Gun Use and Permissive Gun Carry Laws*, Berkeley Media Studies Group, 3-4 (2000) (attributing difference in crime rates to concealed carry law is likely misleading "when in fact part or all of the difference will be due to other unmeasured differences across states").

5

Numerous studies have since refuted the study's conclusion, taking issue with the methodology, the failure to control for certain important factors influencing crime rates, the failure of the conclusion to hold up when additional years of data were added, the dependence of the conclusion on the experience of only one or two states, and outright errors.[6] Subsequent studies reached the contrary conclusion that passage of "shall issue" laws in fact led to an increase in crime rates.[7]

In 2004, a panel of national experts assembled by the National Research Council of the National Academy of Science undertook to identify any conclusions that could be drawn from the available data with respect to a number of issues related to firearms and violence. *See* Ex. B, NRC Report. The panel concluded that the then-existing data was not sufficient to identify an impact of "shall issue" laws on crime to a scientific certainty. *Id.* at 7-8. The report did not conclude that there is no causal link between adoption of

---

[6] *See, e.g.*, Ex. D, Abhay Aneja, John J. Donohue III, Alexandria Zhang, *The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, 13:2 AMERICAN LAW AND ECONOMICS REVIEW 565 (Fall 2011); Ex. B, NRC Report, 2-3, 7, 120-51 (2004); Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns Less Crime" Hypothesis*, 55 STAN. L. REV. 1193 (2003); *see also* Blumstein & Wallman, 327-28 ("[F]ew researchers have been able to corroborate [Lott's] findings, and a number of scholars have shown his studies to be seriously flawed.") For example, one recent analysis of data from 25 different states that had passed "shall issue" laws demonstrated that if data from only two states were excluded, the data from the remaining 23 states showed a "highly pernicious" impact of "shall issue" laws on murder rates. Ex. D, Aneja, Donohue & Zhang at 610-11. Similarly, the conclusions of the original Lott & Mustard analysis appear to be explained much better by the greater impact of the crack cocaine epidemic on crime rates in states that did not adopt "shall issue" laws than by those laws. *Id.* at 601-06.

[7] *See, e.g.*, John J. Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003) (states enacting "shall issue" laws appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted"); Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) (laws allowing concealed carrying of weapons "have resulted, if anything, in an increase in adult homicide rates").

"shall issue" laws and crime rates, or that identification of such a link is not possible, just that then-current data and studies were not sufficiently robust to do so to a scientific certainty. *Id.* at 150-51.

More recently, in 2011, Aneja, Donohue and Zhang published a study that extensively reviewed the existing data, updated that data, and corrected certain errors in it. Ex. D, Aneja, Donohue & Zhang at 578-615. Although the authors agreed with the NRC Report that without further evidence the available data are not sufficient to identify, to a scientific certainty, a causal link between "shall issue" laws and crime rates, they determined that the conclusion that followed from the updated and corrected data they analyzed was that "shall issue" laws "likely increase the rate of aggravated assaults." *Id.* at 615-16.

In light of the existence of studies identifying a positive correlation between "shall issue" laws and increases in certain crimes, especially aggravated assaults, other studies concluding that further research is needed, and the clear significance of state-specific factors, it is particularly significant that the Maryland General Assembly identified a public safety need for a good and substantial reason requirement, and that Maryland law enforcement officials, among others, have concluded that such a requirement is important to public safety. Notably, as of 2010, Maryland's level of violent crime was the lowest ever recorded for both overall violent crime and homicide. *See* Maryland Governor's Office of Crime Control & Prevention, Maryland 2010 Crime Totals, *available at* http://www.goccp.maryland.gov/msac/crime-statistics.php.

## III. Evidence Reveals that Many Permit Holders Commit Crimes, Including Murder.

Although comprehensive data on the law abidingness of permit holders is difficult to obtain because that data is frequently shielded from public view, available information demonstrates that, while the majority of handgun permit holders have not been charged with crimes, many crimes, including murders, are committed by permit holders, particularly permit holders in "shall issue" states.[8]  Since May 2007, the Violence Policy Center has used news and police reports to identify 270 non-suicide killings by concealed carry permit holders.[9]  The vast majority of these killings were committed by individuals who obtained a concealed carry permit in a "shall issue" state, including the recent killing of Trayvon Martin by Florida concealed permit holder George Zimmerman.  *Id.*  The report identified only one non-suicide killing by a Maryland permit holder since May 2007, *id.* at 62, whereas two "shall-issue" states that border it—Pennsylvania and Virginia—have had 44 non-suicide killings (22 each) by permit holders, including 6 killings of law enforcement officers.  *Id.* at 120-36 & 164-175.  Significantly, it was a Virginia concealed carry permit holder who was responsible for the tragic murder-suicide at Johns Hopkins Hospital in 2010.  *Id.* at 63.

---

[8] At least 28 states have laws or regulations that prevent public access to information about gun owners.  *See* Reports Committee for Freedom of the Press, Open Government Guide (2011), *available at*: http://www.rcfp.org/open-government-guide.  Other states, such as Virginia, interpret their state public records acts to exempt carry permit data from public inspection.  *See* Kelsey M. Swanson, *Comment: The Right to Know: An Approach to Gun Licenses and Public Access to Government Records*, 56 UCLA L. Rev. 1579, 1584-85 (2009); *see* Va. Code § 18.2-308(K).  This shielding of data has been a legislative priority for certain advocacy groups.  *See, e.g.*, http://www.ammoland.com/tag/gun-owner-privacy/#axzz1s2dHLqb5.

[9] Violence Policy Center, *Total People Killed By Concealed Handgun Permit Holders* (March 2012), *available* at http://www.vpc.org/fact_sht/ccwtotalkilled.pdf.

The limited data that are available from "shall issue" states are not comforting:

- In Florida, 5,021 concealed weapon or firearm license holders had their licenses revoked or suspended due to a disqualifying arrest or domestic violence injunction between July 1, 2010, and June 30, 2011. Florida Dep't of Agric. & Consumer Servs., Div. of Licensing, Concealed Weapon or Firearm License Report (2011), *available at*: http://licgweb.doacs.state.fl.us/stats/07012010_06302011_cw_annual.pdf.

- In Michigan, in the year ending June 30, 2011, 2,711 criminal charges were filed against concealed carry license holders, with four convictions for second-degree murder and 161 convictions for some form of assault (15 for assault with a deadline weapon), and 349 licenses were revoked due to a felony or misdemeanor charge. Michigan State Police, Concealed Pistol Licensure Annual Report 2, 22, 32 & 34 (2011), *available at*: http://www.michigan.gov/documents/msp/2011_CPL_Report_376632_7.pdf.

- Texas, which only reports convictions, reports that 101 license holders were convicted of crimes—including one for murder, four for terroristic threat, three for sexual assault of a child, 19 for deadly conduct and 45 for some other form of assault—in 2009, the most recent year for which data are available. Texas Dep't of Pub. Safety, Reg. Servs. Div., Conviction Rates for Concealed Handgun License Holders (2009), *available at*: http://www.txdps.state.tx.us/administration/crime_records/chl/ConvictionRatesReport2009.pdf. Before Texas law limited reporting to convictions, Texas had reported that license holders were arrested for 5,314 crimes from January 1, 1996 through August 31, 2001. Karen Brock & Marty Langley, *License to Kill IV, More Guns, More Crime*, Violence Policy Center, 2 (2002).

- In Utah, more than 1,000 concealed carry permit holders had their permits revoked just during 2011. Concealed Firearm Permit and Brady Bill Statistical Data (2012), *available at* http://publicsafety.utah.gov/bci/documents/2012Q1.pdf.

These reports, of course, are only as good as the monitoring and reporting mechanisms of the states at issue, and a New York Times investigation of monitoring by one "shall issue" state, North Carolina, found serious and disturbing shortcomings. Ex. E, Michael Luo, *Guns in Public, and Out of Sight*, N.Y. Times, Dec. 26, 2011. The investigation, which identified convictions of felonies or non-traffic misdemeanors by

9

more than 2,400 North Carolina permit holders between 2007 and 2011, including more than 200 gun- or weapon-related crimes, found that in "about half of the felony convictions, the authorities failed to revoke or suspend the holder's permit, including for cases of murder, rape and kidnapping." *Id.* There is no reason to believe monitoring in these other states is any better. In fact, reporting by the Florida Sentinel in 2007 found the opposite to be true in Florida. *See* Exs. F, G (finding that licenses were issued to hundreds of people found "responsible for assaults, burglaries, sexual battery, drug possession, child molestation – even homicide").

## CONCLUSION

The defendants request that the Court stay the effect of its March 5 Order (ECF No. 53), as amended by its March 30 Order (ECF No. 63), pending appeal to the United States Court of Appeals for the Fourth Circuit.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_____/s/_____

| | |
|---|---|
| DAN FRIEDMAN (Fed. Bar # 24535) | MATTHEW J. FADER (Fed. Bar # 29294) |
| Assistant Attorney General | STEPHEN M. RUCKMAN (Fed. Bar # 28981) |
| Office of the Attorney General | Assistant Attorneys General |
| Legislative Services Building | 200 St. Paul Place, 20th Floor |
| 90 State Circle, Room 104 | Baltimore, Maryland 21202 |
| Annapolis, Maryland 21401 | Tel. 410-576-7906 |
| Tel. 410-946-5600 | Fax. 410-576-6955 |
| dfriedman@oag.state.md.us | mfader@oag.state.md.us |
| | |
| April 19, 2012 | Attorneys for Defendants |