# EXHIBIT E:

Michael Luo, *Guns in Public, and Out of Sight*, N.Y. TIMES, Dec. 26, 2011

The New York Times Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.




December 26, 2011

# Guns in Public, and Out of Sight

By MICHAEL LUO

Alan Simons was enjoying a Sunday morning bicycle ride with his family in Asheville, N.C., two years ago when a man in a sport utility vehicle suddenly pulled alongside him and started berating him for riding on the highway.

Mr. Simons, his 4-year-old son strapped in behind him, slowed to a halt. The driver, Charles Diez, an Asheville firefighter, stopped as well. When Mr. Simons walked over, he found himself staring down the barrel of a gun.

“Go ahead, I’ll shoot you,” Mr. Diez said, according to Mr. Simons. “I’ll kill you.”

Mr. Simons turned to leave but heard a deafening bang. A bullet had passed through his bike helmet just above his left ear, barely missing him.

Mr. Diez, as it turned out, was one of more than 240,000 people in North Carolina with a permit to carry a concealed handgun. If not for that gun, Mr. Simons is convinced, the confrontation would have ended harmlessly. “I bet it would have been a bunch of mouthing,” he said.

Mr. Diez, then 42, eventually pleaded guilty to assault with a deadly weapon with intent to kill.

Across the country, it is easier than ever to carry a handgun in public. Prodded by the gun lobby, most states, including North Carolina, now require only a basic background check, and perhaps a safety class, to obtain a permit.

In state after state, guns are being allowed in places once off-limits, like bars, college campuses and houses of worship. And gun rights advocates are seeking to expand the map still further, pushing federal legislation that would require states to honor other states’ concealed weapons permits. The House approved the bill last month; the Senate is expected to take it up next year.

The bedrock argument for this movement is that permit holders are law-abiding citizens who should be able to carry guns in public to protect themselves. “These are people who have proven themselves to be among the most responsible and safe members of our community,” the federal legislation’s author, Representative Cliff Stearns, Republican of Florida, said on the House floor.

To assess that claim, The New York Times examined the permit program in North Carolina, one of a dwindling number of states where the identities of permit holders remain public. The review, encompassing the last five years, offers a rare, detailed look at how a liberalized concealed weapons law has played out in one state. And while it does not provide answers, it does raise questions.

More than 2,400 permit holders were convicted of felonies or misdemeanors, excluding traffic-related crimes, over the five-year period, The Times found when it compared databases of recent criminal court cases and licensees. While the figure represents a small percentage of those with permits, more than 200 were convicted of felonies, including at least 10 who committed murder or manslaughter. All but two of the killers used a gun.

Among them was Bobby Ray Bordeaux Jr., who had a concealed handgun permit despite a history of alcoholism, major depression and suicide attempts. In 2008, he shot two men with a .22-caliber revolver, killing one of them, during a fight outside a bar.

More than 200 permit holders were also convicted of gun- or weapon-related felonies or misdemeanors, including roughly 60 who committed weapon-related assaults.

In addition, nearly 900 permit holders were convicted of drunken driving, a potentially volatile circumstance given the link between drinking and violence.

The review also raises concerns about how well government officials police the permit process. In about half of the felony convictions, the authorities failed to revoke or suspend the holder’s permit, including for cases of murder, rape and kidnapping. The apparent oversights are especially worrisome in North Carolina, one of about 20 states where anyone with a valid concealed handgun permit can buy firearms without the federally mandated criminal background check. (Under federal law, felons lose the right to own guns.)

Ricky Wills, 59, kept his permit after recently spending several months behind bars for terrorizing his estranged wife and their daughter with a pair of guns and then shooting at their house while they, along with a sheriff’s deputy who had responded to a 911 call, were inside. “That’s crazy, absolutely crazy,” his wife, Debra Wills, said in an interview when told that her husband could most likely still buy a gun at any store in the state.

Mr. Wills's permit was revoked this month, after The Times informed the local sheriff's office.

## Growing National Trend

Gun laws vary across the country, but in most states, people do not need a license to keep firearms at home. Although some states allow guns to be carried in public in plain sight, gun rights advocates have mostly focused their efforts on expanding the right to carry concealed handguns.

The national movement toward more expansive concealed handgun laws began in earnest in 1987, when Florida instituted a "shall issue" permit process, in which law enforcement officials are required to grant the permits as long as applicants satisfy certain basic legal requirements.

The authorities in shall-issue states deny permits to certain applicants, like convicted felons and people who have been involuntarily committed to a mental health institution, unless their gun rights have been restored. North Carolina, which enacted its shall-issue law in 1995, also bars applicants who have committed violent misdemeanors and has a variety of other disqualifiers; it also requires enrollment in a gun safety class.

Today, 39 states either have a shall-issue permit process or do not require a permit at all to carry a concealed handgun. Ten others are "may issue," meaning law enforcement agencies have discretion to conduct more in-depth investigations and exercise their judgment. For example, the authorities might turn down someone who has no criminal record but appears to pose a risk or does not make a convincing case about needing to carry a gun. Gun rights advocates argue, however, that such processes are rife with the potential for abuse.

For now, the permits are good only in the holder's home state, as well as others that recognize them. The bill under consideration in Congress would require that permits be recognized everywhere, even in jurisdictions that might bar the holder from owning a gun in the first place.

In recent years, a succession of state legislatures have also struck down restrictions on carrying concealed weapons in all sorts of public places. North Carolina this year began allowing concealed handguns in local parks, and next year the legislature is expected to consider permitting guns in restaurants.

Efforts to evaluate the impact of concealed carry laws on crime rates have produced contradictory results.

Researchers acknowledge that those who fit the demographic profile of a typical permit holder — middle-age white men — are not usually major drivers of violent crime. At the same time, several states have produced statistical reports showing, as in North Carolina, that a small segment does end up on the wrong side of the law. As a result, the question becomes whether allowing more people to carry guns actually deters crime, as gun rights advocates contend, and whether that outweighs the risks posed by the minority who commit crimes.

Gun rights advocates invariably point to the work of John R. Lott, an economist who concluded in the late 1990s that the laws had substantially reduced violent crime. Subsequent studies, however, have found serious flaws in his data and methodology.

A few independent researchers using different data have come to similar conclusions, but many other studies have found no net effect of concealed carry laws or have come to the opposite conclusion. Most notably, Ian Ayres and John J. Donohue, economists and law professors, concluded that the best available data and modeling showed that permissive right-to-carry laws, at a minimum, increased aggravated assaults. Their data also showed that robberies and homicides went up, but the findings were not statistically significant.

In the end, most researchers say the scattershot results are not unexpected, because the laws, in all likelihood, have not significantly increased the number of people carrying concealed weapons among those most likely to commit crimes or to be victimized.

## Crimes by Permit Holders

Gun advocates are quick to cite anecdotes of permit holders who stopped crimes with their guns. It is virtually impossible, however, to track these episodes in a systematic way. By contrast, crimes committed by permit holders can be.

The shooting at the Hogs Pen Pub in Macclesfield, N.C., in August 2008 took place after two men, Cliff Jackson and Eddie Bordeaux, got into a scuffle outside the bar. John Warlick, who was there with his wife, helped separate them, only to see Eddie's brother, Bobby Ray, fatally shoot Mr. Jackson in the back of the head. Mr. Bordeaux then shot Mr. Warlick in the upper torso, wounding him.

Bobby Ray Bordeaux had obtained a concealed carry permit in 2004 and used to take a handgun everywhere. He was also an alcoholic and heavy user of marijuana with a long history of depression, according to court records. He had been hospitalized repeatedly for episodes related to his drinking, including about a year before, when he shot himself in the chest with a pistol while drunk in an apparent suicide attempt. Mr. Bordeaux, then 48,

started drinking heavily at age 13. He had been taking medication for depression but had not taken it the day of the shooting, he later told the police. He also said he had 15 beers and smoked marijuana that night and claimed to have no memory of what occurred. He was eventually convicted of first-degree murder and assault with a deadly weapon inflicting serious injury.

John K. Gallaher III, a permit holder since 2006, was also an alcoholic with serious mental health issues, said David Hall, the assistant district attorney who prosecuted him for murder. In May 2008, Mr. Gallaher, then 24, shot and killed a friend, Sean Gallagher, and a woman, Lori Fioravanti, with a .25-caliber Beretta after an argument at his grandfather's home. The police found 22 guns, including an assault rifle, at his home. Mr. Gallaher pleaded guilty to two counts of first-degree murder last year.

Among the other killings: three months after receiving his permit in July 2006, Mark Stephen Thomas killed Christopher Brynarsky with a handgun after an argument at Mr. Brynarsky's custom detail shop. In 2007, Jamez Mellion, a permit holder since 2004, killed Capt. Paul Burton Miner III of the Army by shooting him 10 times with two handguns after finding him with his estranged wife. William Littleton, who obtained a permit in 1998 and was well known to the police because of complaints about him, shot his neighbor to death with a rifle in 2008 over a legal dispute.

More common were less serious gun-related episodes like these: in July 2008, Scotty L. Durham, who got his permit in 2006, confronted his soon-to-be ex-wife and another man in the parking lot of Coffee World in Durham and fired two shots in the air with a .45-caliber Glock. Antoine Cornelius Whitted, a permit holder since 2009, discharged his semiautomatic handgun during a street fight in Durham last year. Jerry Maurice Thomas, a permit holder since 2009 whose drinking problems were well known to the authorities, held a gun to his girlfriend's head at his house in Asheville last year, prompting a standoff with the police.

## Falling Through the Cracks

Gun rights advocates in North Carolina, as well as elsewhere, often point to the low numbers of permit revocations as evidence of how few permit holders break the law. Yet permits were often not suspended or revoked in North Carolina when they should have been.

Charles Dowdle of Franklin was convicted of multiple felonies in 2006 for threatening to kill his girlfriend and chasing her to her sister's house, where he fired a shotgun round through a closed door. He then pointed the gun at the sister, who knocked it away, causing it to fire

again. Mr. Dowdle was sentenced to probation, but his concealed handgun permit remained active until it expired in 2009.

Mr. Dowdle, 63, said in a telephone interview that although he gave away his guns after his conviction, no one had ever done anything about his permit. He said he “could probably have purchased” a gun with it but had not done so because federal law forbade it.

Besides felons like Mr. Dowdle, The Times also found scores of people who kept their permits after convictions for violent misdemeanors. They included more than half of the roughly 40 permit holders convicted in the last five years of assault by pointing gun and nearly two-thirds of the more than 70 convicted of a common domestic violence charge, assault on a female.

Precisely how these failures of oversight occurred is not clear. The normal protocol would be for the local sheriff’s office to suspend and eventually revoke a permit after a holder is arrested and convicted of a disqualifying crime, the authorities said. The State Bureau of Investigation, which maintains a computerized database of permits, also tries to notify individual sheriffs when it discovers that a holder has been arrested for a serious crime, according to a spokeswoman, but the process is not formalized.

In Ricky Wills’s case, he not only threatened his wife and daughter last May with a handgun and a rifle, but he shot at their house while a Union County sheriff’s deputy was inside. It led to convictions on two charges: assault with a deadly weapon with intent to kill and assault on a police officer.

Soon after the shooting, Mr. Wills’s wife obtained a restraining order, which also should have led to his permit being suspended.

Sgt. Lori Pierce, who handles concealed handgun permits in Union County, said no one ever notified her about Mr. Wills, who was released from prison in November. And as the sole person handling permits in her county, she said, she does not have time to conduct regular criminal checks on permit holders, unless they are up for a five-year renewal.

As it is, she said, she can barely keep up with issuing permits. She has granted about 1,300 this year.

*Tom Torok contributed reporting.*

*This article has been revised to reflect the following correction:*

***Correction: December 29, 2011***

An article on Tuesday about North Carolina's concealed-handgun permit program misstated the name of the town that is home to the Hogs Pen Pub, the site of a fatal shooting in 2008 by the holder of one such permit. It is Macclesfield, not Macclesville.