# EXHIBIT G:

# System Under The Gun: Errors, Laws Keeping Weapons In Questionable Hands, SOUTH FLORIDA SUN-SENTINEL, Jan. 29, 2007

less misdemeanors, and at least one prison inmate, Arthur W. White, of Okaloosa County.

White began serving 35 years in 2002 for sexual battery on a child. He had a **license** to **carry** a gun from the day he entered prison until May 2006, when the license expired, state records show.

Dennis Henigan, legal director of the Washington-based Brady Center to Prevent Gun Violence, the nation's leading gun control organization, calls the Sun-Sentinel's findings "really shocking," given that the state has been overseeing people with concealed weapon licenses since 1987.

"That's almost 20 years. And yet this kind of sloppiness and negligence still pervades the licensing of concealed weapon holders in Florida," said Henigan.

The people who oversee the weapons program at the Florida Division of Licensing say they are following the rules as set by the Legislature.

"I don't know of a systemic problem," said Licensing Director W.H. "Buddy" Bevis. "I know of problems here and there."

Defining Violence

The state is supposed to suspend a concealed weapon license if the holder is arrested or formally charged with a felony. Or a drug crime. Or if a judge imposes a restraining order against the licensee for domestic violence.

If the charge is dismissed, the person cleared, or the restraining order dropped, the license is restored.

If the person is found guilty of a crime of violence, the state will revoke the license.

Under the rules, people charged with or convicted of "non-violent" misdemeanors keep their licenses.

A misdemeanor can include something as minor as smoking in an elevator or loitering, or as grave as stalking, simple assault or battery.

What is a "violent" misdemeanor?

"Cases are reviewed by the division on a case-by-case basis," said Mary Kennedy, a Division of Licensing bureau chief.

The Sun-Sentinel found that the state does not commonly suspend or revoke licenses for firearm-related misde-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

meanors that show recklessness but are not considered violent, such as bringing a loaded gun through airport security or firing a gun into the air to celebrate the Fourth of July.

"People make mistakes. Very stupid mistakes, quite regularly, where they're not intending to be violent," Bevis said.

In 2002, Leroy Cerny, the Miramar man, kept his license after firing from his kitchen into a backyard ficus. He pleaded no contest to culpable negligence, a misdemeanor the state considers to be non-violent, and was given one year of probation.

In an interview with the Sun-Sentinel, Cerny, 47, said he repairs guns and had fired one into the tree to test it. A neighbor complained to police. "Before I fired it, I made sure nobody was in the backyard, mine and his," Cerny said. "But he said I was trying to kill his kids."

At times, the system frustrates prosecutors, police and others who urge the state to suspend a license immediately but find their pleas rejected.

"I've tried to get them to revoke people's permits, and they'll tell me they'll only start proceedings once they get convictions," said Melissa Steinberg, an assistant state attorney in Broward County. "I send them the convictions, and I hope they're doing what has been asked of them."

Steinberg was referring to multiple instances in which people with concealed weapon licenses are caught with guns in their bags at security checkpoints at the Fort Lauderdale-Hollywood International Airport or the Broward County Courthouse.

When they have concealed weapon licenses, they are charged with misdemeanors, not felonies.

And unless they fire the gun, point it at someone or threaten to use it, the crime typically is not considered violent, said Bevis.

So their licenses remain valid, despite the efforts of public officials such as Steinberg.

Recently, Steinberg took the unusual step of asking a judge to order the state to revoke a man's gun license.

Joseph Damgajian, 35, of Coral Springs, was charged in August with bringing a Walther P99 handgun into the Broward courthouse in downtown Fort Lauderdale.

Damgajian, who had reported for jury duty, had the gun in a backpack as he went through security. He "kept repeating that he forgot, and it was an honest mistake," a Broward Sheriff's Office report states.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Along with the gun, security officers found that he had three loaded magazines, a holster, a "Koran, [the] sacred book of Muslims," and "approximately 20 DVDs of extremely violent tactical games, some in English and some in Arabic," the report states.

The sheriff's report lists his occupation as a salesman for Life Extension, an anti-aging foundation in Fort Lauderdale. He was not charged with any other offenses. He has no prior record in Florida, according to the Florida Department of Law Enforcement.

As a result of the courthouse incident, Damgajian pleaded no contest in November to a weapon permit violation, a "non-violent" misdemeanor that, under state law, would not require revocation of his gun license.

Broward County Judge Gary Cowart "withheld" a formal conviction, sentencing Damgajian to six months probation, six months of wearing an electronic tracking device and ordered him to forfeit the gun -- and surrender his gun license to the state. Damgajian declined to comment.

Fugitives Licensed

Bevis said the law is clear on when the agency can and can't suspend or revoke a license. If the agency veers from those rules, the licensee can appeal the decision through the courts.

"We will lose," Bevis said. "We're wasting money then."

Case in point: fugitives. Under federal law, they can't own firearms.

The Sun-Sentinel matched the state's database of concealed weapon licensees with databases of open warrants kept by FDLE and the sheriffs in Broward, Miami-Dade and Palm Beach counties. The newspaper found 216 licensees with active warrants at the time of the paper's review.

The warrants ranged from minor offenses, such as shoplifting and trespassing, to more serious charges, including assault, battery, arson, drug possession and firing a gun in public.

The Division of Licensing could get warrant information from FDLE and the state's 67 sheriffs but doesn't.

"We wouldn't be aware when a warrant is issued," Bevis said. "The law does not allow us to suspend or revoke on a warrant."

Had the department obtained warrant information it would have seen that John A. Brandley, 34, of Margate, had been arrested for aggravated battery, a felony.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Brandley was licensed to carry a gun in April 2001. Four months later, he was arrested for beating a man so badly at a Pompano nightclub the victim needed reconstructive surgery on his face. In April 2002, a Broward judge issued a warrant for Brandley's arrest after he skipped a court date.

Over the next four years the gun permit was neither suspended nor revoked, Licensing Division records show. It expired in April 2006.

"I think it's seriously messed up that he would still be allowed to carry that," said the victim, Kenneth Collins, now 30. He said he was dating Brandley's ex-girlfriend when Brandley, who is still being sought, allegedly knocked him on his head.

"He's about 6 foot, 3 inches, 285 pounds. Big body builder type," Collins recalled. "He continued to smash my face while I was on the floor. The entire left side of my face was shattered. ..."

Marion P. Hammer, Tallahassee lobbyist for the National Rifle Association, supports the law as written. She argues that the state should not suspend or revoke gun licenses simply because someone is wanted on an arrest warrant.

"The issuance of a warrant doesn't mean that anybody is guilty," she said. "It means that someone is a suspect."

Gaps in the System

Florida's Division of Licensing has about 140 employees. In the past year the division has issued, on average, more than 1,000 new concealed weapon licenses a week, not including renewals. The agency also licenses security guards, private investigators and repo agents.

The division's greatest challenge, Bevis said, is its workload.

Even with more employees, however, the system would not be perfect, he said. "If you gave us twice as much money and two times as many people, we're still going to make mistakes."

The division's four lawyers rely on law enforcement to share criminal record data on the more than 410,000 people licensed to carry guns.

Each week, FDLE provides the division with lists of arrestees from around the state. Each night, FDLE provides a list of people subjected to domestic violence injunctions. And once a month, the Department of Corrections provides the division with names of inmates.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Computers match the names to the roster of people licensed to carry guns. The results are given to the licensing division's lawyers to review.

The division has suspended 699 licenses and revoked 113 since July 1, according to the latest state figures.

"I promise you, our attorneys are absolutely, tongue-hanging-out tired every day," Bevis said.

The data the lawyers receive is not always complete, leading to instances in which licenses are not suspended.

Gaps in the process can occur anywhere in the criminal record-gathering system: at the police station, sheriff's office, courthouse or elsewhere.

"No system is perfect," says Joe Waldron, executive director of the Citizens Committee for the Right to Keep and Bear Arms, a gun rights group headquartered in Washington state.

The Brady Center's Henigan says that's not good enough.

"Where the stakes are so high, where a mistake in granting a license means a dangerous person carrying a hidden handgun on the street ..., the public cannot afford mistakes."

Tomorrow: The Suspension Turnstile

**Megan O'Matz** can be reached at momatz@sun-sentinel.com or 954-356-4518.

John Maines can be reached at jmaines@sun-sentinel.com or 954-356-4737

DESPITE LEGAL PROBLEMS, THEY KEPT GUN LICENSES

Here are some people who retained their gun licenses because of bureaucratic errors or narrowly drawn laws.

Adel R. Ahmad 26, Tampa

In June 2002, Tampa police issued a warrant for Ahmad, a pizza deliveryman wanted for manslaughter. He is still missing, but his **license** to **carry** a gun was valid for four years -- until May 24, 2006, when it expired, state Division of Licensing records show. According to police reports, Ahmad got lost making a delivery and stopped to ask for directions. Tyrone Stephens, 15, approached Ahmad's car, reached in and took an order of chicken wings. Ahmad told police the teen began to run away but six to 10 other men approached the vehicle, frightening him. He fired two rounds from a 9 mm Glock, killing Stephens. Police made a copy of Ahmad's concealed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

weapon permit and let him go. A week later, prosecutors decided to charge him with aggravated manslaughter. By then he was gone.

Nathaniel A. Ferguson, 47, Lake Mary, Seminole County

He still had a **license** to **carry** a gun, according to state records, as of late June -- a year and a half after his arrest for shooting a woman in a parking lot outside a Seminole County bar. In January 2005, Ferguson got into an argument with a group of patrons in the bar's parking lot, grabbed a revolver from his SUV and fired. Melanie Abbott, 30, of Longwood, suffered a flesh wound to the hip. "It was terrifying. I could have died. I have a 10-year-old son," she said. Ferguson claimed self-defense. "They were trying to attack my wife and I," he told the Longwood Police Department. In January 2006, he pleaded no contest to attempted manslaughter. A judge "withheld adjudication" and sentenced him to 180 days in jail, two years of house arrest and three years probation. Under Florida law, Ferguson's gun license should have been suspended after his arrest and revoked after his sentencing. Ferguson's wife, Patricia, told the Sun-Sentinel that her husband returned the license after his sentencing in February 2006. State records, however, show the license was still valid in June.

Barry Cogen 24, Sunrise

State officials blamed human error on their failure to take action against Cogen.

He obtained a **license** to **carry** a gun June 7, 2005. The following day, he was arrested for aggravated stalking, a felony. His concealed weapon license should have been suspended. A year later, however, it was still valid, according to Division of Licensing records. The criminal case against him is pending.

According to the Broward Sheriff's Office, between August 2002 and July 2004, Cogen and another man harassed an Oakland Park-area family, vandalizing their lawn and two cars with firebombs, eggs, burning papers, concrete blocks, an acid bomb, Molotov cocktail and fireworks. Cogen told authorities he was "getting even" with the victim's son, a former middle school classmate. In June, the state said it would begin actions to suspend Cogen's license. Asked about his gun license, Cogen told the Sun-Sentinel: "I have no idea what you're talking about. I got no comment."

Lyglenson Lemorin 32, Miami

Now an accused terrorist, Lemorin got a **license** to **carry** a gun in May 1996. He did not lose the license after two arrests in 1997 and 1998. In each case, the charges were dropped.

In one, Lemorin allegedly threw a beer bottle at an ex-girlfriend, striking her in the neck as she walked along with two children. And in the second, he punched a pregnant former girlfriend, flashed a handgun and warned: "... I'll kill you," police reports state. The state suspended his gun license in February 2000, a year after he was arrested for carrying a concealed firearm with a domestic violence injunction against him. The state lifted the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

suspension in March 2000, then suspended it again in June 2006 after he was arrested with six other South Florida men on terrorism conspiracy charges. Federal authorities claim the group swore allegiance to al-Qaida and plotted to blow up buildings in Miami and Chicago, including the Sears Tower.

Michael Zappia 50, Boca Raton

Retained his **license** to **carry** a gun after being charged in late 2005 with disorderly conduct and resisting arrest, both misdemeanors, while at the Pompano Beach Booby Trap strip club. A dancer had complained that Zappia, a retired Boca Raton police sergeant, was drunk and claiming he had a gun. A police affidavit says Zappia refused to leave the club and struggled with officers. He pleaded no contest in March. A judge withheld a formal conviction and ordered him to pay court costs and fines of $426. His gun license was still valid as of late June, according to the latest publicly available records. In a telephone interview, Zappia denied the incident happened.

**LICENSES** TO **CARRY** A CONCEALED WEAPON IN FLORIDA

Licenses are required to carry concealed weapons in public places.

Concealed weapons are defined as: handguns, knives, electronic weapons or devices, billy clubs, tear gas guns.

Licenses are issued by the Florida Division of Licensing, within the Department of Agriculture and Consumer Services.

For rules, go to http://licgweb.doacs.state.fl.us/weapons/index.html

ABOUT THIS SERIES

The South Florida Sun-Sentinel continues a four-part investigation into Florida's gun laws and who's licensed to carry concealed weapons.

Sunday: Hundreds of Floridians carry guns despite criminal histories.

Today: Bureaucratic errors and narrow laws let people keep **licenses** to **carry** guns.

Tuesday: Licenses reinstated, time and again.

Wednesday: Who's packing heat is now a state secret.

Online: Sun-Sentinel.com/ guns

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

PHOTO: VIOLENCE ERUPTS: Kenneth Collins, holding his daughter Emily, 3, accused John Brandley, left, of beating him in 2001. Despite Brandley's arrest, he kept his concealed weapon permit until it expired in 2006. "I think it's seriously messed up that he would still be allowed to carry that [gun]," Collins said. Staff photo/Michael Laughlin

KEEPING HIS GUN: Melanie Abbott was shot outside a Longwood bar in 2005. Eighteen months later, her attacker, Nathaniel Ferguson, still had a gun license. Staff photo/Michael Laughlin

Ahmad

Ferguson

Cogen

Lemorin

Zappia

---- INDEX REFERENCES ---

COMPANY: STATE FORTIFICATION STS JAKSN MS L L C; SUNRISE

NEWS SUBJECT: (Violent Crime (1VI27); Insurance Fraud (1IN81); Crime (1CR87); Legal (1LE33); Social Issues (1SO05); Criminal Law (1CR79); Technology Law (1TE30); Government (1GO80); Economics & Trade (1EC26))

REGION: (USA (1US73); Americas (1AM92); Florida (1FL79); North America (1NO39))

Language: EN

OTHER INDEXING: (BARRY; BRADY CENTER; CITIZENS COMMITTEE; CONSUMER SERVICES; DEFINING VIOLENCE; DEPARTMENT OF AGRICULTURE; DEPARTMENT OF CORRECTIONS; FDLE; FLORIDA; FLORIDA DEPARTMENT; LIFE EXTENSION; LONGWOOD; LONGWOOD POLICE DEPARTMENT; LYGLENSON; NATIONAL RIFLE ASSOCIATION; OAKLAND PARK; POMPANO; POMPANO BEACH BOOBY TRAP; PREVENT GUN VIOLENCE; STATE; SUN SENTINEL; SUNRISE; SUV) (Abbott; Adel R. Ahmad; Ahmad; Arthur W. White; Bear Arms; Bevis; Big; Boca Raton; Brandley; Cerny; Cogen; Collins; Computers; Damgajian; Dennis Henigan; Eighteen; Ferguson; Gaps; Gary Cowart; Henigan; Joe Waldron; John; John A. Brandley; John Brandley; Joseph Damgajian; Kenneth Collins; Lacho; Leroy Cerny; Leroy W. Cerny; Licensing; Licensing Director; Lubomir Lacho; Marion P. Hammer; Mary; Mary Kennedy; Megan O'Matz; Melanie; Melanie Abbott; Melissa Steinberg; Michael LaughlinAhmadFergusonCogenLemorinZappia; Michael LaughlinKEEPING; Michael Zappia; Nathaniel A. Ferguson; Nathaniel Ferguson; Patricia; Staff; Steinberg; Stephens; Sunday; Tyrone Stephens; White; Zappia)

KEYWORDS: FLORIDA WEAPON LICENSE SS SERIES INVESTIGATION

EDITION: Broward Metro

Word Count: 3484
1/29/07 SFLSUN-SENT 1A
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.