IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RAYMOND WOOLLARD, et al., | ) Case No. 1:10-cv-02068-BEL |
| | ) |
| Plaintiffs, | ) SUPPLEMENTAL BRIEF IN |
| | ) OPPOSITION TO DEFENDANTS' |
| v. | ) MOTION FOR STAY PENDING |
| | ) APPEAL |
| MARCUS BROWN, et al., | ) |
| | ) |
| Defendants. | ) |

_____

**COME NOW** the Plaintiffs, Raymond Woollard and Second Amendment Foundation, Inc.,

by and through undersigned counsel, and submit their Supplemental Brief in Opposition to

Defendants' Motion for Stay Pending Appeal.

Dated: May 9, 2012                    Respectfully submitted,

Alan Gura                             Cary J. Hansel
Gura & Possessky, PLLC                Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405     6404 Ivy Lane, Suite 400
Alexandria, VA 22314                  Greenbelt, MD 20770
703.835.9085/Fax 703.997.7665         301.220.2200/Fax 301.220.1214

By: /s/ Alan Gura_____     By: /s/ Cary J. Hansel_____
      Alan Gura                             Cary J. Hansel

                                      Attorneys for Plaintiffs

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Defendants Concede That A Stay Is Unwarranted. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     The Costs of Obeying the Constitution Are Irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    Defendants Could Easily Revoke Permits In Event of Reversal. . . . . . . . . . . . . . . . . . 3

IV.     Maryland Is Dangerous Relative to States, Including Neighboring States,
        that Allow Individuals to Carry Handguns for Self-Defense. . . . . . . . . . . . . . . . . . . . . 5

V.      Defendants Cannot Prove that Shall-Issue Laws Cause Crime. . . . . . . . . . . . . . . . . . . 6

VI.     Handgun Carry License Holders Are Highly Law-Abiding. . . . . . . . . . . . . . . . . . . . . . 8

VII.    Defendants Are Unlikely To Succeed on the Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TABLE OF AUTHORITIES

Cases

*Bateman* v. *Perdue*, No. 5:10-CV-265-H,
2012 U.S. Dist. LEXIS 47336 (E.D.N.C. Mar. 29, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Denius* v. *Dunlap*,
330 F.3d 919 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hilton* v. *Braunskill*,
481 U.S. 770 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*McDonald* v. *City of Chicago*,
130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States Bancorp Mortg. Co.* v. *Bonner Mall P'ship*,
513 U.S. 18 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


Statutes

Md. Public Safety Code § 5-304(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Public Safety Code § 5-304(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Md. Public Safety Code § 5-310. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


Other Authorities

David B. Kopel, *Pretend "Gun-Free" School Zones:
A Deadly Legal Fiction*, 42 CONN. L. REV. 515 (2009) . . . . . . . . . . . . . . . . . . . . . . . 8

Florenz Plassman & John Whitley, *Comment: Confirming "More Guns, Less Crime,"*
55 STANFORD L. REV. 1313 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gary Kleck & Marc Gertz, *Armed Resistance to Crime:*
   *The Prevalence and Nature of Self- Defense with a Gun*,
   86 J. CRIM. L. & CRIMINOLOGY 150 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

http://licgweb. doacs.state.fl.us/stats/cw_monthly.pdf
   (last visited May 9, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

http://www.michigan.gov/documents/msp/2011_CPL_Report_ 376632_7.pdf
   (last visited May 9, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

http://www.ncdoj.gov/CHPStats.aspx (last visited May 9, 2012). . . . . . . . . . . . . . . . . . . . . . . . 8

http://www.tn.gov/safety/stats/DL_Handgun/Handgun/HandgunReport2011Full.pdf
   (last visited May 9, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

http://www.txdps.state.tx.us/administration/crime_records/
   chl/ConvictionRatesReport2009.pdf
   (last visited May 9, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Jens Ludwig, *Concealed-Gun- Carrying Laws and Violent Crime:*
   *Evidence from State Panel Data*,
   18 INT'L REV. L. & ECON. 239 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Moody, Carlisle E., Lott, John R., Marvell, Thomas B. and Zimmerman, Paul R.,
   *Trust But Verify: Lessons for the Empirical Evaluation of Law and Policy*
   (Jamuary 25, 2012), available at http://ssrn.com/abstract=2026957
   (last visited May 8, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

iii

Supplemental Brief in Opposition to Defendants' Motion for Stay Pending Appeal

PRELIMINARY STATEMENT

Defendants fail to carry their heavy burden of justifying the stay of an injunction, especially as the injunction addresses the widespread denial of a fundamental constitutional right. The facts are simple: (1) Maryland has higher crime than many "shall issue" states; (2) regardless of one's view of criminological theory—a belief that guns lead to crime or reduce crime—*handgun carry permit holders* do not commit much crime, and even less crime theoretically enabled by the permit; and (3) were this Court's decision reversed, the logistical impact upon Defendants would be negligible.

Defendants open by conceding that a stay is unavailable. They submit inconclusive, contradictory, and seriously controvertible studies. Defendant Brown testifies that the police are fully capable of flagging permit applications that do not meet their "good and substantial reason" ("GSR") test, for revocation upon any appellate reversal. Defendants also cite what they claim to be a too-high revocation rate in shall-issue states, states that nonetheless see negligible crime from permit holders and which generally enjoy lower overall crime rates than may-issue states. Defendants claim some states poorly administer their handgun carrying permit systems, but that can be said of any sort of government licensing scheme. And to the extent that Defendants offer further argument with respect to their prospects on appeal, those prospects have grown dimmer still with yet another court in this circuit striking down state laws that infringe upon the right to carry handguns for self-defense.

ARGUMENT

I.   DEFENDANTS CONCEDE THAT A STAY IS UNWARRANTED.

Surprisingly, Defendants open with a significant concession:

It is within the Court's discretion to grant a stay of the [injunction's] first paragraph [relating to general application of "good and substantial reason,"], but not the second [relating to Woollard]. In that case, MSP would promptly process Mr. Woollard's application.

ECF 68, at 1 n.1. The Court should immediately lift the stay with respect to the injunction's second paragraph.

Yet that is not all that should occur. If the Court lacks discretion to stay the injunction in Woollard's favor, it lacks discretion to stay the injunction in the public's favor, and in favor of Plaintiff SAF's members.[1] After all, Defendants have never claimed that Woollard is differently-situated than anyone else, or that they erred in applying the GSR requirement against him. Were Woollard the only plaintiff, Defendants could not self-moot the case after losing it, *United States Bancorp Mortg. Co.* v. *Bonner Mall P'ship*, 513 U.S. 18 (1994), and the case would have precedential value barring further enforcement of the GSR. Certainly there is no explanation given for why the Court lacks discretion to stay enforcement of Woollard's constitutional rights, but not anyone else's under identical circumstances.

II.   THE COSTS OF OBEYING THE CONSTITUTION ARE IRRELEVANT.

Defendant Brown's arguments with respect to the cost and bureaucratic burdens associated with the issuance of handgun carry permits are not only unpersuasive, they are not relevant to the issues before the Court. The Court did not ask whether the injunction would inconvenience the state. Any injunction forces the subject party to do something it would otherwise not do, but the real harm here is the continued deprivation of a fundamental right securing "intangible and unquantifiable interests" in self-defense. *Ezell* v. *City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

As Plaintiffs noted previously, most states administer a "shall issue" system for handgun carry permits. ECF 59, at 8-9 & n.3-5. Because states are allowed to (and do) charge nominal fees

---

[1]The Court previously found, per Judge Motz, that SAF has representational standing to assert its members' interests—an order Defendants have not appealed. *See also Ezell*, 651 F.3d at 696 (SAF members' interest in Second Amendment case).

for operating their handgun licensing programs, scaling up the applications also brings additional funds to operate those licensing programs. There is no *evidence* that any state finds the operation of a shall-issue system unduly burdensome, and in fact, the Court should reject the implicit suggestion that individuals only enjoy those constitutional rights that the state does not find too burdensome to regulate. Regulation can take various forms, and is always optional in a way that rights are not. Twenty-seven states, including Maryland's geographic and circuit neighbors Pennsylvania, West Virginia, Delaware, Virginia and North Carolina, generally allow unlicensed open handgun carry.

Maryland has the option of licensing all handgun carrying, and it can reasonably pass some of the cost of that program to applicants. Md. Public Safety Code § 5-304(b). Of course neither Plaintiffs nor this Court have sought to micromanage the logistics of *how* the state implements permit issuance, but it is generally accepted that once a court rules on an issue, the ruling is to be implemented, and there would be limited room for bureaucratic "delays."

As for the claim that "[d]uring the Interim Period . . . delays will most impact individuals with GSR, those who, by definition, are most in need of a permit," Brown Decl., ¶ 17, this appears to largely miss the point of the Court's opinion. "[T]he regulation at issue is a rationing system," slip op., 18, but "[t]he right's existence is all the reason [a citizen] needs" to carry a gun. *Id.*, 20. The Court has not made any value judgments endorsing Defendants' belief that the people *they* deem to have a "good and substantial reason" for a permit are, in fact, more urgently deserving of one. Under the Court's injunction, a woman who wants to carry a handgun to guard against rape is not less deserving of a permit than a business owner who handles large amounts of cash.

III.   DEFENDANTS COULD EASILY REVOKE PERMITS IN EVENT OF REVERSAL.

Defendants' assertion that it would be difficult, upon a reversal, to revoke only those permits issued pursuant to the injunction, is belied by Defendant Brown's admission that the Maryland State

3

Police ("MSP") would "giv[e] applicants the option of identifying a GSR, and cooperating with

MSP's investigation of that GSR, voluntarily . . . MSP . . . would keep records of individuals who

do demonstrate GSR . . ." Brown Decl. ¶ 6.

Indeed, the injunction bars only the GSR requirement's "enforcement." Defendants are not

barred from thinking about the matter, or from taking good notes. While "the MSP would not

necessarily know whether a recipient of a [permit] during the Interim Period had GSR," Brown

Decl., ¶ 4, it could easily—instantly—return to the status quo ante, by revoking the permits of

anyone who did not establish "GSR."  Brown's concern for possibly revoking the permits of people

who would have established GSR, but would have opted not to do so in reliance on the Court's

injunction, is appreciated; however, the possibility has always existed that someone might truly have

a GSR, but would be denied a permit because they could not articulate it or for whatever reason

declined to actually make the showing. If an applicant "decline[s] to provide [actual GSR] during

the application process as a matter of principle," id. ¶ 6, that's his or her calculated risk.[2]

Plaintiffs do note, however, that Defendants have means beyond voluntary compliance to

parse various carry permit applications. For example, Maryland Public Safety Code § 5-304(d) bars

Defendants from collecting application fees from "(1) a State, county, or municipal public safety

employee who is required to carry, wear, or transport a handgun as a condition of governmental

employment; or (2) a retired law enforcement officer of the State or a county or municipal

corporation of the State." This pile of applications could be reviewed last, as anyone who is fee

exempt—by definition, current or former law enforcement officers—would have presumably been

allowed to carry a firearm in any event. Additionally, the handgun carry permit application forms

---

[2]People who feel strongly about the right to carry a gun and could establish a GSR likely
would have already obtained a permit.

request applicants list their occupation, employer, and title. It would be very easy to discern which applications came from security guards, armored car drivers, and the like.

The claim that some revoked licensees might not return the permit, and thus carry a gun on a revoked permit that appears to be facially valid, is unpersuasive. Defendants have doubtless revoked permits before, and the law merely requires permit holders to return the permit within ten days. Md. Public Safety Code § 5-310. Police officers can summon an astonishing amount of information about any individual or vehicle they encounter within fairly short order, including driver license information, outstanding warrants, and in many states, whether the individual is licensed to carry a handgun. It should not be difficult for the state to establish a means of verifying the current validity of handgun carry licenses much the way it does for driver's licenses or vehicle registrations.[3] In any event, those who would carry a handgun regardless of whether they had a valid permit to do so will not be impacted by any decision in this case.

IV.    MARYLAND IS DANGEROUS RELATIVE TO STATES, INCLUDING NEIGHBORING STATES,
       THAT ALLOW INDIVIDUALS TO CARRY HANDGUNS FOR SELF-DEFENSE.

The data on this point speaks for itself. The Court should take judicial notice of information contained on government websites. *Denius* v. *Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003). Plaintiffs' Exhibit A summarizes and cites the latest available FBI Uniform Crime Reports statistics. Notably, Maryland's firearm murder rate (per 100,000 population) is 5.51, relative to the national average of 2.84. Firearm robberies in Maryland are also higher than average, 57 per 100,000 versus 42 nationally, albeit firearm assaults are lower, at 31 versus 45 per 100,000. Indeed, Maryland is hardly safer than its circuit and geographical neighbor states (Virginia, West Virginia, Pennsylvania, Delaware, North Carolina, South Carolina), all of whom enjoy lower firearm murder rates, and most

---

[3]Brown does not explicitly deny the existence of this capability, which would be surprising.

of whom enjoy lower firearm robbery rates. Maryland is third of these seven neighboring states in firearm assault rates. Moreover, jurisdictions with may- or no-issue laws, which do not otherwise allow the carrying of handguns for self-defense,[4] averaged 4.41 firearm murders, 56.62 firearm robberies, and 32.62 firearm assaults per 100,000 people, with incomplete data from Illinois, against national averages of 2.84, 42, and 45 per 100,000 people, respectively.

Correlation may not be causation, but it is impossible to claim that shall-issue and permissive handgun carry regimes correlate to higher gun crime; the opposite is established fact. Certainly, the hard data does not support a claim that Maryland becoming a shall-issue state would lead to increased firearm crime.

## V.   DEFENDANTS CANNOT PROVE THAT SHALL-ISSUE LAWS CAUSE CRIME.

The Court's question regarding the purported effects of shall-issue versus may-issue laws appears somewhat subsumed by the Court's related question regarding the behavior of carry permit holders. Whether Defendants meet their burden to obtain a stay relates more to the harm potentially caused by licensees rather than to the public benefit of allowing the exercise of constitutional rights, which at law must be presumed.

Plaintiffs have previously explored this ground, citing some of the voluminous research in this very contentious public policy debate. ECF 34, at 4-5. Space does not permit a full exposition of the literature on this debate. Two points bear specific mention. Though Defendants and their allies refuse to acknowledge any positive social value to carrying guns, "there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance*

_____

[4]California, D.C., Hawaii, Illinois, Maryland, Massachusetts, New York, New Jersey.

6

*to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995). And while the precise amount of positive and negative effects will be debated forever, the Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3050 (2010). Defendants' studies on the topic are unpersuasive to many scientists in the field, and cannot satisfy the very severe burden required to justify a stay of the Court's judgment.

It is unclear why Defendants cite to the National Research Council study, their Exhibit B, as they admit that "[t]he panel concluded that the then-existing data was not sufficient to identify an impact of 'shall issue' laws on crime to a scientific certainty." ECF 68, at 6 (citation omitted). But that is not to say that the NRC study is useless. It refutes Defendants' Exhibit C, a paper suggesting there would be a negative impact. Prof. Ludwig's other cited study concedes that data linking shall issue laws to increased homicide is "not statistically significant." Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239, 248-49 (1998). Defendants rely very heavily on the Abhay Aneja, et al., paper submitted as their Exhibit D, for the proposition that one of the leading "more guns, less crime" papers is flawed. But the Aneja paper has itself been debunked. *See* Plaintiffs' Exh. B, Moody, Carlisle E., Lott, John R., Marvell, Thomas B. and Zimmerman, Paul R., *Trust But Verify: Lessons for the Empirical Evaluation of Law and Policy* (Jamuary 25, 2012), available at http://ssrn.com/abstract=2026957 (last visited May 8, 2012).[5] Defendants cite to one study in the Stanford Law Review purporting to disprove the positive impact of gun carrying. Alas, the same issue relates a different perspective as

_____

[5]Notably, Prof. Donohue, an author of the Abeja paper, is also one of two co-editors of the journal in which it appeared.

well. Florenz Plassman & John Whitley, *Comment: Confirming "More Guns, Less Crime,"* 55 STANFORD L. REV. 1313 (2003).

The Court has found that Defendants' GSR requirement violates a fundamental constitutional right. Injunctive relief cannot be stayed—an extraordinary request—by asserting one side of the most intractable of academic debates, of the species which the Supreme Court specifically advised is beyond the federal courts' power to resolve.

VI.   HANDGUN CARRY LICENSE HOLDERS ARE HIGHLY LAW-ABIDING.

This much has previously been explored by Plaintiffs, ECF 34, at 6, but there is now more data. Michigan issued 87,637 permits for the year ending June 30, 2011. In that time frame, it revoked only 466 permits. http://www.michigan.gov/documents/msp/2011_CPL_Report_ 376632_7.pdf (last visited May 9, 2012). North Carolina has revoked only 1,203 permits out of 228,072, half of one percent, in over 15 years. http://www.ncdoj.gov/CHPStats.aspx (last visited May 9, 2012). In 2011, Tennessee issued 94,975 handgun carry permits, and revoked just 97. http://www.tn.gov/safety/stats/DL_Handgun/Handgun/HandgunReport2011Full.pdf (last visited May 9, 2012). Texas compiles detailed information tracking the proclivity of handgun carry license permit holders to commit crimes. In 2009, of 65,561 serious criminal convictions in Texas, only 101— 0.1541%—could be attributed to individuals licensed to carry handguns, though not all such crimes necessarily utilized guns, or used them in public settings. http://www.txdps.state.tx.us/ administration/crime_records/chl/ConvictionRatesReport2009.pdf (last visited May 9, 2012). Perhaps the most comprehensive data comes from Florida, which reports having issued 2,186,010 handgun carry licenses since 1987. http://licgweb.doacs.state.fl.us/stats/ cw_monthly.pdf (last visited May 9, 2012). To date, Florida has only revoked 168 licenses—.00768%—for crimes utilizing firearms. *Id.*; *see also* David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly*

*Legal Fiction*, 42 CONN. L. REV. 515, 564-70 (2009) (surveying data).

Against this hard data, Defendants invoke a non-credible "study" by an anti-gun rights group, and the lamentable Zimmerman-Martin affair. ECF 68, at 8. Plaintiffs have already responded to the VPC website. ECF 34, at 5-6. As to the other matter, Plaintiffs have nothing useful to add to that public controversy, as *just like Defendants*, they know only what they see in the media: a tragedy under unclear yet hotly-disputed facts. Given the widespread prevalence of handgun carrying in the United States, *some* handgun license permit holders will commit crime, just like some licensed drivers will drive drunk and in an otherwise reckless manner. But that is hardly a reason to draw inferences about licensed drivers. Anecdotes do not refute the *data* that whatever else leads to the rare license revocation, crime utilizing publicly carried handguns is quite rare. Defendants complain that the number of revocations indicate the licensing is dangerous, but what matters is not the (valid) precautions taken in revoking licenses, but the virtually non-existent crime by licensees. Defendants alternatively complain that some states are too lax in revoking licenses, and perhaps that is true. But that is an indictment of the authorities, not of the right peaceably enjoyed by millions of Americans.

VII.    DEFENDANTS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Defendants persist in attacking the case on its merits, arguing that the carrying of handguns is not a "core" right and that the right to bear arms for self-defense in everyday public life, presumably including on the streets of Baltimore, is satisfied by the carrying of long arms. ECF 68, 1-2. The argument is styled as an equitable one, but it is premised upon an assumption that the Court erred in its substantive constitutional analysis.

Defendants plainly fail to make a "*strong* showing that [they are] *likely* to succeed on the merits." *Hilton* v. *Braunskill*, 481 U.S. 770, 776 (1987) (emphasis added). The right to carry arms

outside the home for self-defense is well-within the Second Amendment's historical understanding.

ECF 59, at 15-19. Moreover, *Heller* emphatically rejected the argument that handguns may be

banned because long arms are an available substitute. Likewise here, the question is not whether

people may carry shotguns (or sabers) instead of handguns. The question is whether traditionally,

practically, the right to bear arms encompasses carrying handguns outside the home. Plainly, it does,

and Defendants offer no evidence for the specious proposition that individuals can and do carry long

arms for personal self-defense under normal circumstances in public life. That the practice is

virtually unknown in this country is within judicial notice.

Indeed, since the conference call, Defendants' prospects on appeal are yet-more remote.

Another district court of this circuit has struck down laws restricting the carrying of handguns.

> [T]he Second Amendment right to keep and bear arms 'is not strictly limited to the home environment but extends in some form to wherever those activities or needs occur'. . . . Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home.

*Bateman* v. *Perdue*, No. 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336, at *10-*11 (E.D.N.C.

Mar. 29, 2012) (citation omitted).

CONCLUSION

The application for a stay must be denied.

Dated: May 9, 2012                              Respectfully submitted,

Alan Gura                                       Cary J. Hansel
Gura & Possessky, PLLC                          Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405               6404 Ivy Lane, Suite 400
Alexandria, VA 22314                            Greenbelt, MD 20770
703.835.9085/Fax 703.997.7665                   301.220.2200/Fax 301.220.1214

By: /s/ Alan Gura_____                By: /s/ Cary J. Hansel_____
    Alan Gura                                       Cary J. Hansel
                                                    Attorneys for Plaintiffs

10