IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAYMOND WOOLLARD, *et al.*, | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Case No. 1:10-cv-2068-BEL |
| MARCUS BROWN, *et al.*, | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR STAY PENDING APPEAL**

**INTRODUCTION**

This case presents a question of first impression about the constitutionality of a provision of Maryland law that the General Assembly believed necessary to protect public safety and that, according to Maryland law enforcement officials, does protect public safety.  Not quite four years ago, the Supreme Court reset the Second Amendment landscape in a decision that left many open questions without offering much guidance to help lower courts resolve them.  The Fourth Circuit, recognizing the potentially devastating consequences of miscalculating as to Second Amendment rights, has cautioned lower courts to tread lightly until questions about those rights are resolved by higher courts.  This caution is particularly warranted here, where this Court has reached a different conclusion than the majority of courts to have addressed the questions presented in this case.  As detailed in the defendants' prior briefing, these factors favor granting a

stay to preserve the status quo pending resolution by the Fourth Circuit.[1] The plaintiffs' Supplemental Brief in Opposition to Defendants' Motion for Stay Pending Appeal (ECF No. 69) fails to undermine any of these fundamental reasons why a stay is appropriate.

## I.     THE COURT SHOULD STAY THE ENTIRE INJUNCTION.

The plaintiffs misread the first footnote in the defendants' opening supplemental brief (ECF No. 68) to be a concession that the Court lacks discretion to stay its injunctive relief as to Mr. Woollard. ECF No. 69, at 1-2. To the contrary, the Court clearly has the discretion to, and should, stay the effect of both paragraphs of the injunctive relief it awarded. *See* Fed. R. Civ. P. 62(c). The sole point made in the first footnote of the defendants' opening supplemental brief is that the Court's options in resolving the motion for stay pending appeal are not limited to staying either (i) both paragraphs of its injunction, or (ii) neither paragraph. In footnote 1, the defendants were responding to a question posed by the Court about the range of relief that could be entered by noting that *if* the Court were to conclude that a stay is merited as to the broader relief awarded but not as to Mr. Woollard himself, the Court could enter a stay consistent with that conclusion. *Id.* ("[T]he court may suspend, modify, restore, or grant an injunction . . .").

## II.    THE PLAINTIFFS FAIL TO APPRECIATE THE IMPACT OF AN ABSENCE OF A STAY.

In arguing that the Maryland State Police ("MSP") could "easily" revoke permits in the event of a reversal by the Fourth Circuit, the plaintiffs demonstrate a lack of

---

[1] The defendants' opening brief is due on June 15, 2012, and the current schedule will have all briefing completed by August 2, 2012, more than six weeks before the Fourth Circuit's next scheduled sitting for oral argument, which is September 18-21, 2012.

understanding of the realities of law enforcement. In their supplemental brief, the defendants discussed the process that the MSP would follow in an attempt to minimize, to the greatest extent possible, the negative impact of the absence of a stay. ECF No. 68, at 2-5 & Ex. A, Declaration of Marcus Brown ("Brown Decl."). The plaintiffs erroneously infer from this discussion that the MSP "could easily—instantly—return to the status quo ante, by revoking the permits of anyone who did not establish 'GSR.'" ECF No. 69, at 4. The plaintiffs' conclusion is entirely unwarranted. Attempting to revoke a large number of permits would be a messy, difficult process with negative effects, especially for individuals who have good and substantial reason under the existing law. *See generally*, ECF No. 68, at 2-5; ECF No. 68-1, Brown Decl. ¶¶ 5-15.

Moreover, the plaintiffs' attempt to play down the effect of the absence of a stay on the administration of Maryland's handgun permit law by reference to the experience of states that have legislatively adopted "shall issue" laws is misplaced. It would be expected that in adopting such "shall issue" laws the legislatures in those states provided sufficient time and resources to manage any transition. A judicially-imposed transition would not be accompanied by such advanced planning or provision of resources to manage any increased influx of applications. As described in the opening supplemental memorandum, that would likely have an adverse effect on those applicants who, under existing law, have a demonstrable need to wear and carry a handgun. ECF No. 68, at 4-5.

**III.   CRIME STATISTICS SUPPORT A STAY.**

The plaintiffs make three points about crime rates that they contend counsel against entry of a stay.  Two of these points actually favor granting a stay, and the third is simply inaccurate.

    **A.   Maryland's Violent Crime Problem Favors Granting a Stay.**

The plaintiffs note that Maryland has a crime problem that is worse than crime problems in some states with more lenient handgun carry laws.  Plaintiffs' Supplemental Brief (ECF No. 69) at 5-6.  Maryland's crime problem is not new information in this case, of course, as it was highlighted by the defendants on summary judgment.  *See* ECF No. 26, at 10-14.  In fact, a critical purpose of Maryland's handgun wear and carry permit statute, including the good and substantial reason requirement, is to address Maryland's crime problem.  *Id.* at 10-16.

Although the plaintiffs acknowledge that "[c]orrelation may not be causation," they nonetheless cite correlation statistics purportedly showing that jurisdictions with more permissive handgun carry laws have, in the aggregate, fewer firearm murders and robberies—but more firearm assaults—than states with less permissive carry laws.  ECF No. 69, at 5-6.  The plaintiffs' correlation evidence is severely flawed.

First, the plaintiffs' calculations accord equal weight to the crime rates in California, with its 37 million people, and Washington, D.C., with its 600,000 people.  The impact of doing so is greatly exacerbated by the fact that Washington, D.C. is a statistical anomaly, with more than double the rate of firearms murders and robberies of

*any* state.  *See* Plaintiffs' Ex. A (ECF No. 69-1), at 1-2.  Just removing the anomalous Washington, D.C. from the plaintiffs' calculations paints a much different picture: 2.72 firearm murders, 28.14 firearm robberies, and 23.14 firearm assaults in the seven "may- or no-issue" states, versus the United States averages of 2.84 firearm murders, 42 firearm robberies, and 45 firearm assaults per 100,000 people.  *See id.*

Second, even if the plaintiffs' statistics were not so heavily skewed by a single, anomalous jurisdiction, their simplistic comparison ignores the many variables that affect crime statistics, including the fact that the states with less permissive gun laws are generally much more concentrated with urban, densely-populated areas.[2]  Such areas present public safety challenges that affect both crime rates and the public safety risks associated with different types of handgun permit legislation.  The plaintiffs' simplistic comparison of these groups of states without recognizing these or any other variables is inappropriate.

As of 2010, Maryland's level of violent crime was the lowest ever recorded for both overall violent crime rate and homicide rate.  *See* Maryland Governor's Office of

---

[2] The divide between "shall issue" and "may-issue" states based on the number of densely populated areas is stark.  Of the 87 geographical areas within the 50 United States and the District of Columbia the U.S. Census Bureau identifies as having a population density exceeding 7,500 people per square mile, 72 of those areas—more than 82%—are in one of the eight jurisdictions the plaintiffs identify as having "may- or no-issue laws."  *See* ECF No. 68, at 6 n.4 (identifying California, D.C., Hawaii, Illinois, Maryland, Massachusetts, New York, and New Jersey); U.S. Census Bureau, *Population, Housing Units, Area, and Density: 2010 – United States -- Places with 50,000 or More Population by State; and for Puerto Rico (2010)*, U.S. Census Bureau (available at http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_SF1_GCTPH1.US14PR&prodType=table) (last visited May 23, 2012).  By comparison, the remaining 43 states have only 15 such areas among them.  *Id.*  That is the same number as New Jersey has by itself, and fewer than half the number California has.  *Id.*

Crime Control & Prevention, Maryland 2010 Crime Totals, *available at* http://www.goccp.maryland.gov/msac/crime-statistics.php (last visited May 23, 2012). The role of the good and substantial reason requirement in Maryland's ongoing effort to reduce that level of violent crime, as attested by Maryland law enforcement officials, favors granting a stay.

### B. The Plaintiffs' Claims About Defensive Gun Use Have Been Disproven.

The plaintiffs rely on a 1995 article by Gary Kleck and Marc Gertz to support their claim that defensive gun use is very common, and likely even more common than criminal gun use. ECF No. 69, at 6-7. However, the basis for Kleck and Gertz's conclusion has long since been refuted. *See* David Hemenway, *Policy & Perspective: Survey Research & Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. CRIM. L. & CRIMINOLOGY 1430 (1997) (the extreme overestimate of the frequency of defensive gun use comes from the study's reliance on self-reporting of a rare event). Studies using a consistent methodology to estimate both instances of criminal gun use and of defensive gun use demonstrate that "guns in the United States are used far more in crime than in self-defense." Ex. 1, David Hemenway and Mary Vriniotis, *Comparing the Incidence of Self-Defense Gun Use and Criminal Gun Use*, Bulletins, at 2-3 (Spring 2009) (claim that defensive gun use is more common than criminal gun use is based on comparing results of "two radically different survey methodologies").

### C.   The Parties Agree That It Is Not the Court's Job to Evaluate the Costs and Benefits of Firearms Restrictions.

The plaintiffs correctly observe that there have been numerous published studies reaching different conclusions as to the impact of shall-issue carry laws on crime rates. All studies of the impact of "shall-issue" carry laws on crime rates are not created equal,[3] but the defendants agree with the plaintiffs that it is not the responsibility of the courts to resolve a dispute about the benefits and costs of different types of firearms restrictions. *See* ECF No. 69, at 7.  The legislative, not the judicial, branch is generally entrusted with such judgments.  *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (legislative branch is "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions") (internal quotation omitted).

The question currently before the Court, however, is whether to enter a stay.  The importance of the challenged provision to maintaining public safety is confirmed in legislative findings and by the testimony of Maryland law enforcement officials, and the best available evidence indicates that "shall issue" carry laws likely have an adverse impact on at least some crime, ECF No. 68, at 7.  Other legislatures, law enforcement officials, and authors have reached different conclusions, but the existence of a debate

---

[3] Contrary to their claim, the unpublished document the plaintiffs attach as Exhibit B to their supplemental brief (ECF No. 69-2) hardly "debunk[s]" the article from Aneja, Donohue, and Zhang ("ADZ") attached as Exhibit D to the defendants' opening supplemental brief (ECF No. 68-4). ECF No. 69, at 7.  Although the plaintiffs' Exhibit B attempts to defend against some of the criticisms made in the ADZ article, it fails even to address most of the criticisms and fails to undermine the fundamental conclusions of the ADZ article about the flaws in studies purporting to show that "shall issue" laws decrease crime and the results of the ADZ analysis after correcting and updating the data.  *See* ECF No. 68, at 5-7.

does not require all states to adopt shall-issue laws. *Cf. McDonald v. City of Chicago*, 130 S. Ct. 3020, 3046 (2010) ("'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment.'") (quoting with approval Brief of State of Texas, *et al.* as *Amici Curiae*, at 23). In light of the novel legal issues involved, the substantial implications for public safety if Maryland's legislature and officials are correct, and the limited burden on the plaintiffs pending appeal, *see, e.g.*, ECF No. 68, at 1-2, the evidence supports a stay.

## IV. THE PLAINTIFFS' ARGUMENTS ABOUT PERMIT HOLDER STATISTICS ARE UNPERSUASIVE.

In an attempt to move the focus off of public safety more generally, the plaintiffs continue to argue that the only relevant consideration is the conduct of permit holders themselves. The defendants do not agree with the plaintiffs' premise, which ignores broader public safety concerns. But even if that premise were accepted, the plaintiffs' claims are based almost entirely on inapposite statistics regarding permit revocation. Revocation statistics are a poor proxy for identifying actual criminal activity because they depend on states having adequately-staffed, efficient, appropriate mechanisms for their licensing authorities to receive information about, and then act on, criminal activities of permit holders. There is no evidence that the states whose revocation statistics the plaintiffs cite—or Texas, the only state for which the plaintiffs purport to offer actual crime statistics—have any such mechanisms. To the contrary, investigations have found the opposite. *See* ECF No. 68 at 9-10; *see also* ECF Nos. 68-5, 68-6, & 68-7.

Moreover, although the plaintiffs dismiss the Violence Policy Center's ("VPC") cataloguing of killings by concealed carry permit holders since 2007 as something they have addressed previously, ECF No. 69, at 9, that information is significant. The plaintiffs previously claimed that the full list compiled by the VPC, which currently identifies 440 killings by concealed carry permit holders since May 2007, *available at* http://www.vpc.org/fact_sht/ccwtotalkilled.pdf (last visited May 23, 2012), is over-inclusive, primarily because of its inclusion of suicides and certain unintentional killings. *See* ECF No. 34 at 5-6. However, even excluding all suicides and unintentional killings, the list still shows 268 killings by permit holders since May 2007.

## V. DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS.

Finally, the plaintiffs argue erroneously that the "Defendants' prospects on appeal are yet-more remote" as a result of a decision by the United States District Court for the Eastern District of North Carolina holding that the scope of the Second Amendment extends outside the home. ECF No. 69 at 10 (quoting *Bateman v. Purdue*, 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336 (E.D.N.C. Mar. 29, 2012)). *Bateman*, which did not address the constitutionality of a permit statute, became only the third court in the country to hold that the scope of the Second Amendment right identified in *Heller* extends beyond the home. If the plaintiffs want to make this a counting exercise, the overall balance is still very much in favor of the defendants. *See, e.g.*, *Moore v. Madigan*, No. 11-cv-03134, 2012 U.S. Dist. LEXIS 12967, \*19-\*22 (Feb. 3, 2012) (listing cases "concluding that the Second Amendment right in Heller is limited to the

right to bear arms in the home for self-defense"); ECF No. 26, at 22, 24 & n.8; ECF No. 54, at 14-17. However, this is not a counting exercise, and the decision in *Bateman* highlights the fact that the scope of the Second Amendment right recognized in *Heller* and *McDonald* is still an unresolved question. *United States v. Masciandaro*, 638 F.3d. 458, 467 (4th Cir. 2011). Accordingly, and this Court should enter a stay to maintain the status quo until the Fourth Circuit can resolve this case.

## CONCLUSION

The defendants request that the Court stay the effect of its March 5 Order (ECF No. 53), as amended by its March 30 Order (ECF No. 63), pending appeal to the United States Court of Appeals for the Fourth Circuit.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

          /s/
                                                 _

| | |
|---|---|
| DAN FRIEDMAN (Fed. Bar # 24535) | MATTHEW J. FADER (Fed. Bar # 29294) |
| Assistant Attorney General | STEPHEN M. RUCKMAN (Fed. Bar # 28981) |
| Office of the Attorney General | Assistant Attorneys General |
| Legislative Services Building | 200 St. Paul Place, 20th Floor |
| 90 State Circle, Room 104 | Baltimore, Maryland 21202 |
| Annapolis, Maryland 21401 | Tel. 410-576-7906 |
| Tel. 410-946-5600 | Fax. 410-576-6955 |
| dfriedman@oag.state.md.us | mfader@oag.state.md.us |
| | |
| May 23, 2012 | Attorneys for Defendants |