FILED: March 21, 2013

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 12-1437
(1:10-cv-02068-BEL)

———————————

RAYMOND WOOLLARD; SECOND AMENDMENT FOUNDATION, INC.

        Plaintiffs - Appellees

v.

DENIS GALLAGHER; SEYMOUR GOLDSTEIN; CHARLES M. THOMAS, JR.; MARCUS L. BROWN

        Defendants - Appellants

and

TERRENCE SHERIDAN

        Defendant

-------------------------------

AMERICAN PUBLIC HEALTH ASSOCIATION; AMERICAN COLLEGE OF PREVENTIVE MEDICINE; LEGAL COMMUNITY AGAINST VIOLENCE; LEGAL HISTORIANS; BRADY CENTER TO PREVENT GUN VIOLENCE; MARYLAND CHIEFS OF POLICE ASSOCIATION; INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS; MAJOR CITIES CHIEFS ASSOCIATION

        Amici Supporting Appellant

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAYMOND WOOLLARD; SECOND
AMENDMENT FOUNDATION, INC.,

        *Plaintiffs-Appellees,*

        v.

DENIS GALLAGHER; SEYMOUR
GOLDSTEIN; CHARLES M. THOMAS,
JR.; MARCUS L. BROWN,

        *Defendants-Appellants,*

        and

TERRENCE SHERIDAN,

        *Defendant.*

No. 12-1437

AMERICAN PUBLIC HEALTH
ASSOCIATION; AMERICAN COLLEGE OF
PREVENTIVE MEDICINE; LEGAL
COMMUNITY AGAINST VIOLENCE;
LEGAL HISTORIANS;

2                    WOOLLARD V. GALLAGHER

BRADY CENTER TO PREVENT GUN
VIOLENCE; MARYLAND CHIEFS OF
POLICE ASSOCIATION; INTERNATIONAL
BROTHERHOOD OF POLICE OFFICERS;
MAJOR CITIES CHIEFS ASSOCIATION,

         *Amici Supporting Appellants,*

NRA CIVIL RIGHTS DEFENSE FUND;
BUCKEYE FIREARMS FOUNDATION,
INC.; INTERNATIONAL LAW
ENFORCEMENT EDUCATORS &
TRAINERS ASSOCIATION;
INTERNATIONAL ASSOCIATION OF LAW
ENFORCEMENT FIREARMS
INSTRUCTORS, INC.; PROFESSOR
CLAYTON CRAMER; INDEPENDENCE
INSTITUTE; COMMONWEALTH OF
VIRGINIA; STATE OF ALABAMA;
STATE OF ARKANSAS; STATE OF
FLORIDA; STATE OF KANSAS;
COMMONWEALTH OF KENTUCKY;
STATE OF MAINE; STATE OF
MICHIGAN; STATE OF NEBRASKA;
STATE OF NEW MEXICO; STATE OF
OKLAHOMA; STATE OF SOUTH
CAROLINA; STATE OF SOUTH
DAKOTA;

WOOLLARD v. GALLAGHER                3

STATE OF WEST VIRGINIA;
PROFESSORS OF LAW, HISTORY,
POLITICS, AND GOVERNMENT;
CALIFORNIA RIFLE AND PISTOL
ASSOCIATION FOUNDATION; VIRGINIA
SHOOTING SPORTS ASSOCIATION;
CENTER FOR CONSTITUTIONAL
JURISPRUDENCE; GUN OWNERS
FOUNDATION; GUN OWNERS OF
AMERICA, INCORPORATED; VIRGINIA
GUN OWNERS COALITION; VIRGINIA
CITIZENS DEFENSE LEAGUE, INC.;
UNITED STATES JUSTICE
FOUNDATION; CONSERVATIVE LEGAL
DEFENSE AND EDUCATION FUND; THE
ASSOCIATED GUN CLUBS OF
BALTIMORE, INC.; THE MONUMENTAL
RIFLE & PISTOL CLUB; THE ILLINOIS
STATE RIFLE ASSOCIATION; THE
NEW YORK RIFLE AND PISTOL
ASSOCIATION; THE ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL CLUBS,
INC.; THE HAWAII RIFLE
ASSOCIATION; NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC.,

*Amici Supporting Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson Everett Legg, District Judge.
(1:10-cv-02068-BEL)

Argued: October 24, 2012

Decided: March 21, 2013

4                          WOOLLARD v. GALLAGHER

Before KING, DAVIS, and DIAZ, Circuit Judges.

---

Reversed by published opinion. Judge King wrote the opinion, in which Judge Davis and Judge Diaz joined.

---

## COUNSEL

**ARGUED:** Matthew John Fader, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Alan Gura, GURA & POSSESSKY, PLLC, Alexandria, Virginia, for Appellees. **ON BRIEF:** Douglas F. Gansler, Attorney General of Maryland, Baltimore, Maryland, Dan Friedman, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Annapolis, Maryland, Stephen M. Ruckman, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Cary Hansel, JOSEPH, GREENWALD & LAAKE, Greenbelt, Maryland, for Appellees. Jason M. St. John, Jennifer A. DeRose, SAUL EWING LLP, Baltimore, Maryland, for American Public Health Association and American College of Preventive Medicine, Amici Supporting Appellants. Mitchell F. Dolin, Peter Saharko, Jonathan Cohen, COVINGTON & BURLING, LLP, Washington, D.C., for Legal Community Against Violence, Amicus Supporting Appellants. Andrew C. White, Erin Murphy, SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC, Baltimore, Maryland; Dwight W. Stone, II, WHITEFORD, TAYLOR & PRESTON, LLP, Baltimore, Maryland, for Legal Historians, Amici Supporting Appellants. Jonathan E. Lowy, Daniel R. Vice, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C.; Jonathan L. Diesenhaus, S. Chartey Quarcoo, Matthew C. Sullivan, HOGAN LOVELLS US LLP, Washington, D.C., for Brady Center to Prevent Gun Violence, Maryland Chiefs of Police Associa-

tion, International Brotherhood of Police Officers, and Major
Cities Chiefs Association, Amici Supporting Appellants. Mat-
thew D. Fender, Robert W. Loftin, MCGUIREWOODS LLP,
Richmond, Virginia, for NRA Civil Rights Defense Fund,
Amicus Supporting Appellees. L. Kenneth Hanson III, FIRE-
STONE, BREHM, HANSON AND WOLF LLP, Delaware,
Ohio, for Buckeye Firearms Foundation, Inc., Amicus Sup-
porting Appellees. David B. Kopel, INDEPENDENCE
INSTITUTE, Denver, Colorado, for International Law
Enforcement Educators & Trainers Association, International
Association Of Law Enforcement Firearms Instructors, Inc.,
Professor Clayton Cramer, and Independence Institute, Amici
Supporting Appellees. Kenneth T. Cuccinelli, II, Attorney
General of Virginia, E. Duncan Getchell, Jr., Solicitor Gen-
eral of Virginia, Michael H. Brady, Assistant Attorney Gen-
eral, Charles E. James, Jr., Chief Deputy Attorney General,
Wesley G. Russell, Jr., Deputy Attorney General, OFFICE
OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Commonwealth of Virginia; State of Alabama; State of
Arkansas; State of Florida; State of Kansas; Commonwealth
of Kentucky; State of Maine; State of Michigan; State of
Nebraska; State of New Mexico; State of Oklahoma; State of
South Carolina; State of South Dakota; State of West Vir-
ginia, Amici Supporting Appellees. David T. Hardy, Tucson,
Arizona, for Professors of Law, History, Politics, and Govern-
ment, Amici Supporting Appellees. Dan M. Peterson, DAN
M. PETERSON PLLC, Fairfax, Virginia; Stephen P. Hal-
brook, Fairfax, Virginia; John C. Eastman, Anthony T. Caso,
CENTER FOR CONSTITUTIONAL JURISPRUDENCE,
Orange, California; C. D. Michel, MICHEL & ASSO-
CIATES, P.C., Long Beach, California, for California Rifle
and Pistol Association Foundation, Virginia Shooting Sports
Association, and Center for Constitutional Jurisprudence,
Amici Supporting Appellees. Gary G. Kreep, U. S. JUSTICE
FOUNDATION, Ramona, California, for U. S. Justice Foun-
dation; William J. Olson, Herbert W. Titus, John S. Miles,
Jeremiah L. Morgan, Robert J. Olson, WILLIAM J. OLSON,

P.C., Vienna, Virginia, for Gun Owners Foundation, Gun
Owners of America, Incorporated, Virginia Gun Owners
Coalition, Virginia Citizens Defense League, Inc., United
States Justice Foundation, and Conservative Legal Defense
and Education Fund, Amici Supporting Appellees. Brian Stu-
art Koukoutchos, Mandeville, Louisiana, for The Associated
Gun Clubs of Baltimore, Inc., The Monumental Rifle & Pistol
Club, The Illinois State Rifle Association, The New York
Rifle and Pistol Association, The Association of New Jersey
Rifle & Pistol Clubs, Inc., and The Hawaii Rifle Association,
Amici Supporting Appellees. Charles J. Cooper, David H.
Thompson, Peter A. Patterson, COOPER AND KIRK, PLLC,
Washington, D.C., for National Rifle Association of America
Inc., Amicus Supporting Appellees.

---

## OPINION

KING, Circuit Judge:

The district court permanently enjoined enforcement of
section 5-306(a)(5)(ii) of the Public Safety Article of the
Maryland Code, to the extent that it conditions eligibility for
a permit to carry, wear, or transport a handgun in public on
having "good and substantial reason" to do so. Necessary to
the entry of the court's injunction was its trailblazing pro-
nouncement that the Second Amendment right to keep and
bear arms for the purpose of self-defense extends outside the
home, as well as its determination that such right is imper-
missibly burdened by Maryland's good-and-substantial-
reason requirement. *See Woollard v. Sheridan*, 863 F. Supp.
2d 462 (D. Md. 2012). Because we disagree with the court's
conclusion that the good-and-substantial-reason requirement
cannot pass constitutional muster, we reverse the judgment
without needlessly demarcating the reach of the Second
Amendment.

WOOLLARD v. GALLAGHER                    7

I.

A.

Under its permitting scheme, Maryland obliges "[a] person [to] have a permit issued . . . before the person carries, wears, or transports a handgun." Md. Code Ann., Pub. Safety § 5-303. Such permits are not needed, however, by persons in numerous specified situations, including those who are wearing, carrying, and transporting handguns in their own homes and businesses or on other real estate that they own or lease. *See* Md. Code Ann., Crim. Law § 4-203(b)(6). Maryland's statutory permit exceptions also extend to the following:

- Members of law enforcement and the military on active assignment;

- Persons moving handguns to and from places of legal purchase and sale, to and from bona fide repair shops, and between personal residences and businesses;

- Persons engaged in target shoots and practices, sport shooting events, hunting and trapping, fire-arms and hunter safety classes sponsored by the Department of Natural Resources, and dog obedi-ence training classes and shows;

- Gun collectors participating in public and private exhibitions;

- Supervisory employees armed with handguns in the course of their employment and within the confines of the business establishment, when so authorized by the establishment's owner or man-ager;

8                         WOOLLARD v. GALLAGHER

- Boaters equipped with signal pistols and other
  visual distress signals approved by the United
  States Coast Guard; and

- Persons effecting court-ordered surrenders of
  their handguns.

*See id.* § 4-203(b)(1), (3)-(5), (7)-(9). Where a permit is man-
dated, a permitless person risks criminal penalties by "wear-
[ing], carry[ing], or transport[ing] a handgun, whether
concealed or open, on or about the person" or "in a vehicle."
*Id.* § 4-203(a)(1)(i)-(ii). Those penalties begin with imprison-
ment for a term of thirty days to three years, or a fine of $250
to $2500, or both. *Id.* § 4-203(c)(2)(i).

   Handgun permits are issued by the Secretary of the Mary-
land State Police or the Secretary's designee. *See* Md. Code
Ann., Pub. Safety § 5-301(d)-(e). The Secretary must issue a
permit upon making enumerated findings, including that the
applicant is an adult without a disqualifying criminal record,
alcohol or drug addiction, or propensity for violence. *Id.* § 5-
306(a)(1)-(5)(i). Pursuant to the good-and-substantial-reason
requirement, permit eligibility also necessitates the Secre-
tary's finding, following an investigation, that the applicant

      has good and substantial reason to wear, carry, or
      transport a handgun, such as a finding that the permit
      is necessary as a reasonable precaution against
      apprehended danger.

*Id.* § 5-306(a)(5)(ii). The Secretary has assigned permitting
responsibility to the Handgun Permit Unit, which determines,
inter alia, whether the applicant's reasons for seeking a permit
"are good and substantial," whether "the applicant has any
alternative available to him for protection other than a hand-
gun permit," and whether "the permit is necessary as a reason-
able precaution for the applicant against apprehended
danger." *See* Md. Code Regs. 29.03.02.04(G), (L), (O).

The Handgun Permit Unit has identified "four primary categories" under which an applicant may demonstrate "good and substantial reason" to obtain a handgun permit:

> (1) for business activities, either at the business owner's request or on behalf of an employee; (2) for regulated professions (security guard, private detective, armored car driver, and special police officer); (3) for "assumed risk" professions (e.g., judge, police officer, public defender, prosecutor, or correctional officer); and (4) for personal protection.

J.A. 57-58.[1] Regarding the first three of those categories, "the 'good and substantial reason' is usually apparent from the business activity or profession itself." *Id.* at 58. As for the fourth category — personal protection — the Permit Unit considers whether the applicant needs a handgun permit as a safeguard against "apprehended danger." *Id.* at 59-60.

The Handgun Permit Unit is guided by precedent of the Court of Special Appeals of Maryland, recognizing that "'whether there is "apprehended danger" to the applicant'" is an objective inquiry, and that apprehended danger cannot be established by, inter alia, a "'vague threat'" or a general fear of "liv[ing] in a dangerous society." *Scherr v. Handgun Permit Review Bd.*, 880 A.2d 1137, 1148 (Md. Ct. Spec. App. 2005) (quoting *Snowden v. Handgun Permit Review Bd.*, 413 A.2d 295, 298 (Md. Ct. Spec. App. 1980)). That same precedent, as the Permit Unit interprets it, "caution[s] the Unit against relying exclusively on apprehended threats." J.A. 60 (explaining that "failure to meet [the apprehended threat] criterion is not dispositive"). So, the Permit Unit examines such factors as

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

> (1) the "nearness" or likelihood of a threat or pre-
> sumed threat; (2) whether the threat can be verified;
> (3) whether the threat is particular to the applicant,
> as opposed to the average citizen; (4) if the threat
> can be presumed to exist, what is the basis for the
> presumption; and (5) the length of time since the ini-
> tial threat occurred.

*Id.* The Permit Unit treats those factors as nonexhaustive,
however, and "takes the applicant's entire situation into
account when considering whether a 'good and substantial
reason' exists." *Id.*

An initial handgun permit "expires on the last day of the
holder's birth month following 2 years after the date the per-
mit is issued," and "may be renewed for successive periods of
3 years each if, at the time of an application for renewal, the
applicant possesses the qualifications for the issuance of a
permit." Md. Code Ann., Pub. Safety § 5-309(a)-(b). An
applicant denied a permit may request informal review by the
Secretary or immediately appeal to the Handgun Permit
Review Board appointed by the Governor. *Id.* §§ 5-301(b), 5-
302(b), 5-311, 5-312. In the event the appeal is denied by the
Permit Review Board, an applicant may seek further review
in the Maryland state courts. *Id.* § 5-312(e).

### B.

On July 29, 2010, Raymond Woollard and the Second
Amendment Foundation, Inc. (together, the "Appellees"), ini-
tiated this action in the District of Maryland pursuant to 42
U.S.C. § 1983, asserting, inter alia, that Maryland's good-and-
substantial-reason requirement for obtaining a handgun permit
contravenes the Second Amendment. The Appellees' Com-
plaint, as well as their subsequent Amended Complaint of
January 19, 2011, named the Secretary as a defendant,

together with three members of the Handgun Permit Review
Board (collectively, the "State").[2]

Adjudicating the parties' cross-motions for summary judg-
ment, the district court explained that this action was
prompted by the State's denial in 2009 of Appellee Wool-
lard's request for a second renewal of a handgun permit origi-
nally granted in 2003 and renewed in 2006. *See Woollard*,
863 F. Supp. 2d at 465-66. Woollard, who resides on a farm
in a remote part of Baltimore County, had obtained the permit
after a harrowing home invasion:

> On Christmas Eve, 2002, Woollard was at home
> with his wife, children, and grandchildren when an
> intruder shattered a window and broke into the
> house. The intruder was Kris Lee Abbott, Wool-
> lard's son-in-law. Abbott, who was high on drugs
> and intent on driving into Baltimore city to buy
> more, was looking for his wife's car keys. Woollard
> grabbed a shotgun and trained it on Abbott, but
> Abbott wrested the shotgun away. Woollard's son
> restored order by pointing a second gun at Abbott.
> Woollard's wife called the police, who took two-
> and-a-half hours to arrive.

*Id.* at 465. Abbott, the son-in-law, received a sentence of pro-
bation for the Christmas Eve 2002 incident, but was subse-
quently incarcerated for probation violations. *Id.* Woollard's
2006 permit renewal came shortly after Abbott was released
from prison. *Id.* In 2009, however, the Secretary (via the
Handgun Permit Unit) and the Handgun Permit Review
Board refused Woollard a second renewal because he failed to sat-
isfy the good-and-substantial-reason requirement. *Id.* at 465-
66.

---

[2]The then-Secretary and Superintendent of the Maryland State Police,
Terrence Sheridan, has since been replaced by Marcus L. Brown. The
defendant members of the Handgun Permit Review Board are Denis Gal-
lagher, Seymour Goldstein, and Charles M. Thomas, Jr.

12                          WOOLLARD V. GALLAGHER

The Handgun Permit Review Board's decision of November 12, 2009, reflected that Woollard proffered solely the Christmas Eve 2002 incident in support of his request for a second renewal — i.e., as evidence that such a renewal was necessary as a reasonable precaution against apprehended danger — though he acknowledged that he had "not had any contact with his son-in-law [in the seven years since the 2002 incident]." J.A. 15. The decision also observed that, despite being advised that such proof was required in the circumstances of his renewal application, Woollard did not "submit documented threats or incidents that had occurred in the last three years," nor did he provide "documentation to verify threats occurring beyond his residence, where he can already legally carry a handgun." *Id.* Accordingly, the Permit Review Board concluded that Woollard had "not demonstrated a good and substantial reason to wear, carry, or transport a handgun as a reasonable precaution against apprehended danger," and upheld the Permit Unit's denial of a second permit renewal. *Id.* at 16. Instead of employing the state court appeal process provided by Maryland law, Woollard elected to join with Appellee Second Amendment Foundation in this federal action, challenging the constitutionality of the good-and-substantial-reason requirement and asserting jurisdiction under 28 U.S.C. §§ 1331 and 1343.[3]

---

[3]Before it disposed of the parties' cross-motions for summary judgment, the district court denied the State's motion to dismiss the Second Amendment Foundation for lack of standing and to dismiss the Appellees' constitutional claims under the abstention doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. *See Woollard v. Sheridan*, No. 1:10-cv-02068, slip op. at 1 n.1 (D. Md. Dec. 29, 2010), ECF No. 16 (explaining that, because Woollard had standing to bring a facial challenge and only injunctive and declaratory relief was sought, there was no need to "'consider whether [the Second Amendment Foundation also had] standing to maintain the suit'" (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977))); *id.* at 9 (summarizing that "there is no ongoing state proceeding that warrants abstention under the *Younger* doctrine"). On appeal, the State does not contest, and we do not disturb, the court's rulings on the standing and *Younger* abstention issues.

The district court credited the Appellees' claim that the good-and-substantial-reason requirement is facially violative of the Second Amendment, and thus that Woollard, "separate and apart from any concern he may have regarding Abbott," is entitled "to wear and carry a handgun for general self-defense." *See Woollard*, 863 F. Supp. 2d at 466. In so ruling, the district court "br[oke] ground that our superiors have not tread," proclaiming that the Second Amendment right recognized by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) — the right of individuals to possess and carry firearms in case of confrontation — is a right that extends beyond the home. *See United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., writing for the Court as to Part III.B) (recognizing that the Supreme Court left open "the question of *Heller*'s applicability outside the home environment").

Notably, the district court gave considerable attention to our *Masciandaro* decision. There, Masciandaro challenged his conviction of carrying or possessing a loaded handgun in a motor vehicle within a national park area, in contravention of since-superseded 36 C.F.R. § 2.4(b), on the ground that the Second Amendment, as construed in *Heller*, "guaranteed to him the right to possess and carry weapons in case of confrontation and thus protected him from prosecution under § 2.4(b) for exercising that right in a national park area." *Masciandaro*, 638 F.3d at 465. Judge Niemeyer, writing only for himself, posited that "there is a plausible reading of *Heller* that the Second Amendment provides [a right to possess a loaded handgun for self-defense outside the home], at least in some form." *Id.* at 467 (Niemeyer, J., writing separately on this Part III.B). Judge Wilkinson wrote for the majority of the three-judge panel, however, that it was "unnecessary to explore in [Masciandaro's] case the question of whether and to what extent the Second Amendment right recognized in *Heller* applies outside the home" — rendering it the prudent and respectful course "to await direction from the [Supreme] Court itself." *Id.* at 474, 475 (Wilkinson, J., writing for the

Court as to Part III.B). That was so because the panel members unanimously agreed, by Judge Niemeyer's opinion for the Court, that even assuming the *Heller* right extended beyond the home, § 2.4(b) "pass[ed] constitutional muster under the [applicable] standard": intermediate scrutiny. *Id.* at 473.

In the present case, although the district court acknowledged "Judge Wilkinson's admonition that one should venture into the unmapped reaches of Second Amendment jurisprudence 'only upon necessity and only then by small degree,'" the court deemed itself obliged "to determine whether Maryland's broad restriction on handgun possession outside the home burdens any Second Amendment right at all." *Woollard*, 863 F. Supp. 2d at 469 (quoting *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., writing for the Court as to Part III.B)). Guided by Judge Niemeyer's separate opinion in *Masciandaro*, as well as so-called "signposts" left by *Heller* and other recent precedent, the district court concluded that the individual right to possess and carry weapons for self-defense is not limited to the home. *See id.* at 469-71. Purporting to apply intermediate scrutiny, the court then recognized that the good-and-substantial-reason requirement is undergirded by a substantial governmental interest in protecting public safety and preventing crime, but determined that "[t]he Maryland statute's failure lies in the overly broad means by which it seeks to advance this undoubtedly legitimate end." *Id.* at 474; *see also id.* at 476 ("find[ing] that Maryland's requirement of a 'good and substantial reason' for issuance of a handgun permit is insufficiently tailored to the State's interest in public safety and crime prevention," and "impermissibly infringes the right to keep and bear arms").[4]

---

[4] In its opinion, the district court did not embrace every theory advanced by the Appellees in their attack on Maryland's good-and-substantial-reason requirement. The court rejected the Appellees' contention that the good-and-substantial-reason requirement amounts to an unconstitutional prior restraint on the exercise of Second Amendment rights. *See Woollard*,

The district court thus awarded summary judgment to the Appellees, *see Woollard v. Sheridan*, No. 1:10-cv-02068 (D. Md. Mar. 2, 2012), ECF No. 53, and permanently enjoined enforcement of the good-and-substantial-reason requirement, *see Woollard v. Brown*, No. 1:10-cv-02068 (D. Md. Mar. 30, 2012), ECF No. 63. After the State noted this appeal, the district court dissolved a preliminary stay of its judgment and denied the State's request for a stay pending appeal. *See Woollard v. Brown*, No. 1:10-cv-02068 (D. Md. July 23, 2012), ECF No. 72. Nevertheless, on August 1, 2012, we entered our own stay pending appeal and expedited the appellate proceedings, over which we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party.

---

863 F. Supp. 2d at 472 (expressing doubt that First Amendment prior restraint analysis applies to Second Amendment claim, and, in any event, "reject[ing] Woollard's assertion that Maryland's permitting scheme vests officials with unbridled discretion as regards its application"). Additionally, the court would not allow the Appellees to rely on the Equal Protection Clause of the Fourteenth Amendment as a separate means of attack on the good-and-substantial-reason requirement. In that regard, the court reasoned that, having awarded the Appellees relief under the Second Amendment, there was "no need to venture further into unmapped territory by determining whether or not Maryland's permitting scheme would also be unconstitutional [under the Fourteenth Amendment]." *Id.* at 475. The court further recognized that it need not entertain the Appellees' equal protection claim because it was essentially a restatement of their Second Amendment claim, and had been asserted "to obtain review under a more stringent standard than [intermediate scrutiny]." *Id.* at 475-76. As the court explained, "to accept [the Appellees' equal protection] theory would be to erase, in one broad stroke, the careful and sensible distinctions that the Fourth Circuit and other courts have drawn between core and non-core Second Amendment protections and to ignore the principle that differing levels of scrutiny are appropriate to each." *Id.* at 476.

*See FOP Lodge No. 89 v. Prince George's Cnty.*, 608 F.3d
183, 188 (4th Cir. 2010). Summary judgment is appropriate
only if the record shows "that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(a).

Consistently with the summary judgment standard, our
review of a decision granting an injunction is de novo where
the contested issue is a question of law. *See Bacon v. City of
Richmond*, 475 F.3d 633, 638 (4th Cir. 2007). That is,
although "decisions pertaining to injunctive relief normally
are reviewed solely for abuse of discretion in applying the
injunction standard, we review such a decision *de novo* where
it rests solely on a premise as to the applicable rule of law,
and the facts are established or of no controlling relevance."
*Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d
113, 116 (4th Cir. 1993) (citations and internal quotation
marks omitted).

III.

A.

In the familiar words of the Second Amendment, "[a] well
regulated Militia, being necessary to the security of a free
State, the right of the people to keep and bear Arms, shall not
be infringed." U.S. Const. amend. II. We now know, in the
wake of the Supreme Court's decision in *District of Columbia
v. Heller*, that the Second Amendment guarantees the right of
individuals to keep and bear arms for the purpose of self-
defense. *See* 554 U.S. 570, 592 (2008). *Heller*, however, was
principally concerned with the "core protection" of the Sec-
ond Amendment: "the right of law-abiding, responsible citi-
zens to use arms in defense of hearth and home." *Id.* at 634-
35. The *Heller* Court concluded that the District of Colum-
bia's outright ban on the possession of an operable handgun
in the home — proscribing "the most preferred firearm in the
nation to keep and use for protection of one's home and fam-

ily" — would fail to pass muster "[u]nder any of the standards
of scrutiny that we have applied to enumerated constitutional
rights." *Id.* at 628-29 (internal quotation marks omitted). Oth-
erwise, the Court recognized that "the right secured by the
Second Amendment is not unlimited" and listed examples of
"presumptively lawful regulatory measures," but declined to
"clarify the entire field" of Second Amendment jurisprudence.
*See id.* at 626-27 & n.26, 635.

Two years after issuing its *Heller* decision, in *McDonald v.
City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court
considered the constitutionality of municipal bans in Chicago
and one of its suburbs on the possession of handguns in the
home. On account of the similarities between those bans and
the District of Columbia prohibition struck down in *Heller*,
the *McDonald* defendants were left to "argue that their laws
are constitutional because the Second Amendment has no
application to the States." *See McDonald*, 130 S. Ct. at 3026.
The Court recognized, however, that "the Second Amendment
right is fully applicable to the States," and reiterated *Heller*'s
holding "that the Second Amendment protects the right to
possess a handgun in the home for the purpose of self-
defense." *Id.* at 3026, 3050. Accordingly, "a considerable
degree of uncertainty remains as to the scope of [the *Heller*]
right beyond the home and the standards for determining
whether and how the right can be burdened by governmental
regulation." *United States v. Masciandaro*, 638 F.3d 458, 467
(4th Cir. 2011); *see also Kachalsky v. County of Westchester*,
701 F.3d 81, 89 (2d Cir. 2012) ("What we know from [*Heller*
and *McDonald*] is that Second Amendment guarantees are at
their zenith within the home. What we do not know is the
scope of that right beyond the home and the standards for
determining when and how the right can be regulated by a
government." (citation omitted)).

Like several of our sister circuits, we have found that "a
two-part approach to Second Amendment claims seems
appropriate under *Heller*." *See United States v. Chester*, 628

F.3d 673, 680 (4th Cir. 2010) (citing *United States v. Marzza-rella*, 614 F.3d 85, 89 (3d Cir. 2010)); *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 703-04 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010). Pursuant to our two-part *Chester* inquiry,

> [t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This histori-cal inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropri-ate form of means-end scrutiny.

628 F.3d at 680 (citations and internal quotation marks omit-ted).

    As we have recognized, however, we are not obliged to impart a definitive ruling at the first step of the *Chester* inquiry. And indeed, we and other courts of appeals have sometimes deemed it prudent to instead resolve post-*Heller* challenges to firearm prohibitions at the second step — including where the challenge focuses on an outside-the-home prohibition. *Masciandaro* is just one example of such an inci-dence. *See also, e.g., Nat'l Rifle Ass'n of Am.*, 700 F.3d at 204 ("Although we are inclined to uphold the challenged federal laws [banning the sale of firearms to persons under the age of twenty-one] at step one of our analytical framework, in an abundance of caution, we proceed to step two. We ultimately conclude that the challenged federal laws pass constitutional

muster even if they implicate the Second Amendment guarantee."); *United States v. Mahin*, 668 F.3d 119, 123-24 (4th Cir. 2012) (declining Mahin's invitation to "recognize that Second Amendment protections apply outside the home and extend to persons subject to domestic protective orders," because we could assume Mahin "engaged in activity which implicates the Second Amendment" and yet "uphold [his] conviction"). *But cf. Kachalsky*, 701 F.3d at 89 ("Although the Supreme Court's cases applying the Second Amendment have arisen only in connection with prohibitions on the possession of firearms in the home, the Court's analysis suggests[ ] . . . that the Amendment must have *some* application in the very different context of the public possession of firearms. Our analysis proceeds on this assumption." (footnote omitted)).[5]

---

[5] As the Appellees would have it, our Court recently confirmed in *United States v. Black* that the Second Amendment guarantees the right to carry firearms in public for self-protection. *See* No. 11-5084, slip op. at 13 (4th Cir. Feb. 25, 2013). There, we ruled that North Carolina police officers' investigatory detention of Black, along with five other men (including Troupe), was not justified by Troupe's lawful display of a firearm in public. The thrust of *Black* is that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention." *Id.* Additionally, *Black* advises — but only in passing — that "even if the officers were justified in detaining Troupe for exercising his constitutional right to bear arms, reasonable suspicion as to Troupe does not amount to, and is not particularized as to Black." *Id.* That dicta is the basis for the Appellees' contention that *Black* proclaims the Second Amendment to have force outside the home. *Black*, however, can hardly be said to make such a momentous pronouncement.

Of course, in addition to the district court herein, a handful of courts — most prominently the Seventh Circuit — have declared outright that the *Heller* right extends beyond the home. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside."); *see also, e.g., Bateman v. Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) ("Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home."); *United States v. Weaver*, No. 2:09-cr-00222, 2012 WL 727488, at *4 (S.D. W. Va. Mar. 6, 2012) ("While it is true that the Fourth Circuit has so far

20                     WOOLLARD V. GALLAGHER

We hew to a judicious course today, refraining from any
assessment of whether Maryland's good-and-substantial-
reason requirement for obtaining a handgun permit implicates
Second Amendment protections. That is, we merely assume
that the *Heller* right exists outside the home and that such
right of Appellee Woollard has been infringed. We are free to
make that assumption because the good-and-substantial-
reason requirement passes constitutional muster under what
we have deemed to be the applicable standard — intermediate
scrutiny.

                              B.

In *Masciandaro*, we announced that intermediate scrutiny
applies "to laws that burden [any] right to keep and bear arms
outside of the home." *See* 638 F.3d at 470-71 (explaining that
"we assume that any law that would burden the 'fundamen-
tal,' core right of self-defense in the home by a law-abiding
citizen would be subject to strict scrutiny. But, as we move
outside the home, firearm rights have always been more lim-
ited, because public safety interests often outweigh individual
interests in self-defense"); *accord Kachalsky*, 701 F.3d at 96
("Because our tradition so clearly indicates a substantial role
for state regulation of the carrying of firearms in public, we

_____

stopped short of expressly recognizing a Second Amendment right to keep
and bear arms outside the home, this Court has no such hesitation." (foot-
note omitted)).

Other courts have ruled to the contrary, concluding that the *Heller* right
is confined to the home. Notably, Maryland's highest court falls within the
latter category. *See Williams v. State*, 10 A.3d 1167, 1169 (Md. 2011)
("hold[ing] that Section 4-203(a)(1)(i) of the Criminal Law Article [of the
Maryland Code], which prohibits wearing, carrying, or transporting a
handgun, without a permit and outside of one's home, is outside the scope
of the Second Amendment"). On a related note, the Tenth Circuit recently
held "that the carrying of concealed firearms is not protected by the Sec-
ond Amendment." *Peterson v. Martinez*, No. 11-1149, slip op. at 4 (10th
Cir. Feb. 22, 2013).

conclude that intermediate scrutiny is appropriate in this
case."). As explained herein, the State has satisfied the inter-
mediate scrutiny standard, in that it has demonstrated that the
good-and-substantial-reason requirement for obtaining a
Maryland handgun permit, as applied to Appellee Woollard,
"is reasonably adapted to a substantial governmental interest."
*See Masciandaro*, 638 F.3d at 471.

1.

We begin with the issue of whether the governmental inter-
est asserted by the State constitutes a "substantial" one. The
State explains that, by enacting the handgun permitting
scheme, including the good-and-substantial-reason require-
ment, the General Assembly endeavored to serve Maryland's
concomitant interests in protecting public safety and prevent-
ing crime — particularly violent crime committed with hand-
guns. Such purpose is reflected in codified legislative findings
that

> (1) the number of violent crimes committed in the
> State has increased alarmingly in recent years;

> (2) a high percentage of violent crimes committed in
> the State involves the use of handguns;

> (3) the result is a substantial increase in the number
> of deaths and injuries largely traceable to the carry-
> ing of handguns in public places by criminals;

> (4) current law has not been effective in curbing the
> more frequent use of handguns in committing crime;
> and

> (5) additional regulations on the wearing, carrying,
> and transporting of handguns are necessary to pre-
> serve the peace and tranquility of the State and to
> protect the rights and liberties of the public.

Md. Code Ann., Crim. Law § 4-202. The language of those findings, adopted in 2002, was derived without substantive change from former article 27, section 36B(a) of the Maryland Code, which dates back to 1972.

The General Assembly's findings are buttressed by more recent evidence proffered by the State in these proceedings.[6] The State's evidence reflects that, although there has been "a significant improvement over past violent crime, homicide, and robbery totals," Maryland had the "eighth highest violent crime rate," "the third highest homicide rate," and "the second highest robbery rate of any state in 2009." J.A. 116. Over the course of that year, "97.4% of all homicides by firearm were committed with handguns," and handguns were "the weapon of choice" for robberies and carjackings. *Id.* at 116-17; *see also id.* at 110 (explaining that "[h]andguns are the weapon of choice for criminal activity in Baltimore because they are small, relatively lightweight, easy to carry and conceal, easy to load and fire, deadly at short range, and ideal for surprise attacks"). Furthermore, handguns have persisted as "the largest threat to the lives of Maryland's law enforcement officers." *Id.* at 117 (recounting that, "of the 158 Maryland law enforcement officers who have died in the line of duty from non-vehicular, non-natural causes, 132 — or 83.5% — died as the result of intentional gunfire, usually from a handgun").

In these circumstances, we can easily appreciate Maryland's impetus to enact measures aimed at protecting public safety and preventing crime, and we readily conclude that such objectives are substantial governmental interests. *See,*

---

[6]In relevant part, the State's evidence consists of the March 18, 2011 declaration of Frederick H. Bealefeld III, then-Commissioner of the Baltimore Police Department, *see* J.A. 108-14; the March 17, 2011 declaration of Terrence Sheridan, then-Secretary and Superintendent of the Maryland State Police, *see id.* at 115-25; and the March 18, 2011 declaration of James W. Johnson, Chief of the Baltimore County Police Department, *see id.* at 126-34. Between them, Bealefeld, Sheridan, and Johnson have amassed more than 100 years of law enforcement experience in Maryland.

*e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (referring to "the significant governmental interest in public safety"); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (characterizing "the Government's general interest in preventing crime" as "compelling"); *United States v. Chapman*, 666 F.3d 220, 227 (4th Cir. 2012) (relying on *Schenck* and *Salerno* in holding "that reducing domestic gun violence is a substantial governmental objective"); *Masciandaro*, 638 F.3d at 473 (same in concluding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks"). The district court itself recognized that, "[b]eyond peradventure, public safety and the prevention of crime are substantial, indeed compelling, government interests." *Woollard*, 863 F. Supp. 2d at 473.

For their part, the Appellees concede that "a compelling government interest in public safety" generally exists, but they maintain "that no legitimate government interest is at stake" here, because the State "cannot have an interest in suppressing a fundamental right" — including what the Appellees assert, and we assume, is the Second Amendment right of law-abiding, responsible citizens to carry handguns in public for the purpose of self-defense. *See* Br. of Appellees 61-62; *see also McDonald*, 130 S. Ct. at 3042 (declaring "that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty").[7] The

---

[7]To be clear, the Appellees contest solely the restriction on the public carrying of handguns wrought by the good-and-substantial-reason requirement, without challenging any "other aspect of Maryland's regulatory scheme governing the right to carry handguns." Br. of Appellees 1. They also acknowledge that, included in the *Heller* Court's examples of "presumptively lawful regulatory measures," are "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626-27 & n.26; *see* Br. of Appellees 35. Accordingly, the crux of Appellees' argument is that, once an applicant satisfies the criteria other than the good-and-substantial-reason requirement, he has a right to obtain a Maryland handgun permit with all of the privileges that permit entails, subject to lawful restrictions on carrying firearms in certain public locations.

24                    WOOLLARD V. GALLAGHER

Appellees would have us place the right to arm oneself in public on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny in our review of the good-and-substantial-reason requirement.

Unfortunately for the Appellees, their argument is foreclosed by our precedent. First, in *Chester*, we rejected the proposition that we must "apply strict scrutiny whenever a law impinges upon a [fundamental] right." 628 F.3d at 682 (employing intermediate, rather than strict, scrutiny in Chester's Second Amendment challenge to ban on firearm possession by domestic violence misdemeanants). Then, ruling in *Masciandaro* that intermediate scrutiny applies to laws burdening the assumed right to carry firearms in public, we recognized a "longstanding out-of-the-home/in-the-home distinction bear[ing] directly on the level of scrutiny applicable." 638 F.3d at 470. The Appellees therefore do not dissuade us from applying intermediate scrutiny, or from concluding that Maryland's interests in protecting public safety and preventing crime satisfy the "significant governmental interest" aspect of the intermediate scrutiny standard.[8]

### 2.

We thus turn to the question of whether the good-and-substantial-reason requirement, as applied to Appellee Woollard, is "reasonably adapted" to Maryland's significant interests. That is, we must decide if the State has demonstrated that there is a "reasonable fit" between the good-and-

---

[8]While the Appellees suggest that *Masciandaro* wrongly decided that intermediate scrutiny applies to restrictions on the carrying of firearms outside the home, *see* Br. of Appellees 59-61, the State contrarily asserts, for purposes of preserving the issue for further appeal, that a "reasonable regulation" standard would be more appropriate, *see* Br. of Appellants 39 n.8. We are bound, however, to follow *Masciandaro*. *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc) (recognizing "the basic principle that one panel cannot overrule a decision issued by another panel").

substantial-reason requirement and the governmental objec-
tives of protecting public safety and preventing crime. *See
Chester*, 628 F.3d at 683. Importantly, the State must show a
fit that is "'reasonable, not perfect.'" *United States v. Carter*,
669 F.3d 411, 417 (4th Cir. 2012) (quoting *Marzzarella*, 614
F.3d at 98). That test is satisfied if Maryland's interests are
"substantially served by enforcement of the" good-and-
substantial-reason requirement. *See id.* There is no necessity
either that the good-and-substantial-reason requirement "be
the least intrusive means of achieving the relevant govern-
ment objective[s], or that there be no burden whatsoever on"
Woollard's Second Amendment right. *See Masciandaro*, 638
F.3d at 474.

a.

   At the outset of our reasonable fit inquiry, we must con-
sider the precise contours of Maryland's handgun permitting
scheme. *See Chapman*, 666 F.3d at 227 (citing *United States
v. Staten*, 666 F.3d 154, 162 (4th Cir. 2011)). Under that
scheme, even without a permit, Woollard may wear, carry,
and transport handguns not only in his own home and on his
personal and business properties, but also in many public
places. *See* Md. Code Ann., Crim. Law § 4-203(b). For exam-
ple, Woollard may move handguns to and from bona fide
repair shops and places of legal purchase and sale. *Id.* § 4-
203(b)(3). Woollard may also wear, carry, and transport hand-
guns if he engages in target shoots and practices, sport shoot-
ing events, hunting and trapping, specified firearms and
hunter safety classes, and gun exhibitions. *Id.* § 4-203(b)(4)-
(5).

   Nevertheless, absent "good and substantial reason" to do
so, Woollard cannot carry handguns in other public places
where a permit is mandated. *See* Md. Code Ann., Pub. Safety
§ 5-306(a)(5)(ii). Woollard could satisfy the good-and-
substantial-reason requirement by showing that he needs a
permit for business activities, or because he is engaged in a

regulated profession such as security guard or an assumed-risk profession such as correctional officer. *See* J.A. 57-58. Otherwise, Woollard could prove what he failed to substantiate in 2009: that a "permit is necessary as a reasonable precaution against apprehended danger." Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii).

The State has clearly demonstrated that the good-and-substantial-reason requirement advances the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public. That is, limiting the public carrying of handguns protects citizens and inhibits crime by, inter alia:

- Decreasing the availability of handguns to criminals via theft, *see* J.A. 111 (explaining that criminals often target victims *"precisely because* they possess handguns," and that Baltimore police have "frequently investigated homicides and robberies where it appears that one, if not the primary, goal of the attacker was to deprive the victim of his handgun or other weapons"); *see also id.* at 119-20 ("[C]riminals in Maryland are constantly looking for ways to arm themselves with handguns, including by stealing them from others. It is not uncommon for criminals to obtain these guns during street altercations.");

- Lessening "the likelihood that basic confrontations between individuals would turn deadly," *id.* at 112 ("The presence of a handgun in an altercation, however petty, greatly increases the likelihood that it will escalate into potentially lethal violence."); *see also id.* at 132 ("Incidents such as bar fights and road rage that now often end with people upset, but not lethally wounded, take on deadly implications when handguns are involved.");

- Averting the confusion, along with the "poten-
tially tragic consequences" thereof, that can result
from the presence of a third person with a hand-
gun during a confrontation between a police offi-
cer and a criminal suspect, *id.* at 113 ("In [such]
a confrontation . . . , an additional person bearing
a gun might cause confusion as to which side of
the confrontation the person is on, which could
lead to hesitation by the police officer and the
potential for innocent victims, including the per-
mit holder, innocent bystanders, and police offi-
cers."); *see also id.* at 128 ("[C]ivilians without
sufficient training to use and maintain control of
their weapons, particularly under tense circum-
stances, pose a danger to officers and other civil-
ians.");

- Curtailing the presence of handguns during rou-
tine police-citizen encounters, *id.* at 131 ("If the
number of legal handguns on the streets increased
significantly, [police] officers would have no
choice but to take extra precautions before engag-
ing citizens, effectively treating encounters
between police and the community that now are
routine, friendly, and trusting, as high-risk stops,
which demand a much more rigid protocol and a
strategic approach.");

- Reducing the number of "handgun sightings" that
must be investigated, *id.* ("Increasing the number
of people legally carrying handguns in the streets
will also force [police] officers to spend more
resources responding to reports about handgun
sightings and engaging handgun carriers to
ensure they are doing so lawfully."); and

- Facilitating the identification of those persons
carrying handguns who pose a menace, *id.* at 113

("Police officers would also have a harder time identifying potential security risks if more people without good and substantial reason to carry a handgun were able to do so, making it more difficult to respond when necessary.").

At the same time that it reduces the number of handguns carried in public, however, the good-and-substantial-reason requirement ensures that those persons in palpable need of self-protection can arm themselves in public places where Maryland's various permit exceptions do not apply. Consequently, according to the State, the good-and-substantial-reason requirement "strikes a proper balance between ensuring access to handgun permits for those who need them while preventing a greater-than-necessary proliferation of handguns in public places that . . . increases risks to public safety." J.A. 113.[9]

b.

We are convinced by the State's evidence that there is a

---

[9]The Appellees take issue with the State's contention that allowing fewer handguns on the streets facilitates the identification of those persons carrying handguns who pose a security risk. The Appellees characterize the State's position as being that the good-and-substantial-reason requirement's curtailment of the public carrying of handguns affords the police "pretext" to detain handgun carriers on the streets. *See* Br. of Appellees 66. Having so characterized the State's position, the Appellees then accuse the State of having "low regard not only for the Second Amendment, but the Fourth as well, which condemns pretextual searches and seizures." *Id.*; *see also United States v. Black*, No. 11-5084, slip op. at 13 (4th Cir. Feb. 25, 2013) (recognizing that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention"), *discussed supra* note 5. The State simply has not professed, however, that the police may detain handgun carriers without regard for their Fourth Amendment rights. Accordingly, there is no genuine dispute as to any material fact that would render it inappropriate to dispose of this matter on the parties' cross-motions for summary judgment. *See* Fed. R. Civ. P. 56(a).

reasonable fit between the good-and-substantial-reason
requirement and Maryland's objectives of protecting public
safety and preventing crime. In this regard, we find ourselves
in agreement with much of the Second Circuit's recent deci-
sion in *Kachalsky*, rejecting the theory that New York's hand-
gun licensing scheme violates the Second Amendment by
requiring an applicant to demonstrate "proper cause" — i.e.,
a special need for self-protection — as a prerequisite for a
license to carry a concealed handgun in public. *See* 701 F.3d
at 83-84. We specifically subscribe to the *Kachalsky* court's
analysis that New York's proper-cause requirement "is ori-
ented to the Second Amendment's protections," and consti-
tutes "a more moderate approach" to protecting public safety
and preventing crime than a wholesale ban on the public car-
rying of handguns. *See id.* at 98-99. The same must be said
of Maryland's comparable good-and-substantial-reason
requirement.[10]

The good-and-substantial-reason requirement was inappro-
priately condemned by the district court for being a "rationing
system," that "does no more to combat [threats to public

___

[10]The contrast between New York's (and Maryland's) "moderate
approach" and a wholesale ban on the public carrying of firearms is under-
scored by the Seventh Circuit's recent decision in *Moore v. Madigan. See*
702 F.3d 933, 940, 942 (7th Cir. 2012) (declaring unconstitutional Illi-
nois's "flat ban on carrying ready-to-use guns outside the home," but stay-
ing the mandate "to allow the Illinois legislature to craft a new gun law
that will impose reasonable limitations"), *discussed supra* note 5. Writing
for *Moore*'s panel majority, Judge Posner distinguished the Illinois prohi-
bition from "[t]he [less-restrictive] New York gun law upheld in *Kachal-
sky*." 702 F.3d at 941. Thereafter, when rehearing en banc was denied on
a 5-4 vote, the four non-prevailing judges joined in a dissent alerting the
Illinois legislature that the panel majority left "a good deal of constitu-
tional room for reasonable public safety measures concerning public car-
rying of firearms," including a measure along the lines of "New York's
state law requiring 'proper cause' for issuance of a permit to carry a gun."
*Moore v. Madigan*, No. 12-1269(L), slip op. at 6 (7th Cir. Feb. 22, 2013)
(Hamilton, J., dissenting from the denial of rehearing en banc) (citing
*Kachalsky*).

safety] than would a law indiscriminately limiting the issu-
ance of a permit to every tenth applicant." *See Woollard*, 863
F. Supp. 2d at 474. The court pointed out, inter alia, that the
good-and-substantial-reason requirement "will not prevent
those who meet it from having their guns taken from them."
*Id.* The Appellees have added that, because "[c]rime is largely
random and unpredictable," the State is "plainly incapable of
predicting who might be victimized and thus have more prac-
tical use for firearms." Br. of Appellees 68. Additionally, the
Appellees have suggested that a "shall-issue" regime, increas-
ing the number of law-abiding handgun carriers, would more
effectively protect public safety and prevent crime than does
Maryland's current permitting scheme. *See id.* at 63. But we
cannot substitute those views for the considered judgment of
the General Assembly that the good-and-substantial-reason
requirement strikes an appropriate balance between granting
handgun permits to those persons known to be in need of self-
protection and precluding a dangerous proliferation of hand-
guns on the streets of Maryland. *See Kachalsky*, 701 F.3d at
100 ("New York determined that limiting handgun possession
to persons who have an articulable basis for believing they
will need the weapon for self-defense is in the best interest of
public safety and outweighs the need to have a handgun for
an unexpected confrontation.").

As the Second Circuit recognized in *Kachalsky*, "[i]t is the
legislature's job, not ours, to weigh conflicting evidence and
make policy judgments." 701 F.3d at 99. The duty of the
courts is to ensure that the legislature's policy choice substan-
tially serves a significant governmental interest. That is, the
courts must be satisfied that there is a reasonable fit between
the legislative policy choice and the governmental objective.
*See Staten*, 666 F.3d at 167 (reiterating that "[i]ntermediate
scrutiny does not require a perfect fit; rather only a reasonable
one").

Thus, the district court was also wrong to denounce the
good-and-substantial-reason requirement's failure to single-

handedly safeguard the public from every handgun-related hazard. The court expressly faulted the good-and-substantial-reason requirement for not "ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals[,] the mentally ill," or "anyone whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun"; for not "ban[ning] handguns from places where the possibility of mayhem is most acute, such as schools, churches, government buildings, protest gatherings, or establishments that serve alcohol"; and for not "attempt[-ing] to reduce accidents, as would a requirement that all permit applicants complete a safety course." *See Woollard*, 863 F. Supp. 2d at 474 (internal quotation marks omitted). Aside from disregarding the existence of other laws with many of those very aims — including separate provisions of Maryland's handgun permitting scheme — the court improperly conducted a review more reminiscent of strict scrutiny than intermediate scrutiny.

The district court's misapplication of the intermediate scrutiny standard is illustrated by its pronouncement that "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights," in that "[t]he right's existence is all the reason he needs." *Woollard*, 863 F. Supp. 2d at 475. There simply is no way to harmonize the district court's declaration with our recognition in *Masciandaro* that intermediate scrutiny applies to laws burdening any right to carry firearms outside the home, where "firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *See* 638 F.3d at 470; *see also Kachalsky*, 701 F.3d at 99 n.23 (rejecting the notion that "handgun possession in public has the ring of an absolute constitutional right," and deeming it "quite obvious" that "possession of a weapon in the home has far different implications than carrying a concealed weapon in public"); Br. of Appellants 43 ("The same factors that make handguns the weapon of choice for defense of the home also make them the weapon of choice for crimi-

nals outside the home . . . . Similarly, an individual's posses-
sion of a handgun in his own home obviously does not present
the same risks to public safety as does his carry of the same
handgun in public.").

In summary, although we assume that Appellee Woollard's
Second Amendment right is burdened by the good-and-
substantial-reason requirement, we further conclude that such
burden is constitutionally permissible. That is, under the
applicable intermediate scrutiny standard, the State has dem-
onstrated that the good-and-substantial-reason requirement is
reasonably adapted to Maryland's significant interests in pro-
tecting public safety and preventing crime.

### C.

Because we conclude that the good-and-substantial-reason
requirement is constitutional under the Second Amendment as
applied to Appellee Woollard, we also must reject the Appel-
lees' facial challenge. *See Masciandaro*, 638 F.3d at 474. As
the Supreme Court has explained, "a person to whom a statute
may constitutionally be applied will not be heard to challenge
that statute on the ground that it may conceivably be applied
unconstitutionally to others, in other situations not before the
Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973);
*see also Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) ("It
is neither our obligation nor within our traditional institutional
role to resolve questions of constitutionality with respect to
each potential situation that might develop.").[11]

---

[11]Finally, as did the district court, we reject the Appellees' contentions
that the good-and-substantial-reason requirement amounts to an unconsti-
tutional prior restraint on the exercise of Second Amendment rights, and
that such requirement contravenes the Equal Protection Clause of the
Fourteenth Amendment. *See Woollard*, 863 F. Supp. 2d at 472, 475-76,
*discussed supra* note 4. Like the Second Circuit — echoing the district
court's discussion of the prior restraint theory herein — "[w]e are hesitant
to import substantive First Amendment principles wholesale into Second

IV.

Pursuant to the foregoing, we reverse the judgment of the district court.

*REVERSED*

---

Amendment jurisprudence." *See Kachalsky*, 701 F.3d at 91-92 (emphasis omitted) (citing *Woollard*, 863 F. Supp. 2d at 472). We also conclude that the Appellees' prior restraint theory would fail in that it is premised on an uncorroborated assertion that the good-and-substantial-reason requirement vests the State "with virtually unbridled and absolute power to deny permits." Br. of Appellees 58 (internal quotation marks omitted); *cf. Kachalsky*, 701 F.3d at 92 ("Plaintiffs' complaint is not that the proper cause requirement is standardless; rather, they simply do not like the standard — that licenses are limited to those with a special need for self-protection." (emphasis omitted)). As for the Appellees' equal protection claim, they now have essentially acknowledged that it is co-extensive with their Second Amendment claim. *See* Br. of Appellees 58 & n.14.

FILED: March 21, 2013

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1437,   <u>Raymond Woollard v. Denis Gallagher</u>
1:10-cv-02068-BEL

------

NOTICE OF JUDGMENT

------

Judgment was entered on this date in accordance with Fed. R. App. P. 36. Please be advised of the following time periods:

**PETITION FOR WRIT OF CERTIORARI:** To be timely, a petition for certiorari must be filed in the United States Supreme Court within 90 days of this court's entry of judgment. The time does not run from issuance of the mandate. If a petition for panel or en banc rehearing is timely filed, the time runs from denial of that petition. Review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for compelling reasons. (<u>www.supremecourtus.gov</u>)

**VOUCHERS FOR PAYMENT OF APPOINTED OR ASSIGNED COUNSEL:** Vouchers are sent to counsel appointed or assigned by the court in a separate transmission at the time judgment is entered. CJA 30 vouchers are sent to counsel in capital cases. CJA 20 vouchers are sent to counsel in criminal, post-judgment, habeas, and § 2255 cases. Assigned counsel vouchers are sent to counsel in civil, civil rights, and agency cases. Vouchers should be completed and returned within 60 days of the later of entry of judgment, denial of a petition for rehearing, or the grant or denial of a petition for writ of certiorari. If counsel appointed or assigned by the court did not receive a voucher, forms and instructions are available from the court's web site, <u>www.ca4.uscourts.gov</u>, or from the clerk's office.

**BILL OF COSTS:** A party to whom costs are allowable, who desires taxation of costs, shall file a <u>Bill of Costs</u> within 14 calendar days of entry of judgment. (FRAP 39, Loc. R. 39(b)).

**PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC:** A petition for rehearing must be filed within 14 calendar days after entry of judgment, except that in civil cases in which the United States or its officer or agency is a party, the petition must be filed within 45 days after entry of judgment. A petition for rehearing en banc must be filed within the same time limits and in the same document as the petition for rehearing and must be clearly identified in the title. The only grounds for an extension of time to file a petition for rehearing are the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or an extraordinary circumstance wholly beyond the control of counsel or a party proceeding without counsel.

Each case number to which the petition applies must be listed on the petition to identify the cases to which the petition applies and to avoid companion cases proceeding to mandate during the pendency of a petition for rehearing in the lead case. A timely filed petition for rehearing or petition for rehearing en banc stays the mandate and tolls the running of time for filing a petition for writ of certiorari.

A petition for rehearing must contain an introduction stating that, in counsel's judgment, one or more of the following situations exist: (1) a material factual or legal matter was overlooked; (2) a change in the law occurred after submission of the case and was overlooked; (3) the opinion conflicts with a decision of the U.S. Supreme Court, this court, or another court of appeals, and the conflict was not addressed; or (4) the case involves one or more questions of exceptional importance. A petition for rehearing, with or without a petition for rehearing en banc, may not exceed 15 pages. Copies are not required unless requested by the court. (FRAP 35 & 40, Loc. R. 40(c)).

**MANDATE:** In original proceedings before this court, there is no mandate. Unless the court shortens or extends the time, in all other cases, the mandate issues 7 days after the expiration of the time for filing a petition for rehearing. A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay issuance of the mandate. If the petition or motion is denied, the mandate will issue 7 days later. A motion to stay the mandate will ordinarily be denied, unless the motion presents a substantial question or otherwise sets forth good or probable cause for a stay. (FRAP 41, Loc. R. 41).